UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **REDACTED, PUBLICLY FILED VERSION** |
|  | ) | ██████████████████ |
| v. | ) | Criminal No.:  19-10131-NMG |
|  | ) |  |
| TOBY MACFARLANE, | ) | **Leave to Seal Granted on** |
|  | ) | **November 8, 2019 (Dkt. 332)** |
| Defendant. | ) |  |
|  | ) |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with the sentencing of defendant Toby Macfarlane.

Macfarlane, a senior executive at a real estate company, conspired with William "Rick" Singer and others to bribe employees of the University of Southern California ("USC") to secure the admission of his children to the university as purported athletic recruits, using fabricated athletic credentials.

Macfarlane participated in the scheme twice over a four-year period.  He paid $400,000 in sham consulting fees to Singer – part of which Singer passed on to USC coaches as bribes – and an additional $50,000 directly to a USC account controlled by Donna Heinel, a senior associate athletic director at USC who facilitated the admission of Macfarlane's son.[1]  He improperly deducted those payments from his taxes as purported business expenses, using fabricated consulting invoices.  He also agreed with Singer to misrepresent his children's athletic abilities

---

[1] Heinel has been separately charged with racketeering conspiracy and related charges.  *See United States v. Ernst*, No. 19-10081-IT (D. Mass.), Dkt. 272 (Superseding Indictment).

and to lie to USC employees if they asked why his daughter wasn't actually playing soccer after having been admitted to the university to do just that.

For his actions, Macfarlane should be sentenced to a term of incarceration of 12 months and one day, as well as 12 months of supervised release, and a fine of $95,000.

I.   **Macfarlane Was a Repeat Player in the College Recruitment Bribery Scheme**

Alone among the defendants who have been sentenced in the college admissions cases to date, Macfarlane engaged in the college recruitment scheme twice.

By the summer of 2013, Macfarlane had agreed with Singer to bribe USC employees to secure his daughter's admission to USC through what Singer termed the "side door" – bribing coaches to designate Macfarlane's daughter as a recruited athlete.  As part of the scheme, Singer oversaw the creation of a fabricated athletic profile and falsified application that described Macfarlane's daughter as, among other things, a "US Club Soccer All American" in the 10th, 11th, and 12th grades.  *See, e.g.*, Ex. A at 14 (Macfarlane's daughter's USC application).  In fact, while Macfarlane's daughter played soccer in high school, her skills did not qualify her to play on a competitive college team, much less warrant her recruitment to do so.  *See, e.g.*, Ex. B at 6 (October 26, 2018 call transcript).

Macfarlane allowed Singer to include falsehoods in his daughter's application.  For example, on or about July 4, 2013, Singer emailed Macfarlane and his daughter a draft USC essay that falsely claimed, among other things, that she would "be an active participant both on the soccer team and in the classroom," and that she wanted "to play soccer at the collegiate level" to further "her skills on the field" and become a "stronger teammate."  Ex. C (July 4, 2013 email).  None of

that was true.  The misrepresentations were included in the application that Macfarlane's daughter ultimately submitted to USC.  *See* Ex. A at 57.

In or about October 2013, Singer arranged for Ali Khosroshahin, the head coach of the USC women's soccer team,[2] and Laura Janke, the team's assistant coach,[3] to present Macfarlane's daughter to the USC subcommittee for athletic admissions as a soccer recruit.  In exchange for their help in securing her admission as a purported recruit, Singer made an initial bribe payment of $50,000 to a private soccer club Khosroshahin and Janke controlled.  *See, e.g.*, Ex. D at 1 (Soccer Club Financial Records).  Thereafter, Janke emailed Singer requesting "a profile and list of current work in progress" to provide to the USC subcommittee.  Ex. E (October 25, 2013 email chain).  Singer sent Janke the requested information, as well as a photo of Macfarlane's daughter playing soccer.

Khosroshahin and Janke used this information to create a falsified athletic profile in which they wrote:  "We believe that [Macfarlane's daughter] is a diamond in the rough and as she develops we think that she will be able to help our team at USC."  Ex. F at 2 (Fake athletics profile for Macfarlane's daughter).  They also falsely wrote:  "[Macfarlane's daughter] will come into our program and will compete for a role as an outside midfielder."  *Id.*

On or about November 4, 2013, the USC subcommittee for athletic admissions conditionally admitted Macfarlane's daughter to USC as a purported soccer recruit, in reliance on

---

[2] Khosroshahin pled guilty to racketeering conspiracy for his role in the scheme and is cooperating with the government's investigation.  *See United States v. Ernst*, No. 19-10081-IT (D. Mass.), Dkt. 1 (Indictment), Dkt. 182 (Plea & Cooperation Agreements), Dkt. 197 (Clerk's Notes of Plea Hearing).

[3] Janke pled guilty to racketeering conspiracy for her role in the scheme and is cooperating with the government's investigation.  *See United States v. Ernst*, No. 19-10081-IT (D. Mass.), Dkt. 1 (Indictment), Dkt. 160 (Plea & Cooperation Agreements), Dkt. 170 (Clerk's Notes of Plea Hearing).

the false information Khosroshahin and Janke had provided.  Ex. F at 1.  USC mailed Macfarlane's daughter a formal acceptance letter on or about March 26, 2014.  The following month, Singer's bookkeeper sent Macfarlane an email with the subject line "Placement Fees $200K," asking how Macfarlane would transmit his payment.  *See* Ex. G (April 15, 2014 email).  Two days later, Macfarlane asked Singer to send him a "Real Estate Consulting Invoice" for "the entire amount due" – even though Singer had never provided Macfarlane any real estate consulting services.  *See* Ex. H (April 17, 2014 email chain).  Singer's bookkeeper emailed Macfarlane the requested invoice for "Real Estate Consulting and Analysis," and wrote:  "Let me know if this will work for you."  Ex. I (April 18, 2014 email and attachment).  On or about May 2, 2014, Macfarlane mailed a $200,000 check to The Key, Singer's for-profit entity, with "Real Estate Consulting & Analysis" written in the memo line.  *See* Ex. J at 2 (Macfarlane checks sent to Singer).  Ten days later, Singer caused The Key to issue a $100,000 payment to a private soccer club controlled by Khosroshahin and Janke, in exchange for securing the admission of Macfarlane's daughter and the daughter of another client to USC.  *See* Pre-Sentence Report ("PSR") ¶ 43.

After Macfarlane's daughter was admitted to USC but before she enrolled, Khosroshahin and Janke were terminated by the university for reasons unrelated to the scheme.  On or about August 14, 2014, a USC Athletics academic counselor emailed Macfarlane's daughter to ask her to change her class schedule because she would be missing classes on Friday "due to travel or games."  Ex. K (August 15, 2014 email chain).  The following day, the newly appointed head coach of the women's soccer team emailed Macfarlane's daughter:  "I'm sorry but I don't have you on my list of players.  Could you contact me asap please."  Ex. L (August 15, 2014 email from new USC coach to Macfarlane's daughter); *see also* Ex. M (August 15, 2014 email from new USC coach to USC athletics academic counselor stating:  "[Macfarlane's daughter] does not play for

us."). Macfarlane's daughter forwarded the August 14th email from the academic counselor to her father and asked: "Do I need to respond to this?" *See* Ex. K. Macfarlane, in turn, forwarded this email to Singer. *See id.* Macfarlane and Singer thereafter agreed that if anyone from the new coaching staff inquired further, Macfarlane would tell them that his daughter had an injury – plantar fasciitis – and would "not be practicing or playing for a while." *See id.*

Approximately two years later, Macfarlane re-engaged Singer to pursue the "side door" scheme for his son. On or about November 27, 2016, Singer asked Janke – who was no longer employed by USC, but continued to participate in the scheme by creating fake athletic profiles for Singer – to create a falsified basketball profile for Macfarlane's son. *See* Ex. N (November 27, 2016 email). The profile described Macfarlane's son as a member of his high school's varsity basketball team from 2014 through 2016 – even though he did not actually play on the varsity team until his senior year. *See* Ex. O at 2 (Fake athletics profile for Macfarlane's son).

On or about December 11, 2016, Singer emailed the fake profile to Heinel. *See* Ex. P (December 11, 2016 email and attachments). Heinel presented Macfarlane's son to the USC subcommittee for athletic recruitment the following month. *See* Ex. O at 1. Approximately one week later, USC issued a letter to Macfarlane's son stating that he had been conditionally admitted to the university as student athlete. *See* Ex. Q (February 9, 2017 letter). Four days after that, Macfarlane made out a $50,000 check made payable to USC Athletics, which USC subsequently deposited. *See* Ex. R (Macfarlane check to Heinel). The memo line of the check read: "[Macfarlane's son] Women Athletic Board," which was an account controlled by Heinel. *Id.*

On or about March 23, 2017, USC mailed Macfarlane's son a formal acceptance letter. A week later, Macfarlane emailed his accountant: "I paid a consultant $200,000 in 2014. What did we require from the consultant to document the payment[?]" *See* Ex. S (April 3, 2017 email chain).

Macfarlane's accountant replied: "What I have in our files is a 2014 Form W-2 signed by Rick Singer.  I have attached a blank Form W-9. . . .  Hope this helps."  *See id.*  Macfarlane forwarded the email to Singer's bookkeeper and wrote:  "Will you please fill out this W-9 in preparation for payment."  *See id.*  On or about April 12, 2017, Macfarlane mailed Singer a $200,000 check made payable to The Key, with "1134 Real Estate Consulting" written in the memo line.  *See* Ex. J at 1.

In October 2018, Singer – who by this point was cooperating with the government's investigation and acting at the direction of law enforcement agents – told Macfarlane that the Internal Revenue Service ("IRS") was conducting an audit of KWF, his non-profit entity.  *See generally* Ex. B.  During the call, which was consensually recorded, Macfarlane agreed with Singer to mislead the IRS to conceal the scheme.  *See id*. at 4-7.  And Macfarlane once again confirmed his understanding that his children were "really not collegian athletes," but were admitted to USC because of his bribe payments, which he said he "wrote off" as a purported "consultant fee."  *See id.* at 6-7.

## II.    <u>The Applicable Sentencing Guidelines</u>

As part of his plea agreement, Macfarlane stipulated that his offense level should be enhanced pursuant to Section 2B1.1(b) of the Sentencing Guidelines, based on the amount of money he paid to facilitate the scheme.  Such stipulations "will generally govern the resolution of that issue," *see United States v. Granik*, 386 F.3d 404, 411 (2d Cir. 2004), and courts are permitted to rely on the parties' stipulations in finding facts relevant to sentencing.  *See id*. at 412; *United States v. Berndt*, 127 F.3d 251, 253-55, 258 (2d Cir. 1997) (affirming sentencing enhancement based on factual stipulations contained in state court plea agreement); *United States v. Bilal*, 941 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (denying motion to vacate restitution order where defendant "stipulated that the loss amount attributable to his conduct was greater than $1 million but less

than $2.5 million"); *Kapelioujnyi v. United States*, 779 F. Supp. 2d 250, 255 (E.D.N.Y. 2009) (denying petition under 28 U.S.C. § 2255 and finding sentencing court was "within its discretion" in relying on stipulations regarding defendant's role in RICO conspiracy and loss amount).[4]

Notwithstanding this stipulation, the Presentence Investigation Report ("PSR") concludes that USC – the immediate victim of the defendant's crime – suffered no cognizable pecuniary harm for Guidelines purposes. In the absence of pecuniary harm, the PSR concludes that gain may not be used as a substitute for loss, and that Macfarlane's base offense level should therefore not be enhanced for gain or loss.[5]

The government respectfully submits that the PSR is mistaken. The Guidelines consistently include enhancements based on monies paid, received, lost, or gained in the course of criminal conduct. *See, e.g.*, U.S.S.G. §§ 2B1.1, 2B4.1 and 2C1.1.[6] Section 2B1.1 of the

---

[4] The government notes that it erred in calculating the Guidelines pursuant to Section 2B1.1, rather than Section 2B4.1, the commercial bribery guideline. The commentary to Section 2B4.1 provides that it "covers commercial bribery offenses and kickbacks that do not involve officials of federal, state, or local government, foreign governments, or public international organizations." U.S.S.G. § 2B4.1, cmt., n.1. USC charges tuition for educational services, making it a commercial enterprise. *See, e.g.*, *United States v. Brown University*, 5 F.3d 658, 666 (3d Cir. 1993) ("The exchange of money for services, even by a nonprofit organization, is a quintessential commercial transaction. Therefore, the payment of tuition in return for educational services constitutes commerce.") (internal citation and quotation omitted). The application of Section 2B1.1 rather than Section 2B4.1 results, by the government's calculation, in a one point difference in the total offense level – which accrues here to the benefit of the defendant – because Section 2B1.1 has a base offense level of 7 and Section 2B4.1 has a base offense level of 8. The government submits that under either 2B1.1 or 2B4.1, the offense level should be enhanced based on the amount of the bribes paid.

[5] The Probation Department has taken the same position with respect to other defendants previously sentenced in the college admissions cases, and that calculation has been adopted by Judges Talwani and Woodlock. *See United States v. Abbott, et al.*, No. 19-10080-IT (D. Mass.), Dkt. 443 (Mem. and Order) (Talwani, J.); *United States v. Bizzack*, No. 19-10222-DPW (D. Mass.), Dkt. 34 (Tr. of Hrg.) (Woodlock, J.).

[6] The government has briefed the issue of Guidelines enhancements for gain and loss in connection with the sentencings of Macfarlane's co-conspirators. *See United States v. Abbott, et*

Guidelines defines "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and provides that, in determining "loss" for purposes of the enhancement in Section 2B1.1(b), "loss is the greater of actual loss or intended loss."  *See* U.S.S.G. § 2B1.1 cmt., n.3(A).  The Guidelines provide that the Court "need only make a reasonable estimate of loss," *id*. n.3(C), and that where "there is a loss but it reasonably cannot be determined," the Court "shall use gain that resulted from the offense as an alternative measure of loss," *id*. n.3(B).

There can be little dispute that USC has suffered, and will continue to suffer, pecuniary harm, and that this harm was a reasonably foreseeable consequence of the defendant's conduct.[7] As set forth in greater detail below, that harm included the loss of the full value of its employees' honest services, the cost of investigation and remediation, and the lost revenues resulting from the harm the scheme caused to USC's reputation.  Although these financial losses are difficult to quantify with precision, the Guidelines instruct that where a precise loss amount cannot be

---

*al.*, No. 19-10117-IT (D. Mass.), Dkt. 422 (Government's Memorandum Regarding the Methodology for Calculating Gain or Loss Under the Sentencing Guidelines); *United States v. Bizzack*, No. 19-10222-DPW (D. Mass.), Dkt 25 (Government's Sentencing Memorandum).  The briefing from those matters is included in the Appendix hereto, and incorporated herein by reference.  The Appendix also includes the Government's Consolidated Sentencing Memorandum filed in the *Abbott* case, which lays out in Section II.B the key factors the government considered in assessing relative culpability among the parents charged in the college admissions cases.  *United States v. Abbott, et al.*, No. 19-10117-IT (D. Mass.), Dkt. 423 (Government's Consolidated Sentencing Memorandum).

[7] Judge Talwani concluded that "[t]he loss of the value of the honest services of agents or employees is a more concrete harm" to USC, but did not impose an enhancement under Section 2B1.1(b)(1) because "the court is hard-pressed to evaluate the value of those portions of the universities or testing companies' employees or agents whose services were compromised by each Defendant."  *United States v. Abbott, et al.*, No. 19-10117-IT (D. Mass.), Dkt 443 (Mem. and Order).  The government agrees that it is hard to value an employee's honest services, *see* Section II.A below, which is precisely why the Guidelines require the use of gain as a substitute for loss in such circumstances.  *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010) (reversible error where sentencing judge refused to consider gain as an alternative measure of loss in a case where loss was "probable" but difficult to calculate).

"reasonably determined," the Court should substitute the gain from the offense – in this case, the amounts the defendant intended to pay his co-conspirators to facilitate the bribery scheme. Macfarlane stipulated to this calculation in his plea agreement. Such an approach is consistent with the way the Guidelines treat bribe payments generally, aligns the Guidelines ranges in this case with those of similarly situated defendants nationwide, appropriately reflects relative culpability, and thus helps achieve a just result.

### A.   Macfarlane Agreed To Bribe USC Employees, Depriving the University of the Full Value of Its Employees' Honest Services

There is ample precedent for the proposition that salaries paid by victim organizations to bribe recipients constitute pecuniary losses in honest services fraud cases.[8] This makes sense. An employer pays an employee a salary to retain that employee's loyal services. Here, USC paid salaries to employees who were also receiving bribes as part of the charged conspiracy. These employees feigned loyalty to the university, while secretly acting to its detriment by selling spots on athletic teams, and thus admission to USC, to unqualified students. In so doing, the scheme deprived the universities of the full value of the salaries they paid the corrupt employees. The table below sets forth the approximate salaries the corrupt USC employees received during the period in which they also accepted bribes from Macfarlane and Singer's other clients:

---

[8] *See, e.g.*, *United States v. Crawley*, 533 F.3d 349, 357 (5th Cir. 2008) (affirming loss to be the full value of the salary and benefits defendant received from his union while accepting kickbacks and noting that "[b]y intentionally depriving Local 988 of honest services, Crawley *obviously* inflicted some level of pecuniary harm on the organization") (emphasis added); *United States v. Bahel*, 662 F.3d 610, 648-49 (2d Cir. 2011) (in determining restitution, court found that salary paid to employee convicted of honest services fraud was "plainly 'property' that belonged to" employer and subject to forfeiture); *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998) ("We may assume that [the employer] would not have hired [defendant] had it known of his intentions, and in that event it would not have paid him four years' salary . . . [W]hat [the employer] lost . . . [was] the difference in the value of the services that [defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.").

| USC Employee | Period in which Employee Received Bribes | Approximate Total Salary Received During Period in which Employee Received Bribes[9] |
|---|---|---|
| Donna Heinel | February 2014 to March 2019 | $1,164,116 |
| Ali Khosroshahin | October 2012 to November 2013 | $331,542[10] |
| Laura Janke | October 2012 to January 2014[11] | $74,322 |

Whether the pecuniary harm for Guidelines purposes is the full value of the salary or some portion of it – in recognition of the fact that the employees also provided some legitimate services – is less relevant than the *fact* that USC suffered some amount of pecuniary loss. In *United States v. Crawley*, for example, the district court determined that the entire amount of the defendant's salary should be deemed "loss" because it was not possible to "apportion what part of [the salary] he really earned and what part he didn't earn." 533 F.3d at 357 (further citation and internal quotation marks omitted). Other courts have concluded that the better measure of loss is "'the difference in the value of the services that [the defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.'" *Bahel*, 662 F.2d at 650 (brackets and ellipsis in original) (quoting *Sapoznik*, 161 F.3d at 1121). Because that difference can be difficult to calculate, courts have concluded that a percentage of the total salary – ranging between 10 percent and 25 percent – is reasonable under the Guidelines. *See, e.g.*, *Bahel*, 662 F.2d at 648-50 (noting that "it would be unduly complex to try to delineate which part of the $876,000 [salary] was paid for honest services and which part was paid for the dishonest services," and using 10 percent as a "conservative estimate of the cost of the fraud") (internal citations and quotations omitted);

---

[9] These figures do not include car allowances or other fringe benefits.

[10] This figure includes a salary payout of approximately $122,282 Khosroshahin received following his termination by USC in November 2013, which reflects a payment for which USC received no services from Khosroshahin.

[11] USC terminated Janke in January 2014.

*Sapoznik*, 161 F.3d at 1121-22 (finding that 25 percent of salary paid to corrupt police chief was loss for purposes of calculating restitution). Applying those same ranges to this case would result in estimated losses to USC of between $156,998 and $392,495.[12] Yet it is precisely because the losses are difficult to calculate that it is appropriate, as an alternative, to substitute the value of the bribe and related payments the defendant made in calculating the relevant offense level, as the parties have stipulated.

**B.      USC Has Been Forced, at Great Expense, To Conduct Internal Investigations and To Revise Policies and Programs as a Result of the Defendant's Scheme**

USC has also incurred costs in investigating the bribery scheme. Although the Guidelines exclude from the calculation of loss the costs of assisting the government in its investigation, *see* U.S.S.G. § 2B1.1 cmt., n.3(D)(ii) (loss shall not include "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense"), investigative costs are properly included where, as here, a victim engages counsel for reasons independent of the government's inquiry. *See United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (recognizing that investigative costs incurred to aid the government are not counted in the loss calculation, but that attorneys' fees and related costs are properly included where "the investigation was prompted for the bank's own benefit"); *United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002) (victim's investigative fees into coach's scheme to deprive university of the honest services of college basketball players were properly included in calculating loss for Guidelines purposes).[13]

---

[12] Given the sheer volume of students alleged to have been the beneficiaries of the bribery scheme involving Heinel (nearly three dozen), a range closer to 50-75 percent of salary might be more appropriate.

[13] *But cf. Lagos v. United States*, 138 S.Ct. 1684 (2018) (holding, with respect to claims for restitution, as opposed to loss, that the words "investigation" and "proceedings" in the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A(b)(4), refer to government investigations and criminal proceedings, and that section does not permit an award of restitution for private investigations and civil proceedings). *But see United States v. Gammell*, 932 F.3d 1175

Although USC began assisting the government in approximately November 2018, the university subsequently launched its own internal investigation of 33 students to determine whether they had lied on their USC applications.[14]   USC also hired consultants to review its admissions policies in light of the defendants' scheme.[15]

The need for USC to investigate its corrupt employees was reasonably foreseeable to this defendant.   Indeed, the reputational harm USC suffered from the scheme, and the critical importance of academic integrity to research universities generally, *required* that USC review its practices upon learning of the fraud to determine who was involved in perpetrating the scheme, who accepted bribes, and how to prevent it from recurring.

Finally, USC has been named in multiple putative class actions alleging that the university was negligent and violated consumer protection and unfair competition laws based on the conduct of the defendant and his co-conspirators.[16]   USC has incurred legal fees defending against these lawsuits, which were precipitated by the charged fraud.

---

(8th Cir. 2019) (distinguishing *Lagos* and finding that private investigative costs may be compensable restitution under 18 U.S.C. § 3663A(b)(1) with respect to damage, loss, or destruction of property).

[14] Rubin, Joel and Matthew Ormseth, *How many students cheated to get into USC? A look inside the admissions investigation*, L.A. TIMES (July 16, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-usc-20190716-story.html; *see also* Letter from University of Southern California (Aug. 7, 2019); University of Southern California, Updates regarding college admissions investigation, *available at* https://news.usc.edu/155195/statement-regarding-college-admissions-investigation/ (last updated Aug. 12, 2019); University of Southern California, USC information on college admissions issue (Aug. 11, 2019), *available at* https://news.usc.edu/155225/usc-information-on-college-admissions-issue/.

[15] *Id.*

[16] *See, e.g.*, *Olsen, et al. v. Singer, et al.*, No. 3:19-cv-01351 (N.D. Cal. Mar. 13, 2019) (dismissed without prejudice in light of *Bendis* matter); *Bendis, et al. v. Singer, et al.*, No. 5:19-cv-01405 (N.D. Cal. Mar. 15, 2019) (dismissed as to USC in light of *Tamboura* matter); *Tamboura, et al. v. Singer, et al.*, No. 5:19-cv-03411 (N.D. Cal. June 14, 2019) (pending as to USC as of November 8, 2019).

C.     **USC Will Predictably Suffer Lost Revenues as a Result of the Scheme**

USC derives significant revenues from application fees.  One predictable consequence of the reputational harm USC has suffered as a result of the scheme is a decline in the number of applicants and a resulting loss of application fees.

For example, a market research poll concluded that "[t]here has been a significant negative impact to the USC brand," as a result of the fraud scheme, and that, of the schools measured, USC's name was most associated with the terms "scandal" and "cheating."[17]  Although the arrests of Macfarlane and his co-conspirators occurred too late in the admissions cycle to have an impact on the number of applications to USC's class of 2023, a recent academic study suggests that the university can expect a decline in applications on the order of 10 percent for each of the next two years.[18]

For USC, which received approximately 64,000 applications for admission in 2018, with an associated fee of $85 per application, a 10 percent decline in applications would translate to a loss of more than $540,000 in application revenues per year.[19]  *See* U.S.S.G. § 2B1.1 cmt., n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in

---

[17] E-Poll Market Research, *How Do Brands Survive a Crisis?* (May 13, 2019), *available at* https://blog.epollresearch.com/2019/05/13/how-do-brands-survive-a-crisis/.

[18] *See* Rooney, P., and Smith, J., *The Impact of Highly Publicized Campus Scandals on College Outcomes*, CONTEMPORARY ECONOMIC POLICY, Mar. 18, 2019, *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/coep.12427 (concluding that "scandals with significant media coverage substantially reduce applications" and that scandals covered in long-form news articles lead to a 10 percent drop in applications, with greater media coverage precipitating more substantial declines).

[19] Mackovich, Ron, *USC sees record number of applicants for fall 2018 admission*, USC NEWS (March 23, 2018), *available at* https://news.usc.edu/139338/usc-acceptance-rate-fall-2018-admission/ (USC received 64,000 applications in 2018); USC Dornsife College of Letters, Arts and Sciences, Freshman Application Process, *available at* https://dornsife.usc.edu/undergraduate-application-process/ (last accessed November 8, 2019) ($85 application fee for USC).

the value of . . . other corporate assets"). Indeed, even if the study's results overstate the decline dramatically, the point is clear: it is reasonably foreseeable that USC will suffer a cognizable loss from the fraud and bribery scheme.

While pecuniary harm for Guidelines purposes does not include "harm to reputation" *per se*, U.S.S.G. § 2B1.1 cmt., n.3(A)(iii), the Guidelines provide that "reasonably foreseeable pecuniary harm" *does* include pecuniary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a *potential* result of the offense." *Id.* cmt., n.3(A)(iv) (emphasis added). Moreover, probable loss is cognizable for sentencing purposes. *See Vrdolyak*, 593 F.3d at 681; *see also United States v. Corrigan*, 273 F. App'x 15, 16 (2d Cir. 2008) ("We have described 'intended loss' as 'the probable loss from a particular misstatement because one is presumed to intend the natural and 'probable' consequences of one's acts.'") (quoting *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000)). Here, the loss of application-related revenue is a foreseeable result of the scheme, and the Court need not wait for that harm to actually occur to take it into account at sentencing.

## III. Macfarlane's Criminal Conduct Requires a Meaningful Term of Incarceration

Macfarlane's crime was serious; he secured admission to USC for both of his children through bribery and fraud. As a result of his conduct, deserving students were denied admission to USC and deprived of the lifelong opportunities that go with it, while the university itself incurred the costs of investigation and remediation and suffered lasting reputational damage. Such harms are difficult to measure with mathematical precision, but they are real and lasting and they demand punishment.

Macfarlane's payments in furtherance of the bribery scheme totaled $450,000, on the higher end of the sums paid by parents who have been charged with participating in the fraud. The

sheer size of the payments is an indicator of the magnitude of the wrongdoing, and the value Macfarlane himself placed on the illegal asset he was buying.  An experienced businessman, Macfarlane didn't haggle with Singer or try to get a better deal, because he believed that what he was getting was worth it:  a spot for each of his children in the entering class of a highly competitive and prestigious university, and the associated bragging rights and social standing.  Likewise, the money paid demonstrates, on its face, that Macfarlane did not act out of desperation.  He could afford to give his children every legitimate advantage, but chose instead – or in addition – to employ illegal means to secure an even greater edge over those without comparable resources, or who were simply unwilling to cheat to get ahead.

Bribery was at the heart of the charged fraud scheme, but like his co-conspirators, Macfarlane also knew that his children's applications would also be premised on a lie:  that they were elite athletes whose abilities warranted recruitment to play on competitive college teams. Indeed, Singer copied Macfarlane (and his daughter) on an application essay riddled with falsehoods about her intention to play soccer at the university level.  And Macfarlane himself, in the consensually recorded call with Singer, acknowledged that neither of his children were "collegian athletes."  He also agreed to lie to the new USC women's soccer coach if asked to explain his daughter's failure to play soccer once admitted to USC, by claiming that she had suffered an injury.

In this regard, while there is no evidence that Macfarlane actively involved his children in his fraud – as some other parents did – there is evidence that Macfarlane's daughter became aware of the scheme.  As noted, for example, Singer emailed *both* Macfarlane and his daughter a draft of the falsified application essay claiming that she intended to be "be an active participant both on the soccer team and in the classroom," and that she wanted "to play soccer at the collegiate level."

And once admitted, Macfarlane's daughter received an email from a USC counselor about adjusting her course schedule to accommodate her soccer schedule. Macfarlane's daughter did not question the email, but simply forwarded it to her father and asked if she needed to respond. It was Macfarlane, of course, who put his child in this position, and thereby exposed her to the potential consequences of being party to a fraud.

Macfarlane also agreed with Singer to lie to the IRS to cover up the scheme, and took tax deductions to which he was not entitled, directing Singer to falsely invoice the bribe payments as "consulting" fees so that he could deduct them as a business expense. This was Macfarlane's independent contribution to the scheme, and it is a separate, if uncharged, crime – although Macfarlane, to his credit, has sought to repay the taxes he owes since the time of his guilty plea.

Nor do the hardships Macfarlane cites to explain his conduct – including the stresses of his marriage and its ultimate dissolution – excuse his conduct or justify the lower sentence he seeks. Many people experience similar hardships without turning to criminal conduct.[20] That Macfarlane carried out this scheme twice – first for his daughter and then for his son – over the course of four years demonstrates that he did not experience a transitory lapse in judgment. Ultimately, he chose to commit a crime. He did so knowingly and after consideration. And then he did it again. These facts, and all of the other considerations set forth above, require that he be sentenced to a meaningful term in prison.

---

[20]

**Conclusion**

For the foregoing reasons, the government respectfully requests that Macfarlane be sentenced to 12 months and one day of incarceration, 12 months of supervised release, and a fine of $95,000.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:      /s/ Justin D. O'Connell
         ERIC S. ROSEN
         JUSTIN D. O'CONNELL
         LESLIE A. WRIGHT
         KRISTEN A. KEARNEY
         Assistant United States Attorneys

Date:  November 8, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 8, 2019.

By:      /s/ Justin D. O'Connell
         JUSTIN D. O'CONNELL
         Assistant United States Attorney