UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1)  GREGORY ABBOTT, | ) | |
| (2)  MARCIA ABBOTT, | ) | |
| (3)  JANE BUCKINGHAM, | ) | |
| (4)  GORDON CAPLAN, | ) | Criminal No. 19-CR-10117-IT |
| (5)  ROBERT FLAXMAN, | ) | |
| (6)  FELICITY HUFFMAN, | ) | |
| (7)  AGUSTIN FRANCISCO HUNEEUS, | ) | |
| (8)  MARJORIE KLAPPER, | ) | |
| (9)  PETER JAN "P.J." SARTORIO, | ) | |
| (10)  STEPHEN SEMPREVIVO, and | ) | |
| (11)  DEVIN SLOANE, | ) | |
| | ) | |
| Defendants | ) | |

## GOVERNMENT'S MEMORANDUM REGARDING THE METHODOLOGY FOR CALCULATING GAIN OR LOSS UNDER THE SENTENCING GUIDELINES

ANDREW E. LELLING
United States Attorney

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 5, 2019

The government respectfully submits this memorandum in advance of the September 10, 2019 hearing regarding the methodology for calculating the enhancement for gain or loss under the applicable Sentencing Guidelines.[1]

## INTRODUCTION

As part of their plea agreements, all of the defendants have stipulated that, pursuant to Section 2B1.1(b) of the Sentencing Guidelines, their offense levels should be enhanced based on the amount of money each parent paid to facilitate the fraud scheme. Such stipulations "will generally govern the resolution of that issue," *see United States v. Granik*, 386 F.3d 404, 411 (2d Cir. 2004), and courts are permitted to rely on the parties' stipulations in finding facts relevant to sentencing. *See id.* at 412; *United States v. Berndt*, 127 F.3d 251, 253-55, 258 (2d Cir. 1997) (affirming sentencing enhancement based on factual stipulations contained in state court plea agreement); *United States v. Bilal*, 941 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (denying motion to vacate restitution order where defendant "stipulated that the loss amount attributable to his conduct was greater than $1 million but less than $2.5 million"); *Kapelioujnyi v. United States*, 779 F. Supp. 2d 250, 255 (E.D.N.Y. 2009) (denying petition under 28 U.S.C. § 2255 and finding sentencing court was "within its discretion" in relying on stipulations regarding defendant's role in RICO conspiracy and loss amount).

Notwithstanding these stipulations, the final and draft Presentence Investigation Reports ("PSRs") prepared to date conclude that the immediate victims of the defendants' conduct—the affected universities and standardized testing agencies—suffered no cognizable pecuniary harm for Guidelines purposes. In the absence of pecuniary harm, the PSRs conclude that gain may not

---

[1] The government is also submitting to the Court an Appendix containing documents cited herein, with the exception of victim-impact statements, which have been provided to the Court by the Probation office.

be used as a substitute for loss.  As a result, the PSRs calculate the *same* Guidelines offense level for every defendant (with no enhancement for gain or loss under Section 2B1.1(b)(1) regardless whether the defendants paid bribes of $15,000 or $400,000).

The government respectfully submits that the PSRs' conclusion is mistaken.  The Sentencing Guidelines consistently include enhancements based on monies paid, received, lost, or gained in the course of the criminal conduct.  *See, e.g.*, U.S.S.G. §§ 2B1.1, 2B4.1 and 2C1.1. Indeed, as set forth below, numerous circuits, including the First Circuit, have in similar circumstances applied Section 2B4.1, the commercial bribery guideline, to private sector honest services fraud cases, resulting both in a higher base offense level *and* the enhancement of that level, based on the bribe amount, pursuant to the loss table in Section 2B1.1.  And in a pending case in the Southern District of Florida that closely parallels this one, the PSR recommends the application of Section 2C1.1 to likewise enhance the base offense level based on the value of the bribe pursuant to Section 2B1.1.

There can be little dispute that the universities and testing agencies have suffered, and will continue to suffer, pecuniary harm, and that this harm was a reasonably foreseeable consequence of the defendants' conduct.  Although the victims' financial losses are difficult to quantify with precision, the Guidelines instruct that where a precise loss amount cannot be "reasonably determined," the Court should substitute the gain from the offense—in this case, the amounts the defendants intended to pay their co-conspirators to facilitate the bribery and fraud scheme—which are the amounts to which the parties stipulated in the plea agreements.  Such an approach is consistent with the way the Guidelines treat bribe payments generally, would align the Guidelines ranges in this case with those of similarly situated defendants nationwide, appropriately reflect relative culpability and thus help to achieve a just result.

# I.    USC AND GEORGETOWN SUFFERED PECUNIARY HARM

Both USC and Georgetown, the principal university victims of the charged scheme, suffered demonstrable pecuniary harm from the defendants' conduct.[2]

First, as the defendants have acknowledged by pleading guilty to conspiracy to commit honest services fraud, the universities lost the value of their corrupt employees' honest services. While it is difficult to calculate that value precisely, the loss can be approximated by looking to the salaries the universities paid to the employees the defendants and their co-conspirators conspired to bribe—monies the universities would not have paid had they known their employees were corrupt, and that they stopped paying as soon as they found out.

Second, the defendants' scheme caused both USC and Georgetown to undertake costly internal investigations separate and apart from the government's investigation. These costs were a direct and foreseeable consequence of the defendants' fraud.

Third, although the Sentencing Guidelines do not recognize reputational harm as a compensable loss, where such reputational harm results in pecuniary harm, such losses are cognizable. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n.3(C)(v) (loss includes any reduction in the value of

---

[2] Section 2B1.1 of the Sentencing Guidelines defines "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and provides that, in determining "loss" for purposes of the enhancement in Section 2B1.1(b), "loss is the greater of actual loss or intended loss." *See* U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.3(A)(i). Intended loss is "the pecuniary harm that the defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur," such as where the scheme was interrupted before it could succeed. *Id.* n.3(A)(ii). The Guidelines set forth several factors to consider in estimating loss, including (1) the fair market value or replacement cost of the property unlawfully taken; (2) the cost of developing proprietary information; (3) the cost of repairs; and (4) more general factors, such as the scope and duration of the offense and revenues generated by similar operations. *Id.* n.3(C)(i)-(iii) & (vi). The Guidelines provide that the Court "need only make a reasonable estimate of loss," *id.* n.3(C), and that where "there is a loss but it reasonably cannot be determined," the Court "shall use gain that resulted from the offense as an alternative measure of loss," *id.* n.3(B).

"corporate assets" that resulted from the offense).  Here, the evidence indicates that the universities

will foreseeably experience a decline in applications for admission as a result of the scheme, which

will translate into a direct pecuniary loss in the form of lost application fees.

### A.    Defendants Paid Bribes to USC and Georgetown Employees, Costing the Universities the Full Value of Their Employees' Honest Services

Ample precedent in honest services fraud cases supports the proposition that the salaries

paid by victim organizations to bribe recipients constitute pecuniary losses to those victims.[3]  This

makes sense.  An employer pays an employee a salary to retain that employee's loyal services.

Here, USC and Georgetown paid salaries to employees who were also receiving bribes as part of

the charged conspiracy.  These employees feigned loyalty to their employers, while secretly acting

to their employers' detriment by selling admission to athletically unqualified students in exchange

for bribes.  In so doing, the fraud scheme deprived the victim universities of the full value of the

salaries they paid the corrupt employees.  The table below sets forth the approximate salaries that

the corrupt employees of Georgetown and USC received during the period in which they were also

accepting bribes:

---

[3] *See, e.g., United States v. Crawley*, 533 F.3d 349, 357 (5th Cir. 2008) (affirming loss to be the full value of the salary and benefits defendant received from his union while accepting kickbacks and noting that "[b]y intentionally depriving Local 988 of honest services, Crawley *obviously* inflicted some level of pecuniary harm on the organization") (emphasis added); *United States v. Bahel*, 662 F.3d 610, 648-49 (2d Cir. 2011) (in determining restitution, court found that salary paid to employee convicted of honest services fraud was "plainly 'property' that belonged to" employer and subject to forfeiture); *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998) ("We may assume that [the employer] would not have hired [defendant] had it known of his intentions, and in that event it would not have paid him four years' salary . . . [W]hat [the employer] lost . . . [was] the difference in the value of the services that [defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.").

| Employee | Period in which Employee Received Bribes | Approximate Total Salary Received During Period in which Employee Received Bribes[4] |
|---|---|---|
| Donna Heinel (USC) | February 2014 to March 2019 | $1,164,116 |
| Jovan Vavic (USC) | January 2014 to March 2019 | $1,232,945 |
| Ali Khosroshahin (USC) | October 2012 to November 2013 | $331,542[5] |
| Laura Janke (USC) | October 2012 to January 2014[6] | $74,322 |
| Gordon Ernst (Georgetown) | January 2012 to June 2018[7] | $361,653[8] |

Whether the pecuniary harm for Guidelines purposes is the full value of the salary or some portion of it—in recognition of the fact that the employees also provided some legitimate services—is less relevant than the *fact* that the universities suffered a pecuniary loss.  In *United States v. Crawley*, for example, the district court determined that the entire amount of the defendant's salary should be deemed "loss" because it was not possible to "apportion what part of [the salary] he really earned and what part he didn't earn."  533 F.3d at 357 (further citation and internal quotation marks omitted).  Other courts have concluded that the better measure of loss is "'the difference in the value of the services that [the defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.'"  *Bahel*, 662 F.2d at 650 (brackets and

---

[4] These figures do not include car allowances or other fringe benefits.

[5] This figure includes a salary payout of approximately $122,282 Khosroshahin received following his termination by USC in November 2013, which reflects a payment for which USC received no services from Khosroshahin.

[6] USC terminated Janke in January 2014.

[7] While Ernst's acceptance of bribes pre-dates January 2012, the government is in possession of salary information going back only to January 2012.  The figures for Vavic, Khosroshahin and Janke reflect only those periods as currently charged, but understate the loss to USC insofar as they do not include earlier periods for which there is evidence that the defendants also accepted bribes while receiving salaries.

[8] This figure includes salary payments totaling approximately $65,732.43 that Ernst received between January 1, 2018 and June 30, 2018, a time when Georgetown had placed him on leave but not yet fired him.  Georgetown received no services for this payment.

ellipsis in original) (quoting *Sapoznik*, 161 F.3d at 1121).  Because that difference can be difficult to calculate, courts have concluded that a percentage of the total salary—ranging between 10 percent and 25 percent—is reasonable under the Guidelines.  *See, e.g.*, *Bahel*, 662 F.2d at 648-50 (noting that "it would be unduly complex to try to delineate which part of the $876,000 [salary] was paid for honest services and which part was paid for the dishonest services," and using 10 percent as a "conservative estimate of the cost of the fraud") (internal citations and quotations omitted); *Sapoznik*, 161 F.3d at 1121-22 (finding that 25 percent of salary paid to corrupt police chief was loss for purposes of calculating restitution).  Applying those same ranges to this case would result in estimated losses to USC of between $280,292 and $700,731, and to Georgetown of between $36,165 and $90,413.[9]  Yet it is precisely because the losses are difficult to calculate that it is appropriate, as an alternative, to substitute the value of the bribe and related payments the defendants made in calculating the relevant offense level, as the parties have stipulated.

**B.      Georgetown and USC Have Been Forced, at Great Expense, To Conduct Internal Investigations and To Revise Policies and Programs as a Result of The Defendants' Fraud**

The victim universities have also incurred costs in investigating the defendants' fraud. Although the Guidelines exclude from the calculation of loss the costs of assisting the government in its investigation, *see* U.S.S.G. § 2B1.1 cmt. n.3(D)(ii) (loss shall not include "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense"), investigative costs are properly included where, as here, a victim engages counsel for reasons independent of the government's inquiry.  *See United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (recognizing that investigative costs incurred to aid the government are not

---

[9] Given the sheer volume of students alleged to have been the beneficiaries of the bribery scheme involving Heinel (nearly three dozen) and Ernst (more than 10), a range closer to 50-75 percent of salary might be more appropriate.

counted in the loss calculation, but that attorneys' fees and related costs are properly included
where "the investigation was prompted for the bank's own benefit"); *United States v. Piggie*, 303
F.3d 923 (8th Cir. 2002) (victim's investigative fees into coach's scheme to deprive university of
the honest services of college basketball players were properly included in calculating loss for
Guidelines purposes).[10]

Here, Georgetown launched an investigation into tennis coach Gordon Ernst in late 2017,
nearly one year before the government contacted the university about Ernst's scheme.[11]
Georgetown engaged a law firm to conduct the investigation, which determined that Ernst violated
University rules concerning admissions by misrepresenting certain applicants as competitive
tennis players.  As a result, Georgetown placed Ernst on leave and ultimately forced him to resign.
All this occurred *before* federal investigators contacted Georgetown about Ernst's fraud.  The
internal investigation also continued after the government's investigation was made public in
March 2019.[12]  As a result of the scheme, Georgetown undertook an extensive review of students
recruited by Ernst, spending hundreds of hours "individually reviewing each student's case and . .

---

[10] *But cf. Lagos v. United States*, 138 S.Ct. 1684 (2018) (holding, with respect to claims
for restitution, as opposed to loss, that the words "investigation" and "proceedings" in the
Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A(b)(4), refer to government
investigations and criminal proceedings, and that section does not permit an award of restitution
for private investigations and civil proceedings).  *But see United States v. Gammell*, 932 F.3d 1175
(8th Cir. 2019) (distinguishing *Lagos* and finding that private investigative costs may be
compensable restitution under 18 U.S.C. § 3663A(b)(1) with respect to damage, loss, or
destruction of property).

[11] *See, e.g.*, Winton, Richard, *Long before college admissions scandal, universities saw
signs of fraud on campus*, L.A. TIMES (May 20, 2019), *available at*
https://www.latimes.com/local/lanow/la-me-college-admissions-scandal-universities-what-know-
explainer-20190520-story.html; Georgetown University, Update on the U.S. Department of
Justice Investigation (March 12, 2019), *available at* https://www.georgetown.edu/media-
advisories/03122019b.

[12] Letter from Georgetown University (Aug. 2, 2019).

. taking serious disciplinary action" as appropriate, and ultimately adopted a new policy for student-athlete recruitment and admissions, in an effort to protect itself against similar frauds.[13]

Likewise, although USC began assisting the government in approximately November 2018, the university subsequently launched its own internal investigation of 33 students to determine whether they had lied on their USC applications.[14] That investigation continues.[15] USC has also hired consultants to review its admissions policies in light of the defendants' scheme.[16]

The need for the victim universities to investigate their corrupt employees upon learning of the fraud scheme was reasonably foreseeable to the defendants. Indeed, the reputational harm the universities suffered from the scheme, and the critical importance of academic integrity to research universities generally, *required* that the universities review their practices to determine who was involved in perpetrating the fraud, who benefited from it and how to prevent it from recurring.

Finally, as a result of the defendants' conduct, USC and Georgetown have been named in multiple putative class actions alleging that they were negligent and violated consumer protection

---

[13] *Id.*

[14] Rubin, Joel and Matthew Ormseth, *How many students cheated to get into USC? A look inside the admissions investigation*, L.A. TIMES (July 16, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-usc-20190716-story.html; *see also* Letter from University of Southern California (Aug. 7, 2019); University of Southern California, Updates regarding college admissions investigation, *available at* https://news.usc.edu/155195/statement-regarding-college-admissions-investigation/ (last updated Aug. 12, 2019); University of Southern California, USC information on college admissions issue (Aug. 11, 2019), *available at* https://news.usc.edu/155225/usc-information-on-college-admissions-issue/.

[15] *Id.*

[16] *Id.*

and unfair competition laws.[17]  The universities have incurred legal fees defending against these lawsuits,[18] which would not have been filed but for the defendants' fraud.

### C.   USC and Georgetown Will Predictably Suffer Lost Revenues as a Result Of the Fraud Scheme

Georgetown and USC derive significant revenues from application fees.  One predictable consequence of the reputational harm both universities have suffered as a result of defendants' fraud is a decline in the number of applicants and a resulting loss of application fees.

For example, a recent market research poll concluded that "[t]here has been a significant negative impact to the USC brand," as a result of the fraud scheme, and that, of the schools measured, USC's name was most associated with the terms "scandal" and "cheating."[19]  Although the arrests in this case occurred too late in the admissions cycle to have an impact on the number of applications to USC's class of 2023, a recent academic study suggests that the university can expect a decline in applications on the order of 10 percent for each of the next two years.[20]

---

[17] *See, e.g.*, *Olsen, et al. v. Singer, et al.*, No. 3:19-cv-01351 (N.D. Cal. Mar. 13, 2019) (dismissed without prejudice on March 15, 2019 in light of *Bendis* matter); *Bendis, et al. v. Singer, et al.*, No. 5:19-cv-01405 (N.D. Cal. Mar. 15, 2019) (dismissed as to USC, Georgetown, and Wake Forest on July 5, 2019 in light of *Tamboura* matter); *Tamboura, et al. v. Singer, et al.*, No. 5:19-cv-03411 (N.D. Cal. June 14, 2019) (pending as to Georgetown, USC, and other affected schools as of Sept. 4, 2019).

[18] *E.g.*, Letter from Georgetown University (Aug. 2, 2019).

[19] E-Poll Market Research, *How Do Brands Survive a Crisis?* (May 13, 2019), *available at* https://blog.epollresearch.com/2019/05/13/how-do-brands-survive-a-crisis/.

[20] *See* Rooney, P., and Smith, J., *The Impact of Highly Publicized Campus Scandals on College Outcomes*, Contemporary Economic Policy, Mar. 18, 2019, *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/coep.12427 (concluding that "scandals with significant media coverage substantially reduce applications" and that scandals covered in long-form news articles lead to a 10 percent drop in applications, with greater media coverage precipitating more substantial declines).

For USC, which received approximately 64,000 applications for admission in 2018, with an associated fee of $85 per application, a 10 percent decline in applications would translate to a loss of more than $540,000 in application revenues per year.  Likewise, for Georgetown, a 10 percent decline in applications would cause a loss of more than $170,000 per year.[21]  *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in the value of . . . other corporate assets").  Indeed, even if the study's results overstate the decline dramatically, the point is clear:  it is reasonably foreseeable that the universities will suffer a cognizable loss from the fraud.

While pecuniary harm for Guidelines purposes does not include "harm to reputation" *per se*, U.S.S.G. § 2B1.1 cmt. n.3(A)(iii), the Guidelines provide that "reasonably foreseeable pecuniary harm" *does* include pecuniary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a *potential* result of the offense."  *Id.* cmt. 3(A)(iv) (emphasis added).  Moreover, probable loss is cognizable for sentencing purposes.  *See United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010); *United States v. Corrigan*, 273 F. App'x 15, 16 (2d Cir. 2008) ("We have described 'intended loss' as 'the probable loss from a particular misstatement because one is presumed to intend the natural and 'probable' consequences of one's acts.'") (quoting *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000)).  Here, the loss

---

[21] Mackovich, Ron, *USC sees record number of applicants for fall 2018 admission*, USC NEWS (March 23, 2018), *available at* https://news.usc.edu/139338/usc-acceptance-rate-fall-2018-admission/ (USC received 64,000 applications in 2018); USC Dornsife College of Letters, Arts and Sciences, Freshman Application Process, *available at* https://dornsife.usc.edu/undergraduate-application-process/ (last accessed Sept. 4, 2019) ($85 application fee for USC); Kahn-Perry, Taylor, *Admissions Rate Falls to 14 Percent, Lowest in University History*, THE HOYA (April 5, 2019), *available at* https://www.thehoya.com/admit-rate-falls-14-percent-lowest-university-history/ (Georgetown received 22,788 applicants in 2018); Georgetown University Office of Undergraduate Admissions, First Year Application, *available at* https://uadmissions.georgetown.edu/applying/first-year-application/ (last accessed Sep. 4, 2019) ($75 application fee for Georgetown).

of application-related revenue is a foreseeable result of the defendants' conduct, and the Court need not wait for that harm to actually occur to take it into account at sentencing.

## II.    THE TESTING AGENCIES SUFFERED PECUNIARY HARM

Like the universities, the College Board, Educational Testing Service ("ETS") and the ACT, Inc. have suffered pecuniary harm from the lost wages they paid to their corrupt proctors, the cost of their internal investigations, the cost of strengthening their security practices in direct response to the defendants' conduct, the lost revenue resulting from a decline in the number of students taking those exams, and the decline in the value of their intellectual property.  The agencies acknowledge these losses in individual victim impact statements they have submitted to the Court.

Moreover, in the weeks and months after the fraud was publicly disclosed, numerous universities announced they will no longer require applicants to submit standardized test scores as part of their applications, resulting in decreased revenue for the testing agencies.  For example:

| College/University | "Test Optional" Announcement | Last Year Applicant Pool |
|---|---|---|
| University of Minnesota - Crookston | March 18, 2019 | 1,297 |
| University of Denver | March 19, 2019 | 20,475 |
| University of San Francisco | March 27, 2019 | 18,411 |
| Springfield College | March 28, 2019 | 3,367 |
| Southwestern University | April 1, 2019 | 4,551 |
| Alma College | April 17, 2019 | 4,765 |
| Simpson College | April 18, 2019 | 1,401 |
| University of Southern Maine | May 22, 2019 | 4,254 |
| Marquette University | June 10, 2019 | 15,574 |
| University of Rochester | June 12, 2019 | 21,255 |
| Dominican University of California | July 15, 2019 | 1,909 |
| University of New Haven | August 5, 2019 | 10,426 |
| Spring Hill College | August 8, 2019 | 8,587 |
| Carroll College | August 12, 2019 | 2,709 |
| Queens University of Charlotte | August 18, 2019 | 2,419 |
| College of Our Lady of the Elms | August 20, 2019 | 1,085 |

| (except School of Nursing) | | |
| Xavier University | August 23, 2019 | 15,100 |
| Colorado College | August 28, 2019 | 8,552 |
| **TOTAL** | | **146,137** |

While it is difficult to attribute any one of these decisions directly to the fraud scheme, California state officials did just that in introducing legislation to eliminate the use of standardized tests by the state's two public university systems. In introducing the legislation, its author noted:

> [R]ecently, it was uncovered that wealthy parents are buying their children's way into elite colleges and universities including two universities that are part of the University of California system. We all watched in complete disgust as the fraud committed in this recent college admissions scandal unfolded. California seems to be the epicenter of the national scandal as 25 of the 33 families in the initial indictment are from California, and 10 of the 17 corrupt coaches and university officials were based at California colleges and universities.

> This scandal not only undermines the public's trust in the college admissions process, but it further perpetuates the opportunity gap in our college system. Equally disturbing is the fact that qualified California students were undoubtedly squeezed out and denied admission. For every student admitted through bribery and fraud, there was an honest and talented student that was rejected.

> The scandal also shed light on the many legal ways that wealth and social connections skew the college admissions process. This scandal, "Operation Varsity Blues," and the subsequent investigation resulted in dozens of bribery and fraud charges against wealthy parents willing to break the law to get their children into an elite university, including fraudulent testing practices with the SAT and ACT tests.

Calif. Bill No. ACR-64, Comments at p. 2-3. As of September 4, 2019, the bill had passed the California State Assembly and was pending in the California State Senate.

In 2018, more than 800,000 students applied to the California State University and University of California systems alone.[22]  As a result, the College Board, ETS and the ACT can expect a significant decline in the number of applicants taking the SAT and ACT tests, and the loss of associated registration fees.  In 2019, those fees were $52.00 and $49.50 per exam,[23] respectively, for the ACT and the SAT, in addition to fees the agencies charge for sending test scores to schools, expediting scores, late registration, changing test centers, and selling test preparation materials.[24]

These lost revenues are precisely the type of "reduction in the value of [proprietary] information" resulting from the offense that the Guidelines provide should be included in the calculation of pecuniary harm.  *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(ii); *see also id.* n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in the value of . . . other corporate assets").

---

[22] Specifically, the California State University system had 637,350 "First Time Freshman" applications, *see* Press Release, Cal. State System, CSU New Students Applications and Admissions By Campus and Student Level (Dec. 14, 2018), *available at* https://www.calstate.edu/as/stat_reports/2018-2019/apps_f2018_all.htm, while the University of California system had 181,918 applications, *see* Press Release, UC System, Freshman Applications by Campus and Residency, *available at* https://www.ucop.edu/institutional-research-academic-planning/_files/factsheets/2019/fall-2019-applications-table-1-1.pdf.

[23] These figures reflect the lowest possible fee associated with taking the exams. *See, e.g.*, ACT, Inc., Current ACT Fees and Services, *available at* https://www.act.org/content/act/en/products-and-services/the-act/registration/fees.html (last accessed Sep. 4, 2019); College Board, Fees, *available at* https://collegereadiness.collegeboard.org/sat/register/fees (last accessed Sep. 4, 2019).

[24] *See, e.g.*, Jack Meserve, *The SAT May Have Been Changed To Help The College Board Maximize Revenue*, THE MOTLEY FOOL, Mar. 7, 2014, *available at* https://www.businessinsider.com/the-sat-may-have-been-changed-to-help-college-board-maximize-revenue-2014-3 ("The details of the College Board's revenue stream aren't publicly available, but SAT administration and all of its related paraphernalia—The Official SAT Study Guide with DVD ($31.99), the SAT Score Verification Services ($18), the SAT Online Course (just $69.95 a year!)—surely make up a sizable portion. Chadwick Matlin of Slate.com conservatively estimated this combined revenue at around $115 million back in 2006.").

## III.   THE STIPULATED GAIN/LOSS IS APPROPRIATE AND REASONABLE

All of the defendants have stipulated that their offense levels should be enhanced, pursuant to the table in Section 2B1.1(b) of the Sentencing Guidelines, based on the sums they paid to participate in the fraud scheme.  Such an approach is appropriate where the precise amount of pecuniary harm caused by the scheme is difficult or impossible to calculate (not least because, as noted above, that harm is still occurring), and it is also consistent with the way in which various provisions of the Sentencing Guidelines treat bribe payments generally.

Indeed, while the plea agreements in this case stipulate that the Guidelines should be calculated based on Section 2B1.1, the First Circuit and at least *four* other circuits have in similar circumstances applied Section 2B4.1, the commercial bribery guideline, to private sector honest services fraud cases, regardless whether those cases were charged pursuant to 18 U.S.C. § 1346. *See, e.g.*, *United States v. Josleyn*, 99 F.3d 1182, 1198 (1st Cir. 1996) (applying § 2B4.1 where defendant convicted of conspiracy and mail fraud for conspiring to defraud his former employer by accepting bribes from prospective Honda dealers in exchange for dealership rights).[25]  Notably, Section 2B4.1—which has a slightly higher base offense level—instructs courts to refer back to

---

[25] *See also, e.g., United States v. Rybicki*, 38 F. App'x 626, 633 (2d Cir. 2002) (affirming sentence under § 2B4.1 where defendant convicted of honest services fraud); *United States v. Montani*, 204 F.3d 761 (7th Cir. 2000) (same); *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. Aug. 3, 1995) (unpublished) (same); *United States v. Kelly*, No. 17-cr-547001-RWS, 2018 WL 2411593, at *4 (S.D.N.Y. May 29, 2018) (unpublished) (same); *United States v. Hendershot*, 150 F. Supp. 2d 965, 968 (N.D. Ill. 2001) (applying § 2B4.1 where defendant convicted of mail fraud arising out of an illegal kickback scheme and noting that "[t]he government prosecuted this case as a bribery case"); *see also United States v. Poirer*, 321 F.3d 1024, 1035 (11th Cir. 2003) (applying § 2B4.1 where defendants convicted of wire fraud and conspiracy and noting, "[i]t is certainly true that accepting or providing bribes is inconsistent with the delivery of honest services, but that is not to say that the commercial bribery guideline cannot also be applied to a § 1343 money and property wire fraud case. The defendants' conduct in giving and receiving money in exchange for the misappropriation of documents is 'more aptly' covered by the commercial bribery guideline than by the fraud guideline.").

Section 2B1.1, and to apply an enhancement pursuant to the table set forth in that Guideline based on the greater of the amount of the bribe paid or the improper benefit conferred.

In *United States v. Tanner*, for example, the district court applied Section 2B4.1 in a private sector honest services fraud case in which the defendant, a pharmaceutical executive, received a kickback of nearly $10 million in exchange for giving secret guidance to senior executives at a mail-order pharmacy the defendant's employer was negotiating to purchase. *See* Transcript of Proceedings, No. 17-cr-00061-LAP (S.D.N.Y. Oct. 30, 2018) (Dkt. 214). In that case, the Probation Department agreed that Section 2B4.1 was the appropriate Guideline and the court enhanced the base offense level pursuant to the table in Section 2B1.1 based on the $10 million bribe the defendant received. *See id.*

More recently, in a case directly analogous to this one, former University of Pennsylvania basketball coach Jerome Allen was sentenced in July in the Southern District of Florida after pleading guilty to one count of money laundering under 18 U.S.C. § 1957, in connection with a scheme to accept bribes from co-conspirator Phillip Esformes in exchange for recruiting Esformes's son to the University of Pennsylvania basketball team. *See* Judgment, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. July 8, 2019) (Dkt. 34). In that case, the parties' stipulated that the Guidelines should be calculated based on an underlying base offense level derived from Section 2B4.1(a), and that the offense level should be enhanced pursuant to Section 2B1.1 based on bribe payments of between $15,000 and $40,000. *See* Plea Agreement, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. Oct. 3, 2018) (Dkt. 10). At Allen's sentencing, the district court applied Section 2B4.1 and sentenced him under that Guideline, but found that the

bribe amount was higher—between \$150,000 and \$250,000—and enhanced the offense level accordingly.[26]

Like Section 2B4.1, Section 2C1.1, which applies to public-sector honest services fraud, provides for an enhancement pursuant to the table in Section 2B1.1 based on the greater of the value of the bribe or the improper benefit conferred in exchange. *Compare* U.S.S.G § 2C1.1(b)(2) ("if the value of the payment, the benefit received or to be received in return for the payment . . . whichever is greatest, exceeded \$6,500, increase by the number of levels from the table in § 2B1.1") *with* U.S.S.G. § 2B4.1(b)(1)(B) ("If the greater of the value of the bribe or the improper benefit to be conferred . . . exceeded \$6,500, increase by the number of levels from the table in § 2B1.1.").[27]  Although Section 2C1.1 typically applies to bribery involving public officials, it also applies to convictions under 18 U.S.C. § 666(a)(2), which criminalizes fraud and bribery schemes at organizations or agencies that receive more than \$10,000 per year in federal benefits.[28]  As an example, in the Jerome Allen case referenced above, Allen's co-conspirator, Phillip Esformes, was convicted after trial of conspiracy to violate Section 666(a)(2) arising out of his payment of bribes to Allen, an employee of the University of Pennsylvania.  *See* Jury Verdict, *United States v. Esformes*, No. 16-cr-20549-RNS (S.D. Fla. April 5, 2019) (Dkt. 1245).  Although Esformes's sentencing has not yet occurred—the hearing is scheduled for September 11 and 12—the U.S.

---

[26] The court sentenced Allen to probation based on his cooperation with the government at Esformes's trial.

[27] Section 2C1.1 carries a higher base offense level than either Section 2B1.1 or 2B4.1. S*ee Josleyn*, 99 F.3d at 1199 n.15 ("One reasonable explanation for the two-level difference between the BOL for private bribery, *see* U.S.S.G. § 2B4.1 (level 8), and public bribery, *see* U.S.S.G. § 2C1.1 (level 10), may lie in the fact that the Sentencing Commission factored the abuse-of-trust element into the BOL for public bribery only.").

[28] Although the defendants here were not charged pursuant to Section 666, the victim universities receive more than \$10,000 per year in federal assistance.

Probation office in the Southern District of Florida has calculated his offense level pursuant to Section 2C1.1, with a base offense level of 12 and an enhancement based on the amount of the bribe paid.

Accordingly, enhancing the defendants' base offense level based on the value of the bribe and related payments is consistent with the way in which the Guidelines treat bribe payments generally, and would align the defendants' Guidelines ranges in this case with those of similarly situated defendants nationwide.  Measuring harm based on the value of the bribes or the improper benefits conferred is also consistent with the purpose of the Guidelines generally to appropriately reflect the defendants' absolute and relative culpability and to achieve a just result.  By contrast, the PSR's conclusion that the bribe amount has no impact on the calculation of the Guidelines means that a defendant who pays a $10 million bribe will have the *same* offense level as a defendant who pays a $10,000 bribe, and that a defendant who commits a fraud that causes pecuniary harm of $6,501 will have a *higher* offense level than a defendant who pays a $65 million bribe.  The government respectfully submits that such an approach is neither logical nor just.

17

## <u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the Court should find that the victim universities and testing agencies have suffered pecuniary harm from the defendants' fraud, and that the applicable Guidelines levels should be enhanced pursuant to Section 2B1.1 based on the amounts the defendants agreed to pay to facilitate the scheme, as stipulated in the plea agreements.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Eric S. Rosen*
      ERIC S. ROSEN
      JUSTIN D. O'CONNELL
      LESLIE A. WRIGHT
      KRISTEN A. KEARNEY
      Assistant United States Attorneys

Date: September 5, 2019

# APPENDIX
### to the Government's Memorandum Regarding
### the Methodology for Calculating Gain or Loss under the Sentencing Guidelines,
### United States v. Abbott, et al., No. 19-cr-10117-IT

| Tab | Document |
|-----|----------|
| 1. | Winton, Richard, *Long before college admissions scandal, universities saw signs of fraud on campus*, L.A. TIMES (May 20, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-scandal-universities-what-know-explainer-20190520-story.html |
| 2. | Georgetown University, Update on the U.S. Department of Justice Investigation (March 12, 2019), *available at* https://www.georgetown.edu/media-advisories/03122019b |
| 3. | Rubin, Joel and Matthew Ormseth, *How many students cheated to get into USC? A look inside the admissions investigation*, L.A. TIMES (July 16, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-usc-20190716-story.html |
| 4. | University of Southern California, Updates regarding college admissions investigation, *available at* https://news.usc.edu/155195/statement-regarding-college-admissions-investigation/ (last updated Aug. 12, 2019) |
| 5. | University of Southern California, USC information on college admissions issue (Aug. 11, 2019), *available at* https://news.usc.edu/155225/usc-information-on-college-admissions-issue/ |
| 6. | E-Poll Market Research, *How Do Brands Survive a Crisis?* (May 13, 2019), *available at* https://blog.epollresearch.com/2019/05/13/how-do-brands-survive-a-crisis/ |
| 7. | Rooney, P., and Smith, J., *The Impact of Highly Publicized Campus Scandals on College Outcomes*, CONTEMPORARY ECONOMIC POLICY (Mar. 18, 2019), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/coep.12427 |
| 8. | Mackovich, Ron, *USC sees record number of applicants for fall 2018 admission*, USC NEWS (March 23, 2018), *available at* https://news.usc.edu/139338/usc-acceptance-rate-fall-2018-admission/ |
| 9. | USC Dornsife College of Letters, Arts and Sciences, Freshman Application Process, *available at* https://dornsife.usc.edu/undergraduate-application-process/ (last accessed Sept. 4, 2019) |
| 10. | Kahn-Perry, Taylor, *Admissions Rate Falls to 14 Percent, Lowest in University History*, THE HOYA (April 5, 2019), *available at* https://www.thehoya.com/admit-rate-falls-14-percent-lowest-university-history/ |
| 11. | Georgetown University Office of Undergraduate Admissions, First Year Application, *available at* https://uadmissions.georgetown.edu/applying/first-year-application/ (last accessed Sep. 4, 2019) |
| 12. | Calif. Bill No. ACR-64 |
| 13. | Press Release, Cal. State System, CSU New Students Applications and Admissions By Campus and Student Level (Dec. 14, 2018), *available at* https://www.calstate.edu/as/stat_reports/2018-2019/apps_f2018_all.htm, |

14.    Press Release, UC System, Freshman Applications by Campus and Residency, *available at* https://www.ucop.edu/institutional-research-academic-planning/_files/factsheets/2019/fall-2019-applications-table-1-1.pdf

15.    ACT, Inc., Current ACT Fees and Services, *available at* https://www.act.org/content/act/en/products-and-services/the-act/registration/fees.html (last accessed Sep. 4, 2019)

16.    College Board, Fees, *available at* https://collegereadiness.collegeboard.org/sat/register/fees (last accessed Sep. 4, 2019)

17.    Jack Meserve, *The SAT May Have Been Changed To Help The College Board Maximize Revenue*, THE MOTLEY FOOL (Mar. 7, 2014), *available at* https://www.businessinsider.com/the-sat-may-have-been-changed-to-help-college-board-maximize-revenue-2014-3

18.    Transcript of Proceedings, *United States v. Tanner*, No. 17-cr-00061-LAP (S.D.N.Y. Oct. 30, 2018) (Dkt. 214)

19.    Judgment, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. July 8, 2019) (Dkt. 34)

20.    Plea Agreement, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. Oct. 3, 2018) (Dkt. 10)

21.    Jury Verdict, *United States v. Esformes*, No. 16-cr-20549-RNS (S.D. Fla. April 5, 2019) (Dkt. 1245)

22.    Unpublished Decisions
    a. *United States v. Corrigan*, 273 F. App'x 15 (2d Cir. 2008)
    b. *United States v. Rybicki*, 38 F. App'x 626 (2d Cir. 2002)
    c. *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. Aug. 3, 1995)
    d. *United States v. Kelly*, No. 17-cr-547001-RWS, 2018 WL 2411593 (S.D.N.Y. May 29, 2018)



# Los Angeles Times

ADVERTISEMENT

CALIFORNIA

# Long before college admissions scandal, universities saw signs of fraud on campus



Georgetown University is seen in August 2018. (Daniel Slim / AFP/ Getty Images)

8/29/2019      Long before college admissions scandal, universities still weigh rich and famous on campus - Los Angeles Times

Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 23 of 253

By RICHARD WINTON
STAFF WRITER

MAY 20, 2019
9:36 AM



More than a year before the college admissions scandal investigation began, Georgetown University "discovered irregularities" in the athletic credentials of two tennis recruits, initiated a secret investigation and eventually forced coach Gordon Ernst to resign, court records show.

University officials say those two athletic recruits were denied admission.

But none of Ernst's conduct would become public until he was arrested in March on charges he accepted $2.7 million in bribes between 2012 and 2018. He has pleaded not guilty to racketeering conspiracy.

## What the universities missed

As the college admissions scandal investigation continues, a key question is what universities knew and whether more could have been done to detect the widespread fraud.

Several universities have launched investigations to examine that question. But there are lingering questions about how such an audacious scam could go on for so long without detection at some of America's top colleges.

8/29/2019          Long con: It's a collective obsession.Done scandal, universities still weigh in 10 can know - Los Angeles Times

Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 24 of 253

The Times reported in April that documents show UCLA knew years ago there were concerns about parents pledging donations to its athletic program in exchange for their children being admitted to the university in violation of rules prohibiting such a practice.

A source familiar with the case also told The Times that prosecutors want to learn more about who at UCLA and USC knew of any recruiting schemes and are asking questions of two parents who pleaded guilty and are now cooperating.

Prosecutors have said the colleges involved in the scheme are victims, not targets, of the growing criminal investigation. The 10 university coaches and officials charged so far in the far-reaching scandal have been characterized as rogue actors who flouted the law and school policies, pocketing bribes to admit the children of wealthy and powerful families as recruited athletes.

SPONSORED CONTENT

### How to Make Every Day an Adventure: Start With RV Travel ⤤

By Go RVing

## Questions at Georgetown

Ernst accepted payments from the mastermind of the college admissions scam, William "Rick" Singer, who used a "side door" to get a dozen students into Georgetown, according to court records.

"The university was not aware of any alleged criminal activity or acceptance of bribes by Mr. Ernst until it was later contacted by the U.S. attorney's office," a university spokeswoman told The Times, noting that the indictments filed by the U.S. attorney named Georgetown and six other institutions as "victims of fraud."

**Full coverage: Dozens charged — including Hollywood actresses — in connection with college admissions scheme »**

But the spokeswoman also said that after discovering irregularities in 2017, "Georgetown immediately put former coach Gordon Ernst on leave, initiated an internal investigation, established a new policy concerning the recruitment of student-athletes, implemented audits to check whether recruited student-athletes are on team rosters and asked Mr. Ernst to resign."

The university says Ernst violated university policies and the investigation "relied on available information."

After leaving Georgetown, Ernst took a position coaching women's tennis at the University of Rhode Island in August 2018.

## How the scandal unraveled

Georgetown's information about its former tennis coach predates the discovery by federal authorities of Singer's $25-million scheme, in which parents allegedly funneled money to his charity and he is accused of bribing coaches to create phony athletic recruits. Fifty people have been charged in the scandal.

Ernst was already gone from Georgetown in April when federal prosecutors first learned of Singer after a Yale soccer coach was allegedly caught soliciting a bribe from a parent.

Last week, Georgetown kicked out two students by rescinding their admissions and dismissing them. The university said they faked their credentials for entry.

One of the dismissed students, Adam Semprevivo, filed suit against the university, seeking to block his expulsion and his loss of college credits, just hours before Georgetown pulled the plug on his admission. His father, Stephen Semprevivo, has already admitted paying Singer $400,000 to fake his son's entry as a tennis recruit with Ernst's help in 2016.

But the son says he knew none of the subterfuge and sued in an effort to stay in school.

David Kenner, Adam Semprevivo's attorney, said in the lawsuit that Georgetown clearly knew what was happening because the university examined all of Ernst's tennis recruit entries when he was caught trying to slip two non-tennis players into the school in 2017.

"They knew what the coach had done," Kenner said.

The lawsuit says that Semprevivo never wrote his admission essay or signed his application and that Singer, the Newport Beach college consultant, simply typed the student's name into the signature spot.

## Universities vow reforms

Some universities already have vowed to improve safeguards to prevent future fraud.

[USC said that](#) before an application is forwarded to the admissions staff, each prospective athletic recruit for a particular team would be scrutinized by the head coach, the senior sports administrator overseeing the team and the school's Office of Athletics Compliance.

Officials also have promised an audit of athletic rosters at the beginning and end of every academic year and to cross-check rosters with lists of admitted students.

CALIFORNIA

---

NEWSLETTERS

**Get our Essential California newsletter**

Please enter your email address

Subscribe

  Richard Winton



🐦 Twitter     📷 Instagram     Email     f Facebook

Richard Winton is a crime writer for the Los Angeles Times and part of the team that won the Pulitzer Prize for Public Service in 2011. Known as @lacrimes on Twitter, during 20 years at The

Times he also has been part of the breaking news staff that won Pulitzers in 1998 and 2004. He won the ASNE Deadline News award in 2006. A native of England, after getting degrees from University of Kent at Canterbury and University of Wisconsin-Madison, he began covering politics but chose a life of crime because it was less dirty.

---

MORE FROM THE LOS ANGELES TIMES

BUSINESS

**Seniors facing eviction fear homelessness and isolation as California's housing crisis rolls on**

2 hours ago

---

LIFESTYLE

**'Burning Man in the South Bay': A crazy beach party aglow with bonfires and tradition**

2 hours ago

---

CALIFORNIA

**Require ethnic studies for California students. But first, rewrite the curriculum**

Aug. 29, 2019

---

CLIMATE & ENVIRONMENT

**Illegal cannabis farms still scarring public lands, two years after Prop. 64**

Aug. 29, 2019


[Georgetown University](#)



# Update on the U.S. Department of Justice Investigation

March 12, 2019

Dear Members of the Georgetown University Community:

Earlier today, we were deeply troubled to learn that former Tennis Coach, Gordon Ernst, is alleged to have committed criminal acts against the University that constitute an unprecedented breach of trust. Mr. Ernst was charged alongside more than 40 other individuals, including coaches from Stanford, UCLA, the University of San Diego, USC, University of Texas, Wake Forest and Yale. The indictments allege a nationwide conspiracy whereby a for-profit college preparation company, The Key Worldwide, helped facilitate cheating on college entrance exams and bribed coaches to propose students as athletic recruits. The United States Attorney's Office for the District of Massachusetts has identified Georgetown as a victim in the criminal case. You can read more about the case [here (https://www.justice.gov/usao-ma/pr/arrests-made-nationwide-college-admissions-scam-alleged-exam-cheating-athletic)](#).

Mr. Ernst has not coached our tennis team since December 2017, when he was placed on leave after the Office of Undergraduate Admissions identified irregularities in his recruitment practices and the University initiated an internal investigation. The investigation found that Mr. Ernst had violated University rules concerning admissions, and he separated from the University in 2018. The University was not aware of any alleged criminal activity or acceptance of bribes by Mr. Ernst until it was later contacted by the U.S. Attorney's Office, with whom we fully cooperated in its investigation. Mr. Ernst's alleged actions are shocking, highly antithetical to our values, and violate numerous University policies and ethical standards.

Now that the government's investigation has detailed the extent of the alleged fraud, we are reviewing the details of the indictment and will be taking appropriate action. We have no indication that any other Georgetown employees were involved. While Georgetown has always maintained a policy to ensure that recruited athletes have the academic credentials to be successful at the University, we established a new [policy (http://georgetown.app.box.com/s/6zoffweibzxdurvcak63q9lo6g1vpmfy)](#) in 2018 to strengthen the

recruitment and admissions process for potential student athletes. In addition, our Department of Athletics and Office of Undergraduate Admissions now perform audits to determine whether any recruited student-athletes are not on the roster of the sport for which they were recruited.

All employees of Georgetown University are responsible for maintaining the highest ethical standards and for complying with relevant laws, regulations and policies at all times. We encourage all members of our community to report any suspicious activity to our Office of Compliance and Ethics through our Compliance Helpline (https://secure.ethicspoint.com/domain/media/en/gui/17731/index.html).

Sincerely,

Lisa Brown
Vice President and General Counsel

Erik Smulson
Vice President and Senior Advisor to the President

---

Georgetown University
37th and O Streets, N.W., Washington D.C. 20057
Phone: (202) 687-0100



*Los Angeles Times*

Log In

ADVERTISEMENT

CALIFORNIA

# How many students cheated to get into USC? A look inside the admissions investigation



More than any other school, USC has been affected by the college admissions scandal. As parents of students and former coaches face criminal charges, the university is investigating dozens of students. (Reed Saxon / Associated Press)

By JOEL RUBIN, MATTHEW ORMSETH

JULY 16, 2019
5 AM



Shortly after federal authorities took down a [national college admissions scam](#) in March, officials at USC launched their own investigation with emails to dozens of students.

9/4/2019    How many students cheated their way into USC? Inside a probe of UC's biggest cheating scandal - Los Angeles Times

Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 31 of 253

They did not mince words: The school wanted to know whether the 33 students had lied on their applications to USC. Some of the students understood what was happening because their parents had been charged in the federal case. Others were in the dark.

The reason for the emails would soon become clear to them all. They had been linked to William "Rick" Singer, the confessed leader of the admissions con, and they now faced expulsion, depending on what university investigators discovered.

USC officials told students that decisions would come within weeks, according to lawyers representing several of the students. But the probe has turned into a protracted, fraught push by USC to clear its ranks of any students who were complicit in the trickery Singer carried out to sneak them into the highly selective school. So far USC has ruled on only a few students — clearing each of them of wrongdoing — while the rest wait in limbo to learn whether they will be kicked out.

"For an academic institution to discover you've effectively got academic fraud is sort of a stab in the heart," Wanda Austin, who served the past year as USC's interim president, said in a recent interview. . The investigations into the students, Austin said, are following "a very slow process, but it is a fair process ... it's diligent and it gives a student every opportunity to bring forth information to defend themselves."

The student inquiry is at the center of a broader effort by USC to come to grips with the ways Singer infiltrated the campus. The school also screened tens of thousands of applicants vying for spots in next fall's class for ties to Singer and scrutinized coaches and administrators in the athletic department for indications they participated in the bribery and cheating scheme.

In addition, USC has hired two outside firms to pick apart its admissions policies in order to learn, in Austin's words, "how in the world did this happen?"

In the email notifications, the 33 students were given five days to contact USC's Office of Professionalism and Ethics. When they did, they were told they had to come to the office for an interview within a week, according to several criminal defense attorneys hired by students to represent them in the quasi-judicial proceedings. Until students agreed to cooperate in the investigation, the university froze their enrollment at the school, preventing them from enrolling in new classes.

Requests to postpone interviews until after the year's final exams and to review in advance evidence the school had collected were denied, said Josh Ritter, Vicki Podberesky and other attorneys who spoke on the condition their names not be used because they were not authorized to discuss their clients' cases.

The interviews were tense and often emotional. One investigator would quietly take notes while another asked the questions. One by one, documents were pulled out of a binder or from a stack and placed in front of the student, the defense attorneys all said. The records included the student's application to USC, high school transcripts and emails, often written by Singer or an alleged accomplice at USC, in which efforts to get the student admitted as a recruited athlete were discussed, the lawyers said.

Students were pressed on athletic achievements or extracurricular activities that investigators had not been able to independently verify, lawyers said. And students were grilled on what they knew of Singer and of the arrangements he allegedly had struck with their parents to present the students as accomplished athletes in exchange for large payments, according to the lawyers.

Slated for about an hour, the interviews often ran long. One stretched more than three hours, an attorney recounted. Afterward, students were allowed to submit a written defense, provide evidence in support of their case and request that certain people be interviewed.

The interviews were completed several weeks ago. Since then, the lawyers who spoke to The Times said they have heard little, if anything, from the university. While students wait, USC is not

allowing them to withdraw so the school can note on their official transcripts if they are expelled or suspended.

Singer, a college admissions consultant who catered to wealthy families in Los Angeles, Silicon Valley and elsewhere, has pleaded guilty to several felonies stemming from the ploy he and several accomplices pulled off for years. Parents willing to pay six-figure fees could access the "side door" that Singer built into several colleges, where he bribed coaches to give up admission spots reserved for athletic recruits, Singer said in his plea hearing. He also acknowledged charging parents between $15,000 and $75,000 to have an expert take a student's college entrance exams.

USC officials said they found evidence of both types of cheating among the students being investigated.

Much of USC's focus has been on Donna Heinel, a top administrator in the athletic department who prosecutors allege was Singer's main accomplice at the university. Heinel, who was fired the day she was arrested, has pleaded not guilty to allegations she knowingly helped usher in many of the students who were falsely portrayed as athletic recruits.

Austin said a picture has emerged of how Heinel allegedly managed to operate her part of the scam without detection. The coaches of each sport's teams were allotted a certain number of admission slots for recruits each year and would give Heinel the names of applicants they wanted admitted, Austin explained. Before presenting the coaches' choices to a committee of admissions officers for approval, Heinel allegedly would add the names and fabricated athletic resumes of Singer's fake recruits, Austin said. Once the committee had signed off on the students, , Heinel is believed to have kept coaches in the dark by scrubbing the bogus athletes from any paperwork, Austin added.

Going forward, coaches will need to certify directly with admissions officers the names of recruits they want admitted, Austin said.

Nina Marino, an attorney for Heinel, said her client "vehemently denies any wrongdoing."

By far, USC has been affected by the admissions scandal more than any of the other universities where Singer is known to have peddled his scam. The number of students flagged for connections to Singer dwarfs those at others schools. And, in addition to Heinel, 19 parents of current or former

USC students and three coaches have been charged by federal prosecutors for allegedly conspiring with Singer.

After recent revelations that USC failed to confront other major crises, including a gynecologist who is accused of serially abusing students and a drug-addicted medical school dean, the admissions debacle is a chance for it to prove it is capable of holding its people accountable, said Rick Caruso, chair of the university's Board of Trustees.

The quick firings of Heinel and coaches charged in the criminal case, along with the inquiry into the students, "send a strong message … there's a new way of doing business and, folks, everyone is accountable for your actions. That's the only way you can operate a place," Caruso said in an interview with The Times.

A USC spokeswoman said reaching decisions has taken time, in part, because of the "thorough nature of the investigations and the many opportunities the students are given to view and respond to any new evidence as it comes in." But in her comments to The Times, Austin placed some of the blame on defense attorneys, who she said were slowing the process because "what they don't want to do is to get to the end of the process where there is a sanction."

The claim was roundly rebuffed by the lawyers who spoke to The Times. They all fired back with a criticism of their own, saying that throughout the investigation school officials have not been clear about how the students will be judged.

"We were never told what they were looking for as far as what conduct crosses the line and what doesn't," Ritter said. "I wish they would have just spelled it out at the start. Is it enough simply for a student to have worked with Singer on his or her application, even if they didn't know about other things Singer and their parents might have been doing? Are they drawing a hard line that any falsehood on an application will get a kid expelled, even if they didn't know about it? We haven't been told."

Austin attempted to clarify the school's stance to The Times. "We're not judging them on what their parents did," she said. If investigators find fraud occurred, the students will be judged on "whether they knew and actively participated."

Austin added that even in cases in which students were unaware of the scheming Singer carried out on their behalf, USC could still impose discipline if officials conclude the cheating was so blatant that a "student should have known."

Under these standards, the university so far has cleared "a handful" of the 33 students of misconduct, said Brenda Maceo, a USC spokeswoman. Citing students' privacy rights, Maceo declined to give the actual number and said the university would not make public any of the upcoming decisions on the remaining students.

USC is well within its rights to investigate the students as it wishes, said Djuna Perkins, whose Massachusetts firm specializes in investigations conducted by universities and schools.

"Private schools are like a private club — and a private club can make up whatever rules it wants, as long as those rules don't discriminate against a protected group," she said.

Students, however, can fight a school's decision.

Adam Semprevivo, one of the two students Georgetown University has moved to expel for links to Singer, has sued the school, alleging he was denied rights enshrined in a student handbook, which he contends carry the weight of a binding contract between the university and its students.

Semprevivo's father has pleaded guilty to fraud conspiracy charges and admitted to paying $400,000 to secure his son's spot at Georgetown by misrepresenting him as a top tennis recruit. The younger Semprevivo claims in his lawsuit that he had no knowledge of his father's scheme and has asked the school to allow him to withdraw from the school with his credits intact.

At USC, students can appeal discipline decisions and then can file a lawsuit in Superior Court if they believe, like Semprevivo, that the school did not adhere to its own policies for investigating and disciplining students.

More than a dozen other universities launched reviews after Singer's scam was exposed in March. Nearly all of them have turned up just one or two students with links to Singer.

A spokesman for UCLA, for example, said the school so far has flagged two students and one applicant who was admitted but did not enroll.

Chapman University would say only that federal prosecutors subpoenaed records for nine students in November, and that the school is "still evaluating if any action is needed."

CALIFORNIA    EDUCATION

---

NEWSLETTERS

**Get our Essential California newsletter**

Please enter your email address

Subscribe



## Joel Rubin

 Twitter    Instagram    Email    Facebook

Joel Rubin covers federal courts and agencies for the Los Angeles Times.

---



## Matthew Ormseth

 Twitter    Instagram    Email    Facebook

Matthew Ormseth is a reporter for the Los Angeles Times. Before joining The Times in 2018, he covered city news and state politics at the Hartford Courant. He grew up in Arcadia and graduated from Cornell University.

---

MORE FROM THE LOS ANGELES TIMES

CALIFORNIA



# Updates regarding college admissions investigation

AUGUST 12, 2019

## Updated: "USC information on college admissions issue"

Posted Tuesday, August 12, 2019, at 12 p.m.

---

## Updated: "USC information on college admissions issue"

Posted Tuesday, July 16, 2019, at 12 p.m.

---

## Updated: "USC information on college admissions issue"

Posted Wednesday, June 19, 2019, at 12 p.m.

---

## Update from USC interim President Wanda M. Austin regarding college admissions investigation

Released Monday, June 17, 2019, at 4 p.m.

Dear USC community,

I write to provide an update on the university's review of students connected to the potential submission of false information in their applications to USC.

We are continuing to work through a very thorough, deliberative process for each student case under review. Each of the students is entitled to a fair and impartial process as detailed in our

policies, and we are taking the time needed to make sure that those processes are followed carefully.

We recently completed the investigative process for a group of students under review and this week notified those students of the determination on their case. These follow earlier determinations involving applicants in the most recent admissions cycle, when applicants were denied admission as facts and evidence warranted.

All students are protected by federal privacy laws, so the university is unable to share information on the individual case outcomes. What we can say is that the university remains committed to making the appropriate decisions based on the facts of each case. As we stated previously, those outcomes range from no finding of violation to revocation of admission or expulsion.

Investigations are ongoing for other students related to possible admissions violations. We will provide similar general updates after the investigative process is concluded for those students still under review.

We understand and share our community's desire to have updates in a timely manner. Our priority has been, and will continue to be, doing the investigations the right way. Details about our review process, as well as our enhanced processes for reviewing student-athlete applications, are posted on the USC News website.

Meanwhile, we are taking the necessary steps to safeguard the integrity of our admissions process and to ensure we conduct ourselves in a manner that is consistent with our values.

Through it all, I continue to be impressed with the engagement and commitment of our USC community to improve our culture and make our university even stronger.

Sincerely,

Wanda M. Austin
Interim President

---

# Updated: "USC information on college admissions issue"

Posted Monday, June 17, 2019, at 12 p.m.

---

# Letter from USC interim President Wanda M. Austin regarding college admissions investigation

Released Wednesday, April 24, 2019, at 4:57 p.m.

Dear USC community,

I want to update you on the significant steps we have taken to review and strengthen our admissions process for prospective student-athletes since the U.S. Justice Department investigation was announced last month. We are determined to take all necessary steps to safeguard the integrity of our admissions process and to ensure we conduct ourselves in a manner that is consistent with our values.

While we continue to cooperate with the government's investigation, and while our own investigation led by the Office of Professionalism and Ethics remains ongoing, USC has greatly strengthened its process for reviewing applications of prospective student-athletes, effective this month. The improved procedures provide multiple levels of oversight and ensure that our admissions staff receive accurate information about these prospective students.

- Every student-athlete candidate's file will be reviewed on three levels – by the head coach, the senior sports administrator overseeing the team, and the USC Office of Athletics Compliance – before being sent to the admissions staff.
- The head coach will certify in writing that the student is being recruited for athletic abilities.
- Athletic rosters will be audited at the beginning and end of every academic year and cross-checked with admissions lists.

This enhanced policy is currently in force for any student-athlete considered for admission during the 2019-20 academic year.

Meanwhile, the university is presently reviewing the status of certain currently enrolled students. Their cases are proceeding through the USC Student Judicial Affairs and Community Standards (SJACS) process. Each of those students has been notified of the review and given a deadline for response. Most have completed initial interviews. The possible outcomes range from no finding of violation to revocation of admission, and will depend on the facts of each case.

While student-athlete admissions is at the center of the Justice Department's allegations, USC will also examine the wider scope of how students gain admittance to our university.

Apart from the previous employee terminations, if the ongoing investigations reveal additional misconduct, appropriate employment actions will be taken.

Ensuring the integrity of our admissions process remains a top priority of university leadership. I appreciate the patience of our community as we continue to work toward making our university stronger.

Sincerely,

Wanda M. Austin
Interim President

---

# Updated: "USC information on college admissions issue"

Posted Wednesday, April 24, 2019, at 12 p.m.

---

# Updated: "USC information on college admissions issue"

Posted Monday, April 8, 2019, at 12 p.m.

---

# Updated: "USC information on college admissions issue"

Posted Wednesday, April 3, 2019, at 12 p.m.

---

# Updated: "USC information on college admissions issue"

Posted Wednesday, March 27, 2019, at 12 p.m.

---

# Updated: "USC information on college admissions issue"

Posted Monday, March 18, 2019, at 12 p.m.

# Update from USC interim President Wanda M. Austin regarding college admissions investigation

Released Thursday, March 14, 2019, at 7:22 p.m.

Dear USC community,

I write to update you on actions we have taken in response to the U.S. Justice Department's ongoing investigation of the college admissions scheme that targeted several universities across the country, including USC. I want to assure you that I share your disappointment and concern about this matter.

These recent revelations run counter to our values, which prioritize admissions based on merit and opportunity for all qualified candidates. Our record of diversity among students selected for admission is a particular point of pride for me.

We will do all that is necessary to continue to strengthen our culture and to restore trust within our community. This morning, I briefed members of the USC Board of Trustees on the steps we are taking, and they voiced their full support for any and all appropriate actions.

On Tuesday, we announced that we terminated two employees associated with the allegations. We also placed on leave a faculty member, who was named in the federal indictment as a parent. This leave is a required procedural step in the process for terminating tenured faculty. More employment actions may be possible as new facts come to light.

Since that time, we have also:

- Opened our own investigation into the matter while remaining in full cooperation with the U.S. Justice Department.
- Began the process of identifying donations that may have been received in connection with the alleged scheme. We will determine how best to redirect those funds for scholarships benefiting underserved student applicants.
- Announced our decision to deny admission to applicants in the current admissions cycle who are connected to the alleged scheme.
- Initiated a case-by-case review of current students and graduates who may be connected to the alleged scheme. We will make informed decisions about those cases as the reviews are completed. USC's Office of Professionalism and Ethics, Student Affairs, and Admissions and

Enrollment are conferring on this process to ensure the university follows the appropriate course.

Moving forward, we will take all necessary steps to safeguard the integrity of our admissions process and to ensure we conduct ourselves with integrity and ethics consistent with our values.

Sincerely,

Wanda M. Austin
Interim President

---

# Letter from USC interim President Wanda M. Austin regarding college admissions investigation

Released Tuesday, March 12, 2019, at 8:47 a.m.

Dear USC Community,

I want to inform you of an ongoing wide-ranging criminal investigation involving universities nationwide, including USC. The government has made a public announcement and disseminated the charging documents. The federal government has alleged that USC is a victim in a scheme perpetrated against the university by a long-time Athletics Department employee, one current coach and three former coaching staff, who were allegedly involved in a college admissions scheme and have been charged by the government on multiple charges.

At this time, we have no reason to believe that Admissions employees or senior administrators were aware of the scheme or took part in any wrongdoing—and we believe the government concurs in that assessment. The government has repeatedly informed us that it views USC as a victim and that these employees purposefully deceived USC.

We have planned significant remedial efforts. We will take all appropriate employment actions. We will review admissions decisions. We are identifying all funds received that may be connected to the government's allegations. And we will be implementing significant process and training enhancements to prevent anything like this from ever happening again.

It is immensely disappointing that individuals would abuse their position at the university in this way.

As our work on culture and values continues, we must take the appropriate action when we become aware of behavior that is contrary to our values. I appreciate the efforts of the staff who diligently responded to the government's investigation, and for the broad commitment of our community to address problems as we learn of them.

We will continue to cooperate fully with all law enforcement and regulatory investigations.

Wanda M. Austin
Interim President

---

**Top stories on USC News**

Social Impact

# A community's support helps USC student and single mom earn her doctorate

Dezetta Burnett's hometown of South L.A. has rallied around her as she pursues an advanced degree at USC. She plans to return the favor by advocating for her community.

University

# USC ranks No. 18 nationally in Wall Street Journal/Times Higher Education survey

The university posted especially strong scores for engagement, a measure of student interaction with faculty and of the range of courses offered.

Health

# Efforts to minimize opioid use after surgery appear to be working

A major step in reducing reliance on opioids is empowering surgical patients to make informed, educated decisions about their health, a USC expert notes.



## Subscribe
*to receive USC News via email*

your email address

About This Site    Contact Us

9/5/2019
USC information on college admissions issue | USC News
Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 45 of 253

# USC information on college admissions issue

AUGUST 11, 2019

O n Tuesday, March 12, 2019, the U.S. Justice Department announced an ongoing investigation of a college admissions scheme that targeted several universities across the country, including USC. This page provides information from USC about these issues and will be updated as new information becomes available.

What is USC doing in response to the alleged admissions scheme?
We immediately terminated two employees associated with the allegations. We also placed on leave a faculty member who was named in the federal indictment as a parent. This leave is a required procedural step in the process for evaluating the termination of tenured faculty. More employment actions may be possible as new facts come to light.

The university is conducting a full review of the matter and continues to cooperate with the U.S. Justice Department's investigation. We are in the process of identifying donations that may have been received in connection with the alleged scheme and determining how to redirect those funds.

USC determined which applicants in the current admissions cycle are connected to the alleged scheme and they will be denied admission. A case-by-case review of current students who may be connected to the alleged scheme is also underway. We will make informed decisions about those cases as the reviews are completed. USC has not yet made decisions regarding former students who may have been involved in the alleged admissions scheme; our current focus is on students who were enrolled in spring 2019.

We will take all necessary steps to safeguard the integrity of our admissions process and to ensure we conduct ourselves in a manner consistent with our values.

What is USC doing regarding students applying for fall 2019, those already enrolled and those who have graduated?
USC determined which applicants in the current admissions cycle are connected to the alleged scheme and they will be denied admission. A case-by-case review of current students who may be connected to the alleged scheme is also underway. We will make informed decisions about those cases as the reviews are completed.

How many current students are having their admissions reviewed?

The university is conducting (or has finished conducting) reviews of the admissions application of 33 currently enrolled students.

Update:

- An internal investigation is continuing, including a thorough review of the student-athlete admissions process; we are continuing to update our procedures related to admissions review of student-athletes.
- We completed the investigative process in mid-June for a group of students under review and notified those students of the determination on their case. These follow earlier determinations involving applicants in the most recent admissions cycle, when applicants were denied admission as facts and evidence warranted. Investigations are ongoing for other students related to possible admissions violations.
- In March, we placed holds on the accounts of students who may be associated with the admissions issue. Students who agreed to participate in the review of their case have been allowed to enroll in classes for the fall semester. But holds remain preventing them from obtaining a degree or acquiring transcripts while their cases are under review.
- We are unable to provide information about individual students because of student privacy laws.
- We are continuing to work through a very thorough, deliberative process for each student case under review. Each of the students is entitled to a fair and impartial process as detailed in our policies, and we are taking the time needed to make sure that those processes are followed carefully.
- The university remains committed to making the appropriate decisions based on the facts of each case. Those may outcomes range from no finding of violation to revoking admission or expulsion.

What is the investigative process for each of the students whose status is being reviewed?

Students received written notification from the Office of Student Judicial Affairs and Community Standards (SJACS) of the complaint that their admissions status was under review and were given five business days to respond to schedule an interview with an SJACS review officer.

Students who schedule interviews are allowed to have an advisor present with them during their interview. At the interview, the students can provide information or evidence that they wish to have considered as part of the review.

Students who choose not to be interviewed will have their matters proceed to the next SJACS' step, in which investigators complete their review based on the available evidence.

When an investigation is completed, a finding is made about what occurred regarding that student's admission.

The finding is provided to the Division of Student Affairs, which determines what sanction, if any, is appropriate. Actions include no status change, allowing a student to voluntarily withdraw, expulsion, or revocation.

By USC policy, students may appeal a decision resulting from the review within 10 business days of receipt of the decision.

Why isn't USC identifying potential students, current students and graduates involved in the alleged scheme?
USC, like other universities around the country, follows a federal law regarding the privacy of student records called the Family Educational Rights and Privacy Act of 1974, often referred to as FERPA. According to FERPA, personally identifiable information in an education record may not be released without prior written consent from the student.

Do applicants need to sign some sort of attestation when they apply saying what is in their application is true?
We use the Common Application's attestation for all applicants. The common application includes an affirmation statement that all information is factually true and honestly presented.

The alleged admissions scheme involved fraudulent applications in which students' academic and athletic ability were intentionally misrepresented to the university for the sole purpose of bypassing USC's rigorous admissions process.

How much money was involved and what is USC going to do with it?
We are in the process of identifying donations that may have been received in connection with the alleged scheme and determining how to redirect those funds.

---

Published: August 13, 2019
Updated: March 18, 2019 — Added details about holds placed on student accounts
Updated: March 27, 2019 — Clarified that account holds prevent students from withdrawing
Updated: April 3, 2019 — Added details about the review of student-athlete admissions process and procedures
Updated: April 8, 2019 — Added factors for consideration in reviewing student status
Updated: April 24, 2019 — Added description of the investigative process

Updated: June 17, 2019 — Updated current state of investigative process involving student reviews

Updated: June 19, 2019 — Updated current state of investigative process involving former students

Updated: July 16, 2019 — Added details about student reviews

Updated: August 12, 2019 — Updated on status of student reviews

---

**Top stories on USC News**

Social Impact

# A community's support helps USC student and single mom earn her doctorate

Dezetta Burnett's hometown of South L.A. has rallied around her as she pursues an advanced degree at USC. She plans to return the favor by advocating for her community.

University

# USC ranks No. 18 nationally in Wall Street Journal/Times Higher Education survey

The university posted especially strong scores for engagement, a measure of student interaction with faculty and of the range of courses offered.

Health

# Efforts to minimize opioid use after surgery appear to be working

A major step in reducing reliance on opioids is empowering surgical patients to make informed, educated decisions about their health, a USC expert notes.

## Subscribe
*to receive USC News via email*

> your email address





## Menu

MAY 13, 2019

# How Do Brands Survive a Crisis?



How does a brand bounce back from a crisis? As part of [our ongoing series](#), we used **E-Score Brand** to evaluate the effects on brands that have recently been in the news.

## Gucci Weathers a Storm

Gucci's recent sweater design mishap may have raised a few eyebrows, but the luxury fashion giant has seen little pushback since. The fashion industry is known for taking risks which may account for the softer landing after the faux pas.

# GUCCI / H&M
## PRE AND POST CRISIS



E-Score Brand among ages 13+





Share

- In Gucci's case, there were little to no significant changes post-crisis in key measures like **Appeal**, **Awareness**, and **Brand Consideration**.

- H&M, which recently experienced [a similar crisis](#), is an example that Gucci can look to. Since the 2018 incident, H&M has seen a slight increase in **Awareness** with only small dips in **Appeal**, **Trustworthy**, and **A Leader**.

- **Consumer Comments** reveal the nuances of how a crisis impacts public perception. In Gucci's case, there is very little mention of their incident – another example of how **E-Score Brand** can assess public perception to determine the true scope of a crisis.

## Admissions Scandal Hits University Reputations

On the other hand, universities, which must rely on stellar reputations to attract the best and brightest, can be far more susceptible to negative press.  We took a closer look at some of the institutions involved to see how public perception has impacted them since the scandal.

# UNIVERSITIES
## AFTER ADMISSIONS SCANDAL



E-Score Brand among ages 13+

• There has been a significant negative impact to the USC brand, as their **Dislike** score has risen from 26 to 40 and **Appeal** has dropped from 24 to 16. See table below for more of USC's before and after scandal scores.

• Of the schools measured, USC has the highest number of top-of-mind mentions for "Scandal, Cheating, Etc." (18.9% of consumers) in **Consumer Comments** for the question:

"What is the first thought that comes to mind when you see the name of this brand?" Harvard has the lowest at 1.3% followed by Yale (1.5%) then Stanford (2.5%).

- Among the listed universities, the schools with the bigger **High-Quality** scores appear to have been impacted less. We will continue to monitor these schools to see if public perceptions regarding the scandal change over time.

- **E-Score Celebrity** subscribers also have access to **E-Score** ratings of celebrities impacted by the scandal such as Felicity Huffman and Lori Loughlin.



## Boeing: Flying Into Headwinds

In the aviation industry, commercial airlines are typically the brands that take a hit in a crisis, but aircraft manufacturer Boeing has been making headlines with their handling of recent plane crashes. Our data shows Boeing has experienced some negative effects since news of the crisis broke, and public perception of the brand has been declining.

# BOEING
## CRISIS DAMAGES REPUTATION

|  | Pre-Crisis | 12/18 | 4/19 |
|---|---|---|---|
| APPEAL | 36 | 41 | 30 |
| DISLIKE | 3 | 12 | 25 |
| HIGH-QUALITY | 32 | 34 | 29 |
| A LEADER | 56 | 54 | 50 |
| TRUSTWORTHY | 15 | 14 | 11 |
| BRAND CONSIDERATION | 5 | 7 | 6 |

(incidents: 10/18, 3/19)



**E-SCORE BRAND**   E-Score Brand among ages 13 +

- We measured Boeing's public perception following the two most recent incidents in 2018 and again in 2019. While there was a negative impact after the first incident, the second accident and Boeing's questionable handling of the PR has led to a sizable drop in **Appeal** and a spike in **Dislike**.

- Another brand in the aviation industry that has experience with bad PR is United Airlines, which we covered following their 2017 crisis. Two years after the incident, United's **Appeal** and **Dislike** scores are still worse than their pre-crisis numbers. Boeing will have to be careful to avoid a similar trajectory.

- Despite the negative press, Boeing's **Brand Consideration** has seen very little change. It is important to note that consumers generally don't have a say on what plane they board but if public perception starts affecting which aircrafts airlines choose, it could give Boeing cause for concern.

# Resources

Feel free to utilize these infographics in your social shares or other uses. To download, simply click the images and right-click, or pull the full sized images.







Share this:



Twitter  Facebook  LinkedIn  Email

Like this:

Like

Be the first to like this.

E-SCORE BRAND

AIRLINES  AVIATION  BOEING  BOEING PLANE CRASH  BRAND  BRAND MANAGEMENT

BRAND MARKETING  COLLEGE ADMISSION SCANDAL  COLLEGE ADMISSIONS  CRISIS

CRISIS MANAGEMENT  E-SCORE BRAND  FASHION  GUCCI  HARVARD

MARKET RESEARCH  MARKETING  STANFORD  STANFORD UNIVERSITY  UNITED AIRLINES

UNIVERSITY  UNIVERSITY OF SOUTHERN CALIFORNIA  UNIVERSITY SCANDAL  USC  YALE

‹ Previous

Next ›


# THE IMPACT OF HIGHLY PUBLICIZED CAMPUS SCANDALS ON COLLEGE OUTCOMES

PATRICK ROONEY and JONATHAN SMITH*

*Recently, many high-profile scandals have occurred on college campuses. How might scandals affect colleges' outcomes? To investigate, we construct a dataset of scandals at the top 100 U.S. universities from 2001 to 2013. We find that scandals with significant media coverage substantially reduce applications. For example, a scandal covered in a long-form news article leads to a 10% drop in applications the following year-roughly the same impact of dropping ten spots in prominent college rankings. This impact persists for 2 years. We find no impact on incoming student body competitiveness, yield, or alumni donations, and little effect on deterring future scandals. (JEL L82, I23, D83)*

## I. INTRODUCTION

In 2012, *Rolling Stone* published an article titled "Confessions of an Ivy League Frat Boy: Inside Dartmouth's Hazing Abuses" (Reitman 2012), an 8,000 word article documenting the story of a student who had been hazed and abused during the process of pledging a fraternity at Dartmouth College. The article was extremely graphic, including 20 uses of the word "vomit" and its derivatives, and the article expanded to include other stories of—and follow-up articles about—the hazing culture at Dartmouth.

Should we expect this article to affect perceptions of Dartmouth College? Although the article chronicled Dartmouth's culture, many colleges likely have strong hazing cultures. Drinking and abuse are problems that all colleges think about, and it is not clear that Dartmouth's case is any better or worse—it is simply the one that became most public. Moreover, if Dartmouth responds to this coverage by cracking down on campus, Dartmouth may actually be *less* likely than other colleges to have hazing incidents in the years

after this article. Last, while this story is very concerning, it represents one data point out of a wide swath of information that students have access to when choosing a college. Given all of this, the responses we should expect are a priori unclear.

To explore this empirical question, we construct a novel dataset of college-related scandals that garnered substantial negative media attention. We find that the Dartmouth story is in no way unique. Between 2001 and 2013, our search identified 118 different public scandals at the top 100 national universities in the United States as ranked by *U.S. News and World Report (USNWR)* in 2015. Scandals covered by the media affected over 75% of the colleges in our study.

Using these data, we implement a difference-in-differences approach to estimate the impact of scandals on four important college outcomes: applications, incoming student body SAT scores, yield, and donation rates. While the overall impact of scandals seems to be small across most of these outcomes, we find that application volume is depressed by scandals with extensive media coverage. Scandals with more than five mentions in the *New York Times* lead to an 8% drop in applications at the college the following year. Colleges with scandals covered by long-form magazine articles receive 10%

*Special thanks to Michael Luca for his valuable input and comments. Michael Bloem provided excellent research assistance. The findings of this study are our own and do not reflect the views of our respective organizations. All remaining errors are our own.

*Rooney:* PhD Candidate, Rotman School of Management, University of Toronto, Toronto, ON M5S 3E6, Canada. Phone 205-937-7779, Fax 416-978-5433, E-mail patrick.rooney16@rotman.utoronto.ca

*Smith:* Assistant Professor of Economics, Andrew Young School of Policy Studies, Georgia State University, Atlanta, GA 30302-3992. Phone 404-413-0174, Fax 404-413-0145, E-mail jsmith500@gsu.edu

| ABBREVIATIONS |
| --- |
| CAE: Council for Aid to Education |
| IPEDS: Integrated Postsecondary Education Data System |
| NYT: New York Times |
| USNWR: U.S. News and World Report |

492

Contemporary Economic Policy (ISSN 1465-7287)
Vol. 37, No. 3, July 2019, 492–508
Online Early publication March 18, 2019

doi:10.1111/coep.12427
© 2019 Western Economic Association International

fewer applications the following year. To put this into context, a long-form article decreases a college's number of applications roughly as much as falling ten places in the *U.S. News and World Report* college rankings (Luca and Smith 2013).

Our results add to the literature on the role of information in the transition from high school to college. Generally speaking, students do not have full information on colleges, and recent research suggests that their application strategies are suboptimal, in part because they rely on rules of thumb and simplifying heuristics.[1] However, when information comes to them, students are often responsive, be it rankings (Alter and Reback 2014; Luca and Smith 2013; Monks and Ehrenberg 1999), online informational systems (Hurwitz and Smith 2018), or direct outreach through mailings (e.g., Hoxby and Turner 2013). While rankings and outreach are directly aimed at influencing applicant behavior, coverage of scandals provides information that is not directly designed to aid in the decision process.

Our paper also adds to the emerging literature on scandals and media economics. Knittel and Stango (2013) show that the Tiger Woods sex scandal led to a drop in the stock price of his corporate sponsors. Chung, Derdenger, and Srinivasan (2013) show that the same scandal resulted in decreased sales of golf balls from Nike, one of Woods's main sponsors. Azoulay, Bonatti, and Krieger (2017) show that disclosures of scientific retractions impact the career outcomes of scientists, especially those who are highly esteemed in the field. In the paper perhaps most similar to ours, Lindo et al. (2018) find that, contrary to our findings, colleges with Title IX investigations witness *more* applications. The authors attribute their findings to the old adage "any press is good press." Outside of education, Berger, Sorenson, and Rasmussen (2010) show that unfavorable reviews of lesser-known books lead to higher sales—presumably by increasing the attention paid by customers. In contrast to these results, our findings suggest that not all press is good for all colleges. Rather, the media is providing information to consumers, which is consistent with the role of media outlets as accountability systems (Brown and Deegan 1998; Islam and Deegan 2010; Zyglidopolous et al. 2012). In that vein, we find mixed evidence that the supply side

(i.e., colleges) respond to scandals, but that the response, if any, is short-lived.

Our paper also is related to the product-harm and service-harm literature. Negative product and service shocks have important effects on businesses, ranging from loss of baseline sales to reduced impact of marketing tools (Van Heerde, Helsen, and Dekimpe 2007). There is evidence that customers treat positive and negative shocks in perceived quality differently, with negative events being stronger and lasting longer than positive events. Empirically, Gijsenberg, Van Heerde, and Verhoef (2015) analyze service crises of a European railway and note that negative service shocks lead to persistently lower consumer satisfaction. Our findings contribute to this literature by showing that high-profile scandals on college campuses are associated with persistent lower application volume in the 2 years following the scandal.

## II.   BACKGROUND AND EMPIRICAL CONTEXT

Our general framework for understanding outside stakeholder behavior in this setting is similar to that of Zhao, Zhao, and Helsen (2011), who model consumer choice behavior during a product-harm event. In their model, consumers are uncertain about the mean level of product quality and update their beliefs based on diffuse signals from product use and the product-harm crisis. In our case, outside stakeholders (i.e., applicants and prospective donors) have diffuse priors about mean quality levels of the college at some point in time, and noisy signals about value arrive through interaction with the college (via rankings data, perusing the college's webpage, or on-campus visits, for example). Similarly, media coverage of on-campus scandals provides a noisy signal of college quality, and the intensity of media coverage serves as a primary driver of signal strength. Students and prospective donors evaluate quality by weighing these and other signals and updating prior beliefs before choosing to apply or donate to the college.

Our dataset consists of the top 100 national universities as measured by *U.S. News and World Report* for 2015.[2] We focus on this sample

---

1. See Page and Scott-Clayton (2016) for an overview of research on the college application and enrollment processes.

2. See Table A1 for a list of the sample schools in rank order. Due to multiple ranks at the #99 place, the sample contains 102 colleges. It is worth noting that 97 of 100 schools are ranked in the top 100 national universities rankings throughout the available time period in our sample. This stability in the ranked set of colleges helps to limit any potential endogeneity that may occur through scandalized schools dropping out of the top 100 schools in our dataset.

because these colleges tend to be more selective, drawing from a national pool of applicants who often consider college attributes beyond price and location. These schools also tend to receive a lot of student and media attention. For each of these colleges, we collect data on application behavior and scandals (defined below) that have been covered by the media.

## A. IPEDS, Common Application Data, and Donation Data

For a number of applications and other college-specific data, we used the U.S. Department of Education's Integrated Postsecondary Education Data System (IPEDS) database, which contains information for all U.S. higher education institutions participating in federal student aid programs. The database includes data on both institutional characteristics (such as tuition) and student characteristics (such as 25th and 75th percentiles of submitted SAT scores) for each year.

For each college-year observation, we use the college's total number of freshman applications from the year in which it made admissions decisions.[3] We also use IPEDS time-varying data for in-state and out-of-state tuition prices and institutional SAT percentile scores. For missing values in our sample, we called college admissions offices for official statistics, and if the data were still unavailable, we imputed values based on the previous and following years. If the imputed year fell at the end of our time period (admission years 2001 or 2013), we imputed values based on percent changes in values from the prior/subsequent 2 years.[4] We combine these data with an indicator for whether the college is a member of the Common Application and add college donation rates from the Council for Aid to Education's (CAE) Voluntary Support for Education survey from 2004 to 2013.[5]

Table 1 shows the summary statistics for these variables. On average, the 1,192 college-year observations in this sample receive almost 20 thousand applications, half of which come from females. The 25th and 75th percentile verbal SAT scores are slightly lower than those on the math SAT. Also, since many of the top institutions are private, the average in-state tuition is relatively high, at over $20,000, which is about $6,000 less than the average out-of-state tuition. About half of the colleges accept the Common Application during this period of great expansion for the organization.

## B. Scandals

We gathered our scandal data via Google searches of media content published online from 2001 to 2013.[6,7] Our search terms were "(full college name) (scandal type)." We divided the scandals into four categories: sexual assaults, murders, cheating scandals, and hazing scandals. An example search term would be "Harvard University sexual assault." Within the first ten pages of the search results, we identified unique scandals.[8] Scandals are only counted when they occurred on the college campus or in immediately adjacent student housing. Scandals occurring solely within universities' graduate programs (e.g., cheating at a law school) are not included, since our primary outcome variable is the number of applications to undergraduate programs. Hazing incidents accompanied by a Greek organization chapter closure were counted only if the offending incident was covered as a separate event from the closure announcement. For murders, we included professor deaths and student deaths in off-campus housing. We excluded suicides from the count of murders; if the suicide was linked to hazing or sexual assault, the event

---

3. Thus, the applications received during the fall of 2000 would be marked as admission year 2001. Most colleges mark their number of applications in IPEDS in this manner, and using admission year as the time reference has the added methodological benefit of matching the *U.S. News and World Report* timing conventions.

4. After obtaining a final count of official application numbers by year via conversations with admissions offices and cross-checking data from Alter and Reback (2014), IPEDS data for 34 of 1,327 year-school entries were imputed.

5. CAE data were publicly available starting in 2004 rather than 2001, so our sample and power fall accordingly when estimating models of the impact of scandals on donations.

6. Google's PageRank search algorithm ranks pages in search results via the amount and influence of webpages linked to the resultant page. The economics and management literature has previously used Google searches as a rich time series dataset to proxy for individual economic activity in various settings such as the housing market (Wu and Brynjolfsson 2015) and the labor market (Baker and Fradkin 2017).

7. It is worth noting that Google search coverage may be weaker in the early years of the sample. As a robustness check, we examine two colleges, one with no scandals (Caltech) and one with multiple scandals (Duke) in our original search methodology. We find similar results to our initial Google search, with no additional scandals appearing for either school in our search results.

8. In some instances, there were less than ten pages of search results, in which case we chose relevant links from the available number of results pages.

## TABLE 1
### Summary Statistics

| Variable | OBS | Mean | Std Dev | Min | Max | Med |
|----------|-----|------|---------|-----|-----|-----|
| Total applicants | 1,326 | 19,840.6 | 11,449.9 | 732 | 80,522 | 18,493 |
| Female applicants | 1,326 | 10,426.0 | 6,310.5 | 309 | 42,922 | 9,677 |
| Scandal | 1,326 | 0.086 | 0.28 | 0 | 1 | 0 |
| Sexual assault | 1,326 | 0.029 | 0.17 | 0 | 1 | 0 |
| Murder | 1,326 | 0.040 | 0.20 | 0 | 1 | 0 |
| Cheating scandal | 1,326 | 0.011 | 0.10 | 0 | 1 | 0 |
| Hazing scandal | 1,326 | 0.014 | 0.12 | 0 | 1 | 0 |
| Long-form article | 1,326 | 0.008 | 0.09 | 0 | 1 | 0 |
| At least 1 *NYT* cite | 1,326 | 0.028 | 0.16 | 0 | 1 | 0 |
| More than 5 *NYT* cites | 1,326 | 0.009 | 0.09 | 0 | 1 | 0 |
| Scandal with major coverage | 1,326 | 0.028 | 0.17 | 0 | 1 | 0 |
| *Controls* | | | | | | |
| SAT verbal—25th percentile | 1,304 | 575.7 | 57.5 | 420 | 720 | 560 |
| SAT verbal—75th percentile | 1,304 | 679.1 | 50.7 | 580 | 800 | 670 |
| SAT math—25th percentile | 1,304 | 602.6 | 58.2 | 462 | 780 | 600 |
| SAT math—75th percentile | 1,304 | 702.3 | 49.8 | 600 | 800 | 690 |
| In-state tuition | 1,324 | 20,217.5 | 14,227.4 | 0 | 47,055 | 21,207 |
| Out-of-state tuition | 1,326 | 26,563.2 | 9,459.9 | 3,060 | 47,055 | 26,556 |
| Common Application | 1,326 | 0.470 | 0.5 | 0 | 1 | 0 |
| USNWR rank[a] | 1,326 | 41.6 | 32.0 | 0 | 123 | 37 |

[a]Of 1,326 total rank-admission year observations, there were 165 rank-application year observations not reported in *U.S. News and World Report*. We controlled for missing ranks by creating a binary variable that took on the value 1 if rank was missing and 0 otherwise.

*Source: U.S. News and World Report* college rankings 2001–2013 and authors' proprietary scandal data.

was labeled with one of these scandal categories instead. The month, day, and year of the breaking media story were also recorded in our data.

Table 1 shows that 9% of the college-year observations had a scandal unearthed in our search process. However, this statistic masks the distribution by college, which can be found in Figure 1. No college in the sample witnessed more than four scandals during the sample period. The majority of colleges in this sample (around 75%) experienced at least one scandal during the time period studied. There are 118 unique scandals in our sample. Our data include four types of incidents: 30% involve sexual assaults, 40% involve murders, 15% involve hazing, and 15% involve cheating.[9]

9. Note that the preponderance of murders in our data does not mean more murder incidents happened on campus than other incident types, just that more were picked up by our search algorithm. It may be the case that murders attract more media attention per incident relative to the other incident types. The opposite point can be made about sexual assaults, which have been shown to be generally underreported by colleges and, by extension, get less media attention. Yung (2015) reveals that universities generally underreport the number of sexual assaults on campus by auditing colleges' sexual assault policies. During the audit period examined in the paper, universities reported an average of 44% more sexual assaults; after the audit, the number of reported sexual assaults dropped to a value indistinguishable from the preperiod.

## FIGURE 1
### Number of Scandals by College (2001–2013)



*Source:* Authors' scandal selection algorithm. See Section II.B for more detail.

### C. Media Coverage of Scandals

*Scandal Size.* After collecting the list of scandals from the sample colleges, we determined the number of citations for each scandal on the *New York Times* online archive. The number of *New York Times* citations serves as a proxy for size of national media coverage in our analysis, following established conventions in the literature. The

*New York Times* has been described in management research as "the elite U.S. newspaper" and the "benchmark" for studying media attention (Zyglidopoulous et al. 2012). To gain a measure of a scandal's media coverage, we recorded the number of unique articles mentioning the scandal in the month following the breaking news date. In order to categorize coverage intensity, we assign covered scandals to two coverage buckets: one in which the scandal has at least one *New York Times* citation in the month following a scandal and one in which the scandal has more than five *New York Times* citations in the month following a scandal.

Among our sample of 118 scandals, media coverage varied widely. Roughly two-thirds of the incidents were not covered by the *New York Times*, but instead were covered in local media outlets (in order to be included in our sample). Roughly 10% were discussed in at least five *New York Times* articles, and the remainder were discussed at least once in the *New York Times*.

*Long-Form Articles.* From our initial search, we noted whether or not scandals were covered in a long-form article. We had two qualifications for a scandal publication to be considered long-form coverage: first, the article in question must be longer than two pages, and second, the outlet in which the article appears must have nationwide circulation. Media coverage of 9 of 118 scandals met these criteria. The outlets for the long-form articles were *Rolling Stone*, *National Catholic Register*, *The New Yorker*, *New York Magazine*, *New York Times*, *Sports Illustrated, People Magazine*, and *Vanity Fair*. Within our sample, there is significant overlap between a scandal having a long-form article and the same scandal being covered in the *New York Times*—with coverage in the *New York Times* generally coming after the long-form article or local news outlet that breaks the story. Out of the nine scandals with long-form articles, only one scandal was not covered by the *New York Times* in the month following the scandal.[10] Three scandals with long-form articles were covered with between one and five *New York Times* stories, and five were covered with more than five unique *New York Times* articles in the month post–breaking coverage. This overlap

in coverage supports our interpretation of long-form journalism as a form of extensive coverage of a scandal.

### III.  EMPIRICAL ANALYSIS

#### A. Empirical Specifications

To determine the impact of scandals on college outcomes, we use the following specification:

$$\text{Outcome}_{it} = \alpha_0 + \alpha_1 * (\text{Scandal}_{it}) + \beta (X_{it})$$
$$+ \mu_1 (\text{Year}_t) + \mu_2 (\text{College}_i) + \eta_{it}.$$

The dependent variable is some outcome for college $i$ in year $t$, such as (logarithm) of applications, donation rate, yield, or student body competitiveness. *Yield* is defined to be the fraction of admitted students who matriculate, and the student body competitiveness is the standardized test scores of enrollees (i.e., *SAT Math—75th Percentile* and *SAT Verbal—75th Percentile*). *Scandal* equals one if there was at least one scandal for that college in that year.[11] The vector $X$ includes lagged institutional SAT percentile variables (*SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile*),[12] *In-State Tuition* and *Out-of-State Tuition*, *Common Application*, and lagged *USNWR Rank*.[13] Time-fixed effects (*Year*) and college-fixed effects (*College*) are included. Finally, $\eta$ is an independent and identically distributed error term.

To capture variation in the intensity of media coverage of scandals among various outlets, we use a set of *Media Coverage* indicators in the specification below:

$$\text{Outcome}_{it} = \alpha_0 + \alpha_1 * (\text{Media Coverage}_{it})$$
$$+ \beta (X_{it}) + \mu_1 (\text{Year}_t)$$
$$+ \mu_2 (\text{College}_i) + \eta_{it}$$

---

10. This event is the 2010 Elizabeth Seeberg sexual assault and suicide at The University of Notre Dame, which was covered in a long-form article in the *National Catholic Register*.

11. Under this metric, multiple incidents can occur in the same year. Six college-year observations had more than one incident. In an alternative specification not reported in this paper, we regressed the number of incidents per year on number of applications and found no effect.

12. We also explore controlling for lagged dependent variables, but coefficient estimates are qualitatively unchanged. We also exclude the lagged SAT score variables when the contemporaneous variable is the outcome.

13. Changes in the ranking display in the early part of the panel necessitated the later inclusion of a variable, *Rank Dummy*, which equals 1 if the ranking for a college in a certain year is absent from the *U.S. News and World Report* rankings and 0 otherwise.

We use three different indicator variables under the *Media Coverage* umbrella: *At Least 1 New York Times (NYT) Cite*, *More than 5 NYT Cites*, and *Long-Form Article*. These take the value one when a scandal has the associated media coverage profile and zero otherwise. The fixed effects and controls are the same as in the first specification.

In order to determine if scandals exhibit persistent effects, we start with the same specifications in the prior subsection for scandals and media coverage indicators. We then transform these specifications by "leading" our scandal and media coverage variables 1 and 2 years. By doing so, we can examine the impact of a scandal in the second and third years following the initial breaking news to see if there are any persistence effects on later years' outcomes.

For a separate, but related analysis, we also add a "coverage length" variable to our *Media Interaction* specification that determines if coverage length (i.e., a rough proxy for the "evolution" of a scandal over time) impacts college outcomes beyond the intensity of coverage received. To construct our coverage length variable, we recorded the first and last piece of coverage for all of our scandals covered in the *New York Times*, calculated the number of days between initial and final coverage, and interacted the coverage length with our coverage level dummy variables.

### B. The Impact of Scandals on Applications

Table 2 presents the main results from a regression of the log of the number of applications on different measures of scandals and media coverage. The first column shows that in the year following a scandal, colleges receive 2% fewer applications, but this is not statistically different than zero. However, the next few columns consider scandals with relatively larger amounts of media coverage. A scandal that receives at least one mention in the *New York Times* receives almost 5% fewer applications. A scandal generating more than five *New York Times* pieces in the month following breaking news leads to an 8.8% drop in applications. Long-form coverage of a scandal leads to 10% fewer applications. Column 5 considers the impact of the scandal with any relatively large amount of media coverage (at least one *New York Times* cite and/or a long-form article), which corresponds to a 5% drop in applicants. Column 6 reports the full model. The individual coefficients remain negative and lose

significance, but the combined effect of the coverage remains negative and significant. Overall, the results suggest that the impact of a scandal depends on the amount of media coverage that the scandal receives.[14]

As a robustness check, we supplemented our *New York Times* coverage with *USA Today* coverage from the newspaper's proprietary archive and *Wall Street Journal* coverage via Lexis Nexis. Using this expanded definition of national newspaper coverage, we find qualitatively similar effects to measuring coverage with only *New York Times* cites (see Appendix Table A3).[15,16] In the same table, we supplement the long-form article measure from our initial Google search by performing targeted within-site searches of our scandals in archived coverage of *The Atlantic* and *Esquire* and noting whether the scandal was covered in these two prominent outlets. We also drop the *National Catholic Register* from our definition of long-form article due to its comparatively small national readership. Using this new set of long-form articles, we find similar impacts of long-form articles on applications as measuring with our initial long-form article variable.

As a robustness check, we examined school-by-school application deadlines in relation to scandal timing and found results that were consistent with our main specification (Table A4). The temporal distance between the scandal and a university's application deadline does not impact the number of applications received, potentially because the scandal's coverage is ongoing during the period or applications submitted prior to the scandal offset any proximity effect (Table A5).

### C. Do Scandals Persist?

Next, we test whether the impact of a scandal persists to multiple cohorts. While these provide

---

14. In Table A2, we sequentially add control variables to models examining the effect of major scandal coverage (any national newspaper cites or a long-form article) and scandal coverage with more than five *New York Times* cites. We see that point estimates remain significant, stable, and similar to those in Table 2 when sequentially adding these controls.

15. In an analysis not reported in this paper, we also examined the impact of scandals featured in the largest regional newspapers on applications. Our results yielded point estimates that were too noisy to draw meaningful conclusions about the local effects of scandal.

16. As another (unreported) robustness check, we run six regression models with individual coverage indicators that sequentially increase the number of *New York Times* cites (i.e., 1+ *NYT* cite to 6+ *NYT* cites). All of these indicators (except 3+ *NYT* cites) are similar in magnitude and precision to those presented in Table 2.

498

**TABLE 2**
The Impact of Scandals on Applications

| Dependent Variable = log(Total Applicants) | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Scandal | −0.020 (0.013) | | | | | −0.004 (0.012) |
| At least 1 *NYT* cite | | −0.049* (0.025) | | | | −0.020 (0.031) |
| More than 5 *NYT* cites | | | −0.088** (0.038) | | | −0.020 (0.044) |
| Long-form article | | | | −0.104** (0.040) | | −0.028 (0.042) |
| Scandal with major coverage | | | | | −0.052** (0.025) | −0.066 |
| Constant | 9.111*** (0.591) | 9.156*** (0.581) | 9.160*** (0.588) | 9.155*** (0.585) | 9.156*** (0.580) | 9.167*** (0.585) |
| *Summed effects* | | | | | | |
| Scandal + At Least 1 *NYT* cite + More than 5 *NYT* cites + Long-form article | | | | | | −0.119** (0.046) |
| *F*-statistic on joint test of significance | | | | | | 6.71** (0.011) |
| Controls | X | X | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 |
| *R*-squared | 0.749 | 0.749 | 0.749 | 0.750 | 0.750 | 0.750 |
| Number of colleges in sample | 102 | 102 | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank*.

***p < 0.01; **p < 0.05; *p < 0.1.

large shocks in the first year, reputational effects are likely to dissipate over time as the event becomes less salient or the school responds. We explore the persistence of the effect in Table 3, which shows the impacts of scandal coverage on applications in the second and third years after the incident occurs. The impact of a scandal persists for a second year, with roughly similar effect size and significance to the initial impact. The effect is insignificant in the third year. Relative to the impact of the *U.S. News and World Report* college rankings, the immediate effect of a scandal is large (roughly the effect of a ten-rank change). However, the effects seem to dissipate relatively quickly, suggesting that scandals have a large but temporary impact, potentially because the incidents become less salient over time.

While we treat scandals generally as a one-time event, scandal coverage naturally evolves over time, especially for high profile scandals with long-lived media attention. Beyond the coverage intensity of the scandals, the length of time that a scandal is covered could impact applications as well. We recorded the last piece of coverage in the *New York Times* for our covered scandals, calculated the number of days between initial and final coverage, and interacted the coverage length with our coverage level dummy variables. We find little evidence that the length of coverage impacts applications independently of the coverage level (see Table A6). This could be due to highly covered stories already tending to have longer coverage lives.

### D. The Impact of Scandals on Class Composition and Donations

Universities care not only about the number of applications they receive, but also about the ultimate composition of the incoming class. We find that there is no discernible effect on the yield of the admitted students (Table 4) and 75th percentiles of SAT scores (Table 5).[17] While these are very coarse measures of the incoming class, this finding may be driven by the fact the marginal students who choose not to apply due to a scandal are less likely to be admitted even if accepted. In addition to shedding light on potential mechanisms, these results are also directly relevant,

17. We also find no impact of highly covered scandals on 25th percentile scores in unreported analysis.

**TABLE 3**

Do Scandals Persist? "Carry-Over" Effects Following the Year of Breaking News (First Year)

| *Dependent Variable =* *log(Total Applicants)* | Second Year | | | | Third Year | | | |
|---|---|---|---|---|---|---|---|---|
| | **(1)** | **(2)** | **(3)** | **(4)** | **(1)** | **(2)** | **(3)** | **(4)** |
| Scandal | −0.026** (0.013) | −0.013 (0.013) | −0.020 (0.014) | −0.019 (0.014) | −0.013 (0.011) | −0.007 (0.013) | −0.008 (0.012) | −0.013 (0.011) |
| At least 1 *NYT* cite | | −0.040 (0.026) | | | | −0.016 (0.028) | | |
| More than 5 *NYT* cites | | | −0.049 (0.033) | | | | −0.038 (0.041) | |
| Long-form article | | | | −0.081** (0.039) | | | | −0.008 (0.041) |
| Constant | 9.477*** (0.661) | 9.515*** (0.657) | 9.490*** (0.661) | 9.488*** (0.657) | 9.473*** (0.661) | 9.479*** (0.659) | 9.479*** (0.659) | 9.474*** (0.661) |
| Controls | X | X | X | X | X | X | X | X |
| Observations | 1,106 | 1,106 | 1,106 | 1,106 | 1,106 | 1,106 | 1,106 | 1,106 |
| *R*-squared | 0.744 | 0.744 | 0.744 | 0.745 | 0.743 | 0.743 | 0.743 | 0.743 |
| Number of colleges in sample | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 |

*Notes:* Each column fits an ordinary least squares regression model. Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank.*

***p < 0.01; **p < 0.05; *p < 0.1.

**TABLE 4**

The Impact of Scandals on Yield

| *Dependent Variable = Yield* | **(1)** | **(2)** | **(3)** | **(4)** |
|---|---|---|---|---|
| Scandal | −0.001 (0.003) | | | |
| At least 1 *NYT* cite | | −0.000 (0.004) | | |
| More than 5 *NYT* cites | | | 0.008 (0.008) | |
| Long-form article | | | | 0.008 (0.009) |
| Constant | 0.521*** (0.115) | 0.521*** (0.115) | 0.518*** (0.115) | 0.518*** (0.115) |
| Controls | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 |
| *R*-squared | 0.322 | 0.322 | 0.322 | 0.322 |
| Number of colleges in sample | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank.*

***p < 0.01; **p < 0.05; *p < 0.1.

as they enter rankings that can create downstream effects for universities. Overall, these results—highly covered scandals do not shift the yield or percentile SAT scores—are consistent with the findings of Luca and Smith (2013), who examine impacts of the *U.S. News and World Report* rankings (which also impact applications but not percentile SAT scores or yield).

Universities also care about alumni-giving patterns. Using data on alumni-giving rates from the CAE's Voluntary Support for Education survey, we find no significant impact of scandals at any coverage level on alumni donation rates (see Table 6). Similar results have been found in related empirical studies. For example, Lindo et al. (2018) find a null effect when looking at

### TABLE 5
The Impact of Scandals on Matriculating Student Competitiveness

| Dependent Variable = SAT 75th Percentile Scores | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| | Verbal | Math | Verbal | Math | Verbal | Math | Verbal | Math |
| Scandal | −1.446 (1.060) | 0.797 (0.851) | | | | | | |
| At least 1 *NYT* cite | | | −2.992 (1.962) | −2.462 (1.737) | | | | |
| More than 5 *NYT* cites | | | | | −1.856 (2.693) | −2.602 (2.623) | | |
| Long-form article | | | | | | | −1.908 (2.687) | −2.455 (2.234) |
| Constant | 681.444*** (5.501) | 706.218*** (6.069) | 681.602*** (5.534) | 706.588*** (6.068) | 681.354*** (5.530) | 706.434*** (6.057) | 681.299*** (5.524) | 706.353*** (6.050) |
| Controls | X | X | X | X | X | X | X | X |
| Observations | 1,204 | 1,204 | 1,204 | 1,204 | 1,204 | 1,204 | 1,204 | 1,204 |
| *R*-squared | 0.254 | 0.451 | 0.255 | 0.451 | 0.253 | 0.451 | 0.253 | 0.451 |
| Number of colleges in sample | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: *In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank.*

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

### TABLE 6
The Impact of Scandals on Alumni Donation Rates

| Dependent Variable = Alumni Donation Rates | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Scandal | 0.001 (0.003) | | | |
| At least 1 *NYT* cite | | 0.004 (0.004) | | |
| More than 5 *NYT* cites | | | 0.009 (0.009) | |
| Long-form article | | | | 0.008 (0.008) |
| Constant | 0.031 (0.119) | 0.0260 (0.119) | 0.024 (0.119) | 0.027 (0.119) |
| Controls | X | X | X | X |
| Observations | 948 | 948 | 948 | 948 |
| *R*-squared | 0.290 | 0.291 | 0.291 | 0.291 |
| Number of colleges in sample | 96 | 96 | 96 | 96 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank.*

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

the impact of Title IX investigations on alumni donations, despite finding impacts on application volume. While media coverage of these types of scandals might have little effect on donation rates, it is worth noting that there could be impacts on aggregate donations and donor type. Future research could work to obtain fine-grained measures of donor profiles in order to provide a fuller picture of scandals' impacts on alumni giving.

## IV. DISCUSSION

Scandals on college campuses—especially those with extensive media coverage—lead to decreases in the number of applications a college receives. The effect size can be put into context by looking at several other settings. For example, *U.S. News and World Report* is often viewed as a source of college quality and reputation. We

find that a negative long-form article has roughly the same effect as dropping ten rankings in this outlet (based on the point estimate in Luca and Smith 2013). Aside from application responses to reputational changes, there are also countless policies aimed at getting students to apply and enroll in college. For example, when federal policy released alumni earnings by college in the College Scorecard, colleges with 10% lower earnings than their counterparts received 2.4% fewer SAT score sends, which are a proxy for applications (Hurwitz and Smith 2018). We show that particularly highly publicized scandals can reduce applications by 10%, which is roughly equivalent to differences in a college's alumni earnings of approximately 40%. Turning to something directly under the control of the institutions, Smith, Hurwitz, and Howell (2015) find that adding an application essay reduces college applications by 6.5%, which is in line with a scandal receiving at least modest media coverage. In sum, 10% drops in applications are quite large in magnitude and uncommon in response to state and federal policies but are not far off from certain (but not most) college-specific strategies to change application behavior. However, null effects on downstream outcomes are quite common (e.g., Hurwitz and Smith 2018), perhaps because the marginal applicants are either not ultimately enrolling in the colleges or they do not substantially differ from inframarginal applicants.[18]

## A. Limitations and Future Research

Our results shed light on the impact of widely covered negative incidents on product demand. These results can be compared to Lindo et al. (2018) and Berger, Sorenson, and Rasmussen (2010), which find that unfavorable press can lead to favorable outcomes. One potential explanation for these contrasting sets of results comes from the fact that we are analyzing top universities and that scandals presumably receive media coverage precisely because people already

know these institutions (see Table A7).[19] This is consistent with the hypothesis that negative media may increase demand in contexts where awareness is the primary challenge but decrease demand for products or services with more established brands. We acknowledge that one limitation of our empirical approach is our inability to tease out the effects of scandals on lower-ranking colleges, which paradoxically may benefit from the media exposure that accompanies a scandal (e.g., Lindo et al. 2018). However, if we consider adding a larger set of colleges, we would be changing the underlying nature of the applicant pool in question. Applicants and enrollees to less selective colleges tend to stay in-state, and their decisions are heavily influenced by tuition and location (e.g., Dillon and Smith 2017; Hoxby and Avery 2012). Therefore, we would anticipate the estimates for this group to be smaller in magnitude (or zero) compared to our current sample.

In this paper, we treat incidents as one-time major events—in this context, negative incidents that receive salient media coverage. However, one could imagine dynamic elements of scandals that this approach does not capture. For example, how does the effect of small bits of bad news over time compare to the effect of the major incidents we observe in our data? Moreover, scandals have a tendency to evolve—for example, coverage of Hillary Clinton's email servers persisted, ebbed, and flowed for months during the 2016 U.S. presidential campaign. While we have performed an initial analysis of the impact of the coverage length of scandals, an important direction for future research is to more deeply explore the evolution of scandals over time.

While our analysis examines differences in media coverage, there also may be differences in effect among incident types. In principle, the impact of an incident depends on its salience and on the extent to which students update their beliefs based on it. While we lack statistical power to reject heterogeneous effects across incident type, we estimated the results broken out by type of incident. Overall, the results suggest that negative effects are seen across the different types of incidents. We have included a sample analysis examining the impact of murders versus other scandals in Table A8, and further examining these differences across incident type could serve as a fruitful avenue for future research.

---

18. We also use the multiple hypothesis testing procedure described in List et al. (2016) to examine the impact of scandal media coverage on our five primary outcomes (log(Total Applicants), SAT Math-75th Percentile, SAT Verbal-75th Percentile, Yield, and Alumni Donation Rates). Using our "Scandal with major coverage" independent variable, which is an indicator of whether the scandal had any national coverage in the New York Times or a long-form article, we find that our results on applications are robust to this test and maintain significance at the 5% level (Multiplicity-adjusted p value = 0.046).

19. In unreported regressions, we also find that there is little impact of highly covered scandals on total enrollment or out-of-state enrollment at these prestigious schools.

We do not directly observe how colleges respond to these scandals, which is another area that merits additional investigation. Our estimates are net of any college responses, whether it be increased outreach or marketing or changing admission standards. Relatedly, scandals may lead universities to "crack-down" on scandal-inducing behavior in future years, leading to a "deterrent effect." Table A9 briefly shows some underpowered analyses where we estimate the probability of a school having a scandal in years postscandal and whether the amount of coverage matters.[20] Taken as a whole, there is weak suggestive evidence that a deterrent effect may be present in the years following a scandal, but it fades away.

In this setting, reputation may vary based on a college's ranking. For example, Hu and Van den Bulte (2014) show that scientists at middle-ranked universities are more conservative about adopting promising, but not yet generally accepted, methods of genetic engineering, a finding that they attribute to reputational risk. Luca and Smith (2015) show that middle-ranked MBA programs are most likely to publish their MBA program rankings on their home pages, potentially because the very top-ranked universities have the most established reputations. In principle, the impact of a scandal might then depend on the reputation of the university. While we perform an initial analysis in Table A7, more rigorous analysis of reputation effects is an important direction for future research.

## B. College and Consumer Implications

Overall, our results have implications for applicants, for colleges, and for the media. Applicants should consider the multiple effects of a scandal. Scandals provide information about a school, and to the extent that scandals also serve as a deterrent, the campus actually may be less risky. Applicants should also understand that schools will receive fewer applications in the wake of a scandal, potentially making it easier to get in. This demand response is consistent with other research literature highlighting the fact that student applications respond to small changes in costs or the informational environment (e.g., Luca and Smith 2013; Pallais 2015; Smith, Hurwitz, and Howell 2015).

It is tempting for universities to think about applicants as conducting a search for colleges with a wide set of information in a high stakes environment. However, our results suggest that despite the wide availability of influential quality reports and rankings (Luca and Smith 2013), and the fact that colleges market with this material (Luca and Smith 2015), widely covered scandals can have a large impact on student decisions. Given the fact that scandals do not seem to predict future scandals and that there is some suggestive evidence that they deter future scandals, the evidence suggests that the response from students may not be optimal and that the salience of information about scandals is what is driving the response. Schools might then take a broader view of what it means to have a good reputation and maintain focus on factors students normally use to evaluate schools in the absence of a scandal. When negative incidents do occur on a campus, the university might help provide other information and shift students into what psychologists would think about as cold state thinking (e.g., Loewenstein 2000). Given that scandals do not seem to lead to future scandals, temporary rapid changes in applicant preferences driven by fear could lead to projection-biased (and hence, suboptimal) decisions about where to attend college (Loewenstein, O'Donoghue, and Rabin 2003).

These results, which are net of any effort to mitigate the unfortunate circumstances, also have implications for colleges. Clearly college administrators do not wish harm on students, staff, or faculty, regardless of the downstream implications. Our work suggests that scandal coverage leads to demand responses that increase the cost of on-campus incidents. Having fewer applicants can impact rankings and prestige but may also make it difficult to craft the ideal class. Given that we find no impact on the composition of the class, the impacts may be largely reputational, both from potential changes in ranking and the scandal itself.

The results have implications for the media as well. Our estimates show that scandals with more media coverage have larger impacts on applications. Not only are they providing information to potential applicants, but our findings suggest that media may serve the purpose of holding colleges accountable by deterring future scandals. That said, for media outlets looking to help students optimize their decisions, it might be helpful to shift student attention to a broader set of outcomes, including, but not limited to, negative incidents on campus.

---

20. We use a conditional logit, and results are presented in log-odds.

APPENDIX

**TABLE A1**

*U.S. News and World Report* "Best Colleges 2015" Top 100 National Universities, Listed in Rank Order

| College Name | College Name |
| --- | --- |
| Princeton University | Yeshiva University |
| Harvard University | University of Texas—Austin |
| Yale University | George Washington University |
| Columbia University | Ohio State University—Columbus |
| Stanford University | Pepperdine University |
| University of Chicago | Tulane University |
| Massachusetts Institute of Technology | Fordham University |
| Duke University | Southern Methodist University |
| University of Pennsylvania | Syracuse University |
| California Institute of Technology | University of Connecticut |
| Dartmouth College | Brigham Young University—Provo |
| Johns Hopkins University | Clemson University |
| Northwestern University | Purdue University—West Lafayette |
| Washington University in Saint Louis | University of Georgia |
| Cornell University | University of Maryland—College Park |
| Brown University | University of Pittsburgh |
| University of Notre Dame | Texas A&M University—College Station |
| Vanderbilt University | Worcester Polytechnic Institute |
| Rice University | Rutgers University—New Brunswick |
| University of California—Berkeley | American University |
| Emory University | Baylor University |
| Georgetown University | University of Iowa |
| University of California—Los Angeles | University of Minnesota—Twin Cities |
| University of Virginia | Virginia Tech |
| Carnegie Mellon University | Clark University |
| University of Southern California | Indiana University—Bloomington |
| Tufts University | Marquette University |
| Wake Forest University | Miami University—Oxford |
| University of Michigan—Ann Arbor | Stevens Institute of Technology |
| University of North Carolina—Chapel Hill | SUNY College of Environmental Science and Forestry |
| Boston College | Texas Christian University |
| New York University | University of Delaware |
| College of William and Mary | University of Massachusetts—Amherst |
| University of Rochester | Michigan State University |
| Brandeis University | University of California—Santa Cruz |
| Georgia Institute of Technology | University of Vermont |
| University of California—San Diego | Binghamton University—SUNY |
| Case Western Reserve University | Colorado School of Mines |
| University of California—Davis | Stony Brook University—SUNY |
| Lehigh University | University of Alabama |
| University of California—Santa Barbara | University of Colorado—Boulder |
| Boston University | University of Denver |
| Northeastern University | University of Tulsa |
| Rensselaer Polytechnic University | Drexel University |
| University of California—Irvine | Florida State University |
| University of Illinois—Urbana-Champaign | North Carolina State University—Raleigh |
| University of Wisconsin—Madison | University of San Diego |
| Pennsylvania State University—University Park | Saint Louis University |
| University of Florida | University of Missouri |
| University of Miami | University of Nebraska—Lincoln |
| University of Washington | University of New Hampshire |

CONTEMPORARY ECONOMIC POLICY

**TABLE A2**
The Impact of Scandals on Applications: Adding Covariates across Regression Models

| Dependent Variable = log(Total Applicants) | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Scandal with major coverage | −0.069** (0.027) | −0.052** (0.024) | −0.053** (0.025) | −0.052** (0.025) | | | | |
| More than 5 *NYT* cites | | | | | −0.114*** (0.038) | −0.088** (0.037) | −0.084** (0.036) | −0.088** (0.038) |
| Constant | 9.374*** (0.019) | 8.783*** (0.500) | 9.072*** (0.536) | 9.156*** (0.580) | 9.375*** (0.019) | 8.793*** (0.507) | 9.073*** (0.545) | 9.160*** (0.588) |
| College percentile SAT scores | | X | X | X | | X | X | X |
| Tuition covariates | | | X | X | | | X | X |
| Common Application and USNWR rank | | | | X | | | | X |
| Observations | 1,326 | 1,204 | 1,202 | 1,202 | 1,326 | 1,204 | 1,202 | 1,202 |
| *R*-squared | 0.716 | 0.722 | 0.736 | 0.750 | 0.715 | 0.721 | 0.736 | 0.749 |
| Number of colleges in sample | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Other covariates include: (lagged) college percentile SAT scores (*SAT Math—25th Percentile*, *SAT Math—75th Percentile*, *SAT Verbal—25th Percentile*, *SAT Verbal—75th Percentile*), tuition covariates (*In-State Tuition*, *Out-of-State Tuition*), and other institutional characteristics (*Common Application*, *USNWR Rank*).

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A3**
The Impact of Scandals on Applications: Expanded List of National Outlets

| Dependent Variable = log(Total Applicants) | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Scandal | −0.020 (0.013) | | | | | −0.003 (0.012) |
| At least 1 national news cite | | −0.049** (0.024) | | | | −0.021 (0.031) |
| More than 5 national news cites | | | −0.090** (0.035) | | | −0.041 (0.039) |
| Long-form article | | | | −0.089** (0.036) | | −0.043 (0.038) |
| Scandal with major coverage | | | | | −0.049** (0.024) | |
| Constant | 9.111*** (0.591) | 9.151*** (0.581) | 9.158*** (0.588) | 9.160*** (0.587) | 9.151*** (0.581) | 9.167*** (0.586) |
| *Summed effects* | | | | | | |
| Scandal + At least 1 national news cite + More than 5 national news cites + Long-form article | | | | | | −0.109** (0.012) |
| *F*-statistic on joint test of significance | | | | | | 6.53** (0.012) |
| Controls | X | X | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 |
| *R*-squared | 0.749 | 0.749 | 0.750 | 0.750 | 0.749 | 0.750 |
| Number of colleges in sample | 102 | 102 | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. National news outlets include the *New York Times*, *USA Today*, and the *Wall Street Journal*. The *Long-Form Article* indicator variable in this table supplements our *Long-Form Article* indicator variable in Table 2 with site-specific searches of our scandal coverage in *The Atlantic* and *Esquire*. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables (*SAT Math—25th Percentile*, *SAT Math—75th Percentile*, *SAT Verbal—25th Percentile*, *SAT Verbal—75th Percentile*), *In-State Tuition*, *Out-of-State Tuition*, *Common Application*, and *USNWR Rank*.

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A4**
The Impact of Scandals on Applications Given School-By-School Deadlines

| _Dependent Variable =_ _log(Total Applicants)_ | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Scandal | −0.088 (0.161) | | | | | −0.009 (0.014) |
| At least 1 _NYT_ cite | | −0.047 (0.029) | | | | −0.025 (0.033) |
| More than 5 _NYT_ cites | | | −0.072** (0.034) | | | −0.020 (0.043) |
| Long-form article | | | | −0.093** (0.037) | | −0.068* (0.040) |
| Scandal with major coverage | | | | | −0.052* (0.029) | |
| Constant | 9.139*** (0.592) | 9.173*** (0.584) | 9.169*** (0.592) | 9.167*** (0.588) | 9.174*** (0.584) | 9.185*** (0.586) |
| _Summed effects_ | | | | | | |
| Scandal + At least 1 _NYT_ cite + More than 5 _NYT_ cites + Long-form article | | | | | | −0.113** (0.012) |
| _F_-statistic on joint test of significance | | | | | | 6.62** (0.011) |
| Controls | X | X | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 | 1,202 |
| _R_-squared | 0.749 | 0.750 | 0.750 | 0.750 | 0.750 | 0.751 |
| Number of colleges in sample | 102 | 102 | 102 | 102 | 102 | 102 |

_Notes:_ Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables _(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application_, and _USNWR Rank_.
   ***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A5**
The Impact of Scandal "Distance from the Deadline" on Applications

| _Dependent Variable = log(Total Applicants)_ | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Scandal | −0.012 (0.018) | | | |
| Time remaining until deadline*Scandal | −0.018 (0.037) | | | |
| At least 1 _NYT_ cite | | −0.073* (0.043) | | |
| Time remaining until deadline*At least 1 _NYT_ cite | | 0.049 (0.079) | | |
| More than 5 _NYT_ cites | | | −0.029 (0.048) | |
| Time remaining until deadline *More than 5 _NYT_ cites | | | −0.120 (0.092) | |
| Long-form article | | | | −0.082 (0.062) |
| Time remaining until deadline *Long-form article | | | | −0.043 (0.117) |
| Constant | 9.108*** (0.592) | 9.170*** (0.582) | 9.143*** (0.588) | 9.153*** (0.585) |
| Controls | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 |
| _R_-squared | 0.749 | 0.749 | 0.750 | 0.750 |
| Number of colleges in sample | 102 | 102 | 102 | 102 |

_Notes:_ Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables _(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application_, and _USNWR Rank_.
   ***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A6**
Does Coverage Length Matter beyond Coverage Level?

| *Dependent Variable = log(Total Applicants)* | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Scandal | −0.016 | | | |
| | (0.012) | | | |
| Scandal*Coverage length | −0.111 | | | |
| | (0.089) | | | |
| At least 1 *NYT* cite | | −0.042 | | |
| | | (0.027) | | |
| At least 1 *NYT* cite* Coverage length | | −0.065 | | |
| | | (0.089) | | |
| More than 5 *NYT* cites | | | −0.101** | |
| | | | (0.049) | |
| More than 5 *NYT* cites* Coverage length | | | 0.041 | |
| | | | (0.092) | |
| Long-form article | | | | −0.110** |
| | | | | (0.045) |
| Long-form article* Coverage length | | | | 0.023 |
| | | | | (0.099) |
| Constant | 9.143*** | 9.169*** | 9.156*** | 9.154*** |
| | (0.594) | (0.585) | (0.590) | (0.586) |
| Controls | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 |
| *R*-squared | 0.749 | 0.749 | 0.749 | 0.750 |
| Number of colleges in sample | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank.*

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A7**
Do Scandals Impact Higher Ranked Schools Differently?

| *Dependent Variable = log(Total Applicants)* | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Scandal | −0.019 | | | |
| | (0.013) | | | |
| Scandal*T25 | −0.044 | | | |
| | (0.039) | | | |
| At least 1 *NYT* cite | | −0.050* | | |
| | | (0.027) | | |
| At least 1 *NYT* cite*T25 | | 0.007 | | |
| | | (0.048) | | |
| More than 5 *NYT* cites | | | −0.093** | |
| | | | (0.041) | |
| More than 5 *NYT* cites*T25 | | | 0.056 | |
| | | | (0.043) | |
| Long-form article | | | | −0.126*** |
| | | | | (0.044) |
| Long-form article*T25 | | | | 0.122** |
| | | | | (0.050) |
| Constant | 9.120*** | 9.155*** | 9.157*** | 9.146*** |
| | (0.593) | (0.582) | (0.588) | (0.584) |
| Controls | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 |
| *R*-squared | 0.749 | 0.749 | 0.749 | 0.750 |
| Number of colleges in sample | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile), In-State Tuition, Out-of-State Tuition, Common Application,* and *USNWR Rank.*

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A8**
Do Murders Impact Applications Differently than Other Scandals?

| Dependent Variable = log(Total Applicants) | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Scandal | −0.028* | | | |
| | (0.016) | | | |
| Murder*Scandal | 0.015 | | | |
| | (0.022) | | | |
| At least 1 *NYT* cite | | −0.062* | | |
| | | (0.032) | | |
| Murder*At least 1 *NYT* cite | | 0.023 | | |
| | | (0.046) | | |
| More than 5 *NYT* cites | | | −0.114* | |
| | | | (0.063) | |
| Murder*More than 5 *NYT* cites | | | 0.050 | |
| | | | (0.070) | |
| Long-form article | | | | −0.127 |
| | | | | (0.087) |
| Murder*Long-form article | | | | 0.037 |
| | | | | (0.093) |
| Constant | 9.110*** | 9.155*** | 9.155*** | 9.159*** |
| | (0.592) | (0.581) | (0.590) | (0.587) |
| Controls | X | X | X | X |
| Observations | 1,202 | 1,202 | 1,202 | 1,202 |
| *R*-squared | 0.749 | 0.749 | 0.750 | 0.750 |
| Number of colleges in sample | 102 | 102 | 102 | 102 |

*Notes:* Robust standard errors are in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile)*, *In-State Tuition, Out-of-State Tuition, Common Application*, and *USNWR Rank*.

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

**TABLE A9**
Do Administrators React? Probabilities of Future Scandals Given Prior Scandals

| | All Scandals | | | | Scandals with Major Coverage | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Dependent Variable = 1 if scandal occurred in admission year | OLS | | Conditional Logistic Log Odds | | OLS | | Conditional Logistic Log Odds | |
| Lag scandal | −0.231*** | −0.146*** | −2.986*** | −1.450*** | −0.181*** | −0.114* | −1.388** | −1.041* |
| | (0.035) | (0.031) | (0.554) | (0.388) | (0.067) | (0.066) | (0.600) | (0.553) |
| Lag 2 scandal | −0.292*** | −0.199*** | −3.662*** | −2.085*** | −0.232*** | −0.161*** | −2.034*** | −1.563** |
| | (0.044) | (0.034) | (0.659) | (0.520) | (0.059) | (0.064) | (0.755) | (0.706) |
| Lag 3 scandal | −0.216*** | −0.135*** | −3.136*** | −1.567*** | −0.084 | −0.024 | −1.197* | −0.688 |
| | (0.055) | (0.045) | (0.597) | (0.466) | (0.097) | (0.079) | (0.641) | (0.606) |
| Lag 4 scandal | −0.184*** | | −2.898*** | | 0.039 | | −0.455 | |
| | (0.056) | | (0.625) | | (0.107) | | (0.749) | |
| Lag 5 scandal | −0.106* | | −2.398*** | | −0.097 | | −1.564 | |
| | (0.062) | | (0.676) | | (0.131) | | (1.049) | |
| Constant | −1.435 | −0.810 | | | −0.577 | −0.239 | | |
| | (1.225) | (0.934) | | | (1.155) | (0.907) | | |
| Controls | X | X | X | X | X | X | X | X |
| Observations | 809 | 1,008 | 536 | 709 | 809 | 1,008 | 536 | 709 |
| *R*-squared | 0.135 | 0.096 | | | 0.061 | 0.058 | | |
| Number of colleges in sample | 102 | 102 | | | 102 | 102 | | |
| Number of groups in sample | | | 67 | 71 | | | 67 | 71 |

*Notes:* Columns 1, 2, 4, and 5 fit an ordinary least squares (OLS) model, while columns 3, 4, 7, and 8 fit a conditional (fixed-effects) logistic regression model. Standard errors in parentheses, clustered at the college level. All regressions have college and admission year-fixed effects. Each regression includes the following control variables: lagged institutional SAT percentile variables *(SAT Math—25th Percentile, SAT Math—75th Percentile, SAT Verbal—25th Percentile, SAT Verbal—75th Percentile)*, *In-State Tuition, Out-of-State Tuition, Common Application*, and *USNWR Rank*.

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$.

## REFERENCES

Alter, M., and R. Reback. "True for Your School? How Changing Reputations Alter Demand for Selective U.S. Colleges." *Educational Evaluation and Policy Analysis*, 36(3), 2014, 346–70.

Azoulay, P., A. Bonatti, and J. Krieger. "The Career Effects of Scandal: Evidence from Scientific Retractions." *Research Policy*, 46(9), 2017, 1552–69.

Baker, S., and A. Fradkin. "The Impact of Unemployment Insurance on Job Search: Evidence from Google Search Data." *Review of Economics and Statistics*, 99(5), 2017, 756–68.

Berger, J., A. Sorenson, and S. Rasmussen. "Positive Effects of Negative Publicity: When Negative Reviews Increase Sales." *Marketing Science*, 29(5), 2010, 815–27.

Brown, N., and C. Deegan. "The Public Disclosure of Environmental Performance Information—A Dual Test of Media Agenda Setting Theory and Legitimacy Theory." *Accounting and Business Research*, 29(1), 1998, 21–41.

Chung, K., T. Derdenger, and K. Srinivasan. "Economic Value of Endorsements: Tiger Woods' Impact on Sales of Nike Golf Balls." *Marketing Science*, 32(2), 2013, 271–93.

Dillon, E. W., and J. A. Smith. "Determinants of the Match between Student Ability and College Quality." *Journal of Labor Economics*, 35(1), 2017, 45–66.

Gijsenberg, M., H. Van Heerde, and P. Verhoef. "Losses Loom *Longer* than Gains: Modeling the Impact of Service Crises on Perceived Service Quality over Time." *Journal of Marketing Research*, 52(5), 2015, 642–56.

Hoxby, C. M., and C. Avery. "The Missing 'One-Offs': The Hidden Supply of High-Achieving, Low Income Students." NBER Working Paper No. w18586, 2012.

Hoxby, C., and S. Turner. "Expanding College Opportunities for High-Achieving, Low Income Students." Discussion Paper 12-014. Stanford Institute for Economic Policy Research, 2013.

Hu, Y., and C. Van den Bulte. "Nonmonotonic Status Effects in New Product Adoption." *Marketing Science*, 33(4), 2014, 509–33.

Hurwitz, M., and J. Smith. "Student Responsiveness to Earnings Data in the College Scorecard." *Economic Inquiry*, 56(2), 2018, 1220–43.

Islam, M., and C. Deegan. "Media Pressures and Corporate Disclosure of Social Responsibility Performance Information: A Study of Two Global Clothing and Sports Retail Companies." *Accounting and Business Research*, 40(2), 2010, 131–48.

Knittel, C., and V. Stango. "Celebrity Endorsements, Firm Value, and Reputation Risk: Evidence from the Tiger Woods Scandal." *Management Science*, 60(1), 2013, 21–37.

Lindo, J. M., D. Marcotte, J. Palmer, and I. Swensen. "Any Press Is Good Press? The Unanticipated Effects of Title IX Investigations on University Outcomes." NBER Working Paper No. w24852, 2018.

List, J., A. Shaikh, and Y. Xu. "Multiple Hypothesis Testing in Experimental Economics." NBER Working Paper No. w21875, 2016.

Loewenstein, G. "Emotions in Economic Theory and Economic Behavior." *American Economic Review: Papers and Proceedings*, 90(2), 2000, 426–32.

Loewenstein, G., T. O'Donoghue, and M. Rabin. "Projection Bias in Predicting Future Utility." *Quarterly Journal of Economics*, 118(4), 2003, 1209–48.

Luca, M., and J. Smith. "Salience in Quality Disclosure: Evidence from U.S. News College Rankings." *Journal of Economics and Management Strategy*, 22, 2013, 58–77.

———. "Strategic Disclosure: The Case of Business School Rankings." *Journal of Economic Behavior & Organization*, 112, 2015, 117–25.

Monks, J., and R. Ehrenberg. "The Impact of U.S. News and World Report College Rankings on Admissions Outcomes and Pricing Policies at Selective Private Institutions." NBER Working Paper No. 7227, 1999.

Page, L., and J. Scott-Clayton. "Improving College Access in the United States: Barriers and Policy Responses." *Economics of Education Review*, 51, 2016, 4–22.

Pallais, A. "Small Differences that Matter: Mistakes in Applying to College." *Journal of Labor Economics*, 33(2), 2015, 493–520.

Reitman, J. "Confessions of an Ivy League Frat Boy: Inside Dartmouth's Hazing Abuses." *Rolling Stone*, March 28, 2012.

Smith, J., M. Hurwitz, and J. Howell. "Screening Mechanisms and Student Responses in the College Market." *Economics of Education Review*, 44, 2015, 17–28.

Van Heerde, H., K. Helsen, and M. Dekimpe. "The Impact of a Product-Harm Crisis on Marketing Effectiveness." *Marketing Science*, 26(2), 2007, 230–45.

Wu, L., and E. Brynjolfsson. "The Future of Prediction: How Google Searches Foreshadow Housing Prices and Sales," in *Economic Analysis of the Digital Economy*, edited by A. Goldfarb, S. Greenstein and C. Tucker. Chicago: University of Chicago Press, 2015, 89–118.

Yung, C. "Concealing Campus Sexual Assault: An Empirical Examination." *Psychology, Public Policy, and Law*, 21(1), 2015, 1–9.

Zhao, Y., Y. Zhao, and K. Helsen. "Consumer Learning in a Turbulent Market Environment: Modeling Consumer Choice Dynamics after a Product Harm Crisis." *Journal of Marketing Research*, 48(2), 2011, 255–67.

Zyglidopolous, S., A. Georgiadis, C. Carroll, and D. Siegel. "Does Media Attention Drive Corporate Social Responsibility?" *Journal of Business Research*, 65, 2012, 1622–27.








Search USC Dornsife

> Admission
Admission ‹ back
Admitted
Apply
Connect
Learn
Enrich
> Undergraduate
Undergraduate ‹ back
Academics
Advisement
Undergraduate Diversity
Career Pathways
Life in LA
Pre-Health
Pre-Law
Pre-Graduate School
> Graduate
Graduate ‹ back
Academics
Admission
Special Programs
Online Programs
Progressive Degree Programs
Graduate Resources
> Research
Research ‹ back
Investigators
Student Research
Research Administration
Postdoctoral Fellows
Institutes & Centers
> News & Events
News & Events ‹ back
USC Dornsife News
Faculty Recognition
Event Calendar
Our Publications
Video Playlist & Series
Viewpoint Expert Series
USC Dornsife in the News
Dornsife Communication Team
> About
About ‹ back
USC Dornsife Leadership
Dana and David Dornsife
Quick Facts
Diversity
Dornsife Global
Departments & Programs
Institutes & Centers
Dean's Leadership Fellows
Faculty Development Directors
Board of Councilors
Administrative Offices
Search Faculty & Staff

home   >   admission   >   apply   >   how to apply   >   freshman application process





# Freshman Application Process

We encourage bright, motivated, involved students to apply to USC Dornsife. Our students benefit from challenging courses taught by world-class faculty members and numerous innovative research, study abroad, and service-learning activities. We have programs that push you to excel and achieve more than you thought possible. And you can do all this within a university that houses more than 800 student organizations, exciting Division I and intramural sports, and plays, concerts and speakers series throughout the academic year.

### Application Deadlines: Fall 2020

- **December 1, 2019:** Deadline for Scholarship Consideration
- **January 15, 2020:** Final Application Deadline

It is your responsibility to ensure that all required application materials are sent to USC by the posted deadlines. Applications postmarked after the deadlines listed above are not guaranteed a priority review. In no case will applications be returned or application fees refunded.

### Application Process

1. Submit the Common Application and USC Supplement (both available at **www.commonapp.org**), any application supplemental materials, and the application fee. The application fee for USC is $85.

2. Official test scores: Arrange for the testing agency to send your official scores directly to USC. (Our SAT code is 4852; our ACT Code is 0470.) It may seem repetitive or unnecessary, but sending us both the unofficial printout and the official test score is to your advantage because it speeds our process.

3. Official High School Transcript: Please ask your school to send an official copy of your high school transcript. All mail may be sent directly to:

*Office of Undergraduate Admission*
*University of Southern California*
*University Park Campus*
*Los Angeles, CA 90089*

4. International Students in need of a student visa must file a Financial Statement of Personal or Family Support.

**If you still have questions about the application process, please visit the Admission website.**

### Applying for Financial Aid

USC administers one of the largest financial aid programs in the United States, with many options available for a wide variety of students and special circumstances. If you are a U.S. citizen or U.S. permanent resident and would like to be considered for need-based financial aid, please follow the following steps:

*Complete and Submit the Free Application for Federal Student Aid (FAFSA)* -- The FAFSA is a document designed to assist the financial aid office in determining your elibility for the low-interest Federal Direct Stafford Loan, as well as federal and state grants. **The deadline for submission of the FAFSA is February 13th, 2020.** You may find and fill out the FAFSA at **www.fafsa.ed.gov/**.

*Complete and Submit the CSS/Profile* -- The CSS/Profile, along with the information from the FAFSA, will help the financial aid office determine your eligibility for financial aid. The CSS/Profile is due by February 13th, 2020. You may find and fill out the CSS/Profile at profileonline.collegeboard.com/.

Our financial aid office will also ask you and your family to submit Federal Income Tax Return Information. To learn more about this and the other documents that the USC Office of Financial Aid will need in order to evaluate your application for financial aid, please visit their website, which may be found here.

## When will you hear from us?

All freshman applicants who submit a complete application by the deadline will be mailed an admission decision by April 1st. USC does not have an early decision program. Only notification from the USC Office of Undergraduate Admission constitutes an offer of admission.

APPLY

Visit USC Dornsife

Important Dates

How To Apply

Freshman Application Process

Transfer Student Application Process

International Student Application Process

Graduate Application Process

Scholarships & Financial Aid

FAQs

 Dornsife DC 2015-19

University

# USC sees record number of applicants for fall 2018 admission

A landslide of outstanding applications raises the bar for admits, as average GPA and standardized test scores continue climbing

 BY **Ron Mackovich**      MARCH 23, 2018



The admission packets for the 2018 fall admits have been mailed. (USC Photo/Susanica Tam)

**A**n unprecedented surge in applications has made 2018 a historic year for USC admissions. A record 64,000 students applied, a 14 percent increase from the year before and the biggest jump in two decades.

"We've never had a harder time selecting which applicants to put in the classroom," said Timothy Brunold, USC's dean of admission. "We could hardly believe the numbers, and now we're feeling the pain of having to turn away so many candidates we admire. At the same time, it's a breakthrough year for USC."

## Impact on USC acceptance rate

Academic achievement increased as the average GPA and standardized test scores continued climbing. The record number of applicants forced the USC Office of Admission to accept just 13

percent – the lowest ever for USC. The admission rate dropped a full 3 percentage points.

Of those admitted, 26 percent are from underrepresented minority groups, while 69 percent are students of color.

The immense increase in the number of high school students seeking admission to USC was the biggest since 1999 with the exception of 2012, when the introduction of the Common Application caused a spike in applications.

USC conducts a hands-on, personal admissions process some universities no longer provide.

The boom in applications comes after a decade of expanded recruitment efforts. University admissions staff members visit about 2,200 high schools every year.



"We know the high school counselors, and they know us," Brunold said. "As some of their best and well-known students head to USC, there's increased awareness and excitement about us in those communities."

More than a third of the admitted class are straight-A students, and 60 percent have standardized test scores in the 99th percentile.

"Grades and numbers are a starting point," Brunold said. "We want a diverse class, and we think about which students our faculty want to teach, which students want to solve intractable problems. It's a search-and-selection process that lines up with the university's strategic plan, and the mature young people we admit bring something to the student body."

Brunold noted high interest in new degree programs at several schools, as well as the draw of student life enhancements like the massive USC Village, a living/learning environment for 2,500 students and a welcome addition to the neighborhood around the University Park Campus.

## The count: a breakdown of USC's fall admissions

The pool of students admitted for the fall 2018 semester are diverse and high-achieving. They come from all 50 states, the District of Columbia, Puerto Rico, Guam and American Samoa. (Enrollment commitments are due May 1; the makeup of the enrolled class may differ.) Of the admitted students:

- 85 percent have standardized test scores at or above the 95th percentile.
- 60 percent of the admitted freshmen enrolled in seven or more Advanced Placement and/or International Baccalaureate courses in high school.
- Nearly 800 are non-native English speakers.
- 25 percent are Asian.
- 16 percent are Latino.
- 6 percent are African-American.
- 26 percent are from underrepresented minority populations (black, Latino, Native American and some who report multiple ethnicities).
- 3,287 different high schools are represented.
- California is the most-represented state, at 39 percent. Outside California, the leading U.S. states for students are, in order: Texas, New York, Illinois, Washington and Florida.
- International students, from 87 countries, make up 17 percent of those admitted.

Outside the U.S., the most-represented countries are China, India, South Korea, Canada and Brazil.

---

## Top stories on USC News

Health

# Fad diets could contribute to liver disease known as a 'silent killer'

Along with obesity and diabetes, doctors worry that high-fat regimens like the keto diet might worsen an increasingly common condition known as nonalcoholic fatty liver disease.

Health

# As Salton Sea shrinks, experts fear far-reaching health consequences

USC researchers are exploring how losing California's largest lake could affect the respiratory health of people throughout the Imperial Valley and beyond.

University

# Siblings, all new Trojans, rebound after tragedy with community's help

When their mother died several years ago, these four siblings found strength and family in their friends and neighbors. They all start a new chapter this fall as USC students.

## Subscribe
*to receive USC News via email*

your email address

About This Site    Contact Us

# THE HOYA

NEWS    OPINION ▾    GUIDE    SPORTS    FEATURES ▾    PHOTO    BLOG    ABOUT US ▾    CONTACT US ▾

READ THE HOYA ▾    TIPS

## Admissions Rate Falls to 14 Percent, Lowest in University History

by Taylor Kahn-Perry   —   April 5, 2019

Georgetown University's undergraduate acceptance rate dropped to 14 percent this admissions season, the lowest in the university's history, marking the third consecutive year of record-low acceptance rates for Georgetown.

A total of 3,202 applicants were admitted to the Class of 2023 from a pool of 22,788 in hopes of meeting an enrollment target of 1,600 first-year students, according to Dean of Undergraduate Admissions Charles Deacon (CAS '64, GRD '69).

"This is the lowest April 1 admit rate," Deacon wrote in an email to The Hoya. "Although the pool was virtually unchanged from last year's record number, we did offer 130 fewer acceptances because the yield (those saying yes) has increased and last year we enrolled 1621 with a goal of 1600."

This year marks a slight decrease in the size of the applicant pool compared to last year's record-breaking high of 22,897 applicants, which followed the previous record of 21,459 applicants for the Class of 2021.

The School of Nursing and Health Studies saw a 12 percent rise in applicants since last year's admissions cycle, with a total of 1,682 applications compared to last year's 1,500. This year, 222 students were admitted to the NHS with an acceptance rate of 13.2 percent, the lowest acceptance rate of the four undergraduate schools.



ILLUSTRATION BY TARIKA KUMAR/THE HOYA | In this year's admissions cycle, the School of Nursing and Health Studies was the only undergraduate school to see a rise in the number of applications it received compared to 2018.

Outside of the NHS, each undergraduate school saw a decline in the size of its application pool since last year, resulting in a lower number of applicants overall compared to the Class of 2022.

The College received 13,704 applications with an acceptance rate of 13.6 percent; the School of Foreign Service accepted 14.5 percent of its 4,109 applicants; and the McDonough School of Business had a pool of 3,322 applications, accepting 15.9 percent.

Twenty-two percent of students admitted to Georgetown's Class of 2023 are Asian-American, 12 percent are Latinx, 11 percent are black and 1 percent are Native American. Eight percent of admitted students are international.

First-generation students represent 12 percent of the class, up slightly from last year's 11 percent. The admissions office cites programs like the Community Scholars Program and the Georgetown Scholars Program that provide support for first-generation and low-income Georgetown undergraduates as part of Georgetown's initiative to admit a more socio-economically and racially diverse class of students, including first-generation college students.

search...

Search

| Latest | Popular | Comments |

 Kano Reinterprets Grime Genre on "Hoodies All Summer"
September 5, 2019

 BROCKHAMPTON Addresses Controversy on 'GINGER'
September 5, 2019

 NHS Appoints Interim Dean
September 4, 2019

 Tame Impala Takes Audience on Musical Journey at The Anthem
September 4, 2019

 Search Begins for Librarian to Oversee Collections on Slavery
September 4, 2019



Tweets by @thehoya

The Hoya
@thehoya

With a set that electrified the audience's senses and left them feeling a sense of closer @TheAnthemDC.thehoya.com/tame-impala-ta…

Embed                    View on Twitter

The median family income of a student at Georgetown, as of 2017, was $229,100, with 74 percent of students coming from the top 20 percent, while 3.1 percent of students' family incomes fall in the bottom 20 percent, according to a 2017 report by The New York Times.

Georgetown remains need-blind when reviewing applications and guarantees to meet demonstrated need for all accepted students, according to Deacon. The policy has been in place since the late 1970s.

Legacy students make up 8.7 percent of the admitted class of 2023, according to Deacon.

"Of the 3202 total admits, just 2.5% received a legacy tip since most legacy admits are competitive on their own merits," Deacon wrote.

ROCHELLE VAYNTRUB/THE HOYA | Georgetown accepted 3,202 out of 22,788 total applicants to the Class of 2023, making this year's acceptance rate the lowest in the university's history.

This admissions cycle comes amid a March 12 indictment by the Department of Justice in which a former Georgetown tennis coach was charged with accepting bribes from parents in exchange for their children's admission to the university. The coach left the university in December 2017 after an internal investigation.

Student athletes are admitted to the university through a recruitment process spearheaded by university coaches, according to Deacon.

"Coaches recruit talented student athletes and have been allowed to support the admission of a limited number of these athletes," Deacon wrote. "The role of admissions is to verify the academic talent of those recommended."

Georgetown admitted students from all 50 states, the District of Columbia, Guam, Puerto Rico and the U.S. Virgin Islands. Admitted students to the Class of 2023 also came from 77 foreign countries, slightly lower than last year's representation of 81 foreign countries.

This admissions cycle, the university received the highest number of applicants from California — 2,632 — followed by 2,527 applications from countries outside the United States and 2,177 applications from students in the state of New York.

New Jersey, Maryland, Virginia, Massachusetts, Florida, Texas and Pennsylvania completed the list of the top 10 regional sources of applicants.

Overall, admitted students ranked within the top six percent of their high school class. The median score range for the SAT was between 710 and 790 for the math section and between 710 and 770 for the verbal section. The median score range for the ACT was between 32 and 35.

Georgetown holds a no "score choice" policy, meaning students must submit their scores from all standardized tests they have taken rather than sending only their highest scores. Georgetown also differs from most universities by using its own application rather than allowing students to apply via the Common Application or Coalition Application.

Georgetown's separate application limits its applicant pool to those who are seriously interested in the university, allowing most applicants to interview with an alumnus and personalizing Georgetown's admissions process, according to Deacon.

"We have never deviated from the belief that a student centered admissions policy begins with the relationship established between the student and college through the application process," Deacon wrote.

*This article was updated on April 6 to clarify the age of the median income data.*

FACEBOOK



The Hoya
8,404 likes

Like Page        Share

Be the first of your friends to like this

Tags: acceptance, acceptance rate, admissions, class of 2023, new students, regular decision, Students

Tweet                          Like 126



Author: **Taylor Kahn-Perry**

Visit Author:    All Posts

Leave a Reply

# i. First Year Application

We encourage you to begin your application process as soon as possible so we may open your admissions file and track any documents sent in support of your application.

Please visit the **General Information** page for first-year applicants to learn more about Georgetown application process. For important information about the 2020 application process, we recommend you to review the **Information for Applicants** document.

# ii. Georgetown Application Submission

**Step One** – Take a few moments to fill out and submit the **Georgetown Application**. This should only take you ten to fifteen minutes. Please submit this form as soon as possible so that we may create your official admissions file. We can then track and connect any documents or standardized testing sent in support of your application. The Application also initiates the **alumni interview process**.

*Immediately after submitting the Georgetown Application you should complete Steps Two and Three. In Step Three, submission of the Application Supplement need not be completed until the application deadline.*

**Step Two** – Within 24 hours of submitting the **Georgetown Application**, you will receive an email with instructions on how to create your application account. Once your account has been created, you will be able to complete and submit your **Georgetown Application Supplement** and send email requests to your College Counselor and Teacher(s) regarding your required recommendations.

**Step Three** – Once you login to your **application account**, please click on the link to continue your application for the upcoming academic year. Please read the instruction page entirely and then proceed to the recommendation request form. Please note that the recommendation form requires the email addresses of your high school counselor and

recommending teacher(s) so that an email requesting your supporting documents will be sent to them automatically. Please complete this section as soon as you have secured the correct contact information for your recommenders. If for some reason you are unable to obtain or provide the email addresses, please contact the **admissions office** and we will be happy to provide additional guidance. *The remaining pages of the supplement can be completed over time and are due no later than your application deadline.*

iii. Application Links:

**Georgetown Application**

*Deadline to submit: Immediately*
**Create an Applicant Account**
**Georgetown Request for Secondary School Report, Teacher's Report, and MidYear School Report**

*Deadline to submit: Early Action – November 1, 2019; Regular Decision – January 10, 2020*
**Application Supplement**

 *Deadline to submit: Early Action – November 1, 2019; Regular Decision – January 10, 2020*
*If you need to make any changes to your application, please submit **Application Changes Form**. **Please do not submit another copy of the application.***

**We strongly encourage applicants to use the online application.** For your reference, the application forms are available in PDF format below:

**Secondary School Report**
**Teacher's Report**
**Midyear School Report**

iv. Supplemental Materials: Art, Music, Theater, and Dance (Not Required)

We appreciate your interest in Georgetown University and look forward to working with you throughout the application process. If you have any questions, please contact **the admissions office**.

| Deadlines | Checklist |
|---|---|
| Submit Georgetown Application **ASAP** <br> Submit Early Action Applications **November 1** <br> Early Action Results Date **December 15** <br> Submit Regular Decision Applications **January 10** <br> Submit CSS Profile and FAFSA **February 1** <br> Regular Decision Results Date **April 1** <br> Reply Date for Admitted First-Year Students **May 1** | Georgetown Application <br> Application Supplement <br> Secondary School Report <br> Teacher's Recommendation <br> Application Fee **$75.00** <br> SAT/ACT Results <br> SAT Subject Tests Scores |



Exhibit A

Date of Hearing:  April 23, 2019

ASSEMBLY COMMITTEE ON HIGHER EDUCATION
Jose Medina, Chair
ACR 64 (McCarty) – As Introduced April 2, 2019

**SUBJECT**:  California State University and University of California:  SAT and ACT

**SUMMARY**:  Requests the Trustees of the California State University (CSU) and the Regents of the University of California (UC) to conduct a study on the usefulness, effectiveness, and need for the SAT and ACT to determine student admissions, including evaluation of specified matters and recommendations and a plan for phasing out the use of the SAT and ACT as a basis for admission.  Specifically, **this bill**:

1) Makes numerous declarations and findings, including:

    a)  The SAT tests reward costly test preparation rather than hard work and merit;

    b)  Wealthier students tend to do, on average, 400 points better than low-income students on the SAT;

    c)  Male students tend to receive much higher SAT math scores than female students, and slightly higher SAT writing scores than female students;

    d)  Students who generally do well in classes may test poorly in stressful conditions, such as testing to determine college entry;

    e)  The SAT emphasizes speed, quick recall, and time management over subject matter knowledge; and,

    f)  On average, White and Asian students do better than Black and Hispanic students.

2) Requests the Trustees of the CSU and the Regents of the UC conduct a study on the usefulness, effectiveness, and need for the SAT and ACT to determine student admissions.

3) Requests that the study include, but not be limited to, evaluation of norm-referenced versus criterion-referenced tests, test outcomes gaps based on ethnicity or income, test anxiety, test bias, and use of other multiple measures to determine student eligibility and qualifications such as Advanced Placement test results, International Baccalaureate (IB) test results, IB Diploma Programme completion, extracurricular activities, personal essays, teacher recommendations, submissions of creative works, and cumulative grade point average.

4) Requests that the study include recommendations and a plan for phasing out the use of the SAT and ACT as a basis for admission.

5) Requires the Chief Clerk of the Assembly to transmit copies of this resolution to the Trustees of the CSU, to the Regents of the UC, and to the author for appropriate distribution.

**EXISTING LAW**:

1) Establishes UC, to be administered by the Board of Regents, with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. (California Constitution Article IX, Section 9)

2) Establishes the CSU, governed by the Board of Trustees with respect to educational policy, finance, employee relations, campus planning, and facilities, among other areas. (Education Code (EDC) Section 89500, et seq.)

3) Imposes a number of requirements on test sponsors (defined as any individual, partnership, corporation, association, company, firm, institution, society, trust, or joint stock company) that develop, sponsor or administer standardized tests (defined as any test administered in California at the expense of the test subject and used for purposes of admission to, or class placement in, postsecondary institutions or their programs, or preliminary preparation for those tests). These requirements include specified reporting requirements, specified administration and financial data and information, technical psychometric data, test descriptions with specified information to be provided to test subjects, and other miscellaneous items. (EDC Section 99150 et seq.)

**FISCAL EFFECT**: Unknown.

**COMMENTS**: *Need for the bill.* According to the author, "…recently, it was uncovered that wealthy parents are buying their children's way into elite colleges and universities including two universities that are part of the University of California system. We all watched in complete disgust as the fraud committed in this recent college admissions scandal unfolded. California seems to be the epicenter of the national scandal as 25 of the 33 families in the initial indictment are from California, and 10 of the 17 corrupt coaches and university officials were based at California colleges and universities."

"This scandal not only undermines the public's trust in the college admissions process, but it further perpetuates the opportunity gap in our college system…the scandal also shed light on the many legal ways that wealth and social connections skew the college admissions process…the 'Operation Varsity Blues' investigation resulted in dozens of bribery and fraud charges against wealthy parents willing to break the law to get their children into an elite university, specifically with regard to SAT and ACT testing fraud."

"This Assembly Concurrent Resolution will request the Trustees of the CSU and the Regents of the UC to conduct a study on the effectiveness, usefulness and need of the SAT and the ACT to determine student admissions to their respective systems."

*SAT and ACT Exams.* The SAT and ACT exams are the two standardized tests referenced in ACR 64. The SAT exam - owned, developed, and published by the nonprofit College Board - was established in 1926 and is typically taken by high school juniors and seniors. The ACT exam – owned, developed, and published by ACT, Inc. – was introduced in 1959 as a competitor to the SAT exam, and serves the same student population. More than two million students in the class

of 2018 took the SAT, while ACT had 1.9 million test-takers. Many students take both exams as they prepare their college application.

*Standardized testing questions.* California's higher education segments have already begun to study the efficacy of standardized testing as a requirement for admission. In September of 2018 UC faculty leaders announced that they would launch a study aimed at finding out whether SAT and ACT tests accurately predict college success.

This decision to study SAT and ACT testing followed the April 2018 release of *Defining Access: How Test-Optional Works,* a study that offered data from 28 colleges and universities and 955,774 applicants over multi-year periods for each of those institutions. The study found that tests often fail to identify talented applicants who can succeed in higher education - and that applicants who opt not to submit scores are in many cases making wise decisions.

Among the findings from the sample studied:

The years following adoption of a test-optional policy saw increases in the total number of applications - by an average of 29% at private institutions and 11% at public institutions.

1) While the degrees varied, institutions that went test optional saw gains in the numbers of black and Latino students applying and being admitted to their institutions.

2) About one-fourth of all applicants to the test-optional colleges opted not to submit scores. (All of the colleges studied consider the SAT or ACT submitted by applicants.)

3) Underrepresented minority students were more likely than others to decide not to submit. Among black students, 35 percent opted not to submit, did not, while only 18 percent of white students did not submit. (Women were more likely than men to decide not to submit scores.)

4) "Non-submitters" (as the report termed those who didn't submit scores) were slightly less likely to be admitted to the colleges to which they applied, but their yield (the rates at which accepted applicants enroll) was higher.

5) First-year grades were slightly lower for non-submitters, but they ended up highly successful, graduating at equivalent rates or -- at some institutions -- slightly higher rates than did those who submitted test scores. This, the report says, is "the ultimate proof of success."

More than 1,000 universities across the country, and nearly 100 higher education institutions in California, have adopted policies that either do not require test scores to be submitted, or have otherwise de-emphasized the use of standardized tests by making admissions decisions "test optional" or "test flexible."

Nineteen of CSU's 23 campuses are included in the list of 100 California institutions referenced above. These campuses have a policy that may require SAT/ACT scores, but only the scores are considered when minimum grade point average and/or class rank is not met.

The California Community Colleges (CCC) have an open admissions standard, and no standardized test scores are required for admission. CCC Chancellor Eloy Ortiz Oakley, also a

member of UC Board of Regents, was quoted by the Los Angeles Times as saying that tests like SAT and ACT are "…more of a measure of wealth than it is of preparedness…it has created a whole industry around test prep, and it really does nothing to help a university determine who is the best applicant - so I think it should just be gone."

*Background on Admissions.* In 1960, California adopted a unique framework document – the Master Plan for Higher Education - intended to guide the state through the ensuing decades of intense demand for college education. The original 1960 Master Plan report and subsequent reviews are not themselves in state law. Instead, they are reports that were commissioned by the Legislature.

Many significant principles expressed by the Master Plan, however, have been adopted in statute. The Donahoe Higher Education Act (1960) codified many Master Plan recommendations, such as defining the distinct missions of the three public segments, establishing a Board of Trustees for CSU, and creating a coordinating council for higher education. Significant principles from the original Master Plan remain uncodified, however, including the eligibility targets for admission to UC and CSU. These eligibility policies require UC and CSU to admit freshmen students from among the top 12.5 percent and 33 percent, respectively, of the state's high school graduates.

*Committee Comments.* Moving forward, the author may wish to expand upon many of the "Whereas" clauses in ACR 64. Additional detail will help to better justify why a review of the SAT and ACT is necessary – even as the segments seem to already be studying their testing policies or enacting admissions standards that deemphasize standardized tests.

*The committee recommends, and the author has agreed, to amend the bill to read*, "Resolved, That the study should additionally include recommendations and, *if deemed necessary,* a plan for phasing out the use of the SAT and ACT as a basis for admission." Due to time constraints, these amendments will be processed in the Assembly Appropriations Committee.

*Related legislation.* AB 697 (Ting), also on today's committee agenda, prohibits a postsecondary educational institution from participating in the Cal Grant program if the institution provides preferential treatment in admissions to an applicant with a relationship to a donor or alumni of the institution.

AB 1383 (McCarty), also on today's committee agenda, establishes a process for the UC and the CSU to use in granting admissions by exception.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

None on file.

**Opposition**

None on file.

**Analysis Prepared by**: Kevin J. Powers / HIGHER ED. / (916) 319-3960

CSU NEW STUDENTS (DUPLICATED) APPLICATIONS AND ADMISSIONS
BY CAMPUS AND STUDENT LEVEL,  2018
ALL APPLICANTS
14-Dec-18

| CAMPUS | STUDENT LEVEL | APPLICATIONS RECEIVED | UNACCOMMODATED REDIRECTED | NOT REDIRECTED | TOTAL UNACCOMMODATED | ACCOMMODATED | INCOM |
|---|---|---|---|---|---|---|---|
| BAKERSFIELD | FIRST TIME FRESHMEN | 11,455 | 0 | 0 | 0 | 11,455 | |
| | UNDERGRAD TRANSFERS | 5,360 | 0 | 0 | 0 | 5,360 | |
| | POSTBACC/GRADUATES | 1,153 | 0 | 0 | 0 | 1,153 | |
| | TRANSITORY | 293 | 0 | 0 | 0 | 293 | |
| | UNKNOWN | 1 | 0 | 0 | 0 | 1 | |
| | TOTAL | 18,262 | 0 | 0 | 0 | 18,262 | 1 |
| | | | | | | | |
| CHANNEL ISLANDS | FIRST TIME FRESHMEN | 11,330 | 0 | 0 | 0 | 11,330 | |
| | UNDERGRAD TRANSFERS | 5,464 | 0 | 0 | 0 | 5,464 | |
| | POSTBACC/GRADUATES | 358 | 0 | 0 | 0 | 358 | |
| | TRANSITORY | 35 | 0 | 0 | 0 | 35 | |
| | TOTAL | 17,187 | 0 | 0 | 0 | 17,187 | |
| | | | | | | | |
| CHICO | FIRST TIME FRESHMEN | 23,964 | 0 | 0 | 0 | 23,964 | |
| | UNDERGRAD TRANSFERS | 7,571 | 0 | 0 | 0 | 7,571 | |
| | POSTBACC/GRADUATES | 1,182 | 0 | 0 | 0 | 1,182 | |
| | TRANSITORY | 240 | 0 | 0 | 0 | 240 | |
| | TOTAL | 32,957 | 0 | 0 | 0 | 32,957 | |
| | | | | | | | |
| DOMINGUEZ HILLS | FIRST TIME FRESHMEN | 20,235 | 0 | 0 | 0 | 20,235 | |
| | UNDERGRAD TRANSFERS | 12,287 | 0 | 0 | 0 | 12,287 | |
| | POSTBACC/GRADUATES | 2,663 | 0 | 0 | 0 | 2,663 | |
| | TRANSITORY | 47 | 0 | 0 | 0 | 47 | |
| | TOTAL | 35,232 | 0 | 0 | 0 | 35,232 | |
| | | | | | | | |
| EAST BAY | FIRST TIME FRESHMEN | 16,131 | 0 | 0 | 0 | 16,131 | |
| | UNDERGRAD TRANSFERS | 10,197 | 0 | 1 | 1 | 10,196 | |
| | POSTBACC/GRADUATES | 4,089 | 0 | 0 | 0 | 4,089 | |
| | TRANSITORY | 126 | 0 | 0 | 0 | 126 | |
| | TOTAL | 30,543 | 0 | 1 | 1 | 30,542 | |
| | | | | | | | |
| FRESNO | FIRST TIME FRESHMEN | 18,476 | 0 | 0 | 0 | 18,476 | |
| | UNDERGRAD TRANSFERS | 7,306 | 0 | 0 | 0 | 7,306 | |
| | POSTBACC/GRADUATES | 2,886 | 0 | 0 | 0 | 2,886 | |
| | TRANSITORY | 191 | 0 | 0 | 0 | 191 | |
| | TOTAL | 28,859 | 0 | 0 | 0 | 28,859 | |
| | | | | | | | |
| FULLERTON | FIRST TIME FRESHMEN | 51,415 | 0 | 0 | 0 | 51,415 | 1 |
| | UNDERGRAD TRANSFERS | 24,666 | 0 | 0 | 0 | 24,666 | |
| | POSTBACC/GRADUATES | 7,066 | 0 | 0 | 0 | 7,066 | |
| | TRANSITORY | 327 | 0 | 0 | 0 | 327 | |
| | TOTAL | 83,474 | 0 | 0 | 0 | 83,474 | 2 |
| | | | | | | | |
| HUMBOLDT | FIRST TIME FRESHMEN | 10,957 | 0 | 9 | 9 | 10,948 | |
| | UNDERGRAD TRANSFERS | 4,537 | 0 | 8 | 8 | 4,529 | |
| | POSTBACC/GRADUATES | 687 | 0 | 4 | 4 | 683 | |
| | TRANSITORY | 79 | 0 | 0 | 0 | 79 | |
| | TOTAL | 16,260 | 0 | 21 | 21 | 16,239 | |
| | | | | | | | |
| LONG BEACH | FIRST TIME FRESHMEN | 69,610 | 0 | 27 | 27 | 69,583 | |
| | UNDERGRAD TRANSFERS | 33,306 | 0 | 2 | 2 | 33,304 | |
| | POSTBACC/GRADUATES | 9,061 | 0 | 26 | 26 | 9,035 | |
| | TRANSITORY | 241 | 0 | 0 | 0 | 241 | |
| | TOTAL | 112,218 | 0 | 55 | 55 | 112,163 | 1 |
| | | | | | | | |
| LOS ANGELES | FIRST TIME FRESHMEN | 39,854 | 0 | 0 | 0 | 39,854 | |
| | UNDERGRAD TRANSFERS | 20,847 | 0 | 0 | 0 | 20,847 | |
| | POSTBACC/GRADUATES | 5,604 | 0 | 0 | 0 | 5,604 | |
| | TRANSITORY | 74 | 0 | 0 | 0 | 74 | |
| | TOTAL | 66,379 | 0 | 0 | 0 | 66,379 | |
| | | | | | | | |
| MARITIME ACADEMY | FIRST TIME FRESHMEN | 1,117 | 0 | 0 | 0 | 1,117 | |
| | UNDERGRAD TRANSFERS | 392 | 0 | 0 | 0 | 392 | |
| | POSTBACC/GRADUATES | 27 | 0 | 0 | 0 | 27 | |
| | TRANSITORY | 1 | 0 | 0 | 0 | 1 | |
| | TOTAL | 1,537 | 0 | 0 | 0 | 1,537 | |

| | | | | | | |
|---|---|---:|---:|---:|---:|---:|
| **MONTEREY BAY** | FIRST TIME FRESHMEN | 12,423 | 0 | 0 | 0 | 12,423 |
| | UNDERGRAD TRANSFERS | 3,875 | 0 | 0 | 0 | 3,875 |
| | POSTBACC/GRADUATES | 775 | 0 | 0 | 0 | 775 |
| | TRANSITORY | 209 | 0 | 0 | 0 | 209 |
| | TOTAL | 17,282 | 0 | 0 | 0 | 17,282 |
| **NORTHRIDGE** | FIRST TIME FRESHMEN | 34,856 | 0 | 0 | 0 | 34,856 |
| | UNDERGRAD TRANSFERS | 20,187 | 0 | 0 | 0 | 20,187 |
| | POSTBACC/GRADUATES | 5,105 | 0 | 0 | 0 | 5,105 |
| | TRANSITORY | 371 | 0 | 0 | 0 | 371 |
| | TOTAL | 60,519 | 0 | 0 | 0 | 60,519 |
| **POMONA** | FIRST TIME FRESHMEN | 36,662 | 0 | 0 | 0 | 36,662 |
| | UNDERGRAD TRANSFERS | 15,602 | 0 | 0 | 0 | 15,602 |
| | POSTBACC/GRADUATES | 1,795 | 0 | 0 | 0 | 1,795 |
| | TRANSITORY | 161 | 0 | 0 | 0 | 161 |
| | TOTAL | 54,220 | 0 | 0 | 0 | 54,220 |
| **SACRAMENTO** | FIRST TIME FRESHMEN | 27,108 | 0 | 0 | 0 | 27,108 |
| | UNDERGRAD TRANSFERS | 13,239 | 0 | 0 | 0 | 13,239 |
| | POSTBACC/GRADUATES | 3,369 | 0 | 0 | 0 | 3,369 |
| | TRANSITORY | 403 | 0 | 0 | 0 | 403 |
| | UNKNOWN | 5 | 0 | 0 | 0 | 5 |
| | TOTAL | 44,124 | 0 | 0 | 0 | 44,124 |
| **SAN BERNARDINO** | FIRST TIME FRESHMEN | 16,045 | 0 | 0 | 0 | 16,045 |
| | UNDERGRAD TRANSFERS | 9,515 | 0 | 0 | 0 | 9,515 |
| | POSTBACC/GRADUATES | 2,153 | 0 | 0 | 0 | 2,153 |
| | TRANSITORY | 349 | 0 | 0 | 0 | 349 |
| | UNKNOWN | 2 | 0 | 0 | 0 | 2 |
| | TOTAL | 28,064 | 0 | 0 | 0 | 28,064 |
| **SAN DIEGO** | FIRST TIME FRESHMEN | 69,399 | 0 | 185 | 185 | 69,214 |
| | UNDERGRAD TRANSFERS | 25,351 | 0 | 1 | 1 | 25,350 |
| | POSTBACC/GRADUATES | 7,915 | 0 | 0 | 0 | 7,915 |
| | TRANSITORY | 628 | 0 | 0 | 0 | 628 |
| | TOTAL | 103,293 | 0 | 186 | 186 | 103,107 |
| **SAN FRANCISCO** | FIRST TIME FRESHMEN | 35,606 | 0 | 0 | 0 | 35,606 |
| | UNDERGRAD TRANSFERS | 15,934 | 0 | 0 | 0 | 15,934 |
| | POSTBACC/GRADUATES | 3,911 | 0 | 0 | 0 | 3,911 |
| | TRANSITORY | 0 | 0 | 0 | 0 | 0 |
| | TOTAL | 55,451 | 0 | 0 | 0 | 55,451 |
| **SAN JOSE** | FIRST TIME FRESHMEN | 36,243 | 0 | 0 | 0 | 36,243 |
| | UNDERGRAD TRANSFERS | 16,831 | 0 | 0 | 0 | 16,831 |
| | POSTBACC/GRADUATES | 7,302 | 0 | 0 | 0 | 7,302 |
| | TRANSITORY | 241 | 0 | 0 | 0 | 241 |
| | TOTAL | 60,617 | 0 | 0 | 0 | 60,617 |
| **SAN LUIS OBISPO** | FIRST TIME FRESHMEN | 54,663 | 0 | 0 | 0 | 54,663 |
| | UNDERGRAD TRANSFERS | 10,916 | 0 | 0 | 0 | 10,916 |
| | POSTBACC/GRADUATES | 1,153 | 0 | 0 | 0 | 1,153 |
| | TRANSITORY | 63 | 0 | 0 | 0 | 63 |
| | TOTAL | 66,795 | 0 | 0 | 0 | 66,795 |
| **SAN MARCOS** | FIRST TIME FRESHMEN | 17,649 | 0 | 0 | 0 | 17,649 |
| | UNDERGRAD TRANSFERS | 8,934 | 0 | 0 | 0 | 8,934 |
| | POSTBACC/GRADUATES | 577 | 0 | 0 | 0 | 577 |
| | TRANSITORY | 40 | 0 | 0 | 0 | 40 |
| | TOTAL | 27,200 | 0 | 0 | 0 | 27,200 |
| **SONOMA** | FIRST TIME FRESHMEN | 14,478 | 0 | 0 | 0 | 14,478 |
| | UNDERGRAD TRANSFERS | 4,106 | 0 | 2 | 2 | 4,104 |
| | POSTBACC/GRADUATES | 654 | 0 | 16 | 16 | 638 |
| | TRANSITORY | 68 | 0 | 0 | 0 | 68 |
| | TOTAL | 19,306 | 0 | 18 | 18 | 19,288 |
| **STANISLAUS** | FIRST TIME FRESHMEN | 7,674 | 0 | 0 | 0 | 7,674 |
| | UNDERGRAD TRANSFERS | 3,602 | 0 | 0 | 0 | 3,602 |
| | POSTBACC/GRADUATES | 1,214 | 0 | 0 | 0 | 1,214 |
| | TRANSITORY | 39 | 0 | 0 | 0 | 39 |

Note: For SAN FRANCISCO TOTAL row and SAN JOSE TOTAL row there is a "1" in the far right margin column.

| | | | | | | |
|---|---|---|---|---|---|---|
| | UNKNOWN | 1 | 0 | 0 | 0 | 1 |
| | TOTAL | 12,530 | 0 | 0 | 0 | 12,530 |
| **CALSTATE TEACH** | POSTBACC/GRADUATES | 552 | 0 | 0 | 0 | 552 |
| | TOTAL | 552 | 0 | 0 | 0 | 552 |
| **INTERNATIONAL** | UNDERGRAD TRANSFERS | 0 | 0 | 0 | 0 | 0 |
| **PROGRAMS** | TOTAL | 0 | 0 | 0 | 0 | 0 |

CSU NEW STUDENTS (DUPLICATED) APPLICATIONS AND ADMISSIONS
SYSTEMWIDE, 2018
ALL APPLICANTS
14-Dec-18

| STUDENT LEVEL | APPLICATIONS RECEIVED | UNACCOMMODATED REDIRECTED | NOT REDIRECTED | TOTAL UNACCOMMODATED | ACCOMMODATED | INCOM |
|---|---|---|---|---|---|---|
| FIRST TIME FRESHMEN | 637,350 | 0 | 221 | 221 | 637,129 | 6 |
| UNDERGRAD TRANSFERS | 280,025 | 0 | 14 | 14 | 280,011 | 4 |
| POSTBACC/GRADUATES | 71,251 | 0 | 46 | 46 | 71,205 | 1 |
| TRANSITORY | 4,226 | 0 | 0 | 0 | 4,226 | |
| UNKNOWN | 9 | 0 | 0 | 0 | 9 | |
| TOTAL | 992,861 | 0 | 281 | 281 | 992,580 | 13 |
| PERCENT APPLICANTS | 100 | 0 | 0 | 0 | 100 | |
| PERCENT ACCOMMODATED | | | | | 100 | |

BACK

**Preliminary Data Findings**
**Data are Subject to Change**

**Table 1.1**
**University of California**
**FRESHMAN Applications by Campus and Residency**
**Fall 2017, 2018 and 2019**

| | | Number of Applications | | |
|---|---|---|---|---|
| | | 2017 | 2018 | 2019 |
| **Universitywide** | California | 111,725 | 119,908 | 115,862 |
| (unduplicated counts) | Out-of-State | 32,735 | 33,467 | 32,895 |
| | International | 27,186 | 28,543 | 27,773 |
| | **Total** | **171,646** | **181,918** | **176,530** |
| **Berkeley** | California | 49,249 | 51,893 | 50,123 |
| | Out-of-State | 20,305 | 20,599 | 20,193 |
| | International | 15,462 | 17,088 | 17,037 |
| | **Total** | **85,016** | **89,580** | **87,353** |
| **Davis** | California | 51,374 | 56,701 | 55,339 |
| | Out-of-State | 5,587 | 5,760 | 6,180 |
| | International | 13,946 | 15,518 | 16,544 |
| | **Total** | **70,907** | **77,979** | **78,063** |
| **Irvine** | California | 63,097 | 71,240 | 70,540 |
| | Out-of-State | 6,007 | 6,272 | 6,913 |
| | International | 15,956 | 17,502 | 18,103 |
| | **Total** | **85,060** | **95,014** | **95,556** |
| **Los Angeles** | California | 63,480 | 71,519 | 69,558 |
| | Out-of-State | 20,860 | 22,731 | 23,023 |
| | International | 17,841 | 19,445 | 18,685 |
| | **Total** | **102,181** | **113,695** | **111,266** |
| **Merced** | California | 20,075 | 22,291 | 22,614 |
| | Out-of-State | 515 | 404 | 485 |
| | International | 1,258 | 1,168 | 1,373 |
| | **Total** | **21,848** | **23,863** | **24,472** |
| **Riverside** | California | 38,629 | 43,934 | 43,117 |
| | Out-of-State | 1,205 | 1,237 | 1,351 |
| | International | 3,602 | 3,654 | 4,752 |
| | **Total** | **43,436** | **48,825** | **49,220** |
| **San Diego** | California | 59,081 | 65,716 | 66,041 |
| | Out-of-State | 11,434 | 12,402 | 13,176 |
| | International | 17,941 | 19,773 | 19,895 |
| | **Total** | **88,456** | **97,891** | **99,112** |
| **Santa Barbara** | California | 58,465 | 66,630 | 65,784 |
| | Out-of-State | 8,768 | 9,594 | 10,535 |
| | International | 14,557 | 16,070 | 17,104 |
| | **Total** | **81,790** | **92,294** | **93,423** |
| **Santa Cruz** | California | 42,692 | 45889 | 44,354 |
| | Out-of-State | 3,470 | 3579 | 3,519 |
| | International | 6,345 | 6809 | 7,660 |
| | **Total** | **52,507** | **56,277** | **55,533** |

SOURCE: University of California Office of the President, Student Affairs, Admissions, 01/05/17, 01/09/18 and 01/07/19.

[Skip to content](#)

# Current ACT Fees and Services

All fees are nonrefundable unless otherwise noted.

## The ACT

|  | Fee | Details |
| --- | --- | --- |
| **The ACT (no writing)** | $52.00 | Includes reports for you, your high school, and up to four colleges (if codes are provided when you register). |
| **The ACT with writing** | $68.00 | Includes reports for you, your high school, and up to four colleges (if codes are provided when you register). [More about the ACT with writing](#) |
| **Test option change** | $16.00 | The writing test fee is refundable on written request if you are absent on test day or switch to ACT (no writing) before testing begins. |

## Additional Fees

Add to your test fee (except for Test Center Change).

|  | Fee | Details |
| --- | --- | --- |
| **Late registration** | $30.00 | Registration or test date change made during the late period for a national test date. |

| | | |
|---|---|---|
| **Standby testing** | $55.00 | Refunded if you are denied admission to the test center on test day or registration was cancelled due to no photo provided. [More about standby testing](#) |
| **Test date change** | $32.00 | For different date only if absent or unable to test on the original date or if registration is cancelled for failure to meet ACT test security requirements. You must pay the basic registration fee for the new test date plus the test date change fee. If you request a date change after the regular deadline for the new date, you must also pay the late registration fee. Your basic registration fee for the original test date will be refunded. [How can I make changes to my registration?](#) |
| **Test center change** | $32.00 | For the same test date. |
| **Score reports to 5th and 6th college choices** | $13.00 | Request online before the test date. Refundable on written request if you do not test. |

# Additional Services

| | Fee | Details |
|---|---|---|
| **Additional Score Reports** | $13.00 | You can request additional score reports online or by providing an [additional score report form.](#) |
| **Test Information Release** | $22.00 | You can [request a copy of your test questions and answers.](#) |

| | | |
|---|---|---|
| **Telephone re-** | $15.00 | • To register by phone, you must have previously registered for a national test date or have already received a score report from State and District, |

| registration | Arranged, or DANTES testing. |
| | • Plan ahead when re-registering by phone. You can expect longer than average wait times during registration deadline weeks. The earlier you register, the more likely you are to secure your preferred test date and test center. |
| | • If you re-register by phone, you can print your admission ticket from the Web if you have a student Web account. |
| | • If you owe any fees on your account, you will need to pay your balance due before submitting your new registration. |

# More Information

## Fee Waivers

If you are testing on a national test date and can't afford the registration fee for the ACT or ACT with writing, you may be eligible for an ACT Fee Waiver. Information about the eligibility requirements and how to request a fee waiver is sent each summer to high schools. You should work with your local high school to determine your eligibility.

You must meet **all** of the following requirements:

1. Currently enrolled in high school in the 11th or 12th grade.
2. Be testing in the US, US territories, or Puerto Rico.
3. Meet one or more indicators of economic need listed on the ACT Fee Waiver form.

If you are eligible, you may use a maximum of **two** separate fee waivers total. The waiver is used once you register, even if you do not test on the requested test date.

**IMPORTANT: To take full advantage of the waiver, you must follow through and test on your registered test date.**

Fee waivers cover **only** the basic registration fee and late fee for your test option on a national test date, including up to four college choices (if you provide valid codes when you register). After registration, the student can request up to an additional 20 regular score reports for free. Waivers do not cover test date or test center changes, standby fee, additional score reports, or any other services.

You **cannot** request a fee waiver directly from ACT; you must contact your high school counselor. If you receive an ACT Fee Waiver Form, follow the "How to Apply this Fee Waiver" on it for your registration method (or if requesting Special Testing).

When you register online and request any additional services, you **must** enter a credit card to pay those fees before submitting your registration.

**Remember, if you are eligible for a fee waiver, you have access to free learning resources.**

┌─────────────────────────────┐
│   Free Resources            │
└─────────────────────────────┘

# State Vouchers

Some states offer vouchers to select student populations to cover all or portions of the registration fee for the ACT. The vouchers are distributed through the schools. Check with your school's counselor or test coordinator to see if you will receive one.

The following procedures apply:

- The voucher covers reports to your high school and up to four colleges (if you provide valid codes when you register).
- This voucher may not be used to pay any of the following fees: the late registration fee, additional college choices, other services, test date or test center changes, or the standby fee.
- You may submit a voucher for only one test date.
- The voucher is used once you register or request standby testing even if you do not test on the requested test date.

STUDENT DIRECTIONS:

- If registering on the web, enter the serial number from the top-right corner of the voucher on the payment screen, and then follow the directions on the screen to "apply" the voucher to validate it. (If you select any additional services or register during the late period, enter a credit card to pay those additional fees.) You must click "Submit" to complete your registration.
- If registering by mail, enter the serial number from the top-right corner of the voucher in Block W of the registration folder. You must return the completed and signed voucher with your completed registration folder.
- If requesting Special Testing, return the completed and signed voucher with your completed Request for ACT Special Testing.

# Contact Us

If you have more questions about billing, specifically, please use this contact form to get in touch.

See SAT registration fees and other charges for U.S. test takers in the tables below.

Important:

## i. International Students

If you're taking the SAT in another country, you may have to pay an extra processing fee. See international fees.

## ii. Test Fees

| Test | Fee |
|------|-----|
| SAT | $49.50<br>Fee waiver available |
| SAT with Essay | $64.50<br>Fee waiver available |

Important:

## iii. Subject Tests

See all fees for SAT Subject Tests.

## iv. Additional Fees

| Item | More Information | Fee |
|------|-----------------|-----|
| Register by phone | Available only if you've registered previously. | $15 |
| Change fee | For changing your test center or test date or changing between the SAT and SAT Subject Tests or vice versa. Does | $30 |

| Item | More Information | Fee |
|------|-----------------|-----|
|  | not apply to changing between the SAT and the SAT with Essay, but you pay the difference between the tests if adding the essay. |  |
| Late registration fee | For registering after the regular deadline but before the late registration deadline. | $30 |
| Waitlist fee | Charged only if you're admitted to the test center on test day. | $53 |

## v. Score Services and Fees

| Service | More Information | Fee |
|---------|-----------------|-----|
| Registration score reports | Four registration score reports are available up to nine days after the test date. | $0 |
| Additional score report request | Additional score reports (outside of the above four), or score reports ordered outside of the above time period are subject to this fee per report. | $12 Fee waiver available |
| Rush order | If you request rush service, your score reports will typically be sent to colleges within one to two business days (not counting holidays and weekends). **Additional score report fees (as described above) still apply on rush orders.** | $31 |

| Service | More Information | Fee |
|---|---|---|
| Scores by phone | Scores by phone are released according to the same schedule as online scores. This service does not send scores to colleges any earlier.<br>To get your score by phone, call Customer Service. You'll need your test registration number (printed on your admission ticket), your birth date, a credit card number, and the card's expiration date. | $15<br>(per call) |
| Archived (older) scores order | If you want your old test scores, you should request archived scores. You can request them by phone or mail. The standard fee for additional score report requests applies to each score report you'd like to include with your order. | $31 |
| SAT Question-and-Answer Service* | This service provides the test questions from the specified test you took, the correct answers, scoring instructions, and a form you can use to order a copy of your answer sheet.<br>The QAS service is not available for every SAT administration. | $18<br>Fee waiver available |
| SAT Student Answer Service* | This service provides a list of question types from the specified test you took; whether you answered the question correctly or incorrectly, or omitted the answer; and the level of difficulty. | $13.50<br>Fee waiver available |
| Multiple-choice hand score verification | When hand scoring of a multiple-choice score is requested, your entire answer sheet will be manually reviewed—you can't request verification of scores for a single section on the SAT or just one of | $55<br>Fee reduction available |

| Service | More Information | Fee |
|---------|-----------------|-----|
| | several SAT Subject Tests taken on the same date. **For SAT only:** If you order hand score verification, you will no longer see the full online score report, and you won't have access to the Student Answer Service or Question-and-Answer Service for your hand scored answer sheet. | |
| Essay hand score verification | This verification determines whether there was an error made in the scanning or processing of the essay scores assigned by essay readers. If an error is found, your adjusted score is automatically reported and your fee is refunded. | $55 Fee reduction available |

*These are refundable only if your order has not yet been fulfilled or if you missed your test date (for example, if you canceled your test, were absent, or had to take a makeup test).

# i. The SAT May Have Been Changed To Help The College Board Maximize Revenue





AP Photo/Stephen J. Boitano

Wednesday, the College Board, the group responsible for the SAT, announced changes that included removing difficult vocabulary and making the essay portion of the exam optional. Most news reports accepted the College Board's purported reason for changing the SAT: The non-profit wanted to more accurately reflect the schoolwork completed in high school and needed in college.

**The New York Times's headline reported the College Board's goal was for the SAT to "realign with schoolwork." CNN also reported, with little skepticism, that the purpose was to connect the test to high schools and create, in the words of College Board President and CEO David Coleman, "more college-ready students.**

Another answer?

But there's another reason to make the test more appealing to students: improving the College Board's financial outlook.

The SAT faces two challenges. First, the ACT, a competing test, has slowly gained market share, even passing the SAT in total number of test takers in 2012 . Second, the trend of "test flexible" universities is spreading, with top-100 schools like the University of Rochester, Brandeis, and Wake Forest accepting alternatives like graded exams, extracurricular activities, or simply high-school GPA.

Why might these trends be a problem? The College Board is a non-profit, but one with a yearly revenue of more than $750 million, according to the group's most recent publicly available 990 form. The president at the time of the 990, Gaston Caperton, made more than $1.5 million, including incentive and deferred compensation; 22 other employees earned at least $200,000. This is a sprawling non-profit deeply connected to higher education in the United States, with a budget that reflects that omnipresence.

The SAT clearly plays a role in this budget. In 2012, 1.6 million students took the SAT, and as the New York Times reported, today the number is likely higher. The 2014 test will cost students (or their parents, often) $51. Waitlist registration, available to those who miss registration deadlines, costs an additional $45. Changing the date of your test runs you $27.50. The details of the College Board's revenue stream aren't publicly available, but SAT administration and all of its related paraphernalia — The Official SAT Study Guide with DVD ($31.99), the SAT Score Verification Services ($18), the SAT Online Course (just $69.95 a year!) — surely make up a sizable portion. Chadwick Matlin of Slate.com conservatively estimated this combined revenue at around $115 million back in 2006.

It's worth noting here that the twin goals of accurate student measurement and revenue maximization aren't mutually exclusive. For instance, one common complaint of the SAT is that its scores are actually a worse indicator for college success than high school test scores. In that case, a more accurate test would probably be good for students and universities, but also better for the College Board's bottom line. Finally, the College Board is also partnering to make a free test-prep course with the Khan Academy, a move clearly not taken to generate more revenue.

Regardless, journalists should stop reporting the SAT's reforms as if they were the result of a few good-hearted education advocates at an NGO, rather than a business desperately trying to keep a core revenue stream intact.

*Read the original article on The Motley Fool. Copyright 2019. Follow The Motley Fool on Twitter.*

iau2tanS kjc

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                           17 Cr. 61(LAP)

 5    GARY TANNER

 6    ANDREW DAVENPORT,

 7              Defendants.

 8    ------------------------------x        Sentence

 9
                                             October 30, 2018
10                                           10:05 a.m.

11
      Before:
12
                          HON. LORETTA A. PRESKA,
13
                                             District Judge
14

15

16
                              APPEARANCES
17
      GEOFFREY S. BERMAN
18         United States Attorney for the
           Southern District of New York
19    BY:  RICHARD A. COOPER
           AMANDA K. KRAMER
20         Assistant United States Attorneys

21

22    WILMER CUTLER PICKERING HALE & DORR, LLP
           Attorneys for Defendant Tanner
23    BY:  BRENDAN R. McGUIRE
           HOWARD M. SHAPIRO
24         MATTHEW R. GALEOTTI
           CLAIRE GUEHENNO
25
```

iau2tanS kjc

                              APPEARANCES
                              (continued)


KOSTELANETZ & FINK, LLP
        Attorney for Defendant Davenport
BY:  SHARON L. McCARTHY


                    – and –


POLSINELLI PC
        Attorneys for Defendant Davenport
BY:  MARY CLARE BONACCORSI




ALSO PRESENT:

SHAPIRO ARATO, LLP
        Appellate Counsel for Defendant Davenport
BY:  ALEXANDRA  A. E. SHAPIRO


COVINGTON & BURLING LLP
        Attorneys for Valeant
BY:  NANCY L. KESTENBAUM


SPECIAL AGENT MICHAEL PREIS, F.B.I.

1         (Case called)

2         THE COURT:  United States v. Gary Tanner and Andrew

3    Davenport.

4         Is the government ready?

5         MR. COOPER:  Yes.  Good morning, your Honor.  Richard

6    Cooper and Amanda Kramer for the government.  With us at

7    counsel table, F.B.I. Special Agent Michael Preis.

8         THE COURT:  Good morning.

9         MS. KRAMER:  Good morning, your Honor.

10        THE COURT:  Counsel for defendant Tanner.

11        MR. McGUIRE:  Good morning, your Honor.  Brendan

12   McGuire, Howard Shapiro, Matthew Galeotti, and Claire Guehenno

13   on behalf of Mr. Tanner.  Mr. Tanner is here with us, as well.

14        THE COURT:  Yes, sir.  Good morning.

15        Counsel for Mr. Davenport.

16        MS. McCARTHY:  Good morning, your Honor.  Sharon

17   McCarthy.  I am here with Mary Clare Bonaccorsi and also

18   Mr. Davenport.

19        THE COURT:  Yes, ma'am.  Thank you.

20        Mr. McGuire, have you and your client had adequate

21   time to review the presentence report?

22        MR. McGUIRE:  We have, your Honor.

23        THE COURT:  Is there any reason it should not be made

24   a part of the record?

25        MR. McGUIRE:  No, your Honor.

1          THE COURT:  Are there any objections to the report?

2          MR. McGUIRE:  None other than were previously included

3     in our prior written submissions to the court, your Honor.

4          THE COURT:  Do you folks want to discuss loss amount

5     at this point?  Obviously you have all put in materials on it,

6     and I think the question is whether or not, under 2B4.1, we are

7     taken back to the 2B1.1 guidelines and thus the 20 points.

8     That's the question.

9          Ms. McCarthy.

10         MS. McCARTHY:  Your Honor, we certainly put in our

11    submissions that we don't believe that there is a loss here;

12    that we have proven in fact that Valeant earned quite a lot of

13    money off of the work that Philidor did; that in fact the

14    purchase price for Philidor was below its purchase price value

15    and was bought at a bargain by Valeant.

16         So we are not contesting that there was a verdict here

17    against our clients --

18         THE COURT:  But here is the question.  I am focusing

19    on the bribery, commercial bribery guideline, which

20    specifically talks about the value of the bribe --

21         MS. McCARTHY:  Yes, we understand.

22         THE COURT:  -- and doesn't that take us to the 9.7,

23    which then takes us to the 2B1.1 guideline, which gives us the

24    20 points?

25         MS. McCARTHY:  That is correct, your Honor.

1          THE COURT:  Okay.  There is no way around that

2    point --

3          MS. McCARTHY:  Right.

4          THE COURT:  -- regardless of what we think about the

5    other counts of conviction.

6          MS. McCARTHY:  We were not aware that the government

7    was going to be referring to 2B4.1 when we made our sentencing

8    submissions, your Honor.  I believe that that's an accurate

9    reading of 2B4.1 and that is the value of the payment, 9.7.

10         Loss is relevant for other issues that we will be

11   discussing, including towards restitution, which your Honor has

12   given us time to brief.

13         THE COURT:  Yes, ma'am.  I was looking at page 10,

14   footnote 3 of the government's submission.  I guess one of the

15   reasons that I ask this question is if we agree as to that, I

16   think there doesn't need to be further findings on loss or

17   restitution at this point in time and you people can be heard

18   on all of that in due course.

19         MR. McGUIRE:  Your Honor, I think that may be true.  I

20   would just want to add for the record, though, the government

21   on page 6 of its submission, in footnote 2, cites to the *Kelly*

22   case, which is a Judge Sweet opinion, which does, as the

23   government indicates, apply to 2B4.1.  However, I would say in

24   that opinion Judge Sweet's point of reference is loss.  He

25   talks explicitly about loss because 2B4.1 references us back,

1    as your Honor stated, to 2B1.1.  As your Honor stated, the

2    language in 2B1.1 speaks in terms of the amount of the bribe,

3    but I would just note that in that opinion the focus then

4    became loss to the victim.

5          THE COURT:  Okay.  I understand that you people might

6    not necessary and probably don't agree that that is a loss

7    amount, particularly in connection with the honest services

8    count of conviction, but I think that 3D1.2(b) and 3D1.3

9    instructs us to take the highest guideline of the grouped

10   counts of conviction and, thus, under the commercial bribery

11   guideline, we are stuck with the 20 points.  Isn't that right?

12         MS. McCARTHY:  We are of that view except for the 9.7

13   million.  Valeant presented in its victim impact statement, and

14   I'm sure the court hasn't had a chance to focus on that,

15   because we are not dealing with that right now, $8 million as

16   an alternative theory which the government puts forward in

17   footnote 3 as well.  So we would ask the court, instead of 9.7,

18   to use the 8 million, which results in an 18-point, rather than

19   a 20-point, enhancement.

20         THE COURT:  All right.  What is the government's

21   position on all of this, please?

22         MS. KRAMER:  Good morning, your Honor.

23         THE COURT:  Yes, ma'am.

24         MS. KRAMER:  Mr. Cooper will be handling the bulk of

25   the sentencing proceeding today, but I will address this issue.

1          2B4.1 is unequivocal that the question for the number

2     of levels to be increased using the table in 2B1.1 is to be

3     based on the greater of the value of the bribe or the improper

4     benefit to be conferred, so what is paid as a bribe or a

5     kickback or what is received in exchange.

6          We are taking a fairly conservative view that the

7     bribe is the greater amount in this case.  I think all of the

8     litigation -- a lot of the litigation that has taken place in

9     cases applying 2B4.1 is where the bribe or kickback is less

10    than the amount received, which we are avoiding that litigation

11    by taking the conservative view, but there is no world in which

12    the value of the bribe in this case is less than 9.7, and the

13    improper benefit conferred is either larger than that or you

14    use the bribe amount.

15         The use of 2B4.1 was in the government's response to

16    defense counsel's objections to the PSR and was in the final

17    PSR.  And the case law is very plain.  There are a couple of

18    cases, including *Kelly*, where the court uses loss as a

19    shorthand but is still applying the principle of 2B4.1 and

20    looking at the value of the bribe or the improper benefit

21    conferred.

22         There is no authority to the contrary that loss,

23    pecuniary harm to a victim is what should be applied under

24    2B4.1.  The government has not seen any and defense counsel

25    have not cited any.  So there seems to be not a substantive

1    objection to this.

2              THE COURT:  Anything else on that point, please?

3              MR. McGUIRE:  Not from us, your Honor.

4              MS. McCARTHY:  No, your Honor.

5              THE COURT:  All right.  Thank you, then.

6              Relying, then, on Section 2B4.1, I adopt, and I am

7    looking at --

8              MS. McCARTHY:  Your Honor, we have some objections to

9    the PSR.  I don't know if you want to do our objections before

10   going into the findings.

11             THE COURT:  All right.  I am doing Mr. Tanner now.

12             MS. McCARTHY:  Sure.

13             THE COURT:  I thought I would do Mr. Tanner first --

14             MS. McCARTHY:  Absolutely.  I wasn't sure how you were

15   doing it.

16             THE COURT:  -- and then move to you.

17             MS. McCARTHY:  Perfect.  Thank you.

18             THE COURT:  Okay.

19             Anything else, Mr. McGuire, that you wanted to object

20   to?

21             MR. McGUIRE:  No, your Honor.  Thank you.

22             THE COURT:  With respect to the offense level

23   computation, I accept the finding of the presentence report set

24   forth at paragraphs 37, and as I say, through and including

25   paragraph 40, which refers to 2B4.1, so I accept the findings

1    of the presentence report set forth at paragraphs 37 through 48

2    which conclude that a total offense level of 32 is appropriate.

3          With respect to the defendant's criminal history, I

4    accept the findings of the presentence report set forth at

5    paragraphs 49 through 55, which conclude that a criminal

6    history category of I is appropriate.

7          Mr. McGuire, I have an avalanche of paper.  I hope

8    that you will not ask me to recite every one of the letters and

9    the follow-up letters that you people have sent me, but suffice

10   it to say that I have a great package of material.

11         MR. McGUIRE:  Thank you, Judge.  We added to that in a

12   minimal fashion this morning by giving your Honor a one-page

13   late arrival --

14         THE COURT:  Yes, sir.

15         MR. McGUIRE:  -- by Ms. Mary Ramsey.

16         THE COURT:  Yes, sir.

17         Would you like to now speak on behalf of Mr. Tanner?

18         MR. McGUIRE:  Sure, your Honor.  Thank you.

19         Your Honor, to begin today, I would like to thank you,

20   Judge, for the care and consideration that I know you bring to

21   this process and for the courtesies that you have extended to

22   counsel over the past two years.  We have done all that we

23   could to defend Gary, and it was a hard-fought trial.  But as

24   is well known, your Honor ensured that everyone in this

25   courtroom treat each other properly and all parties were

1    treated with respect by your Honor and by everyone in chambers,

2    so thank you.

3          I would also like to note at the outset my respect for

4    the AUSAs on the case.  While I continue to disagree with

5    certain views that Ms. Kramer and Mr. Cooper had of the case

6    and of Gary, as I believe they know, it is their positions that

7    I take issue with, not them personally.

8          My experience over the years before your Honor has

9    taught me many lessons, none more important than it is the

10   quality of the argument, not the quantity that moves the needle

11   in this courtroom.  I have taken that lesson to heart today, as

12   I am sure the court is fully familiar with our submissions, so

13   I do not intend to be repetitive.

14         In preparation for today, I have conferred with others

15   with more experience than I and reviewed more sentencing

16   transcripts than I care to admit.  In addition to reinforcing

17   the gravity of today's proceeding, this preparation has also

18   left me unsettled -- unsettled in the knowledge that no matter

19   how many hours we spent preparing for today, on some level we

20   are bound to fail.  We will fail to adequately convey to you

21   the meaning and the impact of Gary's life.  Our submission and

22   presentation to the court about his history, no matter how

23   lengthy or eloquent, cannot compete with a three-week trial of

24   more than a dozen witnesses and hundreds of exhibits focused

25   entirely on his offense conduct.  It may only be natural, then,

iau2tanS kjc

1  for the offense conduct which spanned a narrow slice of this

2  44-year-old-man's life to assume disproportionate prominence as

3  we all think about the appropriate sentence in this case.

4        But as we all know, each of these factors -- the

5  defendant's history and characteristics, as well as the offense

6  conduct -- must be accorded equal consideration under the

7  statute.  And one could argue that on judgment day, to the

8  extent any factor should receive special consideration, it

9  should be the entirety of the one's life, not one chapter in

10 it.  But that's the way it is, we understand that, and will not

11 spend more than a few minutes today on Gary's history and

12 characteristics.  We know this court appreciates that

13 limitation, but it is certainly clear to me that whatever I say

14 here today will not do this good man justice.

15        I will do my best to provide balance to the relatively

16 dark picture that the government has painted in its submission

17 to convey the humanity inherent in this tragic part of Gary's

18 life and the lives of his wife and sons and to ask this court

19 to consider the fullness and the decency of the life he has led

20 and the potential good he can do in the future.

21        Before I begin, I would like to just make three

22 preliminary points clear for the court.

23        First, neither our submission nor our presentation

24 today is intended to retry this case or to pick a fight with

25 the government about the evidence.  The jury has rendered its

1    verdict and Gary respects the verdict.  By asking the court to

2    consider all of the good that Gary did for Valeant and

3    suggesting that Valeant was not financially harmed by his

4    conduct, Gary is not refusing to accept responsibility.  Gary

5    wholeheartedly accepts responsibility, and you will hear that

6    from him, Judge.  Rather, we, as Gary's lawyers, are trying to

7    highlight the unusual aspects of this case as mitigating

8    factors for sentencing.  By asking the court to also consider

9    the ways in which Gary's performance benefited Valeant, we are

10   not attempting to minimize his intent or his failure to

11   disclose the payments.

12           The government repeatedly notes that the jury rejected

13   certain of the arguments we made in our submission to the

14   court.  Of course some of these arguments were not squarely put

15   to the jury but, more importantly, we are no longer in front of

16   the jury, and we submit that the court can and should seriously

17   consider all of the facts that distinguish this case from every

18   other reported honest services fraud case, including the fact

19   that the efforts of these two men benefited Valeant by hundreds

20   of millions of dollars, which is of course why Valeant directed

21   them to build Philidor in the first place.

22           The second point that we feel compelled to make clear

23   is that, sitting before you today, Gary Tanner more than

24   accepts responsibility for his conduct.  He is genuinely

25   remorseful for his conduct.  He is broken.  Not just sorry that

1   he got caught, but sorry and contrite for his choices and for

2   his lack of transparency with his employer, an employer that

3   provided him with an opportunity to do what he loved doing --

4   building and fixing companies.  Please understand that Gary

5   appreciates the seriousness of his conduct and that he knows he

6   is here today as a result of his own actions.  That is

7   overwhelming to him and will remain with him for the rest of

8   his life.

9            The third and final point, Judge, relates to the

10  sentencing guidelines.  While we recognize that the court, as

11  you just did, as a legal matter must determine the applicable

12  guidelines range, we submit that, as a practical matter, the

13  guidelines are irrelevant to this case.  They fail completely

14  to capture the nature and the nuance of the conduct here, and

15  they are so far out of the realm of the reasonable that they

16  render themselves useless.

17           As we noted in our submission, several respected

18  judges in this district have expressed similar criticism in

19  prior cases that are far less unusual than this one.  As their

20  sentencing recommendations demonstrate, both the government and

21  probation recognize this, so I won't belabor the point.  But we

22  ask the court to ascribe no weight to the applicable guideline

23  range.

24           Instead, when considering the guideline range along

25  with all the other Section 3553(a) factors, we ask the court to

1    do what the government suggests on page 8 of its submission,

2    "to take into consideration your own sense of what is a fair

3    and just sentence under all the circumstances," as the Second

4    Circuit instructed in the *Jones* case.

5            Because the guidelines, Judge, do nothing to guide us

6    in this case, the question of what is a fair and just sentence

7    under all the circumstances here is a more challenging one and

8    is made all the more challenging because there are no analogous

9    cases upon which to rely.  After two years with this fact

10   pattern, like all of us involved in the case know it is an

11   unusual one.  That is one reason why the court had serious

12   questions about the government's theory at the start of the

13   case and when the government's superseded the indictment.  And

14   that is why the government does not cite to a single analogous

15   case in support of its requested sentence, because no such case

16   exists.

17           And that brings me to the key point I would like to

18   focus on today:  The law requires the court to impose a

19   sentence that is sufficient but not greater than necessary to

20   serve the goals of sentencing.  That is the principle with

21   which today's sentence of Gary must be consistent.  The

22   sentence we all know cannot be arbitrary.  Indeed, that is why

23   all of us -- probation, the government and both defendants --

24   have requested sentences of varying degrees well below the

25   guideline range.  The guidelines produce an arbitrary sentence

1   here and an arbitrary sentence is an unjust sentence.  Today's

2   sentence must be principled to be fair and just.

3          So then it begs the question, what is a sufficient

4   sentence in this case?  And if one believes, as the government

5   does, that Gary's sentence can only be sufficient if it is

6   substantially more than two and a half years in prison, what is

7   the principle that renders a shorter term of imprisonment or

8   home confinement insufficient?  Suppose probation had

9   recommended one year.  What then would have been the

10  government's recommendation?

11         There is an ambiguity and an arbitrariness to these

12  numbers, Judge, and I submit that it stems from the challenge

13  of quantifying the real harm here within the context of the

14  many ways in which Gary benefited Valeant as an employee.

15         In the process of engaging in the charged conduct

16  here, Gary and Andy built a company of more than a thousand

17  employees that exceeded Valeant's expectations in terms of

18  performance.  Unlike the typical fraud case, Philidor was not

19  an accounting fiction or an empty storefront.  It was a

20  successful and sustainable business that had a positive impact

21  on the lives of its employees and patients.  And the manner in

22  which it ended had nothing to do with Gary or Andy.  That is

23  why the magnitude of the deprivation of honest services cannot

24  be measured by the amount of money that Andy paid to Gary.

25  That is why this case is so unusual, and that is why a

1    significant sentence here would not be fair or just.

2            To be clear, Judge, we understand and do not seek to

3    minimize the seriousness of the conduct, and there are, of

4    course, real interests that need to be considered in connection

5    with this sentencing, including Valeant's interest and the

6    public's interest.  But can those interests only be vindicated

7    in this case by way of a significant prison term?

8            No matter what the court does today, Gary will

9    experience a life sentence as a result of this case.  He is now

10   a felon whose reputation has been ruined.  He has been living

11   under the weight of this case for more than two years.  And in

12   this day and age, Google will keep him attached to this case

13   for the rest of his life.  He will also spend the balance of

14   his life digging out from millions of dollars of forfeiture and

15   restitution orders.  And as we noted in our submission, even

16   though he has paid $4.7 million in taxes to the government on

17   the $9.7 million he received from Andy, he receives no credit

18   for that under the law.  This will force Gary to earn an

19   additional $4.7 million over the course of his life to satisfy

20   the forfeiture obligation over and above what he received and

21   it permits the government to receive a total of approximately

22   $15 million, even though the payment at issue in this case was

23   for $10, or 9.7 to be precise.  Of course this may be the law,

24   but that doesn't make it fair, and we ask the court to consider

25   that reality as a significant mitigating factor.

1          That brings me to Gary.  We began our written

2     submission to the court with a simple statement:  "Gary Tanner

3     is a good man."  In a sense, nothing more needs to be said

4     about him.  He has handled this tragic chapter in his life with

5     the grace and the dignity of a good man, a man who you would

6     assume was raised in a loving family that instilled within him

7     the values of selflessness, gratitude, and commitment.  But of

8     course that assumption would be wrong.

9          Gary was not raised in a loving family.  Gary suffered

10    as a child.  Gary has asked me not to discuss his upbringing

11    further here today, but the presentence report provides the

12    court with some of what he had to experience as a young boy.  I

13    am sure the court has reviewed that portion of the PSR

14    carefully.  But, Judge, I say it only captures some of his

15    experience because Gary was too overwhelmed during this portion

16    of his interview with the probation officer to provide him with

17    a full account.  But suffice it to say, it is extraordinary

18    that Gary has become the husband, the father, and person he is

19    today after all he had to overcome.

20         I trust that the court has reviewed every letter

21    submitted on Gary's behalf.  They are consistent in the traits

22    they highlight.  They paint a picture of someone who is modest,

23    kind, generous, and for whom family is everything.

24         While it would be my preference to highlight every

25    single one of them, I will direct the court's attention to a

1       portion of just one of them, to a quote that captures the

2       essence of today and the future for Gary more eloquently than I

3       will.  The quote is from the letter written by Chris Hufford,

4       Gary's close friend, who met while the two of them were working

5       at Sears more than 20 years ago.  Judge, it is the first of the

6       four letters we submitted this past Saturday as a supplement to

7       our original filing, and it reads in part, "If his life were a

8       book, this situation would represent only a short and

9       incongruent chapter among an otherwise stellar underdog story.

10      On that note, a trait that I believe relevant to Gary's

11      sentencing is his penchant and skill to analyze past actions

12      and take those lessons forward.  In other words, I have never

13      known Gary to repeat mistakes."

14              Now, in the position I am in today, some lawyers have

15      to compliment their client even though they don't really know

16      their client.  They have to rely heavily on the letters of

17      support because they haven't had the opportunity to spend

18      meaningful time with their client.  That's not the case here.

19              Having spent the better part of the past two years

20      with him, I know this man, Judge.  We are around the same age,

21      and a similar stage of life.  He has trusted all of us for the

22      past two years.  And over that time period every member of our

23      team has done everything we could for him, not because he is

24      our client, but because he is such a good man and because we

25      believe in his fundamental decency.

1          When you have a trial, during the trial and the months

2     of preparation beforehand, you go through the personal

3     experiences of daily life with one another.  You have the

4     opportunity to observe the little things that provide a window

5     into someone's character, sometimes when he doesn't even know

6     you are looking.  You get to meet his wife and witness

7     firsthand the loving partnership they have built.  You overhear

8     him on the phone with his boys trying to avoid talking about

9     why he is in New York again.  You experience the awkwardness

10    when he asks you about your childhood, but then doesn't want to

11    talk about his own.  And perhaps most profoundly, you see and

12    feel another human being experiencing a fear so crippling that

13    he is frequently rendered speechless -- fear of what today will

14    bring; fear that your Honor will see him as nothing more than a

15    liar and a fraud, not for the full person he is; fear that he

16    will have to say goodbye to Jack and Rhett.

17         Certainly it is common for defendants on the day of

18    sentencing to say that family comes first.  For Gary it does

19    not just come first.  There is nothing but family.  He knows

20    life on his own, and he never wants to be alone again.  And,

21    yes, as the government generally points out, it has been his

22    choices that have put him and his family in this position.

23         But unlike so many convicted of honest services fraud

24    who were clearly thinking only of themselves, Gary is

25    different.  His life has been spent building financial security

1    for his family.  He was born with nothing, he was given

2    nothing, and he never had the safety net that so many of us are

3    blessed to have.

4            Just consider how he spent the money that he received

5    from Andy.  He put it into education accounts for his sons and

6    long-term retirement accounts for him and his wife.  Again, no

7    excuses here about the fact that he received the money in the

8    first place, but the manner in which he put the money to use is

9    revealing and relevant.

10           Judge, Jack Tanner is 12 years old and Rhett Tanner is

11   nine years old.  The court will not hear from them today, but

12   today's outcome may impact them more than anyone else.  Unlike

13   their father, they know the love of two caring and attentive

14   parents.  The effect of the removal of their father from their

15   lives, particularly at these ages, will be immeasurable.  Their

16   father is their hero, and he will remain so, irrespective of

17   today, but we ask the court to consider them in fashioning

18   appropriate sentence.

19           I hope, Judge, that my words today have been helpful.

20   As I know this court appreciates, good people can make bad

21   decisions, and this good person screwed up in a serious way.

22   He knows that.  But this is such an aberration, the only

23   deviation from an otherwise law-abiding and inspiring life that

24   will never be the same.  Without spending a day in prison, Gary

25   will be penalized for life as a result of this case.  A

1   percentage of every paycheck for the rest of his life will go

2   to Valeant.

3           In light of all of this, do the circumstances of this

4   case and his life require that he also spend time in prison?

5   Is there no alternative but to separate him from his wife and

6   sons?  Judge, we submit that there is.

7           Thank you for your time and your patience, your Honor.

8   We ask you to temper justice with mercy and impose the lowest

9   possible sentence on Gary.

10           Thank you.

11           THE COURT:  Thank you.

12           Mr. McGuire, did Mrs. Tanner wish to go next?

13           MR. McGUIRE:  Yes.  Thank you, your Honor.

14           THE COURT:  Good morning, ma'am.

15           MS. TANNER:  Good morning, Judge.

16           THE COURT:  Would you just say your name for the

17   reporter, please.

18           MS. TANNER:  Abbey Tanner.

19           Most people in here know Gary as coworker, client, a

20   defendant, so I wanted to speak of him as a father and a

21   husband.

22           I'm sorry.

23           THE COURT:  Take your time, ma'am.  Mr. McGuire, would

24   you adjust that microphone, please.

25           MS. TANNER:  I sincerely wish that every child could

1  have a father like this man.  The emotional support, the

2  guidance, the nurturing and the discipline that he offers as a

3  father cannot be overstated.  His constant involvement lets our

4  boys know that they matter, that they are loved, that they are

5  cherished.  It brings them a sense of safety and comfort that

6  every child should be afforded.  Perhaps given his own

7  childhood, or what I would consider lack of, he doesn't take

8  fatherhood for granted.  He knows it's an absolutely privilege

9  and an honor.

10         Gary and I assume equal roles in many facets of our

11  life together, but there are some life lessons he is teaching

12  them that I just can't do by myself.  And what comes to mind is

13  Gary's love and respect for me.  He has never viewed myself, or

14  any other woman for that matter, as anything other than an

15  equal.  He leads by example, and he is teaching our boys how

16  women should be treated.  This might sound odd, but that's

17  everything when you are trying to raise two young boys into

18  respectful young men.

19         And I was fortunate growing up to have a loving,

20  supporting father who was always present in my life, and I

21  would give anything for Jack and Rhett to have the same

22  constant, consistent presence.  I want them to continue to be

23  excited for Sunday mornings, because it's Gary who makes the

24  best breakfast, and I want them to continue to be enthusiastic

25  when they come home from their jiu-jitsu classes because it is

1    dad that they run to when they want to show him everything that

2    they have learned.  I want them to continue laughing and

3    experiencing the joy when dad does crazy things that mom just

4    doesn't do, like jump in the pool with his clothes on or take

5    them camping.  And most of all, I want them to continue hearing

6    "I love you" every night when Gary tucks them into bed.  Some

7    of these things may sound trivial and insignificant, but they

8    are not, especially to our boys, because it is those innocent,

9    little moments every day that matter.

10          Jack, as I mentioned in my letter, is our logical

11   pre-teen.  He is sometimes too logical for his own good,

12   because he tends to rely on himself and look inward when he has

13   problems to solve.  Normally Gary and I have placed value on

14   this because we have taught him to persevere when things

15   aren't easy.  However, the hurt I know he will experience if

16   Gary is incarcerated is a problem I know he won't be able to

17   solve no matter how many times he goes over the situation in

18   his head.

19          And Rhett is at that age, at nine, where he is old

20   enough that he wants his independence, but he is still young

21   enough that mom and dad are his world.  Gary is his hero, his

22   confidant and, above all else, Gary is his best buddy.  Where

23   Jack is ruled by his head, our younger son is ruled by his

24   heart, and I know Rhett's heart will undoubtedly break without

25   Gary by his side.  I lay awake at night and wonder what the

1    long-term effects will be on our boys if Gary is gone.  How

2    will their sadness, their anger, their confusion manifest?  And

3    as a mother, it is hard to imagine your children in so much

4    pain and not have the ability to fix it.  And I do understand

5    that Valeant is the victim in this case, but it can't be

6    overlooked that Jack and Rhett will be the other casualties if

7    Gary is absent.

8            And as adults, we are very clear and have an

9    understanding of finite time.  Gary and I know that good

10   seasons as well as bad seasons will not last forever, but

11   unfortunately children don't perceive time the same way.  So

12   right or wrong, sending Gary away will make Jack and Rhett feel

13   like they're the ones being punished.  And so I humbly stand

14   before you to ask -- beg -- that if you feel additional

15   punishment is necessary after all that our family has lost,

16   that Gary's debt to society be paid without separating him from

17   our boys.

18           Thank you for your time and your consideration, and

19   your patience.

20           Thank you.

21           THE COURT:  Yes, ma'am.  Thank you.

22           Mr. Tanner, would you like to speak on your own

23   behalf?

24           DEFENDANT TANNER:  Yes.

25           THE COURT:  Yes, sir.

1                THE DEFENDANT:  Thank you, Judge Preska.

2           I wanted to start off just by thanking you for your

3      time, your consideration, and your respect during the trial.  I

4      would I also want to thank Ms. Kramer and Mr. Cooper for their

5      professionalism and courtesy during the trial.  This is

6      certainly not a situation that I ever thought I would ever

7      encounter and personally it has undoubtedly been the most

8      difficult period of my life.

9           My entire life has been defined by working hard and

10     caring for my family.  Based on the experiences I had growing

11     up, I ended up being on my own at a relatively young age and

12     putting myself through school and working as hard as possible

13     to build a better life for myself and for my family.  This

14     included sacrificing a significant amount of time with my

15     family, which was dedicated to work, in an effort to achieve

16     financial independence.

17          Prior to this experience, I have never had any

18     interaction with the criminal justice system, and I never had

19     any reason to believe I would.  This has been an incredibly

20     difficult experience for myself and for my family, and I think

21     about why I didn't disclose these payments every day, multiple

22     times a day.  Overall, I regret so much not disclosing a

23     financial interest, and I will regret it for the rest of my

24     life.

25          At this point, my life as I knew it has been greatly

1  changed, but I have taken a lot from this process.  My primary

2  concern is for my family.  My wife and my two boys mean

3  everything to me, and the thought of being away from them for

4  any period of time is very difficult for me to accept.  I have

5  no choice but to accept the outcome of the trial, but I am

6  begging you to let me stay with my family.  I will do anything

7  the court requires for punishment, but I feel there are far

8  better options for society generally than separating me from my

9  family.

10          I am truly sorry for not disclosing my financial

11  interest, but I ask that you give me a chance to stay with my

12  family during this difficult time and demonstrate how much I

13  can contribute back to society.

14          Thank you.

15          THE COURT:  Yes, sir.  Thank you.

16          Counsel, does it make sense now to move on to consider

17  Mr. Davenport's situation?

18          MS. McCARTHY:  Sure, your Honor.

19          THE COURT:  Ms. McCarthy, have you and your client had

20  adequate time to review the presentence report?

21          MS. McCARTHY:  Yes, your Honor.

22          THE COURT:  Is there any reason it should not be made

23  part of the record?

24          MS. McCARTHY:  No, but we have a couple of provisos.

25          THE COURT:  Yes, ma'am.

1              MS. McCARTHY:  So, your Honor, on page 2 of the

2     probation report, it indicates that Mr. Davenport was arrested

3     and released on the same day, November 17, 2016.  I have

4     provided documents to the government that indicate that that is

5     not accurate.  He was released the next day, November 18, 2016.

6     So we would ask that that be changed on page 2, "release

7     status," indicating that he was released the next day, on

8     November 18.

9              THE COURT:  Any objection?

10              MR. COOPER:  No objection.

11              THE COURT:  Thank you.

12              MS. McCARTHY:  Your Honor, paragraph 86 of the report,

13     I would just ask that it be supplemented.  It talks about

14     Mr. Davenport's tax filings and indicates that there was no

15     record of return filed for years 2014 through 2017.  We

16     submitted yesterday, your Honor, a letter from Alan Gubernick,

17     Mr. Davenport's accountant, indicating that those returns were

18     filed yesterday and that there is no tax due.  The tax had

19     previously been paid.  There was one return showing some tax

20     due, but because of the overpayments in later years, those

21     payments will cover the tax due.  So the net is no tax due.  So

22     that would be our request for paragraph 86, that it be

23     supplemented to indicate that the returns were filed and there

24     is no tax due.

25              THE COURT:  Thank you.

```
 1              Any objection?
 2              MR. COOPER:  No objection to that additional sentence,
 3    your Honor.
 4              THE COURT:  Thank you.
 5              MS. McCARTHY:  And, your Honor, the next is paragraph
 6    77, which actually ties into the forfeiture argument that we
 7    made about the inclusion of the Andrew J. Davenport 2014
 8    irrevocable trust in the items to be forfeited or listed --
 9              THE COURT:  Did you say 77?
10              MS. McCARTHY:  Paragraph 77 indicates that
11    Mr. Davenport personally obtained over $50 million in cash from
12    the sale of Valeant.
13              THE COURT:  Yes, ma'am.
14              MS. McCARTHY:  Mr. Davenport personally received $44
15    million, not over 50.  That number over 50 includes the funds
16    that were paid to the trust; and, as we have set forth in our
17    letter, the chronology does not support that those funds that
18    were provided to the trust as a result of the sale belong in
19    any way to Mr. Davenport.  So we would ask that that be
20    corrected to say 44 million.
21              THE COURT:  Any objection?
22              MR. COOPER:  No, your Honor.  That's accurate.  It
23    would also be accurate to say that Mr. Davenport personally and
24    the trust that he settled obtained over $50 million from the
25    sale.  I think there could be no dispute about that.
```

 1              THE COURT:  Ms. McCarthy.

 2              MS. McCARTHY:  Well, I think a separate sentence,

 3    perhaps, that the Andrew J. Davenport Irrevocable Trust

 4    received over $7 million is fine with us as long as the 50 is

 5    changed to 44, your Honor.

 6              MR. COOPER:  That's fine, your Honor.  Thank you.

 7              THE COURT:  Thank you.

 8              Yes, ma'am.

 9              MS. McCARTHY:  Did the court want to here us now on

10    forfeiture, or did you --

11              THE COURT:  I don't think so.  Counsel, I understood

12    that, except for the special assessments, we are deferring all

13    discussions of other financial penalties for another day.

14              MR. COOPER:  Your Honor, I thought that we were

15    deferring the restitution discussion for a different day.  I

16    think that the court needs to pronounce forfeiture at the time

17    of sentencing.

18              THE COURT:  Counsel.

19              MS. McCARTHY:  So I will be heard on that?

20              THE COURT:  Yes, ma'am.

21              MS. McCARTHY:  So, your Honor, the primary issue that

22    we have with the proposed preliminary order of forfeiture is

23    its inclusion of this trust that we are discussing.  It is an

24    irrevocable trust.

25              I put forward in our letter of October 29 the

1   chronology that establishes that a gift was completed by

2   Mr. Davenport in January of 2013 of a 6.0 percent interest in

3   Philidor to the 2008 trust, which is the precursor to the 2014

4   trust.  The only difference in these trusts, your Honor, is

5   that in 2014, before the funds were received from Valeant,

6   Mr. Davenport received tax advice that the way that the 2008

7   trust was created, he was personally responsible for its tax

8   obligations, and so his accountant suggested that they change

9   the trust to remove that tax obligation from Mr. Davenport

10  personally and put the tax obligation on the trust.  That's the

11  only change that that resulted in.

12         The fact is that as of January 2013, the irrevocable

13  trust held an interest, 6.0 percent interest, in Philidor.  So

14  I don't know what to say to the government's argument that they

15  just disagree.

16         I have been talking to the government about this now

17  for weeks, Judge.  Last night, after I had gone to bed, they

18  sent a letter, which finally tells us why they don't think that

19  this is correct, that they think that he has an interest in the

20  trust.  They claim that money was paid to him out of the trust,

21  *ipso facto* he owns the assets of the trust.

22         Well, Judge, if the government had looked at

23  Mr. Davenport's UBS account for End Game, which was Government

24  Exhibit 231, they would see there were two payments made in

25  exactly the amount that they are talking about, 1.7 million, to

1    both the Treasury and to the Pennsylvania Department of

2    Revenue.  Those payments were made 1.5 million to the Treasury

3    on April 23, and 200,000 on April 30.  It is my understanding,

4    Judge -- and I have had to cobble this together because, again,

5    when I woke up this morning I saw the letter -- that

6    Mr. Davenport's accountant requires checks to be written for

7    taxes.  He doesn't like to do the electronic payments, like

8    many of us do.  The trust at that point did not have checks for

9    its account.  I don't know why.  So Mr. Davenport paid, with

10   his checks, the trust taxes.  The 1.7 paid to Mr. Davenport

11   from the trust was to reimburse him for those taxes.  And,

12   Judge, I will be happy to give the court the documents that

13   support this, but if the government will look at Government

14   Exhibit 231, which they kindly brought this morning, they will

15   see those two payments that I am talking about in that amount.

16        The other thing that the government argues is that

17   somehow this ties into Mr. Davenport secreting money away that

18   they cannot trace.  After he got $4 million in his End Game

19   account, that they can't trace 3.4 million of it.  Well, that

20   went to purchase the home he lives in now.  He is living in the

21   $3.4 million.  So there is no playing going on here with money.

22   So I don't even know what to say to that.  The government has

23   the documents that would show that those funds were paid for

24   the purchase of his home.

25        Bottom line here, Judge, is that, in 2013, the 2008

iau2tanS kjc

1    trust was given, as a completed gift, an interest in Philidor.

2            THE COURT:  Say it again.  Say it again.  Just say it

3    again.

4            MS. McCARTHY:  When Philidor was formed in January

5    2013, which is before the alleged conspiracy began -- the

6    government alleges the conspiracy began in the summer of

7    2013 -- there were people who were given an interest in

8    Philidor.  I have here, Judge, as an exhibit to the Philidor

9    operating agreement -- I am happy to hand it up -- which shows

10   all of the folks who --

11           THE COURT:  I have it memorized from trial.  I just

12   wanted you to tell me what the amount of the trust --

13           MS. McCARTHY:  6 percent.

14           THE COURT:  Thank you.

15           MS. McCARTHY:  And the government has some allegation

16   in its letter of this morning that, unlike the other people who

17   had ownership interest in the trust, the trust didn't put any

18   cash in, so really it is Mr. Davenport's.  I don't know what

19   that means, Judge.  Also, it is not accurate.  There are other

20   owners, at least three other owners, who didn't put any cash

21   in, and the cash was minimal that was put in by any other

22   owner, like $100.  This company was valueless when it was

23   formed in January 2013.

24           So the government can rail against this, but the fact

25   of the matter is that the assets in the trust and the money

1    that the trust received after the sale to Valeant in 2014

2    belonged to the trust.  Mr. Davenport is not a beneficiary of

3    the trust.  It is an irrevocable trust, meaning once a gift is

4    made to the trust, it cannot be taken back.

5              So, Judge, it is basic trust law.  It is based upon

6    the trust documents.  I have the trust documents here, if the

7    court would like to see them.  But I provided those to the

8    government many weeks ago, and it wasn't until late last week

9    that they called to tell me -- it was Friday -- they had talked

10   about it at the highest level of their offices, and the only

11   answer they have is they don't agree with my position.  And

12   again, last night is the first time they set forth their

13   reasons, and we have rebutted them.

14             THE COURT:  All right.  Who would like to speak to

15   that?

16             MR. COOPER:  I will.  Thank you, your Honor.

17             Just, first, on the timing point, the defendant has

18   had notice since the time of indictment, when the trust was

19   listed as specific property that we would seek to forfeit, that

20   that was our intention, and the letter filed last night was in

21   response to Ms. McCarthy's letter of yesterday.

22             But setting that aside, your Honor, our position is

23   set forth in the letter.

24             I just want to make a few points in response to

25   Ms. McCarthy's arguments.

1          First, the money flow that is laid out in our letters

2     whereby the trust transferred $1.7 million to the End Game

3     account which then sent money to Mr. Davenport's personal

4     account -- by the way, both of those accounts, the End Game

5     account and Mr. Davenport's personal account, Mr. Davenport had

6     sole control.  He was the sole signer on those accounts.  The

7     point there is that money that was in the trust was not beyond

8     Mr. Davenport's control.  It was not solely moved around and

9     paid by the executors of the trust who were Mr. Davenport's

10    wife and his brother, but he had an active role and obviously

11    had access to trust funds at the time, so that the contention

12    that the trust assets were beyond or are beyond his personal

13    control is belied by the bank records.

14         THE COURT:  What do you say to counsel's suggestion

15    that that money was reimbursement for his having paid the trust

16    taxes?

17         MR. COOPER:  Your Honor, I will credit Ms. McCarthy's

18    representation along those lines.  Our point is not that the

19    disposition of the funds was ultimately not for the benefit of

20    the beneficiaries of the trust, it is that the trust assets

21    were not beyond Mr. Davenport's ability to access and to move

22    around.  It wasn't his brother --

23         THE COURT:  How do we know he told them to do it?  Is

24    there any reason to think it wasn't the executor of the trust

25    who said to reimburse him for paying the trust taxes?

iau2tanS kjc

1          MR. COOPER:  We have seen no evidence of that, so I

2     can't speak to that fact other than the absence of evidence

3     along those lines.

4          One moment, please, your Honor.

5          THE COURT:  Yes, sir.

6          (Counsel confer)

7          MR. COOPER:  The other point along those lines, your

8     Honor, is that it is true that the trust was listed on the

9     ownership tables as a 6 percent owner of Philidor.  Based on

10    our investigation, every other ownership interest of Philidor

11    was either in response to an investment in Philidor or somebody

12    who had done some work for either Philidor or BQ6, one of

13    Mr. Davenport's earlier --

14         THE COURT:  My recollection is, maybe I didn't

15    memorize it properly, but my recollection was there were some

16    relatives in there someplace.

17         MR. COOPER:  I believe that those relatives had done

18    work for some of Mr. Davenport's prior companies, like BQ6

19    Media.  So it was in response to an investment or essentially

20    sweat equity that was put up by people like Mr. Davenport's --

21         THE COURT:  But not in Philidor.

22         MR. COOPER:  Some of them I believe did early work on

23    Philidor, but everybody did work in some capacity for

24    Mr. Davenport.  The trust falls into neither of those buckets.

25    So both of those facts suggest that this was in fact a tax

1    planning strategy, where Mr. Davenport allocated his assets,

2    his interest between his personal End Game shell and the trust

3    account.  What the proposed order of forfeiture seeks to do is

4    forfeit Mr. Davenport's interest in the trust.  As we note in

5    our letter last night, in a footnote, if the trust can come

6    forward and show that it was a *bona fide* purchaser for value or

7    that it has a valid means to contest the forfeiture, it can do

8    so after the entry of the notice of forfeiture, of the proposed

9    order of forfeiture.  The proposed order includes a mechanism

10   that the trust can follow along those lines.  But that doesn't

11   mean that Mr. Davenport should not be required to forfeit

12   whatever interest he has in the trust, and that's what we are

13   seeking to do here today.

14          THE COURT:  What do you say to counsel's argument that

15   he has no interest in the trust because it was an irrevocable

16   trust?

17          MR. COOPER:  Your Honor, I think his -- I think the

18   facts that we set out in our letter show that it wasn't

19   entirely out of his reach and that he had at least some control

20   over the disposition of the assets here.  So I don't know that

21   it is as easy as Mr. Davenport putting an interest in a trust,

22   in an irrevocable trust, and then being hands-off from that

23   time forward.  That just doesn't appear to be the case.  The

24   money that we traced flows through two of Mr. Davenport's

25   accounts on his way out the door, two of his personal accounts

1    that he had sole control over.

2              THE COURT:  Are those the reimbursements we are

3    talking about?

4              MR. COOPER:  Yes, your Honor.

5              THE COURT:  Thank you.

6              MR. COOPER:  Thank you.

7              MS. McCARTHY:  Your Honor, I can answer the question

8    of how the funds were transferred to Mr. Davenport.  They were

9    transferred at the direction of the trustee of the trust,

10   Matthew Davenport.  And if the court requires, I can get you

11   the documentation that will show that.  Bob Catelli, the banker

12   who handled this matter, is in court today.  I can also get an

13   affidavit from Mr. Gubernick, the CPA, saying that it was at

14   his request that this was done.

15              Look, I have a trust, a lot of people set up trusts,

16   and the idea of a trust is that you set aside assets for your

17   children, for your spouse, for your descendants and that you

18   are hands-off, that you don't control those.  And this trust

19   was set up properly, Judge.  My partner who handles our trusts

20   and estates practice has reviewed these trusts and has gone

21   over them with a fine-tooth comb.  They are proper trusts.  And

22   the result of the way these trusts were set up is -- and the

23   government can't argue against this, because it is literally

24   like explaining why the sun is shining every day, it just is,

25   Judge -- that an irrevocable trust is no longer the grantor's

1      property.  It is no longer Mr. Davenport's interest once it is

2      gifted.  And, Judge, this is gifted to the trust well before

3      the government claims that this conspiracy began.  So the trust

4      should not be in the picture, Judge.  The trust should not have

5      to litigate this and sit with a frozen account.  It should be

6      able to be used for the benefit of Mr. Davenport's children,

7      who are the beneficiaries of the trust.

8              THE COURT:  Anything else?  Yes, sir.

9              MR. COOPER:  One more point, your Honor.

10             Regardless of whether or not the initial interest in

11     January 2013, the initial 6 percent, was gifted to this 2008

12     trust that, defense counsel's papers point out, in November

13     2014, which was in the middle of the charged offense and just a

14     month before the transfer of the money, during the course of

15     all of these conspiratorial communications, in November 2014,

16     that is when Mr. Davenport created the new trust and the

17     interest was transferred to that new trust, and that's the

18     trust where the money sits today.  So it is just not the case

19     that everything, all of the granting and all of the transfers

20     occurred before the charged conduct.

21             THE COURT:  But they were both irrevocable trusts, no?

22             MR. COOPER:  Correct, your Honor.

23             THE COURT:  Thank you.

24             MR. COOPER:  Thank you.

25             THE COURT:  I find that the contents of the trusts are

1    not Mr. Davenport's property and, accordingly, are not the

2    subject of the forfeiture order.

3            What else?

4            MS. McCARTHY:  That's all, your Honor.

5            Would you like to hear from me?

6            THE COURT:  Yes, please.

7            MS. McCARTHY:  You are probably already tired of

8    hearing from me but --

9            THE COURT:  No, ma'am.

10           MS. McCARTHY:  Thank you, your Honor.

11           I know that the court has read our sentencing brief,

12   so I am going to try not to retread.  It is also an unusual

13   situation for me to have another defendant being sentenced at

14   the same time, so I'm afraid that some of the things that

15   Mr. McGuire said I may go over again, so please forgive me for

16   that.

17           Your Honor, we understand the government's theory of

18   honest services fraud, but we agree with what Mr. McGuire said

19   and do believe that this case is different from other honest

20   services fraud cases, and for that reason, we submit that the

21   court should sentence Mr. Davenport differently from other

22   honest services fraud cases and that an appropriate sentence

23   here would be a period of time served with supervised release

24   as we request in our papers.

25           In every other private honest services fraud case that

1    we have seen, money is paid by a vendor to a company employee

2    in order to entice the employee to give business to the vendor,

3    and that's not what happened here.

4            Here, it was Valeant that had an interest in seeing

5    Philidor succeed, so it entered into that alliance with

6    Philidor in January -- it was formed in January 2013, well

7    before the government claims that a conspiracy between

8    Mr. Tanner and Mr. Davenport was formed.  So Valeant and

9    Philidor had a relationship, the purpose of which was for

10   Philidor to distribute as much of Valeant's product to its

11   customers as it could through its mail order services.

12           So Philidor did exactly what Valeant wanted it to do,

13   and Mr. Tanner assisted in making that happen.  Mr. Davenport

14   was not making secret payments to Mr. Tanner along the way, as

15   we see often private honest services fraud cases; rather, he

16   gave Mr. Tanner a portion of the money that he personally

17   earned from the purchase of the option for Philidor.  And we

18   submit that that fact is very different from the typical honest

19   services fraud case.  And I know the government is going to

20   vehemently object to my comments, but I feel strongly about

21   that, your Honor, and I wanted to reiterate that.

22           We appreciate that there was certain evidence

23   submitted at trial about planning that Mr. Tanner did with his

24   financial planner.  There is no evidence that Mr. Davenport

25   partook in that or understood that that was happening.  We ask

1    that that not be imputed to him.

2          We are not rearguing the trial nor are we asking the

3    court to disregard the jury's verdict or trying to minimize

4    Mr. Davenport's conduct.  He will tell you, as we have said in

5    our brief, that he regrets every day not telling Michael

6    Pearson that he was going to make this payment to Gary Tanner.

7    He is going to have to live with that for the rest of his life.

8    We are asking the court to take the factual distinction here

9    into account in fashioning Mr. Davenport's sentence and it is a

10   distinction, your Honor, that we submit calls for leniency.

11         Your Honor, as you know, we submitted 60 letters of

12   support for Mr. Davenport.  Many of the people who wrote those

13   letters are sitting here in this courtroom, and I thank them

14   for being here to support Mr. Davenport.  I know the court has

15   read everything we have submitted, and there were far too many

16   letters for us to reference in our sentencing brief.

17         Each one of those letters, Judge, tells a little bit

18   about Andy Davenport.  And I have to say I have been doing this

19   for a while, at both sides of the table, and frankly have never

20   been so moved by the stories of a person's many acts of

21   kindness, compassion, and generosity as I have been in this

22   case, and the reflection that those letters have on the life

23   that Mr. Davenport has led.  And I am not overstating it,

24   Judge, when I say that Mr. Davenport's conduct that leads him

25   to stand before the court today is an aberration in the way he

has conducted himself throughout his 50 years on this earth.

        There are so many stories about how he taught and
mentored people, people who may not otherwise have gone very
far in their personal lives, because of a lack of education,
training, or skills.  Andy encouraged those people.  He helped
them to take ownership of the work they were doing so that they
weren't just employees.  As a result, these people felt pride
in what they were doing; and the fact that Andy believed in
them, empowered them to meet the challenges of the work he was
asking them to do.

        I know the court read the letter of Valerie Stiltner,
who had worked at Philidor's dispensing operations as its
supervisor.  After she suffered a stroke that came after a
period of disability due to emergency surgery, Andy welcomed
her back to Philidor and found a place for her even after she
partially lost her vision and movement and her cognitive
functions were impaired.  That's extraordinary, Judge.  He told
her to and I am quoting from her letter, "have confidence in
the abilities she still had instead of focusing on the ones she
lost."  I really, frankly, never heard of such encouragement
from an employer.

        These stories go on and on.  Andy contracted out some
of Philidor's packaging work to a company that employs adults
with special needs, again finding a way to give people who
might otherwise have felt worthless a feeling of pride in their

1    work, lifting them up.  There are many letters from Philidor

2    employees who, despite Andy's conviction and the charges in

3    this case, would gladly work for him again.  Judge, that's

4    extraordinary.  That's an extraordinary comment on him as a

5    boss and as a person.  Most people run away from a felon.  I

6    know.  I have tried to bring people in to court or get letters

7    written for many other people.  This is extraordinary.

8         We submitted as Exhibits FF and GG the sentiments

9    written both on a white board at Philidor and in a spiral

10   notebook given to Andy on the day, the last day the employees

11   were going to be at Philidor right after Valeant pulled out of

12   the option deal.  Those sentiments speak volumes, Judge.  They

13   make it abundantly clear that Philidor felt like a family, and

14   the employees were supported by Andy and the other executives.

15   They were supported to work hard, feel pride, and yet attend to

16   their own families the way that Andy attended to his when he

17   needed to, knowing that Philidor would be there for them when

18   their crises passed.

19        Some of the letters are from people Andy lifted up

20   with his support and encouragement who went on to do things

21   they never imagined they were capable of, people like Nick

22   Spuhler, who is here today.  He is the caddy who came to see

23   Andy as a father figure after his own father fell into the

24   spiral of opioid addiction.  From day one, Andy empowered

25   Mr. Spuhler that day on the golf course by asking him:  What do

 1   you think?  Making him feel like his views and input mattered.

 2   Mr. Spuhler carries that empowerment with him to this day,

 3   working at a major healthcare advertising agency, and he

 4   credits Andy with preparing him for that challenge.

 5          There is Andy's sister-in-law Lauren Brimhall, also

 6   here today, who was a failing high school student when Andy met

 7   her.  She credits her success both as a writer and an

 8   award-winning photographer to Andy's constant support and

 9   encouragement, and she poignantly wrote "Andy had faith in me

10   when no one else did and, quite frankly, I will be proving him

11   right until the day I die."

12          That's where I am going to stop on this part of my

13   remarks, Judge.  The stories go on and on, and they are moving

14   and they are important, because they give the court insight

15   into the heart and soul of this man.  He is a good man, he has

16   done a lot of good for other people, and we ask that the court

17   recognize that goodness and show him mercy today.

18          Now, another aspect I would like to touch on, Judge,

19   is Mr. Davenport's health.  We have submitted a number of

20   medical reports that provide the court with the background of

21   Mr. Davenport's health issues as well as current reports about

22   recent tests that show, among other things, that he recently

23   suffered two minor heart attacks and that he has a coronary

24   calcium score that puts him at the highest possible risk for

25   complications, including stroke, heart attack, and sudden

iau2tanS kjc

1    cardiac death.

2              As I am sure the court can appreciate, anyone who goes

3    through this process, including a trial and now sentencing, is

4    under tremendous stress.  Mr. Davenport's heart issues under

5    this sort of stress put him at a higher risk than most other

6    people in his situation.  We have real, significant concerns

7    that if he is sentenced to jail time, he may not survive.  And

8    I don't say that lightly, Judge.

9              But what's remarkable to me, and I'm saddened by it,

10   frankly, is the government's reaction to this information, and

11   I don't understand it.  In the face of the medical evidence

12   that we have submitted, the government's reaction is that our

13   argument is specious and that Mr. Davenport's health issues are

14   a result of his "own poor choices with seemingly no present

15   effort to correct."  It is just a breathtaking position for

16   them to take, Judge.

17             I appreciate, I am a former prosecutor, a trial

18   conviction is terrific.  You are very proud of it, and you are

19   very jealous of that.  You want to protect it and you want to

20   be an aggressive advocate, and I don't challenge their being

21   aggressive advocates.  That is terrific.  But their job is to

22   do justice, Judge, not to crush a man.  And to not take into

23   account real evidence of his health issues, I don't understand.

24   It seems to lack compassion for what are real lifelong health

25   issues.

1          To the extent that the government believes that

2    Mr. Davenport has in some way caused his own health issues,

3    despite the fact that every man in his family has died from

4    sudden heart attacks -- his brother Matt just this past March

5    at the age of 52, his brother Tony at the age of 48 -- I would

6    like to tell the court a few things.

7          First, since September of 2017, Mr. Davenport has had

8    a trainer come to his home three times a week to work with him.

9    They do cardio exercises and strength training.

10          In addition, when he is able to, he plays golf, and he

11   tries to walk as much of the course as he can, despite a very

12   bad back and bad knees, problems that arose starting with his

13   playing football, and later on in life he suffered chronic back

14   problems that weren't solved until very recently, for which he

15   had to take very strong opioid medication.

16          Second, Mr. Davenport is under the care of his

17   personal physician, Dr. Ronald Luber, who works regularly with

18   him on his complex regimen of oral medications and insulin

19   injections which need to be adjusted based on intraday blood

20   glucose readings, and Mr. Davenport measures those himself.  It

21   is fair to say that the daily monitoring that must be done is

22   daunting, and the medical regimen as well.  But Mr. Davenport

23   is committed to this regimen because he wants to stay alive for

24   his wife and his two children and his extended family, many of

25   whom depend upon him for financial and emotional support.

1          Like anyone who works themselves to the bone, as

2     Mr. Davenport has done in his working life, particularly in

3     building Philidor starting in 2013, I think we all know this,

4     kind of hard to stay in good physical shape.

5          In the midst of all of that, Mr. Davenport lost his

6     brother, he lost his father, and he carried the burden of

7     providing for all of his employees and caring for his older

8     brother's children.  He then lost his brother Matt in March,

9     and that added stressor has impacted his health.

10          He is obese, according to Dr. Fisher, but I have

11     talked to his family and his friends.  He has the same body

12     type as his brothers and his father.  So to the extent that's

13     what the government thinks is a result of his poor choices,

14     unfortunately it is a genetic issue.

15          Your Honor, the evidence of Mr. Davenport's health

16     issues speak for themselves and the court, we respectfully

17     submit, should put significant weight on these issues in

18     fashioning an appropriate sentence for Mr. Davenport, which we

19     submit should not include any time in prison.

20          Now, I do want to say this, and this will be

21     embarrassing for Mr. Davenport for me to talk about this here,

22     but I have to do it.  Another aspect of his health that is of

23     concern is his drinking.  His doctor, Edward Fisher, his

24     cardiologist, writes in his report, which is Exhibit D to our

25     submission, Mr. Davenport is clinically an alcoholic.  Perhaps

 1   this is the aspect that the government also thinks is a poor

 2   choice.  If so, I don't know what to say to that.  Anyone who

 3   has dealt with alcoholism in their family or in their life

 4   knows that it is not a choice, it is a disease.  Quickly Google

 5   alcoholism and you will find that right away you see the word

 6   "disease."  Until the alcoholic is able to grapple with it, it

 7   cannot be solved or controlled.  In fact, it is never solved.

 8   Once an alcoholic is always an alcoholic.  Due to the stress of

 9   this case, Mr. Davenport has not had the strength to deal with

10   this issue, and until he has that strength and can face his

11   drinking head on, he will remain dependent on alcohol, and for

12   that reason we ask the court, in fashioning Mr. Davenport's

13   sentence, to require that he participate in alcohol treatment.

14        Finally, your Honor, as is evident, as I said, from

15   the many people here today in support of Andy, he has a very

16   strong community that supports him.  He has lost some friends

17   as a result of his conviction, but his family, many, many

18   former employees, and his longtime friends remain steadfast

19   supporters for him.  On a daily basis, Andy has to deal with

20   the shame of his conduct that led to his conviction.  He had to

21   explain to his young children -- Drew who is fourteen and Jade

22   who is twelve -- what he did that has caused such upheaval in

23   their lives and has caused him tremendous shame and pain.

24        He has been punished by the loss of his stature in the

25   business community.  He has been punished by the possibility

 1    that his family may lose its home, his children may have to

 2    leave their school, and his wife, who has not worked for 17

 3    years, will need to find a job.  He lost his brother Matt while

 4    preparing for this case.  As I have said, all of these things,

 5    your Honor, constitute punishment.

 6            Andy Davenport has led an admirable life.  He has much

 7    to give and many people left to lift up.  We ask that the court

 8    give him the opportunity to do so and sentence him to time

 9    served with supervised release requiring community service and

10    alcohol treatment.

11            Thank you, your Honor.

12            THE COURT:  Yes, ma'am.

13            Ms. McCarthy, did Ms. Milner want to go next?

14            MS. McCARTHY:  Yes.

15            THE COURT:  Yes, ma'am.  Would you say your name for

16    the reporter, please.

17            MS. MILNER:  Gina Milner.

18            THE COURT:  Yes, ma'am.

19            MS. MILNER:  Thank you for this opportunity, Judge.

20            My name is Gina Milner and I am Andy Davenport

21    sister-in-law and friend.  I am here to speak in support of

22    Andy on behalf of his family and friends.  My sister Andy's

23    wife would be standing here if she could but is far too

24    emotional for words.  The pieces of her heart are hanging on by

25    the thread of hope that your Honor will show mercy on her

1    husband for the sake of their children and those that rely on

2    him.

3        Our family is devastated.  I have known Andy for more

4    than 20 years, and I know that he is devastated beyond measure

5    to be sitting before you today awaiting sentencing for what he

6    knows is a terrible error in judgment.  And we are scared,

7    scared of the possibility that the stress of this case and the

8    possibility of a jail sentence may be too much for him to

9    endure.  Andy has serious medical issues, including a

10   congenital heart problem that has plagued his family.  We are

11   scared of losing someone who many of us don't know how to live

12   without.

13       Andy makes the lives of the people around him better.

14   I am sure you have heard it over and over again in the letters

15   submitted to this court in support.  But Andy is kind,

16   brilliant, and generous.  He is a family man and always makes

17   time to prioritize everyone else's needs above his own.  He is

18   hard-working, determined, self-made, and comes from very humble

19   beginnings.

20       THE COURT:  Ms. Milner, maybe slow down just a little

21   bit.

22       MS. MILNER:  Sure.  Sorry.

23       I hadn't known Andy long when I worked with him at

24   Dover Communications along with his father and his two brothers

25   almost 20 years ago.  During that time, I watched them build a

1    successful medical education business, only to bury their

2    father when he was just 63.  The three brothers then sold the

3    business for millions of dollars to Cardinal Health.

4          Not long after, they started yet another successful

5    endeavor in the pharmaceutical industry only to have their

6    eldest brother Tony, a pharmacist and critical to the business,

7    pass away suddenly of a heart attack just 48.  Tony's kids were

8    left without a father, and Andy's mom was devastated.

9          Still grieving himself, Andy had to deal with the

10   reality of so much uncertainty.  His business was in jeopardy.

11   The weight of his employees' livelihoods rested on his great

12   big shoulders, and now he had not only his own family to take

13   care of, but his brother's as well.

14         The only thing bigger than his shoulders is his heart.

15   So Andy did the only thing he knew how:  He took care of

16   everyone.  He, with the help of his only remaining brother,

17   Matt, took care of their mother and their nephews and started a

18   new pharmaceutical marketing firm, BQ6 Media Group, to create a

19   financial vehicle to support all the people who depended on

20   him.

21         Andy went to work, hiring employees, including several

22   people in this room, like Nick Spuhler -- a young man who

23   caddied for him -- me, his two nephews, nobody of whom had any

24   experience in pharmaceuticals.  Andy believed in people he

25   thought had intelligence and determination and took a chance on

 1    them regardless of experience and he was willing to teach.  In

 2    that moment, he created opportunity.  At the time his nephews

 3    were sad and rudderless kids who I watched charting an unsteady

 4    course.  Andy helped steer them in the right direction, devoted

 5    time to mentoring them, and while he continued to help them

 6    financially, he empowered them by giving them purpose.

 7              Over the years, Andy has created opportunity for

 8    countless people and not just family, perfect strangers that

 9    many might easily overlook, like waitresses, caddies, and

10    disabled veterans.  He ceases the best in people, believes in

11    them, and knows how to motivate, encourage, and inspire them to

12    see the best in themselves.

13              Judge Preska, I hope I am starting to paint the

14    picture of a man who you know as a convicted felon who many in

15    society would simply choose to write off, but who I and so many

16    others know as selfless and determined.

17              Over the years, I have also witnessed Andy's

18    extraordinary generosity, whether it be giving hundreds of

19    dollars to complete strangers, helping out a friend or family

20    member or employee who fell on hard times, or even giving an

21    ownership stake of his company to a young man he mentored,

22    despite the fact they no longer worked together, with nothing

23    expected in return.  I have no doubt the court has read many

24    letters of support submitted on Andy's behalf recounting much

25    the same.

1          Thus far I have told you about Andy as it relates to

2     my working relationship.  But my true admiration comes from my

3     personal one.  I can't even begin to tell you how much our

4     personal relationship means, let alone what family means to

5     him, especially his children, my niece and nephew.

6          His children are brilliant -- absolutely,

7     mind-blowingly, beautifully brilliant.  I love my sister, but

8     they didn't get that from us.  You don't have to take my word

9     for it either.  You can look at their IQ tests or ask their

10     schools.  Brilliance like that needs guidance and direction.

11     Those kids are capable of anything.  And if I'm convinced of

12     one thing, it's that there isn't a person in this room capable

13     of tapping into that potential and drawing it out other than

14     Andy.  I pray to God and beg you, Judge Preska, to allow Andy

15     to be here for his kids now, in the most formative years of

16     their lives, to mentor and inspire them the way he has for so

17     many others.  To deny his children the opportunity to have

18     their father teach and guide them is to risk having them not

19     realize their full potential, to take that knowledge and

20     channel it with purpose, to do good and amazing things that can

21     make society better.

22          Over the course of the past year since Andy was

23     indicted, he has had to bear witness as the people he loves

24     struggle -- struggle with his conviction; struggle to find work

25     after losing their jobs, jobs that he created -- and he is

1    devastated not for himself, he is devastated because he feels

2    regret and despair that he has caused this pain.  For a person

3    whose life revolves around taking care of others, around making

4    people's lives better, by carrying their burdens, to go on

5    living, knowing that he has caused their pain, is a punishment

6    all its own.

7              But we are suffering differently.

8              I suffer selfishly for the potential loss of my

9    brother-in-law, mentor, boss, and friend.  Throughout my life,

10   I have had nothing to give.  All I have are the words I share

11   with you today.  This is my honest and heartfelt recollection

12   of the years I have spent with one of the greatest human beings

13   I have ever known.

14             We are all suffering.  And as if Andy hasn't suffered

15   enough loss in his lifetime, this year, he lost his last

16   remaining sibling, his best friend, and the only person in the

17   world who could finish his sentences, his brother Matt, at just

18   52.  Another Davenport loss to another sudden heart attack.  He

19   now finds himself with even greater responsibility, playing

20   father to his niece, caretaker to his mother, and facing

21   sentencing for actions I know he wholeheartedly regrets with

22   every fiber of his being.

23             There is one last story I would like to share.

24             I worked with Andy's brother Matt for ten years.  In

25   that time, I had never known Matt to read a book yet somehow,

1    in his own way, he, too, was brilliant like Andy.  Many didn't

2    see his genius, but Andy did.  He drew out the best in Matt.

3    My own son, Cole, who is nine years old, has learning

4    disabilities.  When I see Andy look at my son, I see him look

5    at him the same way he looked at his brother, with a hopeful

6    determination that this kid has something special, and we are

7    going to find it.

8            Education has always been important to Andy, and over

9    the years he has generously contributed to my children's

10   education, but now is no longer in a position to do so.  This

11   year my husband Andy, who worked at Philidor, and I had to take

12   our son out of private school, a school he loved, because we

13   can't afford it after losing our jobs when Philidor collapsed

14   after Valeant pulled out of the deal and BQ6 deteriorated.

15           My son recently wrote a letter to a friend in his old

16   school saying, "Don't worry.  We will always stay friends, and

17   one day I will be back."

18           When I look at Andy and I see the way he looks at my

19   son, he now looks at him with sadness.  He is dying looking

20   into my son's eyes feeling like he let us down, feeling

21   helpless that he can't fix this.  He isn't thinking about

22   himself other than he wishes he could take back the error in

23   judgment he made while working tireless hours to make this

24   world a better place for everyone he loved -- family or

25   otherwise.

1          Just like it is killing him thinking about what that

2     error in judgment did to the reputation of a company he built

3     that provided exceptional service to physicians and patients,

4     to all the people he employed who lament the loss of a company

5     they loved, stress it has caused his family, those that depend

6     on him for financial support and guidance, especially his

7     children who have suffered being ridiculed in school, who saw

8     their dad plastered on the front page of the *Enquirer* as a

9     convicted criminal.

10         When I tell you Andy is brilliant, hard-working, and

11    selfless, it is because I witnessed firsthand a man with so

12    much grit and intellect put his head down and work like an ox

13    to pay people's salaries even when it meant money out of his

14    own pocket before we ever turned a profit.  I watched him turn

15    a situation that would have devastated most and create

16    something better than before.  I watched him carry the sadness

17    of loss, the burden of faltering business, and the weight of

18    all of these people and heave it up on his six-foot shoulders

19    and plow ahead, never echoing a word of self-doubt or

20    self-pity.

21         Andy is suffering.  He is devastated.  But his only

22    concern is for his family -- his wife, his kids, his mother,

23    two nephews, and his niece -- who depend on him.  How will they

24    survive without him?

25         Given his family history, I have been asking myself:

1    What is the likelihood of him surviving jail?  He just suffered

2    two mild heart attacks and is at risk every day of a fatal

3    heart attack.  He is, without question, paying the price each

4    and every day for his choices and has for the last three years.

5    Any time in jail for Andy could literally mean a life sentence.

6         Your Honor, Andy's life is literally in your hands.

7    You are the only person in this room that gets to decide just

8    punishment.  As my last plea to you, on behalf of myself, all

9    of his family and friends that support him here today, they are

10   all here despite his conviction, I beg you not to incarcerate

11   him.  Please show leniency.  My hope is that one day in the not

12   so far off future you will hear about his children, about his

13   nieces and nephews, including my own two kids and say to

14   yourself, I gave one man a second chance, and because of that,

15   these children who depend on them left the world a better

16   place.

17        The man I know may be a convicted felon in the eyes of

18   the law, but the man I know, if given the opportunity, will

19   never quit in his pursuit to turn his God-given abilities to

20   into possibilities for others.

21        Thank you.

22        THE COURT:  Yes, ma'am.  Thank you.  Ms. Milner, would

23   you be kind enough to give the reporter your notes?  She will

24   return them to Ms. McCarthy.

25        MS. MILNER:  Would you like me to approach?

1              THE COURT:  Yes, ma'am.  You were a little speedy.

2              Mr. Davenport, would you like to speak on your own

3    behalf?

4              DEFENDANT DAVENPORT:  Yes, your Honor.

5              THE COURT:  Yes, sir.

6              DEFENDANT DAVENPORT:  Thank you, your Honor, for the

7    opportunity to speak here today.

8              I deeply regret giving money to Gary Tanner, and I

9    take full responsibility for the consequences of my poor

10   judgments and actions.  I had many opportunities to discuss my

11   intention to pay Gary with Mike Pearson, Valeant's CEO, and

12   seek formal approval for doing so.  I did not, and I will

13   forever regret that poor decision.

14             I apologize to this court.  I apologize to Valeant,

15   and the many good employees who I encountered over the years.

16   I apologize to the good people who worked with me at Philidor

17   and who took such pride in the work we did.  I know that their

18   association with Philidor is now tarnished because of my

19   actions.

20             Family has always been the most important thing in my

21   life.  I have let down those who I care for and who depend upon

22   me the most.  I will spend the rest of my life attempting to

23   atone for the damage that I have done to them.

24             Thank you, your Honor.

25             THE COURT:  Yes, sir.  Thank you.

1          Off the record.

2          (Discussion off the record)

3          THE COURT:  May we hear from the government now,

4     please.

5          MR. COOPER:  Thank you, your Honor.

6          At the outset, I would just like to address the

7     comments from both defendants, from Mrs. Tanner, Mrs. Milner,

8     and defense counsel.

9          It is quite clear from the letters submitted to the

10    court and from all of the comments today that these two men had

11    an impact on their families and communities.  That much is

12    absolutely evident.

13         And it is clear that any sentence will have collateral

14    consequences beyond just these two men.

15         It is also clear that Mr. Davenport has serious health

16    issues.  We understand that.

17         We thought carefully about our sentencing

18    recommendation in light of all of the letters and the documents

19    that were submitted to the court, which is how we came to our

20    ultimate sentencing recommendation.

21         To be clear, your Honor, there are collateral

22    consequences in any sentence, in any case, any sentence that

23    the court hands down.  They are of course regrettable.  But as

24    the court is well aware, they are the consequences not of the

25    court's actions, but of the defendants' actions, of their

1    conduct.

2            Here today, your Honor, I want to speak to a few

3    issues.  I want to first address a couple of specific arguments

4    that defense counsel made.  I want to talk to the seriousness

5    of this offense and the need, the particular need here for

6    general deterrence.

7            So first I want to address the guidelines argument

8    that Mr. McGuire made.  He urged the court to reject the

9    guidelines and to give them no consideration.  Your Honor, the

10   guidelines here are narrowly tailored to the precise offense,

11   to the payment of the bribe, to the size of the bribe.  This

12   was not an insignificant payment for Mr. Davenport to

13   Mr. Tanner.  This was nearly $10 million.  The guidelines

14   recognize that, and that's what they are based on.  So this is

15   not a case where the potential magnitude of loss is perhaps

16   difficult to see at the outset and that drives the numbers.

17   Here, it is the actual offense conduct that both defendants

18   were well aware of at the time.

19           Both defense counsel suggest also, your Honor, that

20   this is a very unusual case.  That was a theme running through

21   both counsel's remarks.  This is not an unusual case.  This is

22   in the heartland of honest services fraud cases.  Money was

23   paid for improper benefit.  This was not merely an undisclosed

24   payment, but it is clear from the evidence at trial that

25   Mr. Davenport purchased significant assistance with that $9.7

1    million, secret assistance.

2            The starkest example that the court may remember from

3    trial was during the negotiations of the option agreement.

4    This was a situation where Mr. Davenport sat on the opposite

5    side of the table from Valeant, where a dollar more here is a

6    dollar less there, and Mr. Tanner provided back-channel

7    information to Mr. Davenport about Valeant's position and then

8    commented to Mr. Davenport and helped Davenport craft his

9    response to Valeant's negotiating position.  That is an

10   improper benefit bought and paid for that is similar to many

11   other honest services fraud cases.

12           This is also in the heartland of honest services fraud

13   cases because of the steps that the defendants took to conceal

14   their activity, which shows their understanding of its

15   wrongfulness at the time, in the use of shell companies, the

16   use of multiple layers, the use of secret alias e-mail

17   accounts, and fake business cards.  Those are steps that took

18   place over many, many months.  This wasn't one single

19   undisclosed payment, but it was a course of conduct over a

20   period of time.

21           Your Honor, this is a serious case.  Companies like

22   Valeant cannot monitor everything that their employees do and

23   everything that their vendors do.  They try.  In this case

24   there were codes of conduct, there were certifications, and

25   even when Laizer Kornwasser who, as the court may remember, had

1    suspicions that Mr. Tanner was close to Philidor, Kornwasser

2    raised them up the ladder, and Mr. Tanner was given specific

3    instructions on maintaining independence from Philidor.

4           But in light of all that, your Honor, in the face of

5    all that, the defendants chose to lie and deceive again and

6    again and violate the trust that Valeant placed in them.

7           Honest services fraud is serious, your Honor, in light

8    of all that, because the whole system depends on the level of

9    trust between companies and their employees.  And here, when

10   you have a publicly traded company, where there are

11   shareholders who are at risk, they can't monitor everything

12   that happens.

13          Now, both defendants -- both defense counsel have

14   suggested in their submissions and also in their oral advocacy

15   today that the defendants accept responsibility and shouldn't

16   have made the payment, the undisclosed payment.  But that, your

17   Honor, is not acceptance of responsibility or demonstration of

18   remorse here because the crux of the crime is not merely the

19   undisclosed payment.  The crux of the crime is all the

20   deception that had happened for months, if not a year and a

21   half, before that undisclosed payment.

22          They also suggest in different ways that this was a

23   victimless crime, that Valeant benefited, that Philidor

24   benefited, that everybody benefited.  Well that's not the case,

25   as the court is aware, in two respects.

1          First, there was pecuniary harm here.  We lay out the

2     facts in our submission.  I know the court has the submission

3     from counsel for Valeant who I understand is in the courtroom

4     today and, on behalf of the victim, would like to address the

5     court prior to sentencing.

6          But there was actual pecuniary harm in a number of

7     different ways, all because of the promise of the payment and

8     all because of this back-channel communications.  I'm not going

9     to address the pecuniary harm in more detail here, but I also

10    want to talk about the intangible harm, because that's, as

11    well, the crux of an honest services fraud case such as this.

12         Companies like Valeant as I said earlier have the

13    right to depend on the honest services of their employees, and

14    violations like this one go to the very heart of that trust.

15    There is an intangible nonpecuniary harm that crimes like this

16    one wreak.

17         I want to say just a few more words here, your Honor,

18    on the topic of general deterrence.

19         Crimes like this are difficult to detect, particularly

20    when defendants use layers of companies and transfers between

21    bank accounts, between multiple bank accounts, and use

22    different e-mail accounts and fake names.  Crimes like this are

23    necessarily conducted in secrecy, and these two defendants

24    conducted their crime in secrecy.  Crimes like this take

25    significant investigative resources to detect, to charge, and

1    to bring to justice.  And so the need for general deterrence is

2    important in part because the cost of these crimes can't be too

3    low.

4              At bottom, this was a crime where there were two men

5    who already had a lot of money and who were earning a lot of

6    money and who engineered a scheme to get even more.  It was a

7    calculation: commit a crime, engage in all the subterfuge in

8    order to make a big payday, and it is clear that the defendants

9    thought at the time that their chances of getting caught were

10   low.  The court will remember an e-mail introduced into

11   evidence where they compared themselves to Butch and Sundance

12   and talked about riding off into the sunset and continuing to

13   play the game.  It is quite clear they didn't think that they

14   would get caught.  They conducted a cost-benefit analysis, and

15   they obviously thought that the potential risks, the potential

16   costs were not significant enough to deter them from acting.

17             People at companies, your Honor, are watching what

18   happens here today because there are people who are invested

19   with trust and discretion at those companies and engage in the

20   same sort of cost-benefit analysis as these defendants engaged

21   in at the time, and those, those are the people who need to be

22   deterred.  Today's sentence, we respectfully suggest, can serve

23   as a general deterrent message to all those people who might be

24   thinking of engaging in conduct like this, of violating the

25   trust that was placed in them, that they cannot and they must

1    not corrupt their positions.

2              With that, your Honor, we will rest on our submission.

3    Thank you.

4              THE COURT:  Yes, sir.  Thank you.

5              Mr. McGuire.

6              MR. McGUIRE:  Your Honor, I realize before we move

7    forward we have not addressed the forfeiture order with respect

8    to Mr. Tanner.

9              THE COURT:  Yes, sir.

10             MR. McGUIRE:  So I just wanted to do that for the

11   record.

12             With respect to the government's proposed forfeiture

13   order, on page 3 of that, and I will give your Honor an

14   opportunity to get there, page 3 is where the bank account --

15             THE COURT:  Paragraph what?

16             MR. McGUIRE:  It is -- it is basically paragraphs (a)

17   through -- it carries on to (h) which list the assets that are

18   the subject of the order.

19             THE COURT:  Yes.

20             MR. McGUIRE:  Mr. Tanner has no objection to the

21   account listed in paragraph (a).  That contains proceeds from

22   the payment and it is in Mr. Tanner's name.  We would, for the

23   record, object to the remaining listed accounts because those

24   either have proceeds -- or funds in them that are independent

25   of the payment that was made by Mr. Davenport to Mr. Tanner

1    and/or they are jointly held by Mrs. Tanner, and so Mrs. Tanner

2    intends to make a claim with respect to some of those funds.

3    So we would just note that objection to, again, it is (b)

4    through following on to page 4(b) through (h).

5            THE COURT:  And I take it that she will do so in the

6    procedure that's set out here?

7            MR. McGUIRE:  That's correct, Judge.

8            THE COURT:  Yes, sir.  Thank you.

9            Are there victims present who wish to be heard?

10           MS. KESTENBAUM:  Yes, your Honor.

11           THE COURT:  Ms. Kestenbaum.

12           MS. KESTENBAUM:  If I may.  May I use the podium?

13           THE COURT:  Yes, ma'am.

14           MS. KESTENBAUM:  Thank you.

15           MR. COOPER:  Your Honor, I'm sorry.  I believe, in

16   going through the PSR, the court had adopted the PSR with

17   respect to Mr. Tanner but not explicitly with respect to

18   Mr. Davenport.  We just ask that that be done prior to imposing

19   sentence.

20           THE COURT:  It is.  You are correct.

21           Forgive me for a minute, Ms. Kestenbaum.

22           With respect to Mr. Davenport's offense level

23   computation, I accept the findings of the presentence report

24   set forth at paragraphs 37 through 48, which conclude that a

25   total offense level of 30 is appropriate.  And in so doing, I

1   rely on my earlier remarks with respect to paragraph 40, citing
2   Section 2B4.1(b)(1)(B).
3           With respect to the defendant's criminal history, I
4   accept the findings of the presentence report set forth at
5   paragraphs 49 through 55, which conclude that a criminal
6   history category of I is appropriate.
7           Thank you, Mr. Cooper.
8           MR. COOPER:  Thank you, Judge.
9           THE COURT:  Ms. Kestenbaum.
10          MS. KESTENBAUM:  Thank you, your Honor.  Nancy
11  Kestenbaum, of Covington & Burling, on behalf of the company
12  formerly known as Valeant Pharmaceuticals, now known as Bausch
13  Health Systems.
14          Your Honor, thank you for the courtesy and opportunity
15  to be heard today and throughout these proceedings.  I will be
16  brief.
17          To be clear, other than restitution, which we
18  understand the court is not addressing today, the company takes
19  no position on any specific sentence or sentences that the
20  court should impose.
21          But I want to be clear here.  The defendants have
22  argued before trial, at the trial, and today that because they
23  were good at their jobs and because Valeant's relationship with
24  Philidor was successful for a time, that Valeant wasn't harmed
25  by their crimes.  As Mr. Cooper just said, what they are saying

iau2tanS kjc

1    is that essentially this was a victimless crime.  But that is

2    not true.

3            Valeant was harmed by the defendants' conduct.

4    Valeant was harmed financially, which is why the company is

5    seeking restitution, but not just financially.  The defendants'

6    betrayed Valeant's trust, which means that the defendants

7    betrayed the trust of the company, the trust of its management,

8    of its shareholders and, perhaps most importantly, betrayed the

9    trust of the company's other employees, employees who also work

10   hard for the company but who don't steal from it just because

11   they think they deserve it.

12           As Mr. Cooper just said, in this way, this case is

13   just like every other honest services case, and we ask that the

14   court take this into account in fashioning an appropriate

15   sentences here.

16           Thank you.

17           THE COURT:  Yes, ma'am.  Thank you.

18           Are there any other victims who wish to be heard?

19           Does anyone wish to add anything?

20           Thank you, counsel.  Thank you, counsel, particularly

21   for your excellent submissions and for your oral presentations

22   today.

23           Counsel, some things I am going to say will apply to

24   both defendants and I think it will be clear which do and which

25   are specific to one defendant.

1          In general, with respect to the nature and

2     circumstances of the offense, certainly you have heard that I

3     have calculated the guidelines and take them into account.

4     Here, however, I agree with Judge Sullivan, where he said in

5     *United States v. Newman*, No. 12 Cr. 121 (RJS) (S.D.N.Y. May 2,

6     2013), "There is a lot of talk about the sentencing guidelines

7     these days, particularly in fraud cases, a lot of suggestion

8     that the guidelines are overly mechanical, and that they are

9     out of whack in many cases, and I think that's probably true.

10    I think in many cases, if left to themselves, if that were the

11    only thing, then the guidelines can lead to sometimes absurd

12    and certainly unjust results."

13         They certainly would have in *United States v. Joseph*

14    *Collins*, 07 Cr. 1170, where the proposed guidelines sentence

15    was four levels below life.  The guidelines are an especially

16    imperfect proxy in a case of private sector honest services

17    fraud like this one.  The crime here, as counsel have

18    discussed, is the employee's deprivation from his employer of

19    its intangible right to the employee's honest services.  That

20    crime is untethered to any financial loss or harm to the

21    employer.  The amount of money that changes hands is not

22    necessarily an accurate measure of the deprivation of the

23    intangible right to honest services.

24         While financial loss played no role at trial in the

25    determination of culpability, under the sentencing guidelines,

1   it becomes the single most important consideration in

2   sentencing. Such approach is patently unfair. As we know,

3   both the probation department and the government have

4   recognized that, and I note that the probation department, as

5   to each defendant, has noted that, without minimizing the

6   seriousness of the offense, given the defendants' familial ties

7   and responsibility and their compliance with the bail

8   conditions, probation believes that a seriously

9   below-guidelines sentence is appropriate. I agree.

10          With respect to the history and characteristics of the

11  defendants, I note that, unlike so many defendants we see in

12  this courthouse, neither of these defendants became a hard

13  worker after his arrest or became a devoted family man after

14  his arrest. They both did so throughout their lives.

15          I guess following on Mr. McGuire, I will not discuss

16  Mr. Tanner's childhood in detail, only to agree with his wife

17  that he did not have one and, indeed, had a less than

18  childhood. Mr. Tanner nevertheless, having had no example of

19  education, went out and educated himself, despite the turmoil

20  in his own life. He put himself through school, did very well

21  in school, and went forward.

22          We know that Mr. Tanner met Mrs. Tanner while they were

23  both working at Sears, and I note her position that "I get

24  emotional thinking about Gary as a father, especially knowing

25  what he endured during his childhood years. I often wonder to

1    myself why Gary turned out as great as he did, when so many

2    others in a similar situation go down a different path."

3          I note the letter of Alison Pritchett, who worked first

4    with Mr. Tanner at Valeant before transferring to Philidor, and

5    who says, "I have always known Gary to be an incredibly hard

6    worker and someone whose main priority was to provide for his

7    family.  His wife, Abbey, and boys, Jack and Rhett, are Gary's

8    whole world, and he is devoted to them."

9          Ms. Pritchett adds that "I have worked for many people

10   during my career, and while most of them claimed to be

11   supportive of family priorities, Gary stands out as a person

12   who actually demonstrated by his actions that he embraced this

13   principle."

14         I note the numerous letters with respect to Mr. Tanner's

15   dedication at his son's school and in his community.  The

16   principal of the school writes that, "During my 15 years in

17   education, I have never seen a more dedicated, helpful father,

18   who consistently and selflessly gives up his time and energy

19   for his children's school."

20            An administrative assistant writes, "I have worked at

21   schools for over 30 years and, without a doubt, I have never

22   seen a dad more involved than Gary is with his children.

23   Mr. Tanner's community work was publicly recognized when he

24   received the school's volunteer award."

25         We have heard a great deal today about how hard

1    Mr. Tanner has worked, and I think there is no one who will

2    take away from that.  Particularly, in growing Philidor, we

3    know that Mr. Tanner traveled back and forth from Arizona to

4    the east coast every weekend for two years.  One of

5    Mr. Tanner's supervisors at Medicis and then at Valeant said,

6    "It is hard to overstate the work ethic I have observed in

7    Gary."

8         Mr. McGuire made mention of the letter received from

9    Chris Hufford, and I note his remark that "I consider Gary to

10    be a wonderful example of how a man should carry himself as a

11    friend, as a citizen, and as a father and husband."

12         Accordingly, I take Mr. Tanner's self-improvement, his

13    hard work, his devotion to family, his devotion to his

14    community, and his charity into account as part of his history

15    and characteristics.

16         With respect to Mr. Davenport, again, Mr. Davenport did

17    not become a hard worker, a family man, and a charitable

18    individual postarrest.  He did that through his entire life.

19         We recall that Mr. Davenport's parents did not attend

20    college, and his brother Tony was the first member of the

21    family to go to college.

22         We also recall that, although Mr. Davenport was

23    accepted at Princeton, Georgetown, and Penn, he chose to attend

24    the University of Richmond so that he could go with his close

25    friend.  He paid for his own education out of student loans and

1    worked 20 hours a week bartending during school.

2         When Mr. Davenport met his wife Kristin, she could

3    hardly believe how hard he worked.  She said, "I quickly

4    appreciated that Andy is the smartest and most hard-working

5    person I have ever met.  He was working so hard, he hardly left

6    the house."

7         Mr. and Mrs. Davenport now have a 14-year-old boy and

8    a 12-year-old girl.  The young man writes, "My dad was with me

9    every step of my childhood, balancing work and parenting, so it

10   never felt like he was away for too long a time.  There were

11   some days he would drive home just to see us for an hour or two

12   before driving all the way back to work until late at night."

13        He continues, "He has always been there to pick me up

14   when I am down, and I feel like I can talk to my dad about any

15   problems I have."

16        Mr. Davenport's daughter notes that "my dad is always

17   there when I need him.  No matter how crazy the idea or how

18   large the task, he will give me help in any way he can."

19        After Mr. Davenport's brother Tony died suddenly at 48

20   years old, Tony's son wrote, "In one day, I lost my protector,

21   my confident, my compass, and my hero.  My Uncle Andy, bearing

22   the loss of his oldest brother, stepped in and saved not only

23   my life, but the life of my young brother, too.  Far beyond

24   providing a roof over both our heads and college educations,

25   Andy is an irreplaceable part of not only my life, but an

1    irreplaceable part of the lives of his wife, Kristin, and his

2    young children."

3         I note the letter filed as Document 207-1 where a

4    young woman who is referred to here as "AM" says, "I understand

5    you may not care about what an 11-year-old girl has to say, but

6    it is really important to me that you take the time to read

7    this letter.  I have known Uncle Andy for my entire life, and I

8    wanted to tell you how much of an impact he has made on me and

9    so many other people.  Whenever I see my Uncle Andy, he always

10   has a big smile on his face, no matter what is happening.  He

11   is always strong for everyone . . . when we first moved to

12   Haverford, along with the Davenports, we had to change schools.

13   I was really excited to be going to a fancy private school,

14   Baldwin.  What I didn't know was that my parents could not

15   afford to pay for that school.  Uncle Andy was kind enough to

16   pay for my Baldwin education and my brother's education, while

17   still paying for his own two kids.  This scenario is one

18   example as to how much of a generous person he is."

19        Michelle Davenport, Andy's brother Matt's widow,

20   writes that when Matt died suddenly in March of 2018, it was

21   Andy who, despite facing an imminent criminal trial, provided

22   emotional support that she so desperately needed.  "The

23   emotional availability that Andrew has afforded my daughter and

24   myself is truly priceless."

25        Andy's mother writes that, after the passing of his

father and his brothers, "Andrew has continued to be a steady,

supporting influence on his family, not only being a terrific

parent to his two young children ages 14 and 12, but also

stepping in to a father figure role over the past decade with

his two nephews and recently for his niece.  In addition to

supporting his brother's children, Andrew has assumed a

patriarchal role, caring for his mother and ensuring the wider

family has the emotional and financial support it requires."

        One of Kristin's younger sisters, Beth Ann Olesen,

notes that "Andy isn't just generous with his money, he is

generous with his time, his energy, and his attention."

        We have heard at length today about the energy that

Mr. Davenport expended in the various entrepreneurial ventures

he engaged in with his family and friends and employees.  I

note in particular Lynn Langan, an accountant in the finance

department at Philidor, explains "I was Andy's toughest critic.

At the point of hire, I had lost all faith in those that ran

companies, how out of touch they all seemed to be from the

average employee.  But then I started noticing Andy in the

pharmacy building boxes or sitting in a cubicle taking calls.

He continued in the trenches even as the company grew as if a

reminder to stay connected.  He talked to his employees, and

mostly not about work, but rather their lives outside the

walls.  He was interested and wanted them to be successful and

happy.  It was the last part that struck me most, that even

1    though he could sit behind his desk and revel in all the

2    success, he cared more about making sure his employees felt the

3    same way."

4          Peggy Neily, who worked as director of human resources

5    for Philidor for a time, noted that Mr. Davenport was an

6    extraordinary leader, and she listed some of the things that

7    Mr. Davenport did to protect his employees and to help the less

8    fortunate.  Those things included, as counsel have mentioned,

9    extending work to adults with cognitive or developmental

10   disabilities, focusing hiring directives to U.S. veterans and

11   women joining the workforce after raising children, personally

12   matching all charitable donations made by the employees dollar

13   for dollar with no limit, and going well above all requirements

14   to see that the employees who were affected by the closure of

15   Philidor were aided.  More personally, she notes that

16   Mr. Davenport paid for hotel rooms for employees willing to

17   work during snow storms and paid the travel expenses for a

18   young employee to travel to her mother's funeral on the west

19   coast.

20         Counsel has mentioned Ms. Karen Reo, who suffered a

21   stroke, and within 24 hours of Ms. Reo's daughter's notifying

22   Philidor of the situation, she heard back from the HR

23   department that "as per Mr. Davenport, Ms. Reo would be paid

24   her full salary while she is out recuperating."  As counsel

25   have already mentioned, when Ms. Reo returned to the company

1    with various disabilities resulting from the stroke, "Andy was

2    able to carve out a role for me within the company where I

3    could still be effective despite my limitations."

4          I also note the letter from Brett Winters, who was

5    vice president of operations, who explains that the company

6    learned on a Friday that, due to a payroll company error,

7    employee paychecks would not be delivered on time, requiring

8    the employees to wait until the following week.  He sets out in

9    his letter that the banks were closed, there was no way to deal

10   with this, and when he informed Mr. Davenport of the situation,

11   Mr. Davenport gave him the entire contents of his wallet, all

12   of the cash in his safe, and proceeded to borrow cash from

13   close friends so that the employees were paid.

14         We have heard already today about Nick Spuhler, whose

15   father suggested that he start caddying for Mr. Davenport when

16   Mr. Spuhler was 13 years old.  He did that and, as we have

17   heard, Mr. Davenport made him feel as an equal, encouraged him

18   to be somebody some day, gave him a job offer, stuck with him

19   through the financial downturn, and Mr. Spuhler concludes

20   that -- we have heard this sad situation with his father.  He

21   concludes, "In the absence of a father worth emulating, I used

22   my proximity to successful men at the golf club as a ready

23   collection of role models after which to fashion myself.

24   None's influence was more alluring or more enduring than

25   Andy's.  Lucky me that I got to benefit so directly from his

1    years of guidance, generosity, and good will."

2        I also note that from 2001 to 2008 Mr. Davenport

3    served on the board of directors of St. Mary's Villa for

4    Children, filling the board seat made available by his father's

5    untimely death in 2001.  That charity provides residential

6    treatment to boys and girls who manifest mental health problems

7    that cannot be addressed in less structured settings.

8        So in considering the history and characteristics of

9    these defendants, I take into account all of these facts.

10        With respect to the paragraph 2 factors, there is a

11    need for a serious sentence here to reflect the seriousness of

12    the offense and to provide respect for the law.  As we have

13    heard at length from the government, there is a need here to

14    protect companies' right to the honest services of their

15    employees.

16        With respect to paragraph B, I am convinced that there

17    is no need for extensive incarceration to deter either of these

18    individuals.

19        With respect to general deterrence, I agree with

20    Judge Rakoff, who says there is "considerable evidence that

21    even relatively short sentences can have a strong deterrent

22    effect on prospective 'white-collar' offenders."  *United States*

23    *v. Adelson*, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (citing

24    Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80

25    (2005) and Elizabeth Szockyj, *Imprisoning White Collar*

1    *Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)); *see also*

2    *United States v. Tomko,* 562 F.3d 558, 573 (3d Cir. 2009)

3    (rejecting government's argument that district court's

4    probation-only sentence in complex securities fraud case would

5    harm general deterrence).

6            In this instance, as we have heard at great length,

7    particularly from the individuals speaking on behalf of these

8    defendants, even a relatively short sentence has a very

9    devastating effect on defendants and certainly has a strong

10   deterrent effect in general.

11           In considering the paragraph D factors, I have taken

12   into account Mr. Davenport's medical situation, which is indeed

13   a difficult situation which requires monitoring.

14           I have in mind the paragraph 3, 4, and 5 factors.

15           With respect to paragraph 6, the need to avoid

16   unwarranted sentencing disparities, of course I am aware that

17   it is my job to take into account nationwide sentences,

18   nationwide cases, not just these cases; however, as I noted

19   with respect to the fraud guidelines, they are truly out of

20   whack at the higher ends, and that is where we find ourselves

21   today.  So to the extent that there is any perceived disparity,

22   it is because of the unworkability of the fraud guidelines at

23   the far end.

24           With respect to paragraph 7, the need to provide

25   restitution, I note that both defendants of course are looking

1    at enormous financial penalties, and thus a very lengthy

2    sentence will deter from their ability to make restitution and

3    thus that argues against requiring a lengthy prison term.

4            Mr. Tanner, counsel, taking all of those factors into

5    account, it is my intention to impose a sentence of a year and

6    a day on Mr. Tanner, followed by a period of two years of

7    supervised release on each count to run concurrently.

8            It is not my intention to impose a fine, in light of

9    the other financial penalties that Mr. Tanner is facing.

10           It is my intention to impose the restitution amount

11   set out in the proposed order of restitution, which is

12   $9,703,995.33.

13           Forfeiture, as we have discussed, will be determined

14   later.

15           MR. COOPER:  Your Honor, I'm sorry to interrupt.

16           THE COURT:  Forgive me.  You are right.  Forfeiture is

17   in the amount I noted.  Restitution is to be determined later.

18           It is my intention to impose the special assessment of

19   $400.

20           It is my intention to provide the payment schedule

21   that is set forth at pages 31 to 32, which talks about period

22   of incarceration and monthly installments at 20 percent of

23   Mr. Tanner's gross monthly income.

24           It is my intention to impose the recommended special

25   conditions of access to financial information and no lines of

iau2tanS kjc

1    credit unless he is in compliance with the installment payment

2    schedule.

3           Is there any reason, counsel, why such a sentence

4    should not be imposed?

5           MR. COOPER:  No, your Honor.

6           MR. McGUIRE:  No, your Honor.

7           THE COURT:  Very well, then.  Mr. Tanner, you are

8    sentenced, sir, to a period of incarceration of a year and a

9    day.  Following that time, you will spend a period of two years

10   on supervised release.

11          During that period, you will comply with all of the

12   standard terms and conditions of supervised release.  Among

13   them are that you not commit another federal, state, or local

14   crime, you not illegally possess a controlled substance, and

15   you not possess a firearm or other destructive device.

16          In addition to those and all of the other standard

17   terms and conditions of supervised release, during that period

18   you will provide the probation officer with access to any

19   requested financial information.

20          In addition, you will not incur any new credit charges

21   or open any additional lines of credit without the approval of

22   the probation officer unless you are in compliance with the

23   installment payment schedule.

24          As I mentioned, I do not impose a fine, but impose the

25   forfeiture amount of $9,703,995.33 jointly and severally.

1          During the period of incarceration, if you are engaged

2    in a BOP non-UNICOR work program, you will pay $25 per quarter

3    toward the criminal financial penalties.  If you participate in

4    the Bureau of Prisons UNICOR program at a grade 1 through 4,

5    you will pay 50 percent of your monthly UNICOR earnings toward

6    the criminal financial penalties consistent with BOP

7    regulations at 28 C.F.R. § 545.11.

8          Any payment made that is not payment in full shall be

9    divided proportionally among the persons named.

10          The restitution, upon release, shall be paid in

11    monthly installments beginning 30 days after release.  The

12    installments will be in no less than 20 percent of your gross

13    monthly income.

14          And finally, sir, I must impose and do impose the $400

15    special assessment, and that should be paid promptly.

16          It is my duty to inform you, sir, that, unless you

17    waived it, you have the right to appeal this sentence, and you

18    might have the right to appeal *in forma pauperis*, which means

19    as a poor person, with the waiver of certain fees and

20    expenses.

21          Mr. McGuire, did you wish a recommendation for a

22    designation, or Mr. Cooper did you have something to add?

23          MR. COOPER:  I do briefly, your Honor.

24          I believe the court ordered forfeiture jointly and

25    severally.

1              THE COURT:  You are right.  Not.  I take it back.

2              MR. COOPER:  Thank you.

3              THE COURT:  Forfeiture is not joint and several.

4     Thank you.

5              Mr. McGuire.

6              MR. McGUIRE:  Yes, Judge.  We have explained to

7     Mr. Tanner that the court cannot order a particular facility,

8     but we would ask that your Honor make a recommendation to the

9     Bureau of Prisons that Mr. Tanner be designated to a facility

10    where his family resides in Arizona, where we believe there is

11    FCI Tucson and FCI Arizona.  The preference would be FCI

12    Arizona, but the overall goal here is I think to ensure that he

13    goes to a minimum security camp, and we believe those two

14    institutions in Arizona --

15             THE COURT:  It is the court's recommendation that

16    Mr. Tanner be designated to a facility as close as possible to

17    his home in Arizona, particularly in the light of his having

18    two young children.  It is the court's recommendation that he

19    be designated to FCI Arizona or FCI Tucson.

20             MR. McGUIRE:  Your Honor, we would request a surrender

21    date in late January to allow Mr. Tanner to spend the holidays

22    with his family and get his affairs in order.

23             THE COURT:  Yes, sir.

24             (Pause)

25             THE COURT:  January 31, 2019.

1          MR. McGUIRE:  And your Honor, one other issue, which

2      is a request.  We have raised this with the government.  There

3      is a minor issue with respect to the record and a request that

4      we have with the government that -- the trial record, that is,

5      that we would ask to keep open the judgment for a period of a

6      couple of days this week to see if we can resolve it with the

7      government, and we may come to your Honor with that.  So we

8      just ask for that time.  By the end of the week, we will submit

9      a letter.  We will contact chambers otherwise to update the

10     court.

11         THE COURT:  Thank you.

12         MR. McGUIRE:  Thank you.

13         Then I believe there will be a request for bail

14     pending appeal, but we can handle that after the Davenport

15     sentence is imposed.

16         THE COURT:  Okay.  Was there any reason not to

17     continue it?

18         MR. COOPER:  No, your Honor.

19         THE COURT:  So ordered.

20         Ms. McCarthy, would you remind me, in light of the

21     holding with respect to the irrevocable trust, what the number

22     is.

23         MS. McCARTHY:  The number of what, Judge?

24         THE COURT:  The forfeiture.

25         MS. McCARTHY:  In the forfeiture order?

1            THE COURT:  Yes.

2            MR. COOPER:  Your Honor, sorry.  I believe the number

3    remains the same.  The court can just strike out the specific

4    property of the trust, which is --

5            THE COURT:  What about paragraph 1?

6            MR. COOPER:  The money judgment amount will remain the

7    same in paragraph 1.  On the third page, paragraphs E and F,

8    which are the paragraphs that relate to the specific property

9    and trust, maybe your Honor can just cross those out and the

10   order should otherwise be fine.

11           THE COURT:  Is that okay with you, Ms. McCarthy?  E

12   and F.

13           MS. McCARTHY:  Yes, it is E and F, your Honor.

14           THE COURT:  Yes, ma'am.  Thank you.  Thank you,

15   counsel.

16           You have heard the considerations that I have gone

17   through in thinking about a sentence.  As I said, I am

18   cognizant of Mr. Davenport's health situation, but it is

19   nevertheless my intention to impose a period of a year and a

20   day incarceration with the recommendation that Mr. Davenport

21   spend his time at the highest level medical facility that is

22   available at BOP.

23           It is also my intention to impose a period of two

24   years of supervised release on each count to run concurrently.

25           It is my intention to impose the special conditions

1    set forth, starting on page 31, which is a substance abuse

2    program, mental health program, providing requested financial

3    information and not incurring new credit charges or additional

4    lines of credit without approval unless in compliance with the

5    installment payment schedule.

6            It is not my intention to impose a fine.

7            It is my intention to impose the forfeiture amount of

8    $9,703,995.33.

9            It is my intention to impose the payment schedule

10   which is set out at page 33 of the presentence report.

11           And it is my intention to impose the $400 special

12   assessment.

13           Is there any reason, counsel, why such a sentence

14   should not be imposed?

15           MS. McCARTHY:  No, your Honor.

16           THE COURT:  Very well, then.  Mr. Davenport, you are

17   sentenced, sir, to a period of incarceration of a year and a

18   day.

19           It is the court's very strong recommendation to the

20   Bureau of Prisons that you be designated to the highest level

21   medical facility that is available.

22           Following that time, sir, you will spend a period of

23   two years on supervised release.  During that period, you will

24   comply with all of the standard terms and conditions of

25   supervised release.  Among them are that you not commit another

1    federal, state, or local crime, you not illegally possess a

2    controlled substance, and you not possess a firearm or other

3    destructive device.

4            In addition to those and all of the other standard

5    terms and conditions of supervised release, during that period,

6    you participate in an outpatient treatment program approved by

7    the probation officer for substance abuse, and that program may

8    include testing to determine whether you have returned to the

9    use of alcohol.

10           In addition, sir, during that period, you will

11   participate in an outpatient mental health treatment program

12   approved by the probation officer.

13           During that time, you will continue to take any

14   prescribed medications unless otherwise instructed by the

15   healthcare provider.

16           Sir, you might be required to pay some or all of those

17   two programs, depending on your ability to pay and the

18   availability of third-party payment.

19           The court authorizes the release of available drug

20   treatment evaluations and reports and available psychological

21   and psychiatric evaluations and reports, including the

22   presentence investigation report, to the respective healthcare

23   providers.

24           In addition, sir, during that period, you will provide

25   the probation officer with any requested financial information.

You will also not incur any new credit charges or open any

additional lines of credit without the approval of the

probation officer unless you are in compliance with the

installment payment schedule.

During the period of incarceration, if you are engaged

in a Bureau of Prisons non-UNICOR work program, you will pay

$25 per quarter toward the criminal financial penalties;

however, if you participate in the BOP's UNICOR program, at a

grade 1 through 4, you will pay 50 percent of your monthly

UNICOR earnings towards the criminal financial penalties

consistent with Bureau of Prisons regulations at 28 C.F.R. §

545.11.  Any payment made that is not payment in full shall be

divided proportionally among the persons named.

Following release, sir, restitution will be paid in

monthly installments of 20 percent of your gross monthly income

commencing 30 days after release.

As I mentioned, I do not impose a fine, but must

impose and do impose the $400 special assessment, and that

should be paid promptly.

It is my duty to inform you, sir, that, unless you

have waived it, you have the right to appeal this sentence, and

you might have the right to appeal *in forma pauperis*, which

means as a poor person, with the waiver of certain fees and

expenses.

Ms. McCarthy, did you want a specific recommendation

iau2tanS kjc

1    or what?

2              MS. McCARTHY:  Your Honor, he lives in the

3    Philadelphia area.  The two medical facilities that are in any

4    way close are both over six hours away.  One is in Devens, the

5    other is in Lexington, Kentucky.

6              (Defense counsel and defendant confer)

7              MS. McCARTHY:  He doesn't have a preference, your

8    Honor.

9              Secondly, your Honor, we would ask that if the Bureau

10   of Prisons determines, based upon an analysis of his medical

11   needs, that he does not require federal medical facility, that

12   the court then alternatively recommend FCI Schuylkill, which is

13   very close to his home.

14             THE COURT:  It is so recommended.

15             MS. McCARTHY:  Thank you.

16             THE COURT:  Did you want the January 31 surrender

17   date?

18             MS. McCARTHY:  Yes, your Honor, and also we would ask

19   that bail be continued pending appeal.

20             THE COURT:  Yes, ma'am.  Any objection?

21             MS. KRAMER:  Yes, your Honor.  We have no objection to

22   bail continuing pending the sentencing -- the surrender date of

23   January 2019, but bail pending appeal is disfavored and only

24   warranted in exceptional circumstances where the court finds,

25   by clear and convincing evidence, that an appeal raises a

1    substantial question of law or fact likely to result in

2    reversal, an order for a new trial, a sentence that does not

3    include a term of imprisonment, or a sentence that is reduced

4    from what the court has imposed.  There is absolutely no basis

5    to reach that conclusion in this case, certainly not by clear

6    and convincing evidence.

7              THE COURT:  Ms. McCarthy.

8              MS. McCARTHY:  Your Honor, if the court would permit,

9    Alexandra Shapiro will be handling the appeal on behalf of

10   Mr. Davenport, and I would ask the court permit her to address

11   this issue.

12             THE COURT:  All right.  Well, the motion is denied

13   now.  As of now, bail is continued through the surrender date.

14   If Ms. Shapiro wants to make a presentation, that's fine.

15             MS. KRAMER:  I understand that Mr. McGuire is making

16   the same motion for bail pending appeal on behalf of

17   Mr. Tanner.

18             THE COURT:  Forgive me.  I thought Mr. McGuire said

19   pending surrender.

20             MR. McGUIRE:  I said both, your Honor.  I asked for

21   the surrender date, then I also said, after the Davenport

22   sentence is imposed, that there would be a request for bail

23   pending appeal on behalf of Mr. Tanner.

24             We are going to yield the floor to Ms. Shapiro, as the

25   arguments that she is going to make we will join in.

1          THE COURT:  All right.

2          Ms. Shapiro.  Yes, ma'am.

3          MS. SHAPIRO:  I will try to be brief, your Honor.  I

4   know it's been a long morning.

5          With respect to the -- I think the government concedes

6   there is no risk of flight or danger, and the sole question

7   before the court is whether we can establish that there is a

8   substantial question that, if resolved in the defendants'

9   favor, would result in reversal or a new trial.

10         The leading Second Circuit case on the matter makes

11  clear that this is not a high hurdle, that "substantial" means

12  a question that is not frivolous, but rather a close question

13  or one that could well be decided the other way or one that is

14  novel and which has not been decided by controlling precedent,

15  and that is *United States v. Randell*, 761 F.2d 122, a Second

16  Circuit decision from 1985.

17         We clearly don't have to prove that the defendants are

18  likely to succeed and this court need not find that it has

19  erred, but merely whether, if we do succeed, a new trial or

20  reversal will be granted.

21         THE COURT:  What about the clear and convincing part?

22  What about the clear and convincing part?

23         MS. SHAPIRO:  Your Honor, I am about to address what

24  the issues are and why they are substantial.

25         So in the first -- we think that there are several

1    substantial issues which arise in part from the fact that I

2    think everyone has acknowledged, even accepting the verdict,

3    the theory of honest services fraud in this case is highly

4    unusual and that we are unaware of any other case in which a

5    private sector honest services fraud case was not based on the

6    situation described by other counsel, and I won't go on at

7    length about it, in which business is essentially steered to a

8    vendor who makes a bribe or kickback.  I think your Honor

9    acknowledged that even at the oral argument on the motion to

10   dismiss.

11          So we think that, under these unique facts, as well as

12   the Supreme Court's narrowing of the honest services fraud

13   statute most recently in the *McDonnell* case from 2016, give

14   rise to several substantial questions about both fair notice

15   and jury instructions in this case.

16          First, we think there is a substantial question

17   whether the honest services fraud statute is unconstitutionally

18   vague as applied to this conduct.  And I won't go on at length,

19   I know your Honor has ruled on this, but I think, at a minimum,

20   it is clear that that presents a novel question.  The circuit

21   has never addressed it.

22          And I have one that satisfies the substantial question

23   standard.  I think in particular I just would note that in the

24   *Skilling* case the Supreme Court was clear that the statute does

25   not criminalize mere undisclosed self-dealing by a private

employee and that something more is required, and that the type

of paradigmatic cases of bribes and kickbacks that the court

was describing in *Skilling* in context of private services are

the types of cases that we all have been talking about, which

is not what happened here.  This was very unusual, given that

this started because Valeant nurtured a relationship with

Mr. Davenport and Philidor, and I won't go through all of the

other facts.  The court is extremely familiar with them, more

than I am.

         And I recognize that the court thought very carefully

about all of its rulings in the case, but I just respectfully

submit that this is, at a minimum, a novel question and

therefore satisfies the bail standard.

         In addition, we think that there are a couple of

issues with respect to the jury instruction, particularly with

regard to the *quid pro quo*, that are similar to issues raised

recently by Sheldon Silver in his argument to the Second

Circuit, which was accepted, that he should be entitled to

bail, and both of those apply to this case, and there is one

other issue I want to mention.

         So the first question that he raised in his successful

bail argument to the circuit was a question about whether the

jury charge was deficient because it failed to instruct the

jury that there needs to be a *quid pro quo* agreement before the

employee took the acts in question, and we think in this case,

as well, that the jury instruction, in particular with respect to Mr. Davenport, failed to convey that the jury had to find that Andy Davenport paid Mr. Tanner a kickback with the understanding that the payment was made in exchange for specific actions by Mr. Tanner.

This requirement of an agreement which, as I said, the Second Circuit found was at least substantial in the *Silver* case, is dictated by a long line of cases from the Supreme Court and this circuit. I won't go through all of them, but the *Evans* case from 1992 in the Supreme Court makes clear that there has to be a showing of an agreement in exchange for performing specific acts.

Similarly, in the more recent case of *McDonnell*, the court held that the jury had to determine that in that case the official agreed to perform a specific act at the time of the alleged *quid pro quo*.

There is a similar holding in the Supreme Court's *McCormick* decision from 1991.

Then there are several Second Circuit cases which reinforce that, including you the original *Silver* decision from 2017, the *Rosen* case from 2013, and *United States v. Ganim* from 2007.

In this case, the defendants requested an instruction that the government had to prove "that the defendant specifically intended there to be a *quid pro quo*" and they also

1    requested an instruction that, to establish the necessary *quid*

2    *pro quo*, it is not enough for the government to prove that a

3    payment was made for some future act that the employee had

4    already decided to take or for a past act that he has already

5    taken, and the court did decline to give both of those

6    instructions.  And as I mentioned earlier, it also did not

7    instruct the jury that the government had to prove that there

8    was a *quid pro quo* between the two defendants before Mr. Tanner

9    took the acts in question.

10          In addition, the jury instructions stated that all

11    that is required is that Tanner performed or promised to

12    perform the act in question at least in part because of a

13    potential bribe or kickback which was focused exclusively on

14    Mr. Tanner and failed, in our judgment, to communicate to the

15    jury that there had to have been a meeting of the minds between

16    the two defendants, and we did object to that sentence.

17          So at a minimum, again, understanding that the court

18    obviously takes a different view of this, we submit that this

19    is a substantial question, as the Second Circuit apparently

20    recognized in the *Silver* case.

21          In addition, there was a second issue that Mr. Silver

22    raised in his bail application to the circuit which had to do

23    with an instruction that your Honor also gave which permitted

24    the jury to convict on a theory that involved a so-called

25    "stream of benefits" or "as opportunities arise" theory, rather

1   than one that was focused on a particular act in this case by

2   Mr. Tanner, and this issue was not only briefed, but also

3   discussed as well at the oral argument in the *Silver* case, and

4   Judge Cabranes commented during the argument that this was an

5   important question that the circuit had yet to decide as to

6   whether the *McDonnell* case forecloses that theory which

7   previously had been permitted in the Second Circuit.

8           And we think that that statement is supported by

9   *McDonnell* which was focused on the government identifying a

10  particular matter on which a person receiving the bribe has

11  agreed to act and stated that it had to be focused and

12  concrete, among other things.

13          THE COURT:  That's the public service, the public

14  honest services fraud case.

15          MS. SHAPIRO:  That's correct, your Honor.  But I think

16  that the circuit has ruled, including in *DeMizio*, that the case

17  law from the public official cases applies to private sector

18  cases in large part, and also I would just point out --

19          THE COURT:  Certainly not the official act part of it.

20  It can't.

21          MS. SHAPIRO:  Well, there has to be an act.  In this

22  case, it is a corporate act or it is a different kind of act,

23  but it has to be specific.  And I think the court in *McDonnell*

24  reached the conclusion that it did based on three

25  constitutional concerns that it identified which caused the

1    court to construe the honest services fraud statute narrowly in

2    the context of the finding of what in that case the official

3    act, but I would submit the act in a private case, as well; and

4    two of those three concerns clearly apply in private cases.

5    One of them is fair notice, vagueness concerns about both

6    defendants knowing what the line is between criminal conduct

7    and noncriminal conduct in this context, as well as the concern

8    about deterring the government from abusing the broadness, the

9    breadth of the statute.

10           The second constitutional concern which applies

11   equally in private cases and, indeed, perhaps more so, one

12   might add, is the federal concern, because these are obviously

13   things that are governed by state law as well.

14           And at a bare minimum, your Honor, I would submit that

15   the Second Circuit has never addressed the question of to what

16   extent does the *McDonnell* case apply in private honest services

17   fraud cases, and that in and of itself is a novel question of

18   first impression and therefore satisfies the bail standard

19   under the *Randell* case.

20           Just one last point, your Honor.  We also think that

21   there is a substantial question, we respectfully submit that

22   there is a substantial question as to whether the jury

23   instructions were also deficient because they failed to charge

24   that it is not enough for the government to prove that a

25   payment was made to curry favor or build good will.  And, as

1    the court will recall, the defendants requested this specific

2    instruction, and the court declined to give it.  It is directly

3    supported by Second Circuit law, including the *United States v.*

4    *Ganim*, a 2007 case, which I mentioned earlier.

5         And so, in summary, I think the critical point here is

6    that the defendants don't have to show by clear and convincing

7    evidence or otherwise that they are likely to prevail on any of

8    these issues.  The point is, under the Second Circuit

9    precedent, is it a substantial question, is it more than

10   frivolous, is it something courts could disagree on, or is it a

11   novel question.  And I submit at least one of these issues, if

12   not all of them, certainly satisfy that standard.

13        And I would also just note that, given the length of

14   the sentences that have been imposed here today, it is

15   virtually certain that, if bail pending appeal is not granted,

16   defendants will have served most, if not all, of the sentences

17   by the time the appeal is decided, and we ask the court to

18   consider that as well.

19        Thank you.

20        THE COURT:  Thank you.

21        Yes, ma'am.

22        MS. KRAMER:  Your Honor, we must be reading different

23   *Randell* cases, because I understand the Second Circuit to have

24   said that "a substantial question is one that is close or that

25   very well could be decided the other way," and your Honor

1    passed on all of these issues through the various forms of

2    litigation that we have had in this case, from the motion to

3    dismiss through the jury charge, and made decisions that were

4    unequivocal, not that were close or that your Honor viewed

5    could be decided the other way.

6         The Third Circuit in *United States v. Miller*

7    articulated the view expressed by the Congress in enacting

8    Section 3143(b), concerning bail pending appeal, that "once a

9    person has been convicted and sentenced to jail, there is

10   absolutely no reason for the law to favor release pending

11   appeal or even to permit it in the absence of exceptional

12   circumstances."

13        These are all certainly arguments that the defendants

14   will no doubt raise on appeal, but they don't fall into the

15   limited bucket of exceptional circumstances that warrant bail

16   pending appeal.

17        THE COURT:  Thank you.

18        Anything else, Ms. Shapiro.

19        MS. SHAPIRO:  Your Honor, I would just briefly note

20   that the statement about exceptional circumstances is not

21   accurate to the extent the government is suggesting that the

22   substantial issue standard isn't the one that I read from

23   *Randell*, which says, "'Substantial' means one that is not

24   frivolous but, rather, a close question."  The government read

25   that part correctly.  And I would respectfully submit, again,

1    respecting the court's decisions and its careful attention to

2    the various issues, that -- I understand the court disagrees

3    with defendants' position, but clearly that is not the end of

4    the matter, and that's the whole point.  And, indeed, the

5    *Randell* decision also specifically states that the district

6    court does not need to decide that it erred in order to grant

7    bail pending appeal.

8            And the last thing I will mention is that, in another

9    recent case out of the Eastern District of New York, the *Mark*

10   *Johnson* case, in that case the district court denied bail

11   pending appeal and said there was a presumption against bail,

12   and that was the basis for it.  The Second Circuit took a

13   different view and granted bail in that case, notwithstanding

14   the fact that the defendant was a foreign citizen.

15           And we respectfully submit here, at a minimum, these

16   issues are certainly novel issues the circuit has never

17   considered before, and that is sufficient, under *Randell*, to

18   grant bail.

19           THE COURT:  Anything else?

20           MS. KRAMER:  No, your Honor.

21           THE COURT:  Thank you.

22           I find the defendants have not made out the

23   requirements for bail pending appeal; and, accordingly, it is

24   denied.

25           Is there anything else today, counsel?

1          MR. COOPER:  Yes, your Honor.  Two ministerial issues.

2          One is, I know that the briefing and the argument on

3     restitution are being deferred, but to the extent it is unclear

4     on the record, I believe the court needs to order restitution

5     today and defer determination of losses to that later date, so

6     we would ask that the court do that.

7          THE COURT:  No objection, right?

8          MR. McGUIRE:  No, your Honor.

9          THE COURT:  Restitution is ordered.  The amount will

10    be determined following your briefing, and I assume you will

11    let me know what your schedule is.

12          Thank you.

13          MR. COOPER:  Yes, your Honor.

14          Finally, the government moves to dismiss the

15    underlying indictment in this case as against both defendants.

16          THE COURT:  So ordered.

17          MR. COOPER:  Thank you, your Honor.

18          MS. McCARTHY:  Your Honor, just one minor fact.  We

19    removed from the forfeiture order the trust assets, but I would

20    ask that the government affirmatively lift the restraint on

21    those assets.

22          MR. COOPER:  We will, your Honor.

23          THE COURT:  Yes, sir.

24          Anything else?

25          MR. COOPER:  Not from the government.  Thank you, your

iau2tanS kjc

1    Honor.

2            MS. McCARTHY:  No.

3            MR. McGUIRE:  No, thank you, Judge.

4            THE COURT:  Thank you, counsel.  Thank you again for

5    your presentations, which were exceedingly helpful.

6            Good morning.

7                              oOo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## Southern District of Florida
### Miami Division

UNITED STATES OF AMERICA

v.

**JEROME ALLEN**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **18-20773-CR-WILLIAMS**
USM Number: **19202-104**

Counsel For Defendant: **Ronald S. Sullivan, Jr.**
Counsel For The United States: **Elizabeth Young**
Court Reporter: **Patricia Sanders**

**The defendant pleaded guilty to count 1 of the Information.**

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 1957 | Money Laundering. | 12/01/2014 | 1 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: **7/1/2019**

_____
**Kathleen M. Williams**
**United States District Judge**

Date: _____7/5/19_____

DEFENDANT: **JEROME ALLEN**
CASE NUMBER: **18-20773-CR-WILLIAMS**

## PROBATION

The defendant is hereby sentenced to probation for a term of **4 years.**

The defendant shall not commit another federal, state or local crime.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: **JEROME ALLEN**
CASE NUMBER: **18-20773-CR-WILLIAMS**

## SPECIAL CONDITIONS OF SUPERVISION

**Community Service -** The defendant shall perform **600 hours** of community service over the period of Probation as monitored by the U.S. Probation Officer.

**Financial Disclosure Requirement -** The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer.

**Unpaid Restitution, Fines, or Special Assessments -** If the defendant has any unpaid amount of restitution, fines, or special assessments, the defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay.

**Home Detention with Electronic Monitoring -** The defendant shall participate in the Home Detention for a period of **six (6)** months. During this time, the defendant shall remain at his place of residence except for employment and other activities approved in advance, and provide the U.S. Probation Officer with requested documentation.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                   Page 4 of 5

DEFENDANT: **JEROME ALLEN**
CASE NUMBER: **18-20773-CR-WILLIAMS**
### CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|         | Assessment | Fine | Restitution |
|---------|------------|------|-------------|
| TOTALS  | **$100.00** | **$202,000.00** | $0.00 |

**If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.**

| NAME OF PAYEE | TOTAL LOSS* | RESTITUTION ORDERED |
|---------------|-------------|---------------------|
|               |             |                     |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Assessment due immediately unless otherwise ordered by the Court.

          

DEFENDANT: **JEROME ALLEN**
CASE NUMBER: **18-20773-CR-WILLIAMS**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $100.00 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE
ATTN: FINANCIAL SECTION
400 NORTH MIAMI AVENUE, ROOM 08N09
MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| CASE NUMBER DEFENDANT AND CO-DEFENDANT NAMES (INCLUDING DEFENDANT NUMBER) | TOTAL AMOUNT | JOINT AND SEVERAL AMOUNT |
|---|---|---|

**The Government shall file a preliminary order of forfeiture within 3 days.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 18-20773

UNITED STATES OF AMERICA

vs.

JEROME ALLEN,

        Defendant.

_____/

## PLEA AGREEMENT

The United States of America, by and through the Fraud Section of the Criminal Division of the Department of Justice and the United States Attorney's Office for the Southern District of Florida (hereinafter referred to as the "United States"), and Jerome Allen (hereinafter referred to as the "Defendant"), enter into the following agreement:

1.      The Defendant agrees to plead guilty to the Information.  The Information charges the Defendant with:  one count of money laundering, in violation of Title 18, United States Code, Section 1957, which makes it a federal offense to knowingly engage or attempt to engage in a monetary transaction affecting interstate commerce that involved proceeds of a specified unlawful activity namely, a wire fraud conspiracy, knowing that the transaction exceeded $10,000 and represented the proceeds of some form of unlawful activity.

2.      The Defendant is aware that the sentence will be imposed by the Court.  The Defendant understands and agrees that federal sentencing law requires the Court to impose a sentence that is reasonable and that the Court must consider the United States Sentencing

Guidelines and Policy Statements (hereinafter the "Sentencing Guidelines") in determining that reasonable sentence. The Defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a presentence investigation by the United States Probation Office ("Probation"), which investigation will commence after the guilty plea has been entered. The Defendant is also aware that, under certain circumstances, the Court may depart from the advisory Sentencing Guidelines range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The Defendant is further aware and understands that while the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, it is not bound to impose that sentence. Defendant understands that the facts that determine the offense level will be found by the Court at the time of sentencing and that in making those determinations the Court may consider any reliable evidence, including hearsay, as well as the provisions or stipulations in this Plea Agreement. The United States and the Defendant agree to recommend that the Sentencing Guidelines should apply pursuant to *United States v. Booker*, that the Sentencing Guidelines provide a fair and just resolution based on the facts of this case, and that no upward or downward departures are appropriate other than the reductions for acceptance of responsibility. The Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the Defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the Defendant may not withdraw the plea solely as a result of the sentence imposed.

3.     The Defendant also understands and acknowledges that as to the offense charged in the Information, the Court may impose a statutory maximum term of imprisonment of up to ten (10) years.  In addition to any period of imprisonment the Court may also impose a period of supervised release of up to three (3) years to commence at the conclusion of the period of imprisonment.  In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to the greater of $250,000, pursuant to 18 U.S.C. § 3571(b)(3), or twice the pecuniary gain from the offense, pursuant to 18 U.S.C. § 3571(d).

4.     The Defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this Agreement, a special assessment in the total amount of $100.00 will be imposed on the Defendant.  The Defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

5.     The Defendant recognizes that pleading guilty may have consequences with respect to the Defendant's immigration status if the Defendant is not a natural-born citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offense to which the Defendant is pleading guilty.   In addition, under certain circumstances, denaturalization may also be a consequence of pleading guilty to a crime.   Removal, denaturalization, and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including the Defendant's attorney or the Court, can predict to a certainty the effect of the Defendant's conviction on the Defendant's immigration status.  The Defendant nevertheless affirms that the Defendant chooses to plead guilty regardless of any immigration consequences that the Defendant's plea may entail, even if the consequence is the Defendant's denaturalization and automatic removal from the United States.

3

6.      The Defendant shall cooperate with law enforcement officials, attorneys with the United States Department of Justice and United States Attorney's Office for the Southern District of Florida, and with federal regulatory officials charged with regulating or overseeing the Medicare program by providing full, complete and truthful information regarding his knowledge, conduct and actions while involved in fraud and by providing active cooperation in ongoing investigations if requested to do so. If called upon to do so, the Defendant shall provide complete and truthful testimony before any grand jury or trial jury in any criminal case, in any civil proceeding or trial, and in any administrative proceeding or hearing. In carrying out his obligations under this paragraph Defendant shall neither minimize his own involvement nor fabricate, minimize or exaggerate the involvement of others. If the Defendant intentionally provides any incomplete or untruthful statements or testimony, his actions shall be deemed a material breach of this Agreement and the United States shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges as may be otherwise set forth in this Agreement.

7.      The Defendant shall provide the Probation Office and counsel for the United States with a full, complete and accurate personal financial statement. If the Defendant provides incomplete or untruthful statements in his personal financial statement, his action shall be deemed a material breach of this Agreement and the United States shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges otherwise set forth in this Agreement.

8.      Provided that the Defendant commits no new criminal offenses and provided that he continues to demonstrate an affirmative recognition and affirmative acceptance of personal

4

responsibility for his criminal conduct, the United States agrees that it will recommend at

sentencing that the Defendant receive a three-level reduction for acceptance of responsibility

pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the Defendant's recognition

and affirmative and timely acceptance of personal responsibility. The United States, however, will

not be required to make this sentencing recommendation if the Defendant: (1) fails or refuses to

make a full, accurate and complete disclosure to the United States and Probation of the

circumstances surrounding the relevant offense conduct and his present financial condition; (2) is

found to have misrepresented facts to the United States prior to entering this Plea Agreement; or

(3) commits any misconduct after entering into this Plea Agreement, including but not limited to

committing a state or federal offense, violating any term of release, or making false statements or

misrepresentations to any governmental entity or official.

      9.     The United States reserves the right to inform the Court and Probation of all facts

pertinent to the sentencing process, including all relevant information concerning the offenses

committed, whether charged or not, as well as concerning the Defendant and the Defendant's

background. Subject only to the express terms of any agreed-upon sentencing recommendations

contained in this Plea Agreement, the United States further reserves the right to make any

recommendation as to the quality and quantity of punishment.

      10.    The United States reserves the right to evaluate the nature and extent of the

Defendant's cooperation and to make the Defendant's cooperation, or lack thereof, known to the

Court at the time of sentencing. If in the sole and unreviewable judgment of the United States the

Defendant's cooperation is of such quality and significance to the investigation or prosecution of

other criminal matters as to warrant the Court's downward departure from the sentence advised by

the Sentencing Guidelines, the United States may at or before sentencing make a motion pursuant to Title 18, United States Code, Section 3553(e), Section 5K1.1 of the Sentencing Guidelines, or subsequent to sentencing by motion pursuant to Rule 35 of the Federal Rules of Criminal Procedure, reflecting that the Defendant has provided substantial assistance and recommending a sentence reduction. The Defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require the United States to file such a motion and that the United States' assessment of the nature, value, truthfulness, completeness, and accuracy of the Defendant's cooperation shall be binding on the Defendant.

11. The Defendant understands and acknowledges that the Court is under no obligation to grant a motion by the United States pursuant to Title 18, United States Code, Section 3553(e), 5K1.1 of the Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, as referred to in paragraph 11 of this Agreement, should the United States exercise its discretion to file such a motion.

12. Based on the foregoing, the United States and the Defendant agree that, although not binding on Probation or the Court, they will jointly recommend that the Court impose a sentence within the advisory sentencing guideline range produced by application of the Sentencing Guidelines. Although not binding on Probation or the Court, the United States and the Defendant further agree that, except as otherwise expressly contemplated in this Plea Agreement, they will jointly recommend that the Court neither depart upward nor depart downward under the Sentencing Guidelines when determining the advisory Sentencing Guideline range in this case. Further, the United States and the Defendant agree, although not binding on Probation or the Court, that there are no factors or circumstances which would support or otherwise suggest the propriety

6

of the Court's finding of any variance under Title 18, United States Code, Section 3553(a). The parties agree that, at the time of sentencing, the United States will recommend a sentence at the low end of the Sentencing Guidelines. The parties further agree that, pursuant to Section 5B1.1, the applicable offense level is in Zone B of the Sentencing Table and therefore a sentence of probation may be authorized if the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention.

      13.     The United States and the Defendant agree that, although not binding on Probation or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

      (a)    <u>Base Offense Level</u>: That the base offense level is twelve (12), pursuant to Section 2S1.1(a)(1), because the offense level for the underlying offense from which the laundered funds were derived is twelve (12), and is calculated using the following Sentencing Guidelines:

          i.    <u>Underlying Offense Base Offense Level</u>: That pursuant to 2B4.1(a), the base offense level for the underlying offense is eight (8).

          ii.    <u>Value of the Unlawful Payment to Defendant</u>: That the offense level of the underlying offense shall be increased by four (4) levels pursuant to 2B4.1(b)(1)(B) and 2B1.1(b)(1)(C), because the value of the unlawful payment to Defendant exceeded $15,000 but did not exceed $40,000.

      (b)    <u>Specific Offense Characteristics</u>: That the Defendant's offense level will be increased by one (1) level pursuant to Section 2S1.1(2)(A) because the conviction is under Title 18, United States Code, Section 1957.

7

TOTAL OFFENSE LEVEL – UNADJUSTED                    <u>13</u>

(c)     <u>Acceptance of Responsibility</u>: That the Defendant's offense level shall be
decreased by two (2) levels pursuant to Sections 3E1.1(a) because the Defendant
has demonstrated acceptance of responsibility for his offense.

TOTAL OFFENSE LEVEL – ADJUSTED                      <u>11</u>

(d)     <u>Fine</u>:  That a fine should be imposed on the Defendant in the amount of at least
$202,000.

14.     The Defendant acknowledges and understands that additional or different
enhancements or provisions of the Sentencing Guidelines might be applicable, and that neither the
Court nor Probation are bound by the parties' joint recommendations.

15.     The Defendant knowingly and voluntarily agrees to the entry of a forfeiture money
judgment against him in the amount of $18,000 (the "Forfeiture Money Judgment"), which equals
the amount involved in the conduct charged in Count 1 of the Information.  The Defendant agrees
to satisfy the Forfeiture Money Judgment prior to sentencing.

16.     The Defendant knowingly and voluntarily agrees to waive his right to a hearing,
pursuant to Fed. R. Crim. P. 32.2(b)(1)(A), to determine the amount of the Forfeiture Money
Judgment.  Furthermore, the Defendant knowingly and voluntarily agrees that he shall not, in any
manner, act in opposition to the United States in seeking entry and full satisfaction of the Forfeiture
Money Judgment.

17.     The Defendant knowingly and voluntarily agrees to waive the following rights with
respect to the entry of the Forfeiture Money Judgment and/or fine against him:

8

(a)     All constitutional, legal, and equitable defenses to such forfeiture and/or fine;

(b)     Any constitutional or statutory double jeopardy defense or claim regarding such forfeiture and/or fine;

(c)     Any claim or defense to such forfeiture and/or fine brought or raised under the Eighth Amendment to the United States Constitution, including, but not limited to, any claim or defense of excessive fine; and

(d)     Any right he may have to an appeal of any resulting order of forfeiture regarding the Forfeiture Money Judgment or to the fine imposed by the Court.

18.     The Defendant also agrees to assist this Office in all proceedings, administrative or judicial, involving forfeiture to the United States of any property, including substitute property, regardless of its nature or form, real or personal, which the Defendant or others known to the Defendant, have accumulated as a result of illegal activities.  The assistance shall include: identification of any property subject to forfeiture, agreement to the entry of an order enjoining the transfer or encumbrance of such property, and the transfer of such property to the United States by delivery to this Office upon this Office's request, any necessary and appropriate documentation, including consents to forfeiture and quit claim deeds, to deliver good and marketable title to such property.

19.     In furtherance of the collection of the Forfeiture Money Judgment, fine, and/or a restitution judgment, the Defendant agrees to the following:

(a)     The Defendant agrees to make full and accurate disclosure of his financial affairs to the United States Attorney's Office and U.S. Probation Office.  Specifically, the

Defendant agrees that **within 10 calendar days** of the signing of this Plea Agreement, the Defendant shall submit a completed Financial Disclosure Statement (form provided by the United States), and shall fully disclose and identify all assets in which he has any interest and/or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. The Defendant agrees to provide, in a timely manner, all financial information requested by the United States Attorney's Office and U.S. Probation Office, and upon request, to meet in person to identify assets/monies which can be used to satisfy the Forfeiture Money Judgment, fine, and/or the restitution judgment. In addition, the Defendant expressly authorizes the United States Attorney's Office to obtain a credit report.

    (b)    The Defendant agrees that he will not sell, hide, waste, encumber, destroy, or otherwise devalue any asset until the Forfeiture Money Judgment, fine, and his restitution judgment is paid in full without prior approval of the government. The Defendant shall also identify any transfer of assets valued in excess of $5,000 since the date of his Information or when he became aware of the criminal investigation, including the identity of the asset, the value of the asset, the identity of the third party to whom the asset was transferred, and the current location of the asset.

    (c)    The Defendant agrees to cooperate fully in the investigation and the identification of assets to be applied toward forfeiture, fine, and/or restitution. The Defendant agrees that providing false or incomplete information about his financial assets, or hiding, selling, transferring or devaluing assets and/or failing to cooperate fully in the investigation and identification of assets may be used as a basis for: (i) separate prosecution, including, under 18

10

U.S.C. § 1001; or (ii) recommendation of a denial of a reduction for acceptance of responsibility pursuant to Sentencing Guidelines § 3E1.1.

        (d)     The Defendant further agrees to liquidate assets, or complete any other tasks which will result in immediate payment of the Forfeiture Money Judgment, fine, and/or the restitution judgment in full, or full payment in the shortest amount of time, as requested by the government.

        (e)     The Defendant shall notify, within 30 days, the Clerk of the Court and the United States Attorney's Office of: (i) any change of name, residence, or mailing address, and (ii) any material change in economic circumstances that affects the ability to pay the Forfeiture Money Judgment, fine, restitution.

20.     The Defendant acknowledges that because the offenses of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay and that the Court must order the Defendant to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A, provided, however, that the value of any property forfeited shall be credited against any order of restitution.

21.     The Defendant is aware that the sentence has not yet been determined by the Court. The Defendant is also aware that any estimate of the probable sentencing range or sentence that the Defendant may receive, whether that estimate comes from the Defendant's attorney, the United States, or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court.   The Defendant understands further that any recommendation that the United States makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the

recommendation in its entirety. The Defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the Defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the Defendant, the United States, or a recommendation made jointly by both the Defendant and the United States.

22.     The Defendant is aware that Title 18, United States Code, Section 3742 affords the Defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the Defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any forfeiture, fine, or restitution ordered, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the guideline range that the Court establishes at sentencing. In addition to the foregoing provisions, the Defendant hereby waives all rights to argue on appeal that the statute to which the Defendant is pleading guilty is unconstitutional and that the admitted conduct does not fall within the scope of the statute. The Defendant further understands that nothing in this agreement shall affect the right of the United States and/or its duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the Defendant's sentence pursuant to Section 3742(b), the Defendant shall be released from the above waiver of appellate rights. By signing this agreement, the Defendant acknowledges that he has discussed the appeal waiver set forth in this agreement with his attorney. The Defendant further agrees, together with the United States, to request that the district Court enter a specific finding that the Defendant's waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

23.     For purposes of criminal prosecution, this Plea Agreement shall be binding and enforceable upon the Fraud Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Florida. The United States does not release Defendant from any claims under Title 26, United States Code. Further, this Agreement in no way limits, binds, or otherwise affects the rights, powers or duties of any state or local law enforcement agency or any administrative or regulatory authority.

24.     The Defendant agrees that if he fails to comply with any of the provisions of this agreement, including the failure to tender such agreement to the Court, makes false or misleading statements before the Court or to any agents of the United States, commits any further crimes, or attempts to withdraw the plea (prior to or after pleading guilty to the charges identified in paragraph one (1) above), the Government will have the right to characterize such conduct as a breach of this agreement. In the event of such a breach: (a) the Government will be free from its obligations under the agreement and further may take whatever position it believes appropriate as to the sentence and the conditions of the Defendant's release (for example, should the Defendant commit any conduct after the date of this agreement that would form the basis for an increase in the Defendant's offense level or justify an upward departure – examples of which include but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or Court – the Government is free under this agreement to seek an increase in the offense level based on that post-agreement conduct); (b) the Defendant will not have the right to withdraw the guilty plea; (c) the Defendant shall be fully subject to criminal prosecution for any other crimes which he has committed or might commit, if any, including perjury and obstruction of justice; and (d) the

Defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, and the Government will be free to use against the Defendant, directly and indirectly, in any criminal or civil proceeding any of the information, statements, and materials provided by him pursuant to this agreement, including offering into evidence or otherwise using the attached Agreed Factual Basis for Guilty Plea.

25.     This is the entire agreement and understanding between the United States and the Defendant. There are no other agreements, promises, representations or understandings.

RANDY HUMMEL
EXECUTIVE ASSISTANT U.S. ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

SANDRA MOSER
ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

Date: 7|5|18                By: _____ EY 10/3/18
ELIZABETH YOUNG
DREW BRADYLYONS
TRIAL ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

Date: 7/5/18                By: _____ 10/3/18
JEROME ALLEN
DEFENDANT

Date: 7/5/18                By: _____ RSS 10/3/18
RONALD S. SULLIVAN, ESQ.
COUNSEL FOR JEROME ALLEN

14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 16-CR-20549-SCOLA/OTAZO-REYES (s)(s)(s)**

**UNITED STATES OF AMERICA**

**vs.**

**PHILIP ESFORMES,**
      **Defendant.**
_____/

<u>**VERDICT**</u>

<u>**Count 1**</u>
**Conspiracy to Commit Health Care Fraud and Wire Fraud**

1.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 1 of the Third Superseding Indictment:

      GUILTY: _____        NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 1, please move on to Count 6. If you find the Defendant Guilty as to Count 1, please indicate which offense the Defendant conspired to commit. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the nine lines below),

      a.     by knowingly and willfully executing a scheme or artifice to defraud a health care benefit program based on the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes;

      _____        _____
      Yes          No

      b.     by knowingly and willfully executing a scheme or artifice to defraud a health care benefit program based the submission of false and fraudulent claims to Medicare and Medicaid for services that were medically unnecessary;

      _____        _____
      Yes          No



c.     by knowingly and willfully executing a scheme or artifice to defraud a health care benefit program based the submission of false and fraudulent claims to Medicare and Medicaid for services that were never provided;

_____          _____
Yes                      No

d.     by knowingly and willfully executing a scheme or artifice to obtain money and property of a health care benefit program based on the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes;

_____          _____
Yes                      No

e.     by knowingly and willfully executing a scheme or artifice to obtain money and property of a health care benefit program based the submission of false and fraudulent claims to Medicare and Medicaid for services that were medically unnecessary;

_____          _____
Yes                      No

f.     by knowingly and willfully executing a scheme or artifice to obtain money and property of a health care benefit program based the submission of false and fraudulent claims to Medicare and Medicaid for services that were never provided;

_____          _____
Yes                      No

g.     by knowingly and with the intent to defraud devising and intending to devise a scheme or artifice to defraud by means of wire communication in interstate commerce based on the submission of false and fraudulent claims to Medicare and Medicaid for claims based on kickbacks and bribes;

_____          _____
Yes                      No

2

h.     by knowingly and with the intent to defraud devising and intending to devise a scheme or artifice to defraud by means of wire communication in interstate commerce based the submission of false and fraudulent claims to Medicare and Medicaid for services that were medically unnecessary;

_____          _____
Yes                      No

i.     by knowingly and with the intent to defraud devising and intending to devise a scheme or artifice to defraud by means of wire communication in interstate commerce based the submission of false and fraudulent claims to Medicare and Medicaid for services that were never provided;

_____          _____
Yes                      No

## Count 6
### Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

6.     We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 6 of the Third Superseding Indictment:

GUILTY: __✓____          NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 6, please move on to Count 7. If you find the Defendant Guilty as to Count 6, please indicate which offense the Defendant conspired to commit.  (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a.     by knowingly and willfully defrauding the United States

✓
____          ____
Yes                      No

b.  by knowingly and willfully offering and paying health care kickbacks.

_____          _____
Yes                      No

c.  by knowingly and willfully soliciting and receiving health care kickbacks.

_____          _____
Yes                      No

3

## Counts 8-9
### Receipt of Kickbacks in Connection with a Federal Health Care Program

8.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 8 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

9.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 9 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

## Counts 10-15
### Payment of Kickbacks In Connection with a Federal Health Care Program

10.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 10 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

11.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 11 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

12.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 12 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

13.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 13 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

14.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 14 of the Third Superseding Indictment:

GUILTY: _____          NOT GUILTY: _____

15.   We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 15 of the Third Superseding Indictment:

GUILTY: _____            NOT GUILTY: _____

### **Count 16**
### **Conspiracy to Commit Money Laundering**

16.   We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 16 of the Third Superseding Indictment:

GUILTY: ___✓___            NOT GUILTY: _____

### **Counts 18-23, 25-28, and 30**
### **Money Laundering**

18.   We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 18 of the Third Superseding Indictment:

GUILTY: ___✓___            NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 18, please move on to Count 19.  If you find the Defendant Guilty as to Count 18, please indicate which unlawful activity the proceeds involved in the transaction came from.  (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a.   health care fraud;

_____            _____
Yes               No

b.   conspiracy to commit health care fraud and wire fraud;

___✓___          _____
Yes               No

c.   receipt of kickbacks in connection with a federal health care program;

_____            _____
Yes               No

5

19.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 19 of the Third Superseding Indictment:

GUILTY: ___✓___                NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 19, please move on to Count 20.  If you find the Defendant Guilty as to Count 19, please indicate which unlawful activity the proceeds involved in the transaction came from.  (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a.    health care fraud;

___✓___          _____
Yes                    No

b.    conspiracy to commit health care fraud and wire fraud;

___✓___          _____
Yes                    No

c.    receipt of kickbacks in connection with a federal health care program;

___✓___          _____
Yes                    No

20.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 20 of the Third Superseding Indictment:

GUILTY: ___✓___                NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 20, please move on to Count 21.  If you find the Defendant Guilty as to Count 20, please indicate which unlawful activity the proceeds involved in the transaction came from.  (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a.    health care fraud;

___✓___          _____
Yes                    No

b.    conspiracy to commit health care fraud and wire fraud;

___✓___          _____
Yes                    No

6

c. receipt of kickbacks in connection with a federal health care program;

_____✓_____        _____
   Yes                  No

21. We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 21 of the Third Superseding Indictment:

GUILTY: __✓_____        NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 21, please move on to Count 22. If you find the Defendant Guilty as to Count 21, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a. health care fraud;

___✓_____        _____
   Yes                  No

b. conspiracy to commit health care fraud and wire fraud;

___✓_____        _____
   Yes                  No

c. receipt of kickbacks in connection with a federal health care program;

____✓____        _____
   Yes                  No

22. We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 22 of the Third Superseding Indictment:

GUILTY: _____        NOT GUILTY: _____

7

If you find the Defendant Not Guilty as to Count 22, please move on to Count 23. If you find the Defendant Guilty as to Count 22, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

     a.    health care fraud;

        \_\_\_\_\_        \_\_\_\_
        Yes        No

     b.    conspiracy to commit health care fraud and wire fraud;

        \_\_\_\_\_        \_\_\_\_
        Yes        No

     c.    receipt of kickbacks in connection with a federal health care program;

        \_\_\_\_\_        \_\_\_\_
        Yes        No

23.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 23 of the Third Superseding Indictment:

     GUILTY: _____         NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 23, please move on to Count 25. If you find the Defendant Guilty as to Count 23, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

     a.    health care fraud;

        \_\_\_\_\_        \_\_\_\_
        Yes        No

     b.    conspiracy to commit health care fraud and wire fraud;

        \_\_\_\_\_        \_\_\_\_
        Yes        No

     c.    receipt of kickbacks in connection with a federal health care program;

        \_\_\_\_\_        \_\_\_\_
        Yes        No

25. We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 25 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 25, please move on to Count 26. If you find the Defendant Guilty as to Count 25, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

   a.   health care fraud;

   ___✓___          _____
   Yes                No

   b.   conspiracy to commit health care fraud and wire fraud;

   ___✓___          _____
   Yes                No

   c.   receipt of kickbacks in connection with a federal health care program;

   ___✓___          _____
   Yes                No

26. We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 26 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 26, please move on to Count 27. If you find the Defendant Guilty as to Count 26, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

   a.   health care fraud;

   ___✓___          _____
   Yes                No

   b.   conspiracy to commit health care fraud and wire fraud;

   ___✓___          _____
   Yes                No

9

c. receipt of kickbacks in connection with a federal health care program

✓ ____
Yes           No

27. We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 27 of the Third Superseding Indictment:

GUILTY: ✓_____        NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 27, please move on to Count 28. If you find the Defendant Guilty as to Count 27, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a. health care fraud;

✓ ____
Yes           No

b. conspiracy to commit health care fraud and wire fraud;

✓ ____
Yes           No

c. receipt of kickbacks in connection with a federal health care program;

____ ____
Yes           No

28. We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 28 of the Third Superseding Indictment:

GUILTY: ✓_____        NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 28, please move on to Count 30. If you find the Defendant Guilty as to Count 28, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

10

a.    health care fraud

    ✓

    ———        ———
    Yes          No

b.    conspiracy to commit health care fraud and wire fraud

    ✓

    ———        ———
    Yes          No

c.    receipt of kickbacks in connection with a federal health care program

    ———        ———
    Yes          No

30.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 30 of the Third Superseding Indictment:

    GUILTY:  __✓___         NOT GUILTY: _____

If you find the Defendant Not Guilty as to Count 30, please move on to Count 31. If you find the Defendant Guilty as to Count 30, please indicate which unlawful activity the proceeds involved in the transaction came from. (Please remember that in order to return a guilty verdict as to this offense, you must unanimously answer "yes" on at least one of the three lines below),

a.    health care fraud

    ———        ———
    Yes          No

b.    conspiracy to commit health care fraud and wire fraud

    ✓

    ———        ———
    Yes          No

c.    receipt of kickbacks in connection with a federal health care program

    ———        ———
    Yes          No

## Counts 31-32
## Conspiracy to Commit Federal Program Bribery

31.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 31 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

32.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 32 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

## Count 33
## Federal Program Bribery

33.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 33 of the Third Superseding Indictment:

GUILTY: _____          NOT GUILTY: _____

## Count 34
## Obstruction of Justice

34.    We, the Jury, unanimously find the Defendant, **PHILIP ESFORMES**, as to Count 34 of the Third Superseding Indictment:

GUILTY: ___✓___          NOT GUILTY: _____

SO SAY WE ALL THIS _05_ day of _APRIL_ 2019

_____          _____5_____
Foreperson Signature          Foreperson Juror #

12

273 Fed.Appx. 15
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,

v.

Bruce J. CORRIGAN, Jr., Defendant-Appellant.

No. 07-2854-cr.
|
April 2, 2008.

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the District of Connecticut, Arterton, J., upon his plea of guilty to mail fraud. He appealed his conviction and sentence to 8 months' imprisonment.

**Holdings:** The Court of Appeals held that:

[1] District Court's finding that probable loss from defendant's fraudulent statement was $18,500 was not clearly erroneous;

[2] defendant waived his claim that District Court violated the Due Process Clause and rule requiring courts to "allow parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence" by not disclosing report; and

[3] even if District Court relied on allocution by a separate defendant in another case, such reliance was not error.

Affirmed.

West Headnotes (3)

[1]      **Sentencing and Punishment**
👉 Value of Loss or Benefit

District Court's finding that probable loss from defendant's fraudulent statement was $18,500 was not clearly erroneous, in sentencing defendant under the Sentencing Guidelines

for mail fraud, where defendant's lost wages statement was part of a larger, integrated claim, and defendant intended lost wages statement to affect amount of the claim by more than the lost wages amount itself. U.S.S.G. § 2B1.1, commentary (n. 3), 18 U.S.C.A.; 18 U.S.C.A. § 1341.

Cases that cite this headnote

[2]      **Sentencing and Punishment**
👉 Objections and Disposition Thereof

Defendant waived his claim that District Court violated the Due Process Clause and rule requiring courts to "allow parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence" by not disclosing report, where he declined District Court's offer to provide him with a copy of the report. U.S.C.A. Const.Amend. 5; Fed.Rules Cr.Proc.Rule 32(i)(1)(C), 18 U.S.C.A.

Cases that cite this headnote

[3]      **Sentencing and Punishment**
👉 Necessity

Even if District Court relied on allocution by a separate defendant in another case and failed to notify defendant of its intention to consider that allocution, in sentencing defendant for mail fraud, such reliance was not error, where District Court did not consider the allocution as part of the relevant conduct, but, rather, sentenced defendant for just the offense of conviction, and lack of notice did not impair defendant's ability to "comment" on the allocution. 18 U.S.C.A. § 1341.

Cases that cite this headnote

**\*16**  Appeal from judgment of conviction and sentence by the United States District Court for the District of Connecticut (Arterton, J.).

UPON DUE CONSIDERATION IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the

judgment of said District Court be and it hereby is **AFFIRMED.**

**Attorneys and Law Firms**

Andrew B. Bowman, Westport, CT, Appearing for Defendant-Appellant.

David J. Sheldon, Assistant United States Attorney for the District of Connecticut (William J. Nardini, Assistant United States Attorney, on the brief), for Kevin J. O'Connor, United States Attorney for the District of Connecticut, Appearing for Appellee.

PRESENT: Hon. JOSEPH M. McLAUGHLIN, Hon. PETER W. HALL, Circuit Judges, Hon. LEONARD B. SAND, District Judge. [*]

SUMMARY ORDER

**\*\*1** Defendant-Appellant Bruce Corrigan appeals from the June 28, 2007 judgment of the District Court for the District of Connecticut (Arterton, J.) sentencing him to 8 months' imprisonment after he pleaded guilty to mail fraud in violation of 18 U.S.C. § 1341. We assume the parties' familiarity with the facts and proceedings below.

**[1]** Corrigan's first argument on appeal is that the district court abused its discretion and committed clear error when it determined the intended loss to be $18,500. "We review the factual determinations underlying a district court's loss calculation at sentencing for clear error and its application of the Sentencing Guidelines de novo." *United States v. Canova,* 412 F.3d 331, 351 (2d Cir.2005). Under the Guidelines, "loss" is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). The "intended loss" is "the pecuniary harm that was intended to result from the offense" and it "includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.,* as in a government sting operation ...)." *Id.* cmt. 3(A)(ii). We have described "intended loss" as "the probable loss from a particular misstatement because one is presumed to intend the natural and 'probable' consequences of one's acts." *United States v. Carboni,* 204 F.3d 39, 47 (2d Cir.2000) (internal quotation marks omitted). The district court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. 3(C).

**\*17** The district court's finding that the "probable loss" from Corrigan's fraudulent statement was $18,500 was not clearly erroneous. Corrigan had been recorded telling Agent that the lost wages statement brought his case "up a notch" and "put [him] in a different category." As the district court observed, the lost wages amount was not simply one of several separate, divisible amounts that made up the larger claim; the lost wages were "also a consideration of how injured a person was, such that they couldn't work for X period of time," thereby "really transform[ing]" the insurance claim by "driving valuation of the noneconomic damages." The district court thus found that the lost wages statement was part of a larger, integrated claim, and that Corrigan intended the lost wages statement to affect the amount of the claim by more than the lost wages amount itself. These findings are not clearly erroneous, as Corrigan himself told the Agent that the lost wages statement "put [him] in a different category."

**[2]** Corrigan's second claim is that the district court violated Federal Rule of Criminal Procedure 32 and due process when it "did not disclose" the Fogel report. Under Rule 32, the district court "must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence." Fed.R.Crim.P. 32(i)(1)(C). Defendant's claim of error is weak: The district court itself offered to have the Government give Corrigan's attorney a copy of the Fogel report. In any event, Corrigan affirmatively waived this claim when he declined the district court's offer to provide him with a copy of the report. Corrigan's decision to decline the district court's offer makes clear that if there was any error, it was one that Corrigan "himself invited" and as to which he is therefore "not entitled to relief." *United States v. Wellington,* 417 F.3d 284, 290 (2d Cir.2005).

**\*\*2 [3]** Corrigan's final argument is that the district court erred by taking into consideration the allocution by a separate defendant in another case, Mr. Francois. As an initial matter, Corrigan's belief that the district court relied on the Francois allocution when sentencing Corrigan is somewhat speculative, as the court described the allocution as "not part of the relevant conduct" and later confirmed that it had "sentenced [Corrigan] for just the offense of conviction." Even if the district court did rely on the allocution as Corrigan claims, that reliance was not error. *See United States v. Carmona,* 873 F.2d 569, 574 (2d Cir.1989) ("The fact that some material, upon which the trial judge relied, may have had its source in a judicial proceeding in which appellant was

U.S. v. Corrigan, 273 Fed.Appx. 15 (2008)

not a defendant or represented by counsel does not bar its use." (internal quotation marks omitted)).

As for Corrigan's claim that the district court's failure to notify Defendant of its intention to consider the Francois allocution violated Rule 32 and due process, our review is for plain error because he made no objection on this basis before the district court. Fed.R.Crim.P. 52(b). We need not address whether the district court committed error or whether that error was plain, because Corrigan has not shown that the alleged error affected his substantial rights. The purpose of any notice the district court should have given would have been to effectuate Corrigan's ability to respond to the material at issue. Corrigan has not identified how the lack of notice impaired his ability to "comment" on Francois's allocution, claiming neither that the material therein was false nor that he had evidence undermining its credibility.

 **\*18**  We have considered all of Corrigan's other arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the District Court.

### All Citations

273 Fed.Appx. 15, 2008 WL 895930

### Footnotes

\*     The Honorable Leonard B. Sand, of the United States District Court for the Southern District of New York, sitting by designation.

---

**End of Document**                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

38 Fed.Appx. 626
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Thomas RYBICKI, Fredric Grae,
and Grae, Rybicki & Partners, P.C.,
Defendants–Appellants–Cross–Appellees.

Nos. 00–1043L, 00–1055(CON),
00–1044(CON), 00–1052(XAP).

|

April 22, 2002.

**Synopsis**
Attorneys were convicted, in the United States District Court
for the Eastern District of New York, Amon, J., of mail
fraud, based on their practice of using middlemen to give
kickbacks to insurance adjusters when settling personal injury
claims, and they appealed. The Court of Appeals held that: (1)
attorneys' practice constituted "scheme or artifice to defraud,"
within meaning of mail fraud statute; (2) business records
were admissible; (3) evidence of uncharged, prior bribes was
admissible; (4) two-level sentence enhancement for use of
"special skill" in commission of crime was warranted; and
(5) amount of bribes, for sentencing purposes, was reasonably
calculated as amount paid by middlemen to adjusters rather
than amount of money paid to middlemen.

Affirmed.

West Headnotes (12)

[1]     **Postal Service**
         👈 Injury from fraud
        **Postal Service**
         👈 Nature of scheme or device in general
        Attorneys' practice of settling personal injury
        claims through intermediary who shared his fee
        with insurance company adjusters, in violation
        of insurance company rules prohibiting adjusters
        from accepting gifts, constituted "scheme or

artifice to defraud," within meaning of mail fraud
statute; scheme deprived insurance companies of
their employees' honest services. 18 U.S.C.A. §§
1341, 1346.

1 Cases that cite this headnote

[2]     **Postal Service**
         👈 Effectiveness of matter mailed to further
        fraud
        Attorneys who engaged in kickback scheme to
        settle personal injury claims made sufficient
        use of mails to bring their conduct within
        jurisdictional scope of mail fraud statute;
        settlement checks were sent by mail, bribes were
        invoiced and paid by mail, mandatory filings to
        state court administrator, which were adulterated
        to conceal fraud, were sent by mail. 18 U.S.C.A.
        § 1341.

        Cases that cite this headnote

[3]     **Postal Service**
         👈 Legality of object
        **Telecommunications**
         👈 Nature of scheme or device in general
        Fraudulent scheme need not violate state law
        in order to support federal mail or wire fraud
        conviction. 18 U.S.C.A. §§ 1341, 1343.

        1 Cases that cite this headnote

[4]     **Postal Service**
         👈 Injury from fraud
        Attorney engaged in practice of settling personal
        injury claims through intermediary who shared
        his fee with insurance company adjusters could
        be convicted of mail fraud if it was reasonably
        foreseeable to attorney that companies in
        question might suffer economic harm as result
        of adjusters' breach of companies' anti-bribery
        rules. 18 U.S.C.A. § 1341.

        1 Cases that cite this headnote

[5]     **Postal Service**
         👈 Injury from fraud

Employee's breach of obligation to account to employer for secret profits can form basis of mail fraud conviction based upon deprivation of employer's right to honest services. 18 U.S.C.A. §§ 1341, 1346.

Cases that cite this headnote

**[6]**   **Postal Service**
   👉 Injury from fraud

No fiduciary relationship is required in order to find deprivation of right to honest services, and hence scheme or artifice to defraud within meaning of mail fraud statute. 18 U.S.C.A. §§ 1341, 1346.

1 Cases that cite this headnote

**[7]**   **Postal Service**
   👉 Injury from fraud

Attorneys who settled personal injury claims through intermediary who shared his fee with insurance company adjusters could be convicted of mail fraud on ground they engaged in scheme to deprive insurance companies of their employees' honest services, even if they believed that venture would ultimately succeed in such a way that no one would, in the end, suffer any loss. 18 U.S.C.A. §§ 1341, 1346.

Cases that cite this headnote

**[8]**   **Criminal Law**
   👉 Particular records

Records whose accuracy was essential to success of criminal venture had adequate indicia of trustworthiness and reliability to warrant their admission in mail fraud prosecution. Fed.Rules Evid.Rule 803(6), 28 U.S.C.A.

Cases that cite this headnote

**[9]**   **Criminal Law**
   👉 False pretenses and fraud
**Criminal Law**
   👉 Showing relationship between defendant and others

Insurance adjuster's testimony about prior uncharged transactions with attorney charged with mail fraud, based on his practice of using middlemen to give kickbacks to insurance adjusters when settling personal injury claims, was relevant to contested issue of attorney's knowledge and intent, as well as to his later relationship with witness as middleman. Fed.Rules Evid.Rules 403, 404(b), 28 U.S.C.A.

Cases that cite this headnote

**[10]**   **Criminal Law**
   👉 Limiting effect of evidence competent only as against one of several defendants

Admission of evidence as to one attorney's knowledge and intent did not unfairly prejudice co-defendant attorney, in mail fraud prosecution based on their practice of using middlemen to give kickbacks to insurance adjusters when settling personal injury claims; court gave adequate limiting instruction. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

Cases that cite this headnote

**[11]**   **Sentencing and Punishment**
   👉 Use of special skill

Attorneys convicted of mail fraud, based on their practice of using middlemen to give kickbacks to insurance adjusters when settling personal injury claims, were properly subject to two-level enhancement in their sentences for their use of "special skill" in commission of crime; defendants' skills as attorneys were integral to fraud scheme. U.S.S.G. § 3B1.3, 18 U.S.C.A.

Cases that cite this headnote

**[12]**   **Sentencing and Punishment**
   👉 Value of loss or benefit

Amount of bribes, for purpose of sentencing attorneys convicted of mail fraud based on their practice of using middlemen to give kickbacks to insurance adjusters when settling personal injury claims, was reasonably calculated as amount paid by middlemen to adjusters, rather than

amount of money paid to middlemen. U.S.S.G. § 2B4.1, 18 U.S.C.A.

Cases that cite this headnote

**\*628** Appeal from the United States District Court for the Eastern District of New York (Amon, J.).

**Attorneys and Law Firms**

Barry E. Schulman, Esq., Law Office of Barry E. Schulman, Esq. (Deborah A. Santelmo, Esq., on the brief), Brooklyn, NY, for Rybicki.

Ephraim Savitt, Esq., New York, NY, for Grae.

Herald Price Fahringer, Esq., Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP (Erica T. Dubno, Esq., on the brief), New York, NY, for Grae Rybicki & Partners, P.C.

Daniel R. Alonso and Karen R. Sage, Assistant United States Attorneys (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Peter A. Norling and David C. James, Assistant United States Attorneys, on the brief), Brooklyn, NY, for Appellee.

Present WALKER, Chief Judge, CABRANES and STRAUB, Circuit Judges.

SUMMARY ORDER

**\*\*1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgments of said district court be and they hereby are AFFIRMED.

Defendants-appellants Thomas Rybicki, Fredric Grae, and the law firm of Grae, Rybicki & Partners, P.C. appeal from the January 27, 2000 judgments of the district court, following a jury trial, convicting them of mail and wire fraud and conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 371 based on their practice of making payments through **\*629** middlemen or expediters to insurance company adjusters in order to settle personal injury lawsuits. To obtain more favorable settlement results, either as to timing or amount, appellants would pay a percentage of the settlement to the middlemen to split with the insurance companies' adjusters, notwithstanding that each

of the insurance companies prohibited the acceptance of any gifts or fees by adjusters and required adjusters to report the offer of any gifts or fees. Appellants Grae and Rybicki were each sentenced to terms of imprisonment of one year and one day, three years of supervised release, a \$20,000 fine, and a \$1,150 special assessment. The appellants' surrender date was stayed pending this appeal. Appellant Grae, Rybicki & Partners, P.C. was sentenced to three years' probation, an \$80,000 fine, and a \$4,600 special assessment.

On appeal, appellants raise a host of legal and factual challenges to their convictions, which, briefly summarized, are that (1) appellants' practice of settling personal injury claims through an intermediary who shared his fee with the insurance company adjuster did not constitute a "scheme or artifice to defraud" in violation of 18 U.S.C. § 1341 because the government failed to prove actual or intended economic or pecuniary harm and because any breach of duty by the adjuster was not material; (2) the government failed to prove use of the mails sufficient to bring appellants' conduct within the mail fraud statute; (3) the prosecution exceeded the jurisdictional scope of the mail and wire fraud statutes; (4) the "honest services" fraud provision, 18 U.S.C. § 1346, is void for vagueness; (5) several of the district court's jury instructions were erroneous; (6) appellants' federal prosecution constituted a vindictive prosecution in light of the dismissal of a similar state case against appellants brought by the same prosecutor; (7) prosecutorial misconduct deprived appellants of a fair trial; (8) several evidentiary rulings by the district court were erroneous; and (9) the district court erred in enhancing appellants' sentences for the "use of a special skill."

The government has filed a cross-appeal arguing that the district court erred in failing to consider the middlemen's share of the payments made by appellants in calculating the value of the bribe to determine appellants' offense level under § 2B4.1 ("Commercial Bribery and Kickbacks") of the United States Sentencing Guidelines ("U.S.S.G." or "the guidelines").

**\*\*2** By an opinion issued today in this case, we have addressed two of appellants' arguments: that the conduct they engaged in did not constitute a "scheme or artifice to defraud" as defined by 18 U.S.C. §§ 1341 and 1346 because there was no evidence of actual or intended economic or pecuniary harm and that § 1346 is void for vagueness. For the reasons discussed below, we find appellants' remaining challenges to

lack merit. We also reject the government's claim raised in its cross-appeal.

[1]   Appellants argue that an adjuster's breach of a company's internal code of conduct cannot constitute mail fraud, and even if it could, then only if the breach is material to the transaction, which, they argue, was not the case here. We reject this argument. First of all, our cases have made clear that the breach of an internal code of conduct is sufficient to prove deprivation of honest services under § 1346 because the code of conduct constitutes proof of the duty owed by the employee to the employer. As we held in *United States v. Middlemiss,* 217 F.3d 112, 120 (2d Cir.2000), by "violat[ing] his employer's rules regarding conflicts of interest and financial disclosures [, defendant] ... did not render all the services that a totally faithful employee would have provided [his employer], **\*630** and his actions were not in the best interests of his employer." Contrary to appellants' assertion, an employee need not owe a fiduciary duty to his employer for purposes of § 1346. *See United States v. Sancho,* 157 F.3d 918, 921 (2d Cir.1998) (*per curiam* ) ("Section 1346 does not require the existence of a fiduciary relationship."). As for whether the breach must be material to the transaction, we need not address this argument because the case at hand satisfied any such requirement. The very reason bribes were paid to the adjusters was to obtain favorable results in settlements. The insurance companies, acting as reasonable entities, were bound to have considered the fact that their employees had a financial interest in settling cases to be important information with respect to those settlements. *See United States v. Dinome,* 86 F.3d 277, 280 (2d Cir.1996) (affirming jury instruction charging that a representation was material if "a reasonable person might have considered [it] important in making a decision"); *see also United States v. Rodolitz,* 786 F.2d 77, 80–81 (2d Cir.1986) (holding, in a case involving falsified insurance claims, that "the government needed to prove only that [defendant] employed a deceptive scheme intending to prevent the insurer from determining for itself a fair value of recovery").

[2]   Appellants next contend that the government failed to establish use of the mails sufficient to bring their conduct within the jurisdictional scope of the mail fraud statute. The mail fraud statute does not require that "[t]he scheme to defraud ... contemplate the use of the mails as an essential part of the scheme." *United States v. Altman,* 48 F.3d 96, 102 (2d Cir.1995). It is sufficient if the defendant's use of the mails is "at least incident to an essential part of the scheme." *Middlemiss,* 217 F.3d at 120. Thus, a conviction will stand

if the government establishes that the defendant " 'act [ed] with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.' " *Altman,* 48 F.3d at 102–03 (quoting *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)) (alteration in original). We hold that this requirement was easily satisfied here given that the settlement checks issued by the insurance companies (i.e., the fruition of the scheme) were sent by mail. In addition, several of the bribes were invoiced and paid by mail. Finally, the appellants' mandatory filings with the New York State Office of Court Administration, which were adulterated to help conceal the fraud, were sent by mail. *See Schmuck v. United States,* 489 U.S. 705, 711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (holding that mailing of title-registration forms satisfied mailing requirement because they contributed to success of the scheme).

**\*\*3** [3]   Appellants argue that their prosecution under the mail- and wire-fraud statutes violated principles of federalism and the Tenth Amendment. These claims are frivolous. Having proved the elements of mail and wire fraud, this case rests squarely within the group of cases that have prosecuted similar private sector frauds under federal law, and appellants' conduct is statutes precisely the type of misuse of the mails and wires the statutes were meant to address. *See, e.g., United States v. Von Barta,* 635 F.2d 999, 1005 (2d Cir.1980). In a similar vein, appellants argue that the conduct at issue here was not illegal under New York state law and, therefore, could not form the basis of federal charges. We note that both the trial and appellate courts that were involved in the state court proceedings initially brought against the appellants and others based on the same **\*631** scheme found that the type of conduct at issue here did violate state law. *See New York v. Wolf,* 284 A.D.2d 102, 726 N.Y.S.2d 83, 84 (N.Y.App.Div.2001) (holding that similar conduct by co-defendant of Grae and Rybicki "satisfie[d] the elements of commercial bribery ... and scheme to defraud"), *leave to appeal granted,* 96 N.Y.2d 926, 732 N.Y.S.2d 644, 758 N.E.2d 670 (2001); *People v. Reynolds,* 174 Misc.2d 812, 667 N.Y.S.2d 591 (N.Y.Sup.Ct.1997) (denying motions to dismiss indictment charging multiple defendants—including Grae and Rybicki—with commercial bribery and scheme to defraud on grounds that scheme, if proven, would satisfy all required elements of both statutes). In any event, it is well settled that a fraudulent scheme need not violate state law in order to support a federal mail or wire fraud conviction. *See United States v. Sawyer,* 85 F.3d 713, 726 (1st Cir.1996); *see*

*also McNally v. United States,* 483 U.S. 350, 377 n. 10, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (Stevens, *J.,* dissenting).

Appellants next challenge several of the district court's jury instructions, specifically, the instructions given on the issues of "reasonably foreseeable" harm, "constructive trust," "breach of fiduciary duty," and "honest belief." The parties dispute whether appellants preserved their objections for appeal. We need not resolve this dispute because we find that appellants' claims lack merit even under the less-stringent standard we apply to preserved objections. Under this standard, we review claims of error in jury instructions *de novo* and will grant a new trial only where the jury has been misled as to the correct legal standard or inadequately informed of the law and where the error is not harmless. *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 115–16 (2d Cir.2000). An error is harmless "if the court is convinced that the error did not influence the jury's verdict." *Id.* at 116.

[4] The district court instructed the jury that in order to convict the appellants, they had to find that it was "reasonably foreseeable [to the appellants] that the companies in question might suffer economic harm as a result of the breach of the employee's duty." As discussed more fully in the opinion we issue today in this case, this instruction accurately reflected the law and, therefore, was not erroneous.

**4 [5] The district court also charged the jury that among an employee's duties to its employer is an obligation to account for secret profits. Appellants argue that this was error, relying on *United States v. Miller,* 997 F.2d 1010 (2d Cir.1993). *Miller,* however, was not an honest services case, but an ordinary property fraud. We held that the government had failed to establish the deprivation of a property interest because a constructive trust was not a property interest. *Id.* at 1019. Thus *Miller* is inapposite because the issue here was whether the employer was deprived of its right to honest services. Indeed, the *Miller* court stated that "[i]t is settled law that an agent owes his principal a duty of loyalty, and must account for any profits realized in connection with his representation of the principal." *Id.* at 1018. There was no error in the district court's charge.

[6] Appellants also challenge the district judge's instructions concerning the claims adjusters' duty of loyalty to their employers, specifically her instruction that the jury need not find that a fiduciary relationship existed and also that each of the insurance companies "had a strict prohibition against claims adjusters [deriving] any personal gain from

settlements." These claims lack merit. As discussed above, § 1346 does not require proof of a fiduciary duty. *See Sancho,* 157 F.3d at 920–21. In addition, the company codes of conduct did strictly prohibit employees **632 from deriving personal gain from the settlements. Again, we find no error in this instruction.

[7] Finally, appellants rely on *United States v. Rossomando,* 144 F.3d 197 (2d Cir.1998), to argue that the district court's instruction on good faith warrants reversal. The district court, after instructing the jury about the specific intent the government was required to prove and that good faith is a defense, continued:

> No amount of honest belief on the part of the defendant, if such a belief existed, that the venture would ultimately succeed in such a way that no one would, in the end, suffer any loss or be deprived of the intangible right of honest services will excuse fraudulent conduct by the defendant if you conclude that such omissions were made with the specific intent to deprive another of the intangible right of honest services, even in the short term.

In *Rossomando,* this court reversed a similar charge under a plain error standard on the ground that it might be prejudicially confusing because it might mislead the jury into convicting even if they found that the defendant did not intend to harm the victim. *Rossomando,* 144 F.3d at 199–201. The charge here is distinguishable from that given in *Rossomando* because appellants' assertion that they never intended any financial loss to the insurance companies created a factual predicate for the instruction and because the instruction here was modified to clarify that the jury had to find that the appellants intended to deprive the insurance companies of honest services. *See United States v. Koh,* 199 F.3d 632, 641 (2d Cir.1999) (upholding similar instruction on grounds that there was a factual predicate for it and the language had been modified so that it "clearly informed the jury that they could not convict [the defendant] unless he intended to cause loss to someone") (internal quotation marks omitted) (alteration in original). Accordingly, we find that there was no error.

**\*\*5** **[8]**  Among several challenges to the district court's evidentiary rulings, appellants contend that the district court erred in admitting the "McGrath Cards" against defendant Grae under the business records exception and Quigley's testimony under Fed.R.Evid. 404(b), and, further, that this evidence was unduly prejudicial to co-defendant Rybicki. "[W]e review evidentiary rulings for abuse of discretion," *United States v. Sewell,* 252 F.3d 647, 650 (2d Cir.), *cert. denied,* 534 U.S. 968, 122 S.Ct. 382, 151 L.Ed.2d 291 (2001), and find no such abuse here. The district court's decision to admit the McGrath Cards was properly based on its findings that they were created by McGrath, a person with knowledge, in the regular course of business; they were authenticated by Quigley, who was familiar with McGrath's system and had frequently relied on the cards themselves; and they constituted records whose accuracy was essential to the success of the criminal venture, thus providing adequate indicia of trustworthiness and reliability to warrant their admission.

**[9]**  Equally without merit is appellants' argument that Quigley's testimony concerning the five to ten transactions he conducted with Grae in the early 1980's when he was an insurance adjuster was improperly admitted under Fed.R.Evid. 404(b), and that even if properly admissible under 404(b), should have been excluded under Rule 403 because its probative value was outweighed by the prejudice it caused to Grae and Rybicki. We agree with the district court's assessment that Quigley's testimony about the earlier transactions was relevant to the issue of Grae's knowledge and intent with respect to payments to adjusters, as well as to **\*633** Grae's later relationship with Quigley as a middleman. Thus, the testimony was properly admitted given appellants' refusal to stipulate to the issues of knowledge and intent.

**[10]**  As for spillover prejudice to Rybicki, the district court specifically instructed the jury that they could consider the McGrath Cards and Quigley's testimony only as evidence of Grae's relationships with McGrath and Quigley and that the jurors could not consider this evidence against either Rybicki or the firm. This limiting instruction was sufficient to prevent any prejudicial spillover.

**[11]**  The last two issues we address concern the sentences imposed upon appellants by the district court. Appellants object to the district court's imposition of a two-level enhancement in their sentences for their use of a "special skill" in the commission of the crime pursuant to U.S.S.G. § 3B1.3. We must "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). Here, the district court agreed with the government that the appellants' skills as attorneys were integral to the fraud scheme. The district court was particularly persuaded by this court's decision in *United States v. Fritzson,* 979 F.2d 21, 22 (2d Cir.1992) (*per curiam*), where we upheld application of the enhancement for the defendant's use of accounting skills, finding that "[t]he fact that the same offenses could have been committed by a person without the defendant's special training is immaterial; a § 3B1.3 adjustment is proper where the defendant's special skills increase his chances of succeeding or of avoiding detection." We agree with the government that here, although the other conspirators need not have been lawyers, it was necessary to the scheme that the appellants were lawyers who represented personal injury clients. We therefore affirm the district court's enhancement.

**\*\*6** **[12]**  Finally, we address the government's argument that the district judge erred in calculating the amount of the bribes for sentencing purposes under U.S.S.G. § 2B4.1 because she did not include the amount of money paid to the middlemen, but only included the amount paid by the middlemen to the adjusters. We are not persuaded by the government's argument, which is not supported by the primary case upon which it relies. In *United States v. Sutton,* 13 F.3d 595, 597 (2d Cir.1994) (*per curiam* ), while the court did state that "the bribes ... paid to Sutton usually ranged from $750 to $1200, including the premiums paid to the middlemen," this fact had little bearing on the holding affirming the district court's calculation. In fact, the district court ultimately applied a much lower amount of $250 per bribe. *Id.* In affirming the district court's calculation, we observed that "[t]he commentary to § 2F1.1 specifies that loss 'need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.' " *Id.* at 599 (quoting U.S.S.G. § 2F1.1, cmt. n. 8 (1993)). We concluded that "the district court's findings will not be disturbed unless clearly erroneous." *Id.* (internal quotation marks omitted). Here, the district court rejected the government's calculation method, determining that "it is appropriate in light of all the factors to strictly construe this term bribe and to give the defendants the benefit of that interpretation." We fail to see how the district court's calculation was either unreasonable or clearly erroneous.

We have carefully considered all of appellants' remaining arguments and find them to lack merit. Accordingly, for the **\*634**  reasons set forth above, the judgments of the district court are hereby AFFIRMED.

**All Citations**

38 Fed.Appx. 626, 2002 WL 655214

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

62 F.3d 1418
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

David H. WINTERS, Defendant–Appellant,

No. 94–4269.
|
Aug. 3, 1995.

On Appeal from the United States District Court, for the Northern District of Ohio, No. 94–00222; John M. Manos, District Judge.

**Synopsis**
N.D.Ohio

AFFIRMED.

Before: ENGEL, NELSON and SUHRHEINRICH, Circuit Judges.

**Opinion**

PER CURIAM.

 **\*1** Defendant David H. Winters pled guilty to three counts of mail fraud in violation of 18 U.S.C. § 1341 for defrauding his employer of its right to loyal services. The sole issue presented in this appeal is whether the district court erred by applying the commercial bribery guideline, United States Sentencing Guidelines § 2B4.1, in determining his sentencing range rather than the fraud and deceit guideline, U.S.S.G. § 2F1.1, where the Statutory Index–Appendix A lists only U.S.S.G. §§ 2F1.1 and 2C1.7 as appropriate guidelines for the offense of 18 U.S.C. § 1341. We hold that the district court did not err and AFFIRM.

I.

The present charges arise out of defendant's employment at LTV Steel in Cleveland, Ohio. Based on his expertise and influence with LTV, defendant provided "consultation services" to Cleveland Metallurgical helping it to develop various desulferization products which would satisfy the needs of LTV. Between 1988 and 1993, Cleveland Metallurgical paid defendant $723,000, which included $1500 per month plus 10% of the net profit of sales to LTV, later increased to 30% of the gross profit of sales of new products to LTV. LTV was not aware of the arrangement between defendant and Cleveland Metallurgical. During the period in question, LTV purchased about $15 million in products from Cleveland Metallurgical. LTV paid Cleveland Metallurgical by check via mail. It is these checks which formed the basis of the thirty mailings charged in the superseding indictment.

Defendant pleaded guilty to three counts of mail fraud in violation of 18 U.S.C. § 1341. In sentencing defendant, the district court applied guideline section 2B4.1, "Commercial Bribery and Kickbacks," with a base offense level of eight (8). The court added ten (10) points for the value of the bribe under § 2B4.1(b)(1), subtracted three (3) points for acceptance of responsibility, and further reduced the offense calculation by two (2) for substantial cooperation. This resulted in a final offense level of thirteen (13), which combined with a Criminal History Category I, produced a range of twelve (12) to eighteen (18) months. The court sentenced defendant to twelve months (12).

Defendant contends that the court should have used U.S.S.G. § 2F1.1, "Fraud and Deceit," with a base offense level of six (6). According to defendant, this would result in a final offense level of eleven (11) months with a range of imprisonment of eight (8) to fourteen (14) months. More importantly, use of the fraud offense guideline would place defendant in Zone C, rather than Zone D, of the Sentencing Table. *See* U.S.S.G., Sentencing Table, Ch. 5 Pt. A; § 5C1.1(d) (2).

II.

We review de novo a district court's application of the Sentencing Guidelines to mixed questions of law and fact. *United States v. Mills*, 1 F.3d 414, 421 (6th Cir.1993). The lower court's findings of fact in that regard are examined for clear error. *Id.*

The first step in applying the Sentencing Guidelines is to "[d]etermine the applicable offense guideline section" found in "Statutory Index (Appendix A)." United States Sentencing Commission, *Guidelines Manual,* § 1B1.1(a) (Nov. 1993). Under Appendix A, the general guidelines applicable to a mail fraud conviction under 18 U.S.C. § 1341 are sections 2C1.7, "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials," and section 2F1.1, "Fraud and Deceit." Neither side contends that section 2C1.1 is applicable. This leaves section 2F1.1. However, Application Note 13 of that section provides that in convictions under the mail or wire fraud statutes:

> **\*2** "[w]here the indictment or information setting forth the count of conviction (or a stipulation as described in § 1B1.2(a)) establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1. Otherwise, in such case, § 2F1.1 is to be applied, but a departure from the guidelines may be considered."

U.S.S.G. § 2F1.1, comment. (n. 13) (emphasis added). *See generally United States v. Duranseau,* 19 F.3d 1117, 1123 (6th Cir.1994) (noting that commentary to section 2F1.1 provides that other guideline sections may be applied for false statement convictions under 18 U.S.C. § 1001 in certain circumstances; declining to apply perjury rather than fraud and deceit guideline on facts). This commentary to the guideline is authoritative and binding unless inconsistent with the Constitution, a federal statute, or the guidelines themselves. *Stinson v. United States,* 113 S.Ct. 1913, 1915 (1993); *United States v. Landers,* 39 F.3d 643, 646 n. 7 (6th Cir.1994). *See also United States v. Rubin,* 999 F.2d 194, 197 (7th Cir.1993) (noting "authoritative nature of Application Note 13").

Defendant argues that neither the indictment nor the plea agreement state that defendant received a "bribe," or any payment with a "corrupt purpose," and that as a result, U.S.S.G. § 2B4.1, "Commercial Bribery and Kickbacks," is inapplicable. Regardless of whether defendant's offense of conviction is characterized as accepting bribes or gratuities; that is, kickbacks, *see United States v. Mariano,* 983 F.2d 1150, 1159 (1st Cir.1993) (explaining distinction between bribes and gratuities); *United States v. Muldoon,* 931 F.2d 282, 287 (4th Cir.1991) (same), the indictment and stipulated facts in the plea agreement support the district court's application of U.S.S.G. § 2B4.1, rather than U.S.S.G. § 2F1.1.

Application Note 1 to section 2B4.1 specifically states that "[t]his guideline covers commercial bribery offenses *and kickbacks* that do not involve officials of federal, state, or local government." U.S.S.G. § 2B4.1, comment. (n. 1) (emphasis added).[1] In any event, the indictment specifically charges that defendant knowingly defrauded LTV "of its intangible right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of the duties of LTV's employee ... free from *bribery, corruption,* partiality, willful omission, bias, dishonesty, deceit, and fraud." (J.A. 10; emphasis added.)

Given this resolution of the issue presented, it is not necessary for us to consider the government's alternative argument that defendant suffered no prejudice by application of the commercial bribery guideline because the guideline range would have been the same if the fraud guideline had been applied. In any event, this argument assumes a predicate fact which the district explicitly refused to find. (J.A. 73.)

The judgment of the district court is AFFIRMED.

**All Citations**

62 F.3d 1418 (Table), 1995 WL 462415

Footnotes

1    Defendant's argument loses further force when one compares U.S.S.G. § 2B4.1 with U.S.S.G. §§ 2C1.1 (bribery of public official); and 2C1.2 (gratuity), and the corresponding statutes, 18 U.S.C. §§ 201(b) (bribery) and 201(c) (gratuity), respectively. There is no similar dichotomy in the guidelines for violations of the various of federal bribery statutes that do not involve government officials. *See* U.S.S.G. § 2B4.1, comment. (backg'd.).

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

United States v. Kelly, Not Reported in Fed. Supp. (2018)

2018 WL 2411593
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES of America
v.
Nelson KELLY, Defendant.

17 Cr. 547-001 (RWS)
|
Signed 05/29/2018

**Attorneys and Law Firms**

Sarah Y. Lai, U.S. Attorney's Office, New York, NY, for United States of America.

Donald Joseph Yannella, III, Donald Yannella P.C., New York, NY, for Defendant.

SENTENCING OPINION

ROBERT W. SWEET, U.S.D.J.

**\*1** On December 6, 2017, Nelson D. Kelly ("Defendant" or "Kelly") allocuted to conspiracy to commit honest services and mail fraud, and to committing honest services and mail fraud. Based on the conclusions set forth below, Kelly will be sentenced to 24 months' imprisonment, followed by three (3) years' supervised release, subject to the scheduled sentencing hearing on June 1, 2018.

**Prior Proceedings**

Kelly is named in a superseding felony information filed in the Southern District of New York on September 13, 2017. Count One charges that from January 2008 to September 2016, in the Southern District of New York and elsewhere, Kelly and others known and unknown, conspired to commit honest services and mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.

Count Two charges that from January 2008 to September 2016, in the Southern District of New York and elsewhere, Kelly and others known and unknown, committed honest services and mail fraud in that Kelly caused Allied Aviation ("Allied" or the "Victim Company") at which he worked as a senior executive to pay a purported engineering company that co-defendant James R. Christ ("Christ" or "co-defendant")

owned and operated more than $4 million for services that Christ's company never provided to the Victim Company. In the course of executing such scheme, Christ and Kelly caused checks in payment of Christ's fraudulent invoices to be delivered by the United States Postal Service from the Victim Company's office in Manhattan to Christ, in Georgia.

On December 6, 2017, Kelly appeared before the Honorable James L. Cott and allocuted to the conduct as charged in Counts One and Two without the benefit of a plea agreement. Kelly and Christ are sentenced to be scheduled on June 1, 2018.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;

United States v. Kelly, Not Reported in Fed. Supp. (2019)

Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 250 of 253

(5) any pertinent policy statement [issued by the Sentencing Commission];

**\*2** (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

### The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Defendant's personal and family history.

### The Offense Conduct

The Court adopts the facts set forth in the PSR with respect to the offense conduct. These facts are summarized, in brief form, below.

The investigation in this case was conducted by the United States Postal Inspection Service ("USPIS").

Kelly was employed by an aviation services company, the Victim Company, that provided commercial airplane fueling services at over twenty-five major airports in the United States and Canada, including a certain international airport in California (the "California Airport"). The Victim Company maintained a "Policy of Business Conduct" handbook (the "Handbook"), which required every employee to avoid conflicts of interest and to report potential conflicts of interest to the Victim Company. The Handbook also obligated employees to maintain books and records that "accurately" and "fairly" reflect all transactions and expressly prohibited "false, artificial or misleading entries." Moreover, the Handbook warned that acceptance of "gifts, kickbacks, or bribes" may be a violation of federal wire and mail fraud laws. Kelly received a copy of the Handbook in February 2006.

From May 2013 to June 2016, Kelly also served as the Victim Company's Regional Assistant Vice President and General Manager. In this capacity, Kelly prepared the annual budgets for the Victim Company's operations at the California Airport and supervised those operations, including hiring vendors.

Christ was a resident of Georgia and the president and chief executive officer of Christ Marketing, Inc., d/b/a Christ Engineering ("Christ Marketing"), which was registered in California in July 2006. Christ Marketing's registered addresses were Christ's home address in Grayson, Georgia, and Kelly's home address in Spring Valley, California. Christ Marketing purported to be a general engineering contractor.

The Victim Company manages and operates clusters of jet fuel tanks, known as fuel tank farms, and pumping stations, known as loading racks, at numerous airports. As the name implies, jet fuel is initially stored in the fuel tanks and later piped to pumping stations, where fuel trucks go to load up with fuel for delivery to awaiting aircraft. Since at least 2007, the Victim Company has been responsible for maintaining the fuel tank farm and pumping station at the California Airport and ensuring that the fuel complied with regulatory standards.

The Victim Company tested all batches or truckloads of jet fuel delivered to its fuel tank farm and removed water from the fuel. That removed water was stored in a containment tank along with precipitation that fell within the containment areas surrounding the fuel tank farm. Most of the captured water was allowed to evaporate from the containment areas, provided that the water level remained below certain levels.

**\*3** Before October 2013, water that exceeded acceptable levels was transported offsite by truck for safe disposal. In October 2013, the Victim Company installed water separators at both the fuel tank farm and the pumping station to clean the water in the containment areas. Thereafter, the bulk of the water was discharged directly into the sewer system, leaving only a small amount, if any, which needed to be transported by truck for disposal.

The Victim Company hired Christ Marketing to provide Water Disposal Services for its facilities at the California Airport beginning in 2007. From January 2008 through June 2016, Christ Marketing submitted to the Victim Company approximately 457 invoices, totaling over $5.1 million, the bulk of which was for water disposal services.

Based on a review of the Victim Company's ledgers, the records from the National Oceanic and Atmosphere Administration, and the cost per gallon of water disposal charged by Christ Marketing, the Victim Company's total cost

Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 251 of 253

United States v. Kelly, Not Reported in Fed. Supp. (2018)

for Water Disposal Services from 2008 to 2013 should have been approximately $300,000. During that time period, Christ Marketing charged $2.9 million.

After the water separators were installed in October 2013, the cost of water disposal for the Victim Company should have been significantly reduced. Instead, in 2013 Christ and Kelly caused the Victim Company to pay over $719,340 for Water Disposal Services. This amount was $300,000 higher than the already inflated sum billed in 2012, even though the installation of the water separators in 2013 and lower rainfall in 2013 as compared to 2012 should have resulted in substantially lower expenses.

In 2014, 2015 and 2016, Christ continued to bill the Victim Company hundreds of thousands of dollars each year for Water Disposal Services that were not actually provided and were unnecessary. Kelly prolonged the fraudulent scheme by directing that the invoices for Water Disposal Services be concealed in the Victim Company's general ledger under different line items, such as "Inspection Services," "Special Project Expense," and "EPA Services." From 2014 to 2016, the total amount booked to those line items, plus the sum booked to "water treatment expense" was nearly $2 million.

Christ emailed invoices from his home in Georgia to Kelly in California. Kelly forwarded the invoices to the Victim Company's headquarters located in New York, New York, who in turn sent checks by U.S. Mail to Christ in Georgia.

On May 16, 2016, the treasurer of the Victim Company sent Kelly an email requesting backup documentation for an invoice in the amount of $64,063.81 from Christ Marketing. In response, Kelly claimed that Christ Marketing at that time was "working on our asphalt repairs," "oil water separator cleaning, waste water collection, spent filter collections and barrel collections [...] and [ ] underground tank testing and cleaning." One month later, Kelly resigned from the Victim Company.

On November 28, 2016, as part of the Victim Company's effort to audit Christ Marketing's invoices and payments, the Victim Company's controller called Christ to request documentation to support the total of approximately $5.2 million that Christ Marketing had billed the Victim Company from 2007 to 2016. In response, Christ left a voicemail message in which he claimed that Christ Marketing ceased operations in about June 2016 and was no longer in business. Furthermore, Christ claimed that he was unable to provide

any supporting documentation for his invoices to the Victim Company because he had discarded all Christ Marketing business records relating to the work performed for the Victim Company.

**\*4** Based upon bank records, Kelly received at least 90 checks totaling at least $372,600 drawn on accounts held in the name of "Christ Marketing."

In a mortgage application submitted to CitiMortgage in June 2007, Kelly claimed to have two sources of income: the Victim Company and "Christ Engineering" (i.e., Christ Marketing's "doing business as" name). With respect to the latter, Kelly claimed he was self-employed at "Christ Engineering" from "1/1/06-present," with a monthly income of "$1,500." In support of his mortgage application, Kelly also submitted a letter signed by Christ stating that Kelly was employed by Christ Engineering and "earned a minimum of $1,500 per month." There is no record of Kelly receiving a salary from Christ.

Kelly was arrested in the Northern District of Georgia on May 8, 2017. According to the Government, Kelly is responsible for at least $3,999,618 in loss.

Christ was arrested in the Northern District of Georgia on May 9, 2017. According to the Government, Christ is responsible for at least $3,999,618 in loss.

**The Relevant Statutory Provisions**

For Counts One and Two of the information, to which Kelly pleaded guilty, the maximum term of imprisonment is twenty (20) years on each Count. See 18 U.S.C. §§ 1341, 1349. The Court may impose a term of supervised release of not more than three (3) years as to Counts One and Two. Id. § 3583(b)(2). Multiple terms of supervised release shall run concurrently. Id. § 3624(e). The Defendant is eligible for not less than one nor more than five years' probation because the offense is a Class C felony. Id. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. Multiple terms of probation shall run concurrently. Id. § 3564(b). The maximum fine is twice the gross gain or less, namely $7,999,236 on each Count. Id. § 3571(b). A special assessment of $100 on each Count is mandatory. Id. § 3013.

Pursuant to 18 U.S.C. § 3663A, restitution shall be ordered in this case. Specific restitution information is awaited from the Government and the victim.

### The Guidelines

The 2016 edition of the United States Sentencing Commission Guidelines Manual, incorporating all Guideline amendments, was used to determine the defendant's offense level. U.S.S.G. § 1B1.11. Pursuant to U.S.S.G § 3D1.2(b), Counts One and Two are grouped together into a single Group. Guideline § 2B4.1 applies to the Group.

The base offense level is 8. U.S.S.G. § 2B4.1(a). An 18-level enhancement applies because the loss exceeded $3.5 million, but was less than $9.5 million. Id. §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(J). The Defendant abused a position of private trust, in a manner that significantly facilitated the commission or concealment of the offense; specifically, the Defendant prepared the annual budgets for the Victim Company's operations at the California Airport and supervised those operations, including hiring vendors. Therefore, a two-level enhancement applies. Id. § 3B1.3. The Defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two (2) levels. Id. § 3E1.1(a). The Defendant has also assisted authorities in the investigation or prosecution of the Defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one (1) additional level. Id. Searches of all relevant databases reveal that the Defendant has no prior criminal convictions or arrests. Defendant's total criminal history score is zero (0). Accordingly, the sentencing table in U.S.S.G. Chapter 5, Part A, a criminal history of zero establishes a criminal history category of I. In accordance with the above, the applicable Guidelines offense level is 25.

 **\*5** Based upon a total offense level of 25 and a criminal history category of I, the Guideline imprisonment range is 57 to 71 months. Since the offense is a Class C felony, the Guidelines range for a term of supervised release is 1 to 3 years. Id. § 5D1.2(a)(2). Since the applicable Guideline range is in Zone D of the Sentencing Table, the Defendant is ineligible for probation. Id. § 5B1.1, comment n 2.

The fine range for this offense is from $20,000 to $15,998,472. Restitution shall be ordered. Id. § 5E1.1. Costs of prosecution shall be imposed on the Defendant as required by statute. Id. § 5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. Id. § 5E1.2(d)(7), 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated July 13, 2017, provides a daily cost of $95, a monthly cost of $2,898, and an annual cost of $34,770 for imprisonment.

Restitution shall be ordered. U.S.S.G. § 5E1.1.

### The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a) ), having considered the Guidelines and all of the factors set forth in § 3553(a), and having reviewed the Presentence Investigation Report, the Court will impose a sentence within the Guidelines range.

### The Sentence

For the instant offense, Nelson D. Kelly shall be sentenced to 24 months' imprisonment on Counts One and Two. The term of imprisonment shall be followed by a term of three (3) years of supervised release on each Count with the terms to run concurrently.

As mandatory conditions of his supervised release, the Defendant shall:

  (1) Not commit another federal, state, or local crime.

  (2) Not unlawfully possess a controlled substance.

  (3) Refrain from any unlawful use of a controlled substance.

  (4) Cooperate in the collection of DNA, as directed by the probation officer.

Case 1:19-cr-10131-NMG   Document 334-1   Filed 11/08/19   Page 253 of 253

United States v. Reilly, Not Reported in Fed. Supp. (2018)

(5) Comply with the standard conditions that have been adopted by this Court as well as with any other conditions on the attached page.

The standard conditions of supervision (1-13) apply with the following special conditions:

(1) The Defendant must submit his person, residence, place of business, vehicle, and any property or electronic devices under his control to a search on the basis that the probation officer has reasonable suspicion that contraband or evidence of a violation of the conditions of his probation/supervised release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant must inform any other residents that the premises may be subject to search pursuant to this condition.

**\*6** (2) The Defendant must provide the probation officer with access to any requested financial information.

(3) The Defendant must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the Defendant is in compliance with the installment payment schedule.

(4) The Defendant shall be supervised by the district of residence.

It is further ordered that the Defendant shall pay to the United States a special assessment of $200, which shall be due immediately.

As Allied Aviation Service has suffered injury compensable under the Victim and Witness Protection Act, the Defendant must make restitution except that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered the compensable injury.

Specific restitution information is awaited from the Government and the victim. If necessary, the determination of restitution may be deferred for a maximum of 90 days after sentencing, in accordance with 18 U.S.C. § 3664(d)(5) and (e).

If the Defendant is engaged in a BOP non-UNICOR work program, the Defendant must pay $25 per quarter toward the criminal financial penalties. However, if the Defendant participates in the BOP's UNICOR program as a grade 1 through 4, the Defendant must pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11.

The remaining restitution must be paid in monthly instalments of 10% of gross monthly income over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed.

The Defendant must notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

Because the Defendant does not have the ability to pay a fine, the fine in this case has been waived.

As a result of committing the offense as cited in Counts One and Two of the Information, the Defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

Pursuant to Rule 32.3, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at the sentencing. The Court must also include the forfeiture order, directly or by reference, in the judgment."

The Defendant is viewed as a good candidate for voluntary surrender. He has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release. He is not viewed as a flight risk or a danger to the community.

It is so ordered.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2411593

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.