UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1)  GREGORY ABBOTT, | ) | |
| (2)  MARCIA ABBOTT, | ) | |
| (3)  JANE BUCKINGHAM, | ) | |
| (4)  GORDON CAPLAN, | ) | Criminal No. 19-10117 |
| (5)  ROBERT FLAXMAN, | ) | |
| (6)  FELICITY HUFFMAN, | ) | |
| (7)  AGUSTIN FRANCISCO HUNEEUS, | ) | |
| (8)  MARJORIE KLAPPER, | ) | |
| (9)  PETER JAN "P.J." SARTORIO, | ) | |
| (10)  STEPHEN SEMPREVIVO, and | ) | |
| (11)  DEVIN SLOANE, | ) | |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM**

ANDREW E. LELLING
United States Attorney

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 6, 2019

**Table of Contents**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 4

   I.     THE DEFENDANTS SHOULD BE SENTENCED TO SOME PERIOD OF
         INCARCERATION ........................................................................................... 4

     A.  The Seriousness of the Offense:  Systemic Harm to the College Admissions
        Process and Individualized Harm to Universities and College Applicants ..................... 5

     B.  The Defendants' History and Characteristics .................................................. 7

     C.  The Need for Just Punishment ........................................................................ 8

     D.  The Avoidance of Unwarranted Sentencing Disparities ................................ 10

     E.  The Need for Specific and General Deterrence .............................................. 15

   II.     INDIVIDUAL SENTENCING RECOMMENDATIONS ............................... 16

     A.  The Offense Conduct ..................................................................................... 17

        i.     Gregory and Marcia Abbott .............................................................. 17

        ii.    Jane Buckingham ............................................................................... 17

        iii.   Gordon Caplan ................................................................................... 18

        iv.   Robert Flaxman .................................................................................. 19

        v.     Felicity Huffman ............................................................................... 19

        vi.   Agustin Huneeus ............................................................................... 19

        vii.  Marjorie Klapper ............................................................................... 20

        viii. Peter Jan "P.J." Sartorio .................................................................... 20

        ix.   Stephen Semprevivo .......................................................................... 21

        x.     Devin Sloane ..................................................................................... 21

     B.  Key Factors Considered To Determine Relative Culpability ......................... 22

        i.     Amount of the Bribes and Other Payments ....................................... 22

        ii.    Repeat Players .................................................................................... 23

        iii.   Active Versus Passive Participation .................................................. 24

        iv.   Involvement of Children .................................................................... 24

        v.     Positions of Trust .............................................................................. 25

        vi.   Other Conduct ................................................................................... 25

     C.  Sentencing Recommendations ....................................................................... 26

CONCLUSION ............................................................................................................... 28

## INTRODUCTION

Since this case and its companion cases were first charged in March 2019, the "college admissions scandal" has become a national conversation, a kind of Rorschach test for middle class angst about college admissions.  The reasons are clear:  applying to college is an annual rite of passage for about two million students, each of whom hopes to earn entry to his or her dream school; it is also a rite of passage for millions of parents, each of whom knows that sending their children to a well-known college can positively impact their lives in countless ways.  The experience is the same across neighborhoods, states, even income levels:  work hard in high school, pursue the right extracurricular activities, nail the SAT or ACT, pick your "safe," "competitive," and "reach" schools, write your essays, send in the applications, wait and hope.

And then there are these defendants.  Perched at the apex of wealth, privilege and, in some instances, fame, these defendants were not content with the distinct advantages they already enjoyed in the admissions process:  access to the best private schools and tutors; unlimited resources to pursue sports and extracurricular activities; and legacy standing, in several cases, as alumni of the universities they defrauded.  Instead of relying on merit, they opted to cheat, by buying their children illegal advantages:  fake standardized test scores and guaranteed admission, via fraud, to the schools of their choice.  Betraying an astonishing degree of self-entitlement and moral insularity, they corrupted a system that millions of Americans depend on every year, merely so their children could attend one college instead of another.

Some period of incarceration is the only meaningful sanction for these crimes.  Not because the defendants' relative wealth has generated public resentment, but because jail is a particularly meaningful response to this kind of offense.  For wrongdoing that is predicated on wealth and rationalized by a sense of privilege, incarceration is the only leveler:  in prison everyone is treated

the same, dressed the same, and intermingled regardless of affluence, position or fame.  To be clear—as reflected in the government's sentencing recommendations—it is the fact of incarceration that matters more than its duration; with limited exceptions, the public interest does not require substantial prison terms for these parents.  But no other form of sanction makes plain that all Americans *are equally obligated to play by the rules and must be equally accountable for breaking them*.  Home confinement would be a penological joke, conjuring images of defendants padding around impressive homes waiting for the end of curfew; probation with community service is too lenient and too easily co-opted for its "PR" value; and a fine is meaningless for defendants wealthy enough to commit this crime in the first place.

Nor is the fact of prosecution itself a sufficient sanction.  Defendants at this level of affluence, like many white-collar defendants, typically argue that they have "suffered enough already" because of the exceptional publicity their cases received.  There is no question that embarrassment, loss of position and other social consequences are real collateral effects of prosecution.  But to accept this argument is to accept an inverse relationship between affluence and incarceration:  it cannot be that the *more* affluent, or famous, the defendant, the *less* of a sanction is warranted.  The public has repeatedly witnessed the pernicious impact of wealth and fame on the equal administration of justice.  This case should counter that narrative, not reinforce it.

## **BACKGROUND**

The defendants engaged in an elaborate scheme to secure the admission of their children to elite universities through bribery and fraud.  Some conspired to bribe standardized test administrators to allow a corrupt proctor to correct their children's SAT and ACT exams, or to take those exams in their place.  Others conspired to bribe university coaches and administrators,

2

and to falsify their children's qualifications, in order to have their children designated as recruited athletes—regardless of their athletic abilities and, in some cases, even though they did not play the sports they were purportedly recruited to play.  Still others did both.  And some did it more than once.

Several defendants enlisted their children as participants in the scheme.  One purchased athletic gear, photographed his son posing as a water polo player in the family swimming pool, and hired a graphic designer to make the photo appear more realistic.  Another allowed his son to send an email to Georgetown's tennis coach boasting of false achievements so that the coach, in turn, could use those bogus claims to advance the child's application.

Other defendants deceived their children about the fraud.  One administered a practice SAT exam to her son at home, falsely telling him that it was the real thing, even as a co-conspirator took the exam in his place hundreds of miles away.

And there were other lies, and other frauds.  One defendant conspired to lie about her son's race on his college application, falsely presenting him as African-American.  Another hired a lawyer to pressure the ACT to release his daughter's fraudulent scores.  Still others lied to high school guidance counselors, paid bribes in cash or disguised bribes as tax-deductible charitable donations for underprivileged youth.  One even pursued a lawsuit against Georgetown after the school threatened to dismiss his (fraudulently admitted) son.

Even as they were stealing admissions slots for their children, the defendants held themselves out publicly as models of integrity.  One was the chairman of an international law firm, who boasted of his *pro bono* work helping immigrant children receive medical care while also secretly confiding to a co-conspirator that he was "not worried about the moral issue" of committing fraud.  Another was the bestselling author of a "Guide to Motherhood," who duped

her own son into providing a handwriting exemplar so that someone else could take the ACT in his place and mimic his handwriting.  A third was an Academy Award-nominated actress who dispensed parenting advice online, while also scheming to deceive her daughter's high school about why she would be taking the SAT somewhere else.

The defendants have admitted to a brazen criminal scheme with widespread and lasting consequences.  Exceptional student-athletes were denied recruitment slots at elite schools, and other qualified students were denied admission, because of the defendants' crimes.  The reputations of several universities were damaged, institutions that have now spent considerable sums investigating the fraud and implementing measures to prevent it from recurring.  In response to this fraud, California is considering legislation to eliminate the use of ACT and SAT tests by state universities.  More broadly, the defendants' crimes have undermined faith in the integrity of the college admissions process and demoralized students and parents.

## ARGUMENT

### I.   THE DEFENDANTS SHOULD BE SENTENCED TO SOME PERIOD OF INCARCERATION

In fashioning an appropriate sentence, courts consider the factors set forth in 18 U.S.C. § 3553(a), including the seriousness of the offense, the history and characteristics of each defendant, the need for the sentence imposed to constitute just punishment and provide for adequate deterrence, and the importance of avoiding unwarranted sentencing disparities among similarly situated defendants.

The government has considered these factors, along with other measures of culpability: the magnitude of the bribes they agreed to pay, whether they repeatedly engaged in the scheme, the extent to which individual defendants actively participated in the fraud and contributed to its

success, the extent to which they involved their own children as co-conspirators, the degree to which they occupied positions of trust, and other obstructive or otherwise egregious conduct in which they engaged as the scheme unraveled.

For each defendant, incarceration appropriately reflects the seriousness of the offense and provides just punishment.  Likewise, non-jail sentences for these defendants would say to the victims of these crimes—including the applicants denied admission to the colleges of their choice in favor of the defendants' less qualified children—that their losses matter little.  Having chosen to buy illegal advantages through bribery and fraud, the defendants should face real consequences for their choices.

### A.   The Seriousness of the Offense:  Systemic Harm to the College Admissions Process and Individualized Harm to Universities and College Applicants

The ACT and the SAT are the flagship exams in a standardized testing system that is critical to millions of college applicants.  These exams are required by many universities, particularly the most selective, and they determine eligibility for a variety of awards and academic scholarships, including the National Merit Scholarship and the U.S. Presidential Scholarship.  Students prepare extensively for the exams, and many take them more than once, hoping to improve their odds of admission to the colleges of their choice and their ability to afford an education.  These students and their families are entirely dependent on the fairness of the testing process.

Beyond standardized tests, most elite schools evaluate applicants on a range of criteria including academic, athletic and extracurricular performance.  High school students labor for years to stand out in these areas, because every one of them knows the competition is increasingly intense for the limited number of slots.  At Georgetown, for example, nearly 23,000 students applied for admission to the class of 2023.  Just 3,202 were admitted—an acceptance rate of approximately

14 percent.[1]  At the University of Southern California ("USC"), the acceptance rate was just 11 percent.[2]  Amid these daunting odds, for a select few applicants—athletes who endure years of training and competition to rank among the finest of their cohort—that commitment can lead to recruitment to play college sports, dramatically improving the prospects of admission.

The defendants intentionally corrupted this process to steal admissions slots from deserving applicants.  For each of the defendants' children who was admitted based on fake test scores or as a recruited athlete, another applicant with legitimate credentials was rejected.  The defendants thus directly cheated honest, diligent students out of admission slots in favor of their own less qualified children.  In so doing, they stole economic opportunities earned by others.[3]  And even where the defendants' children were not actually admitted to college based on falsified test scores—because the scheme was interrupted before their applications were submitted or acted upon—their intent was the same:  to steal admissions spots from deserving applicants through deception and fraud.

---

[1] *See* Taylor Kahn-Perry, *Admissions Rate Falls to 14 Percent, Lowest in University History*, THE HOYA (Apr. 5, 2019), https://www.thehoya.com/admit-rate-falls-14-percent-lowest-university-history/.

[2] *See* Natalie Oganesyan, *USC Acceptance Rate Drops to 11 Percent, Record Low*, DAILY TROJAN (Mar. 28, 2019), http://dailytrojan.com/2019/03/28/usc-fall-acceptance-rate-drops-to-11-percent-record-low/.

[3] There is a significant economic return to attending an elite private college such as USC or Georgetown.  *See, e.g.*, Domenic J. Brewer et al., *Does It Pay To Attend an Elite Private College? Cross Cohort Evidence on the Effects of College Quality on Earnings*, (Nat'l Bureau of Econ. Research, Working Paper 5613, June 1996), https://www.nber.org/papers/w5613 (noting that "there is strong evidence of significant economic return to attending an elite private institution, and some evidence that this premium has increased over time").  This is particularly true for "racial and ethnic minorities (black and Hispanic students), and for students whose parents have relatively little education," as well as for students from lower socio-economic circumstances.  *See* Stacy Dale & Alan B. Krueger, *Estimating the Return to College Selectivity Over the Career Using Administrative Earnings Data* 4–5 (Nat'l Bureau of Econ. Research, Working Paper 17159, June 2011), https://www.nber.org/papers/w17159.pdf; *see generally* Raj Chetty et al., *Mobility Report Cards: The Role of Colleges in Intergenerational Mobility*, Equality of Opportunity Project (June 2017), http://www.equality-of-opportunity.org/papers/coll_mrc_paper.pdf.

The defendants' crimes weakened public trust in the fairness of standardized testing and the larger college admissions process, both outside and inside these universities. Just as vote rigging corrupts democracy and insider trading corrupts markets, the defendants' actions caused *systemic* harm, unfairly tilting the playing field in their favor and contributing to the destabilization of a process on which millions of Americans depend. As one Stanford student told CNN:

> [W]hat's even more disappointing is knowing that among my peers are those who cut in line; those who prevented other first-generation, low-income students who worked just as hard or harder than I had from getting in, just because they had money. It's a slap in the face to the American dream . . . . It makes me question the value of the degree I will receive this June, and it hurts me to my core that other parents who worked hard like mine to see their kids go to a school like Stanford won't be in attendance.[4]

The Executive Director of the American Association of Collegiate Registrars and Admissions Officers put it similarly, warning that the defendants' conduct "compromises the integrity of college admissions and reinforces stereotypes that people of privilege can circumvent the rules," even as it "undermines public confidence in our institutions."[5]

### B. The Defendants' History and Characteristics

Each of the defendants is situated somewhat differently, and the government will address their individual backgrounds and characteristics under separate cover. The defendants do have many common traits, though: they are highly successful, well-educated professionals, some with advanced degrees. They include founders or leaders of companies and people prominent in their fields. A few are nationally famous. Several have accumulated enormous wealth, a few from

---

[4] Jane Carr et al., *We Asked How the College Cheating Scam Made You Feel. Your Stories Were Incredible*, CNN (Mar. 21, 2019), https://www.cnn.com/2019/03/21/opinions/college-admissions-scam-cheating-share-your-story-opinion/index.html.

[5] Scott Jaschik, *The Week that Shook College Admissions*, INSIDE HIGHER ED. (Mar. 18, 2019), https://www.insidehighered.com/admissions/article/2019/03/18/look-how-indictments-shook-college-admissions.

humble beginnings, and some give to charity.  All were, until their arrest, respected members of their communities.

These characteristics cut both ways.  The defendants' achievements, law-abiding past, and standing in their communities are mitigating factors, but they underscore that all of the defendants and their children—regardless of their wealth, where it came from, or the circumstances of their upbringing—enjoy advantages and opportunities available only to a select few:  the best schools and tutors, access to any niche sport or extracurricular activity one could imagine, and—in many cases—legacy at elite schools.  That was not enough.  In short, the defendants used bribery and fraud to pile illegal advantages atop the other rare advantages they already enjoyed.

It is no answer that the defendants were just trying to help their children get ahead.  All parents want to help their kids get ahead, yet most manage to steer clear of conspiracy, bribery and fraud.  Most parents have a moral compass and impress upon their children the correlation between hard work and just reward.  In contrast, the defendants relied on fraud and bribery, knowing that they were cheating other children out of admissions spots.

### C.    The Need for Just Punishment

The defendants in this case, as in many cases, have been subject to public scrutiny.  Some have lost jobs or suffered other financial setbacks as a result of the charges against them.  But these collateral consequences must be put in perspective.  Neither reputational harm nor financial reversals are adequate substitutes for meaningful punishment in white-collar cases.  They are, for one thing, unexceptional; countless criminals face similar consequences when they are caught.  They are also ephemeral.  Memories fade, reputations recover.  Accordingly, the First Circuit has said that "it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater

reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.").

Similarly, neither probation nor criminal fines are sufficient penalties given the magnitude of the defendants' criminal scheme and the harm flowing from it; criminal defendants "with money or earning potential" should not be able to "buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the desirability of minimizing "discrepancies between white- and blue-collar offenses"); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."). Nor would home confinement be a meaningful punishment in the circumstances of this case, given the overall prosperity in which most of the defendants reside.

Particularly in light of the systemic aspects of the defendants' crime—that is, that they knowingly corrupted a system on which millions of American families rely—failure to sentence them to prison would send the message "that would-be white collar criminals stand to lose . . . practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). Such a result would be profoundly unjust.

### D.     <u>The Avoidance of Unwarranted Sentencing Disparities</u>

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes

should not be able to avoid incarceration, even where those crimes are a defendant's first offense.

The legislative history of the Sentencing Reform Act of 1984 indicates that one of the Act's goals

was to rectify the serious problem that white-collar offenders were not being adequately punished.

*See* S. REP. NO. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders

. . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then-

Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline
> punishment of certain white-collar crimes, such as fraud, and other similar common
> law crimes, such as theft. The Commission's statistics indicated that where white-
> collar fraud was involved, courts granted probation to offenders more frequently
> than in situations involving analogous common law crimes; furthermore, prison
> terms were less severe for white-collar criminals who did not receive probation. *To*
> *mitigate the inequities of these discrepancies, the Commission decided to require*
> *short but certain terms of confinement* for many white-collar offenders, including
> tax, insider trading, and antitrust offenders, who previously would have likely
> received only probation.

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which*

*They Rest*, 17 HOFSTRA L. REV. 1, 20–21 (1988) (emphasis added) (footnotes omitted).

Defendants who perpetrate frauds comparable to this one, including cheating on tests and

misrepresenting academic records, are routinely sentenced to terms of incarceration:

| Case | Charge(s) | Prison Term |
|---|---|---|
| *United States v. Barrington*, 4:08-cr-00050-WS-GRJ (N.D. Fla.)[6] | Defendant convicted of scheming to access university's online grading system and changing grades for themselves and friends applying to graduate school, as well as changing residencies so non-resident students would qualify for in-state tuition. | 84 months |

---

[6] *United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011) (affirming sentence and noting that co-defendants who pleaded guilty and received substantial assistance departures under U.S.S.G. § 5K1.1 were each sentenced to 22 months in prison and 3 years of supervised release).

| Case | Charge(s) | Prison Term |
|---|---|---|
| *Connecticut v. Tanya McDowell*, S20N-CR11-0128870 (Norwalk Sup. Ct.)[7] | Homeless mother pleaded guilty to fraudulently claiming her babysitter's address as her own so her child could attend school in a different district. | 60 months |
| *Indiana v. Roy C. Sun*, 79D02-1304-FC-18 (Tippecanoe Sup. Ct.)[8] | University student pleaded guilty to inflating grades in classes—by using passwords of his professors and forgery—to obtain credits necessary for graduation. | 48 months (suspended to serve 90 days) |
| *United States v. Lorenzo García*, 3:11-cr-01830-DB-1 (W.D. Tex.)[9] | El Paso School District Superintendent pleaded guilty to directing staff to "change passing grades to failing grades in an effort to prevent qualified students from taking the 10th grade [Texas Assessment of Knowledge and Skills Test]." | 42 months |
| *United States v. Ozell Clifford Brazil*, CR-02-00882-SVW (C.D. Cal.)[10] | Reverend who founded program to help minority students get into college convicted of mail fraud for advising students to fraudulently claim on scholarship forms that "they were orphans or came from broken homes." | 41 months |
| *United States v. Patricia Adams Lambert*, 1:15-cr-00004 (E.D. Tx.)[11] | Beaumont School District Superintendent pleaded guilty to "directly or indirectly, encourag[ing] teachers and staff to manipulate students' standardized test scores or had knowledge that cheating occurred." | 40 months |

[7] *See* Ann Cammett, *Welfare Queens Redux:  Criminalizing Black Mothers in the Age of Neoliberalism*, 25 S. Cal. Interdisc. L.J. 363, 375–76 (2016), https://gould.usc.edu/why/students/orgs/ilj/assets/docs/25-2-Cammett.pdf.

[8] *See* Irving DeJohn, *Purdue University Graduate Gets Four-Year Sentence for Grade-Changing Scandal*, N.Y. Daily News (Mar. 3, 2014), http://www.nydailynews.com/news/national/purdue-university-graduate-hit-four-year-sentence-grade-changing-scandal-article-1.1709170.

[9] *Former E.P.I.S.D. Superintendent Garcia Sentenced To Federal Prison*, U.S. Dep't. of Just. (Oct. 5, 2012), https://www.justice.gov/archive/usao/txw/news/2012/EPISD%20Garcia%20sentencing%20final.pdf.

[10] *See* David Rosenzweig, *Minister Is Given Prison Term for Student Aid Fraud*, L.A. Times (Oct. 21, 2003), https://www.latimes.com/archives/la-xpm-2003-oct-21-me-scholar21-story.html.

[11] *Former Beaumont ISD Assistant Superintendent Sentenced for Federal Violations*, U.S. Dep't. of Just. (June 8, 2016), https://www.justice.gov/usao-edtx/pr/former-beaumont-isd-assistant-superintendent-sentenced-federal-violations.

| Case | Charge(s) | Prison Term |
|------|-----------|-------------|
| *United States v. Lance Brauman, Neil Elliott, Ryan Cross, & Lyles Lashley*, **6:05-cr-10197-MLB & 6:05-cr-10232-34-MLB (D. Kan.)**[12] | Barton County Community College coaches and athletic director convicted of mail and wire fraud for taking online classes for student-athletes and misrepresenting classes taken by student-athletes to make it appear as if the students were eligible to earn junior college degrees. | Ranging from 12 months and one day to 12 weekends |
| *California v. Timothy Lai*, **(Orange County Sup. Ct.)**[13] | High school tutor pleaded guilty to changing students' grades 19 times by stealing teachers' passwords. | 12 months |
| *United States v. Mellissa Krystynak*, **5:18-cr-00196 (S.D.W. Va.)**[14] | Mother, who was a counselor at her children's school, pleaded guilty to changing 34 of her daughter's grades, which her daughter then used to apply to college. | 6 months |
| *United States v. Joseph Fonge*, **1:14-cr-10194-WGY (D. Mass.)**[15] | Father pleaded guilty to wire fraud for falsifying financial aid applications so that his daughter could attend a university. | 4 months |

[12] *Investigative Report: Former Barton County Track Coach Lance Brauman Sentenced to 12 Months and a Day in Federal Prison*, U.S. Dep't. of Educ. (Oct. 2, 2006), https://www2.ed.gov/about/offices/list/oig/invtreports/ks102006.html; *see also* Associated Press, *Four Going to Jail for Fraud at Community College*, ESPN (Oct. 2, 2006), https://www.espn.com/college-sports/news/story?id=2611020 (reporting that at sentencing, judge remarked "Some of the fraudulent conduct occurred in the classroom—this is not the message teachers and coaches should be sending to young students").

[13] *See* Hannah Fry, *Tutor Pleads Guilty in Corona del Mar High Cheating Scandal, Gets 1 Year in Jail*, L.A. Times (Aug. 4, 2015), https://www.latimes.com/socal/daily-pilot/news/tn-dpt-me-0805-lai-20150804-story.html.

[14] *See Former High School Counselor Sentences for Mail Fraud Scheme Inflating Daughter's Grades to Obtain College Scholarships*, U.S. Dep't of Just. (May 17, 2019), https://www.justice.gov/usao-sdwv/pr/former-high-school-counselor-sentenced-mail-fraud-scheme-inflating-daughters-grades.

[15] *Chelsea Man Pleads Guilty to Student Financial Aid Fraud*, U.S. Dep't. of Just. (Dec. 10, 2014), https://www.justice.gov/usao-ma/pr/chelsea-man-pleads-guilty-student-financial-aid-fraud.; *see also* Judgment, *United States v. Fonge*, No. 1:14-CR-10194-WGY (Dkt. 19).

| Case | Charge(s) | Prison Term |
|------|-----------|-------------|
| *United States v. Bosung Shim*, **1:13-cr-00367-TSE-1 (E.D. Va.)**[16] | Aspiring medical student attempted to hack into multiple computer systems, including the Association of American Medical Colleges system, in order to change his Medical College Admissions Test scores. | 3 months, plus 7 months in a halfway house |
| *California v. Omar Khan*, **(Orange County Sup. Ct.)**[17] | Student pleaded guilty to changing his grades and the grades of 12 other students, altering his Advanced Placement exam score, and stealing Advanced Placement exams. | 30 days |

Even cases involving far less egregious conduct, and defendants with mitigating personal circumstances, have resulted in incarceration.  For example, in a 2011 case, a single mother living in an Ohio housing project falsely claimed her father's address to get her children into a nearby suburban school district, and did so while working as a teacher's aide and taking night classes to earn a teaching degree.  She was charged with two felony counts and sentenced to five years in prison, a sentence later suspended to ten days in jail, three years' probation, and community service.[18]  Still more recently, as set forth below, ten Atlanta public school teachers, principals, and administrators were sentenced to as much as 36 months in prison after being convicted of racketeering and other charges arising out of a conspiracy to inflate students' test scores:[19]

---

[16] *Hacker Sentenced for Breaking into Medical School Application Computers*, U.S. Dep't of Just. (Sept. 1, 2013), https://www.justice.gov/usao-edva/pr/hacker-sentenced-breaking-medical-school-application-computers.

[17] Scott Martindale, *Student Computer Hacker Pleads Guilty, Gets 30 Days*, O.C. REGISTER (Mar. 22, 2011), https://www.ocregister.com/2011/03/22/student-computer-hacker-pleads-guilty-gets-30-days/.

[18] *See* Lisa Belkin, *Jailed for Choosing a Better School?*, N.Y. TIMES (Jan. 27, 2011), https://parenting.blogs.nytimes.com/2011/01/27/jailed-for-choosing-a-better-school/?scp=1&sq=Williams-Bolar&st=cse.

[19] *See, e.g.*, Richard Fausset & Alan Blinder, *Atlanta School Workers Sentences in Test Score Cheating Case*, N.Y. TIMES (Apr. 14, 2015) https://www.nytimes.com/2015/04/15/us/atlanta-school-workers-sentenced-in-test-score-cheating-case.html.

| Individual | Role | Prison Term |
|---|---|---|
| **Sharon Davis-Williams**[20] | School Resource Team Executive Director convicted of RICO. | 84 months; reduced to 36 months on appeal |
| **Tamara Cotman**[21] | School Resource Team Executive Director convicted of RICO. | 84 months; reduced to 36 months on appeal |
| **Michael Pitts**[22] | School Resource Team Executive Director convicted of RICO and influencing witnesses. | 84 months; reduced to 36 months on appeal |
| **Angela Williamson**[23] | Teacher convicted of RICO, false statements, and false swearing. | 24 months |
| **Tabeeka Jordan**[24] | Assistant Principal convicted of RICO. | 24 months |
| **Shani Robinson**[25] | Teacher convicted of RICO and false statements. | 12 months |
| **Diane Buckner-Webb**[26] | Teacher convicted of RICO and false statements. | 12 months |
| **Dana Evans**[27] | Principal convicted of RICO and false statements. | 12 months |

---

[20] *See* Donna Lowry, *Sentences Reduced for 3 in Atlanta Cheating Scandal*, USA TODAY (Apr. 30, 2015), https://www.usatoday.com/story/news/nation/2015/04/30/atlanta-educators-resentenced/26643997/; *Sharon Davis-Williams*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/sharon-davis-williams/53733806.

[21] *See* Lowry, *supra* note 20; *Tamara Cotman*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/tamara-cotman/53731018.

[22] *See* Lowry, *supra* note 20; *Michael Pitts*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/michael-pitts/53732959.

[23] *See Angela Williamson*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/angela-williamson/53731513.

[24] *See Tabeeka Jordan*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/tabeeka-jordan/53731094.

[25] *See Shani Robinson*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/shani-robinson/53733845.

[26] *See Diane Buckner-Webb*, WSB-TV Atlanta (Mar. 26, 2015) https://www.wsbtv.com/news/local/diane-buckner-webb/53730752,

[27] *See Dana Evans*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/dana-evans/53730379.

| Individual | Role | Prison Term |
|---|---|---|
| **Donald Bullock**[28] | Testing Coordinator convicted of RICO, false statements, and false swearing. | Weekends in jail for 6 months |

There are educational fraud cases in which defendants have received probationary sentences—particularly in instances involving foreign nationals who were deported as a result of their conduct.  But the cases most analogous to this one—involving organized schemes and multiple co-conspirators—have typically resulted in the imposition of meaningful terms of incarceration.  Frequently, those cases involved defendants who are members of racial and ethnic minorities and/or from disadvantaged socioeconomic backgrounds.  A different result in this case, particularly given the history and characteristics of these defendants, would not be appropriate.  Rather, "short but certain" terms of incarceration, such as those the government is requesting, would avoid unjustified disparities, be proportional, consonant with the spirit and letter of the Sentencing Guidelines, and not more than necessary to see justice done.

E.      **The Need for Specific and General Deterrence**

These particular defendants are unlikely to repeat the specific crime charged here.  But merely because they are unlikely to again cheat the college admissions process does not mean they are unlikely to re-offend.  The criminal conduct here was multi-faceted:  it involved bribery, false statements, laundering funds through a sham charity and scheming to take fraudulent tax deductions.  These are crimes that are, by their nature, easy to commit and difficult to detect.  They occur quietly, in conference rooms, living rooms, and over the phone.  They are rationalized by those who commit them.

---

[28] *See Donald Bullock*, WSB-TV Atlanta (Mar. 26, 2015), https://www.wsbtv.com/news/local/donald-bullock/53733873.

The defendants engaged in bribery and deceit because another wealthy parent referred them to the conspiracy's mastermind, William "Rick" Singer, they could afford the illicit service he provided, and they thought they could get away with it. Despite their public personae, they willfully broke the law because it was easy and they thought no one was looking. This time, the context was college admissions; it could just as well have been tax fraud, insurance fraud, accounting fraud, or securities fraud. Incarceration is the best and surest way to deter these defendants in the future.

Incarceration will also effectively deter similarly situated individuals from engaging in similar crimes, not least because the resolution of these cases will be widely reported. Courts recognize "the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Martin*, 455 F.3d at 1240. The fact that perpetrators of fraud crimes are "rational, cool, and calculated," makes them "prime candidate[s] for general deterrence." *Id.* (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker,* 47 WM. & MARY L. REV. 721, 724 (2005)) (internal quotation marks omitted). Sentences of incarceration here will make unambiguously clear that everyone is accountable to the law regardless of status, and will deter others from buying illegal advantages in the college admissions process.

## II.    <u>INDIVIDUAL SENTENCING RECOMMENDATIONS</u>

Beyond properly reflecting the gravity of the offense and the other factors in Section 3553(a), the defendants' sentences should also account for relative culpability within the group. What follows is a short summary of each defendant's offense conduct, a discussion of the methodology the government used to assess relative culpability, and a table setting forth the government's sentencing recommendations. Prior to each sentencing in the case, the government

will submit a supplemental memorandum addressing other individualized factors relevant to each defendant in greater detail.

A.    **The Offense Conduct**

All of the defendants knowingly and intentionally paid bribes and other monies, and engaged in other forms of fraud, as part of the scheme to facilitate their children's admission to elite colleges and universities over more qualified applicants.  Set forth below is a brief synopsis of each defendant's conduct.

i.    *Gregory and Marcia Abbott*

In 2018, Gregory Abbott, a retired corporate executive, and his wife, Marcia Abbott, arranged with Singer to pay a total of $125,000 to facilitate cheating on two separate sets of standardized tests:  the ACT and the SAT II subject tests.  On both occasions, the Abbotts disguised the payments as donations to Singer's sham charitable organization, the Key Worldwide Foundation ("KWF").  In April 2018, the Abbotts paid $50,000 to have a corrupt proctor, Mark Riddell, correct their daughter's ACT exam; Riddell ultimately achieved a near perfect score. Then, in September 2018, the Abbotts paid $75,000 to have Riddell cheat on the SAT II subject tests.  On that occasion, Marcia Abbott specifically requested that Riddell "administer" the test based on his earlier performance.   The scheme also involved bribing a corrupt test site administrator, Igor Dvorskiy, to permit the cheating to occur.

ii.    *Jane Buckingham*

In 2018, Jane Buckingham, a prominent Los Angeles entrepreneur and the best-selling author of a book titled *The Modern Girl's Guide to Motherhood*, agreed to pay $50,000, funneled through KWF, to have Riddell correct her son's ACT exam.  As originally conceived, the scheme involved Buckingham flying with her son from Los Angeles to Houston, where a corrupt test site

administrator, Niki Williams, would allow the cheating in exchange for a bribe. When Buckingham's son became ill, however, Buckingham asked that Riddell simply take the test himself.

To facilitate the fraud, she obtained a handwriting sample from her son so Riddell could mimic his script on the actual exam. Riddell then took the test alone in his hotel room, earning Buckingham's son a near-perfect score. Buckingham, meanwhile, gave her son a practice exam at home, in order to deceive him into thinking he had taken the test himself. Pleased with the results, Buckingham later told Singer she would like to cheat on the ACT test on behalf of her daughter, although these plans were interrupted by Buckingham's arrest.

### iii.    *Gordon Caplan*

In 2018, Gordon Caplan, the chairman of a large international law firm, agreed to pay $75,000 as a purported contribution to KWF to participate in the college entrance exam cheating scheme. Singer told Caplan that his daughter would need to be evaluated by a psychologist for a "learning difference" to justify extending her time on the exam in order to facilitate the fraud. Singer advised that the goal of the evaluation was "to be stupid . . . to be slow, to be not as bright . . . so we show discrepancies." Caplan then flew from his home in the New York City area to Los Angeles, where his daughter was evaluated by a psychologist recommended by Singer. Having succeeded in getting extra time for the exam, Caplan and his daughter flew to Los Angeles a second time in December 2018, so that she could take the ACT at the test center operated by Dvorskiy, the corrupt test administrator, and have Riddell correct her answers. When the ACT ultimately notified Caplan that it was retracting its decision to grant Caplan's daughter extended time and intended to cancel her score, Caplan retained a lawyer to pressure ACT to release the fraudulent score.

### iv.    *Robert Flaxman*

In or about October 2016, Robert Flaxman, the chief executive of a Los Angeles-based real estate development firm, caused his company to pay Singer $75,000, disguised as a contribution to KWF, in exchange for having Riddell cheat on his daughter's ACT exam.  Flaxman's daughter flew to Houston so she could take the exam at the Houston test center operated by Williams, the second of Singer's corrupt test administrators.  During the exam, Riddell instructed Flaxman's daughter and another student taking the test at the same time to answer different questions incorrectly so that they did not have the same incorrect answers on their tests and the ACT would not suspect cheating.

### v.    *Felicity Huffman*

In 2017 and 2018, the actress Felicity Huffman agreed to pay Singer $15,000, disguised as a contribution to KWF, to participate in the college entrance exam scheme for her oldest daughter.  Huffman, who before her arrest operated a website on which she offered parenting advice, worked with Singer to fabricate reasons why her daughter needed to take the SAT at Dvorskiy's test center instead of at her own high school, where it would have been supervised by a legitimate proctor.  After obtaining the fraudulent score, Huffman discussed with Singer pursuing the cheating scheme a second time for her younger daughter, although she ultimately decided not to do so.

### vi.    *Agustin Huneeus*

In 2017 and 2018, Agustin Huneeus, the owner of several well-known vineyards, agreed to pay Singer a total of $300,000, disguised as donations to KWF, to participate in both the entrance exam cheating scheme and the college recruitment scheme.  In or about August 2018, after Riddell fraudulently achieved an SAT score placing Huneeus's daughter in the 96th percentile nationally, Huneeus complained to Singer that the score was too low.  Huneeus also made plans with Singer,

which he later abandoned, to cheat on the ACT. Huneeus then engaged in the college recruitment scheme, agreeing to pay a bribe totaling $250,000 in exchange for having his daughter "recruited" to USC as a purported water polo player, a sport she did not play competitively. Ultimately, Huneeus was arrested before he could make the final payment of $200,000.

### vii.    *Marjorie Klapper*

In 2015, the College Board invalidated Ms. Klapper's older son's SAT score because the score had increased markedly relative to his performance on the PSAT and there was "substantial agreement between [his] answers . . . and those of another test taker" seated nearby. Klapper then conspired with Singer to create a fake tutoring invoice to make it appear that her son had achieved a high score due to diligent preparation, which she detailed in a letter to ETS.

Later, in 2017, Klapper agreed to make a fake charitable contribution of $15,000 to KWF to participate in the college entrance exam cheating scheme for her younger son. Klapper also approved various falsehoods on her younger son's college application—including that he was Mexican and African-American and a first-generation college student—with the expectation that doing so would improve his admissions prospects.

### viii.   *Peter Jan "P.J." Sartorio*

In 2017, Peter Jan "P.J." Sartorio, a packaged food entrepreneur, agreed to pay Singer $15,000 to participate in the college entrance exam cheating scheme for his daughter. In June 2017, Sartorio and his daughter flew to Los Angeles, where Riddell corrected the answers to her ACT exam after she had finished. Sartorio then made payments to Singer in cash, to make it harder to trace, and structured his bank withdrawals into three separate transactions over the course of four days. Sartorio later told Singer, "There is nothing on my end that shows that your company,

Rick, or anybody, received any cash payments. . . .  But anything that was done verbally, that was verbal and there's no record.  There's nothing.  There's nothing."

### ix.    *Stephen Semprevivo*

In 2015 and 2016, Stephen Semprevivo, a business executive, agreed to pay Singer $400,000 to defraud Georgetown University into admitting Semprevivo's son by falsely presenting his son as a competitive tennis player.  Semprevivo's son, on Singer's direction and with the awareness of Semprevivo, sent an email to Gordon Ernst, the corrupt Georgetown tennis coach, about his purported interest in playing tennis, so that Ernst could use the email to further the fraudulent application.  Semprevivo also knew that his son's application essay included falsehoods about his son's tennis experience.  After Semprevivo entered his guilty plea, his attorney sued Georgetown on behalf of Semprevivo's son, seeking an injunction to prevent his dismissal from the university.  The lawsuit was later dropped.

### x.    *Devin Sloane*

In 2017 and 2018, Devin Sloane, a successful entrepreneur and business executive, agreed to pay Singer $250,000 to have his oldest son fraudulently recruited to USC as a water polo player, notwithstanding the fact that Sloane's son did not play the sport, in which USC is nationally ranked.  Sloane made the payments in two parts:  a $50,000 payment to a fund at USC controlled by athletics administrator Donna Heinel, who facilitated the fraudulent recruitment, and a $200,000 sham donation to KWF, which Singer used, in part, to make additional payments to Heinel personally.  Sloane later boasted to Singer about how he misled a USC advancement officer about the reason for the $50,000 payment by telling him that Sloane's mother "was an Olympic

athlete and she just passed away last year, and we as a family decided that we wanted to support women's sports."

As part of the scheme, Sloane bought water polo gear, photographed his son posing in the gear in the family swimming pool, and hired a graphic designer to make the photo look more realistic.  Sloane also approved a falsified athletic profile submitted to USC that portrayed his son as an experienced and talented water polo player.   When a high school guidance counselor questioned why Sloane's son was being admitted to USC as a water polo player, Sloane expressed outrage at her inquiry, and conspired with Singer to come up with an explanation to hide the scheme from the school.

Sloane later suggested to Singer that they not discuss the scheme over the phone, and asked Singer to send him some "marketing materials" for Singer's fake charity, so that Sloane could use them to support misrepresentations to the Internal Revenue Service about the reason for his purported $200,000 contribution.

**B.**     **Key Factors Considered To Determine Relative Culpability**

For each defendant, the government's recommended sentence begins with the recognition that the defendants are first-time offenders who accepted responsibility almost immediately following their arrests, and waived both indictment and substantial Rule 16 discovery.   The government's recommendations also take into account the individual circumstances of each defendant.  The government considered several additional factors, as set forth below.

**i.**     ***Amount of the Bribes and Other Payments***

In assessing relative culpability, the government considered, as a starting point, the magnitude of the bribes and other payments the defendants agreed to make, consistent with the Sentencing Guidelines' mandate that "loss serves as a measure of the seriousness of the offense

and the defendant's relative culpability." U.S. Sentencing Guidelines Manual § 2B1.1, Commentary, Background (U.S. Sentencing Comm'n 2018). Placing weight on the bribe amount—which the parties have stipulated is an appropriate substitute for loss—is consistent with the Guidelines' treatment of bribery schemes generally, *see* U.S.S.G. §§ 2B4.1, 2C1.1, as well as with the Guidelines' purpose of achieving "greater equivalence between penalties for white collar crimes like fraud and violent crimes like robbery." *Prosperi*, 686 F.3d at 38 (noting that "'[o]ne means chosen by the Sentencing Commission to accomplish this goal was by giving greater weight to the amount of loss involved in a scheme to defraud.'") (quoting *United States v. Prosperi*, No. 06-10116-RGS, 2010 WL 1816346, at *1 (D. Mass. May 6, 2010) (Stearns, J.)).

    **ii.**    ***Repeat Players***

The government took into account the extent to which the defendants were "repeat players," that is, their willingness to engage in defrauding the system more than once. Thus, for example, the government recommends that Huneeus serve a term of incarceration modestly longer than Semprevivo, despite the fact that Semprevivo paid bribes totaling $100,000 more than Huneeus, because Huneeus willfully engaged in both the exam cheating and bogus recruitment schemes while Semprevivo was involved only in the latter.

Likewise, the government recommends a sentence of one month of incarceration for Huffman, who agreed to pay $15,000 for the exam cheating scheme for her older daughter, and considered doing it again for her younger daughter, but ultimately chose not to do so. By contrast, the government recommends a sentence of four months for Klapper—who, like Huffman, agreed to pay $15,000 in connection with the exam cheating scheme—because Klapper participated in the scheme for her younger son *after* the College Board invalidated her older son's exam score based on suspicion of cheating, and *after* she enlisted Singer in a fraudulent attempt to cover it up.

In short, Klapper pursued a more sophisticated cheating scheme that would reduce the odds of detection. Moreover, she agreed to falsely represent her son in his applications as a Mexican and African-American first-generation college student in order to gain a competitive edge in the admissions process.

### iii.   *Active Versus Passive Participation*

The government's recommendations also take into account the extent to which each defendant was an active rather than passive participant in the scheme, including steps taken independently to advance the fraud and conceal it. Sloane, for example, merits a comparatively greater sentence because—rather than merely funneling bribe payments through Singer's purported charity—he took steps to affirmatively mislead USC, including by buying water polo equipment for his son to wear in a staged photograph, hiring a graphic designer to make the photo look more realistic, lying to a high school guidance counselor about why his son was recruited as a water polo player, and independently misleading a USC advancement officer about the reasons for his purported donation to a fund administered by Heinel. Likewise, the recommendation for Buckingham accounts for her independent suggestion that Riddell take the exam without her son even being there, and her effort to deceive and manipulate her own son by administering a practice exam to him at home and telling him it was the real thing.

### iv.   *Involvement of Children*

Stiffer sentences are appropriate for defendants who enlisted their children in the scheme. For example, as noted above, Semprevivo allowed his son to send an e-mail to the Georgetown tennis coach boasting of invented tennis accomplishments and falsely expressing his interest in playing tennis at Georgetown, even though he did not play tennis competitively. Similarly, Huneeus and his daughter had at least one in-person conversation with Singer in which they

explicitly discussed the athletic recruitment fraud, and Huneeus instructed his daughter to keep quiet about it.

### v. *Positions of Trust*

The government considered the extent to which the defendants occupied positions of trust in the community.  Caplan, for example, was a prominent attorney and the chairman of an international law firm employing more than 700 attorneys.  Caplan was also a member of the New York Bar and an officer of the court.  Attorneys who flagrantly disregard the law—as underscored by Caplan's private admission that he was "not worried about the moral issue" of committing fraud—merit particular sanction.

Likewise, other defendants were senior corporate executives with heightened responsibilities to investors, employees, and business counter-parties for honesty and fair-dealing.  Still others used their positions of prominence to anoint themselves as authorities on parenting.  Buckingham literally wrote a book on the subject, while Huffman offered advice to thousands of her followers on the internet.  Brazen hypocrisy weighed in the government's calculus.

### vi. *Other Conduct*

Lastly, the government considered the defendants' conduct as the scheme unraveled and following its exposure, ranging from public expressions of post-arrest contrition at one end to defiant efforts to retain the benefits of the fraud at the other, including through abuse of the legal system.  As the scheme neared its end, for example, Caplan retained a lawyer to pressure the ACT to release his daughter's fraudulently-obtained scores, while Sloane advised Singer that they should not speak on the phone as they discussed ways to mislead the IRS about the purpose of Sloane's payment to Singer's sham charity.  Semprevivo, even after pleading guilty, countenanced *suing Georgetown*—the school he conspired to defraud—to retain his son's fraudulently obtained

admission.  These efforts show a determined interest in protecting the fruits of patently illegal activity and merit relatively longer terms of incarceration.

C.      **Sentencing Recommendations**

For each defendant, the government's recommended sentence is near or below the low end of the Sentencing Guidelines as calculated by the parties.  For some defendants, the government's recommendation is also below what the government agreed to recommend as part of the relevant plea agreement.  The most severe sentence the government seeks is 15 months; the least severe, 1 month.  These recommendations are set forth in the following table:

| Defendant | Bribe/Payment Amount | Stipulated Guidelines Range (Plea Agreement) | Final Sentencing Recommendation |
|---|---|---|---|
| Gregory **ABBOTT** | $125,000 (college entrance exam cheating scheme – ACT and SAT subject tests) | 12–18 months (total offense level of 13) | 9 months |
| Marcia **ABBOTT** | $125,000 (college entrance exam cheating scheme – ACT and SAT subject tests) | 12–18 months (total offense level of 13) | 9 months |
| Jane **BUCKINGHAM** | $50,000 (college entrance exam cheating scheme – ACT) | 8–14 months (total offense level of 11) | 8 months |
| Gordon **CAPLAN** | $75,000 (college entrance exam cheating scheme – ACT) | 8–14 months (total offense level of 11) | 8 months |
| Robert **FLAXMAN** | $75,000 (college entrance exam cheating scheme – ACT) | 8–14 months (total offense level of 11) | 8 months |

| Defendant | Bribe/Payment Amount | Stipulated Guidelines Range (Plea Agreement) | Final Sentencing Recommendation |
|---|---|---|---|
| Felicity **HUFFMAN** | $15,000 (college entrance exam cheating scheme – SAT) | 0-6 months (total offense level of 7) | 1 month |
| Agustin Francisco **HUNEEUS** | $300,000 ($50,000 college entrance exam cheating scheme – SAT; $250,000 college recruitment scheme – USC water polo) | 21–27 months (total offense level of 16) | 15 months |
| Marjorie **KLAPPER** | $15,000 (college entrance exam cheating scheme – ACT) | 4–10 months (total offense level of 9) | 4 months |
| Peter Jan **SARTORIO** | $15,000 (college entrance exam cheating scheme – ACT) | 0–6 months (total offense level of 7) | 1 month |
| Stephen **SEMPREVIVO** | $400,000 (college recruitment scheme – Georgetown tennis) | 21–27 months (total offense level of 16) | 15 months |
| Devin **SLOANE** | $250,000 (college recruitment scheme – USC water polo) | 15–21 months (total offense level of 14) | 12 months |

## CONCLUSION

This case is a singular opportunity to assure the general public that the college admissions system—a system millions of Americans rely on each year—will be as level a playing field as the law can realistically make it.  The Court should hold these men and women accountable for their callous disregard for others, and for the systemic and individualized harm they caused.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Eric S. Rosen*                            
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 6, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by CM/ECF on September 6, 2019.

*/s/ Eric S. Rosen*                            
ERIC S. ROSEN