UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

      Plaintiff,

         v.

TOBY MACFARLANE,

      Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)

Case No. 1:19-cr-10131 NMG

**PUBLIC/REDACTED SENTENCING MEMORANDUM OF
DEFENDANT TOBY MACFARLANE**

**(leave to file oversized brief granted on November 5, 2019)**

# I.    INTRODUCTION

Defendant Toby Macfarlane comes before this Court for sentencing after pleading guilty to a single count of conspiring to commit mail fraud in violation of 18 U.S.C. § 1349. By our count, Mr. Macfarlane will be the thirteenth individual to be sentenced in this District in connection with the college admissions scandal, including twelve individuals who, like Mr. Macfarlane, unlawfully sought to give their children an unfair advantage in the college admissions process. But even in this crowded field, Mr. Macfarlane stands out for several reasons.

First, Mr. Macfarlane is a hardworking individual who picked himself up from a challenging and humble family background, received a paycheck and W-2 all of his adult life, and built a successful business in insurance while earning a stellar reputation for personal and professional integrity. Although Mr. Macfarlane succeeded in establishing a comfortable income and financial support for his family far beyond his dreams, he differs from many of the other defendant-parents caught up in this case; he is not a person of fabulous wealth, power or fame.

Second, also unlike several of the other defendant-parents who were previously sentenced, Mr. Macfarlane has not sought to justify or excuse his offense. Rather, within a few weeks of his arrest he waived his right to an Indictment and agreed to plead guilty to an Information, and he continues to take full and unqualified responsibility for his offense:

> I know that it was wrong to get my kids admitted to USC as recruited athletes when they were not. I know that I alone am to blame for the bad decisions I made and for their consequences. For me, the most difficult thing to accept is the fact that I set such a bad example for my kids. I want to apologize first and foremost to them, but also to USC, to other people's families who were applying to USC, to the prosecutor, the Court and everyone else who has been hurt by my actions.

Macfarlane Personal Statement, pp. 3-4; Exhibit A. As the Court will see, numerous colleagues, friends and family members attest to Mr. Macfarlane's sincere acceptance of responsibility and

contrition for his offense.  Additionally, with complete transparency to the prosecution, Mr. Macfarlane acted expeditiously to file amended returns and to pay the IRS for the back taxes and interest owed for improper tax deductions that he took for the payments charged in the Information.  Thus, by word and by deed Mr. Macfarlane has demonstrated his determination to take responsibility for his misconduct and to begin making amends for it.

Third, the objective and contemporaneous evidence demonstrates that all of Mr. Macfarlane's misconduct occurred during an intense and prolonged personal crisis—with diagnosed symptoms of depression and anxiety for which he was receiving professional treatment—and entailed completely uncharacteristic errors of judgment.  For Mr. Macfarlane, the slow and tortuous disintegration of his marriage generated especially emotionally-charged distress:  having been abandoned by his father while still a young child, Mr. Macfarlane made a life-long commitment not to visit similar pain on his children.  It was during the most heightened periods of this distress that Mr. Macfarlane committed his offense.

Fourth, and relatedly, Mr. Macfarlane's misconduct was truly aberrant.  Until his involvement with Rick Singer, Mr. Macfarlane led a completely unblemished life.  To those who know him, his misconduct was more than shocking; his friends and colleagues find his actions to be completely uncharacteristic.  Over the last 32 years, Mr. Macfarlane emerged as a leading title insurance executive in the commercial real estate industry in San Diego County.  By every account, Mr. Macfarlane succeeded and became a successful executive in the title insurance industry precisely because his word was his bond, and because everyone involved in complicated real estate transactions knew that they could trust him.

Finally, for Mr. Macfarlane the collateral consequences of the conviction have been catastrophic and immediate.  Within a few days of his guilty plea, he lost the license he required

to conduct his title insurance business, he lost his job, and his once stellar reputation was decimated. At the same time, his banks and lenders closed his accounts and shut down his lines of credit, disabling him from pursuing his second source of income: partnership investments in commercial real estate. As a result, Mr. Macfarlane's two careers were terminated.

For these and other reasons elaborated below, we urge that the imposition of a prison sentence of a year and a day, as urged by the government, is far "greater than necessary" to achieve the objectives of the sentencing laws. *See* 18 U.S.C. § 3553(a). Completely unanchored from the thirteen sentences already imposed in related cases, that request would result in "unwarranted disparities among defendants" similarly situated. § 3553(a)(6). Accordingly, we ask the Court for leniency.

## II. PERSONAL HISTORY

### A. Youth and Education

Born on January 29, 1963 in Salt Lake City, Utah, Mr. Macfarlane was the first of two sons born to ███████ Macfarlane. Mr. Macfarlane's home life during his childhood was not happy. His parents were no longer in love by the time he was old enough to be conscious of such matters. He remembers arguments and at least one shattered glass jar, and his parents divorced when he was only seven. At some point during his youth, Mr. Macfarlane learned that his father had entered into an affair while still married to his mother. Regardless, Mr. Macfarlane loved and adored his father, and the divorce shook him to the core:

> [M]y whole world felt like it had been torn apart. I remember crying myself to sleep on many occasions. When I was older, I promised myself that I was going to have a family someday and that I would never let it be split apart. I wasn't going to let that happen to my children.

Macfarlane Personal Statement, p. 1; Exhibit A. Mr. Macfarlane's long-time psychiatrist confirms that his parents' divorce affected him profoundly:

> Without a doubt, the defining trauma in Toby's life was his parents' divorce. Only seven years old at the time, Toby adored his father and felt very close to him. Yet, one day without warning Toby's father left his mother for another woman and abandoned Toby and his younger brother. That devastating experience helped to shape Toby's world view and moral core . . . . He became extremely responsible, reliable and loyal, actively chose honesty and candor over deceit, and pursued fairness and stability over entitlement and self-dealing.

Letter of Joan Friedson, M.D., p. 1; Exhibit B.

When Mr. Macfarlane was nine years old, his mother moved to a small town in the San Francisco Bay Area where she and her children set about starting a new life. After a time, his mother found work as a secretary and she moved her small family into an apartment—but money was scarce. Mr. Macfarlane remembers feeling responsible to be the "man of the house." When he was twelve years old, he got a paper route and started contributing to the family's resources. Macfarlane Personal Statement, p. 1, Exhibit A. His mother confirms that Mr. Macfarlane was an especially responsible teenager who always worked at jobs in addition to school. Letter of █████████, Exhibit C.

During his high school years, Mr. Macfarlane's mother helped him to overcome a shyness he had developed after his parents' divorce and engage in extra-curricular activities. During his senior year Mr. Macfarlane played four varsity sports, was elected Student Body President, worked 20 hours/week and still pulled good grades. For Mr. Macfarlane, seeing U.S.C. was love at first sight. His parents could not afford the tuition, but he was determined to go there. He was accepted to U.S.C. and scrambled to make it through financially, with various jobs, scholarships, grants and loans. Mr. Macfarlane's years at U.S.C. are packed full of treasured memories. His friendships from U.S.C. endure to this day. *See, e.g.,* Letter of Patrick Ford, Exhibit C. Mr. Macfarlane graduated from U.S.C. in four years with a Bachelors' Degree in Business.

## B. Professional Life and Young Adulthood

Two years after college, Mr. Macfarlane visited one of his father's closest friends in San Diego and was offered a job in commercial title insurance. Mr. Macfarlane excelled in his new métier. Letter of Jim Crestani, p. 1; Exhibit C ("Toby immediately showed me he was special, eagerly learning everything quickly and rapidly becoming a leader and a mentor to other new sales reps."). As one of his early customers, the manager of a major real estate brokerage firm, remembers, "[Toby's] honesty, thoughtfulness and sincere caring and concerns to support the entire office and clients was exceptional." Letter of John Garner, p. 1; Exhibit C. In 1990, Mr. Macfarlane was a founder of a new title insurance firm, Southland Title of San Diego, and served on the parent company's board of directors. In 2000, he joined with his mentor, Jim Crestani, to become the managing partners for another startup title insurance company. During difficult economic times, as well as times of personal loss, Mr. Macfarlane demonstrated the same mettle that had enabled him to work his way through high school and college:

> In 2000, two life changing events happened for Toby. First, we became managing partners for a fledgling title and escrow operation in San Diego, and second, his father passed away. While I was concerned one, or the other, may become a distraction, Toby showed his ability to adjust and adapt quickly, showing more concern for the new employees under our leadership, pushing us to succeed, so everyone could keep their jobs during the tough economic conditions at that time, instead of dwelling on any personal struggle he may have been going through, that could interfere with our goals and objectives.

Letter of Jim Crestani, p. 1; Exhibit C. Beginning in 2001, Mr. Macfarlane also began serving on the board of directors of a new bank, Sunrise Bank of San Diego. For the last 20 years, Mr. Macfarlane has served as a Senior Vice President of Sales of relatively small but highly successful title insurance firms.

In California, the title insurance industry plays a central role in virtually every real estate transaction, especially in commercial real estate. The functions of a title insurer are fiduciary in

nature.  In the commercial real estate arena, where transactions frequently involve many millions of dollars and firms cannot survive without repeat customers, a title insurance sales representative is responsible not only for relationships with customers but also for helping to troubleshoot the unforeseen issues that almost always arise and for delivering the necessary assurances upon which all parties rely.  Since 2009, California has required that title insurance sales representatives be licensed as "Title Marketing Representatives."  *See* California Insurance Code § 12418.  Since that time, Mr. Macfarlane has been a licensed professional.

Over more than three decades, Mr. Macfarlane has cultivated a reputation for impeccable honesty and high ethics that greatly contributed to the success of each of the firms with which he was associated.  Many customers and colleagues so attest.  For example, one commercial real estate broker who has worked with Mr. Macfarlane for many years writes:

> First of all, throughout the years, Toby has always been considered by me and many others in the industry to have the highest integrity, work ethic and trust in the Title Insurance business in San Diego. He has always been extremely well respected.
>
> Toby has a lot of competition in the Title Insurance business in the San Diego area, but he has always been ranked number one in San Diego for the previously mentioned reasons. In the past, I have placed complete trust and faith in more transactions than I can even count with him and he always kept his word and he never failed me on anything. Much of Toby's business with me and others was done with a handshake where his word was always his bond.

Letter of Robert Farrior, p. 1; Exhibit C.  Another real estate broker who is younger than Mr. Macfarlane and was mentored by him extols Mr. Macfarlane's integrity:

> I can share unequivocally that I found Toby to be one of the most genuine, honest, dedicated people I have ever met. Simply a good person. There was never a hint of dishonesty, or BS of any kind. Toby is literally to me one of the most honest and direct people I have ever met. I didn't always like the response I would get from Toby, but it was always sincere, unfiltered, and came from the heart. Truly a refreshing and very uncommon experience in the world of investment real estate that I see far too infrequently.

Letter of Elliot Scott, p. 2; Exhibit C.

During the years 2013 through 2017, Mr. Macfarlane endured a personal crisis arising from the deterioration and ultimate failure of his marriage that affected his productivity at work. Nevertheless, as the accompanying letters of support demonstrate, Mr. Macfarlane's reputation for integrity and excellence remained untarnished, and following his divorce he looked forward to reinvigorating his career in the title insurance industry. *See* Exhibit C.

## C. Family, Marriage and Divorce

Although Mr. Macfarlane's relationship with his father was compromised by his feelings of abandonment and betrayal of his mother, Mr. Macfarlane never gave up on him and always felt great fondness for him. Mr. Macfarlane became especially close to ███, his kid half-sister. Tragically, within a year or two after his move to San Diego, ███ was diagnosed with a rare form of terminal leukemia. Because she received much of her treatment at the Children's Hospital in Los Angeles, Mr. Macfarlane was able to spend almost every weekend with her until her death a year later. A close friend remembers Mr. Macfarlane's devotion to ███:

> About a year after Toby and I met his 12-year-old sister ███ was diagnosed with terminal leukemia. What I witnessed was simply amazing. Toby sprung into action to help support his sister and his parents through such a difficult time. One day I said let's go grab a beer after work to which Toby said "I'm not going to touch a drop of alcohol not even a soda" "I want to remain completely present and feel all of the emotions I'm going through with my sister over the coming months" Once his sister passed he formed a tennis tournament in her honor and raised money for cancer research and awareness.

Letter of Rande Turner, p. 1, Exhibit C. For Mr. Macfarlane, the loss was a devastating and defining moment: his first real taste of mortality. He tried to make some good come of it and devoted himself to charitable causes in ███ honor, including the Make A Wish Foundation, the Leukemia Society and Big Brothers. Macfarlane Personal Statement, p. 2; Exhibit A. Mr. Macfarlane's commitment to charitable organizations and to giving to those less fortunate

became hallmarks of his character that others note and respect. *See infra* at 11-12.

Not long after ███ death, Mr. Macfarlane met ████████, who was also working as a sales representative at the same title insurance company. It was a passionate love affair; Mr. Macfarlane had never met anyone with █████'s joy, zeal and zest for life. They were married in October 1990. Their first child, a daughter ("███"), was born in 1996. ██████ decided to stay home full time, so Mr. Macfarlane became the sole breadwinner. When their second child, a son ("███") arrived two years later, Mr. Macfarlane's heart was full. Together with █████, he was building the family of his dreams, and Macfarlane threw himself wholeheartedly into fatherhood—coaching sports teams, attending school events, playing sports, etc. Macfarlane Personal Statement, p. 2; Exhibit A. Others confirm that he was a devoted and doting father:

> Toby is a genuine family man and has a uniquely close relationship with his children, ██████████. I have personally seen on many occasions his generosity and love for his children. They have the kind of close relationship few parents and children ever experience. To me, this is demonstrative of a high-minded character and generosity that few parents ever experience; a selfless devotion to the wellness of their family.

Letter of J. Dean Loring, Exhibit C; *see also* Letter of Steve Hougard, p. 1; Exhibit C.

A man of tremendous energy, Mr. Macfarlane's devotion to his family always and passionately included his wife, █████, whom he continued to adore and woo:

> Toby was an extremely loyal and devoted husband during his marriage to ████. Toby has been a plugged-in Dad who has coached his kids sports, traveled extensively with his kids and supported their endeavors.

Letter of Rande Turner, p.1; Exhibit C. But, as Dr. Friedson notes, there was also a desperate and anxiety-driven edge to his family devotion that harkened back to his childhood:

> As a young person, Toby promised himself that he would one day establish his own family and that, unlike his own father, he would be a loving and reliable husband and would always be there for his children. When marriage and fatherhood arrived, Toby threw himself whole-heartedly into both roles. Despite a demanding and successful career, he coached ███████████ sports teams,

regularly attended school functions, and continued to romance ██████… He saw his primary role as that of a provider/protector of his family, and he acted unwaveringly to ensure the safety and happiness of his children, beginning with a commitment to maintaining a stable and intact family. Because of the central role played by divorce in Toby's own psyche, he willingly endured great personal sacrifice and self-deprivation—and, as we can now see, engaged in self-destructive conduct—in his efforts to help his own children avoid that same pain.

Letter of Joan Friedson, M.D., pp. 1-2; Exhibit B.

Sadly, the wheels were slowly falling off Mr. Macfarlane's marriage and he was the last to know it. Certainly, he was the last to accept it. In retrospect, he recognizes that by 2012 ██████ was not happy:

I know now that ██████ was becoming more and more unhappy. ██████
████████████████████████ But she was still the love of my life and I was determined to make the marriage work. I believed that I could will my way to a successful marriage. We saw a counselor together, but ██████ didn't put much energy into it.

Macfarlane Personal Statement, p. 2; Exhibit A. The relationship continued to founder through 2013 and, indeed, over the next four years as Mr. Macfarlane clung tenaciously to his childhood commitment not to do as his father had done. ████████████████████████████
████████████████████████████ ██████ ████████████████████████ Then, in February 2014, she announced that she wanted a divorce and moved out of the home.

For a few months, Mr. Macfarlane juggled responsibilities as both a high-profile businessman and essentially a single parent of two teenagers (██ was a senior in high school, ██ a freshman). Then ██████ decided to move back home and said that she had changed her mind about a divorce. Mr. Macfarlane was still in love with her and still committed to keeping his family intact, but she was not. As Dr. Friedson recounts:

Toby continued to do everything he could to maintain stability for ██████.
He was determined that they should experience as little anxiety or pain as possible.
He saw himself as the only constant in their lives. After a few months, ██████
decided to move back in, and she dropped the request for a divorce. But it was

only temporary, and ███ never really recommitted to the marriage. She took lengthy trips, sometimes with little or no warning.

Letter of Joan Friedson, M.D., p. 2; Exhibit B. It all took a huge emotional toll on Mr.

Macfarlane; as one friend observes:

> On a personal side, I have seen Toby pour his life into his wife and children, hoping for the best for his kids and family. I was there at his side as he walked through a very painful divorce just a few years ago. He has been so dedicated to his wife and children for nearly 25 years, but despite huge efforts through separation, rekindling the relationship for two years, and then having it end in dovorce [sic] was the most painful thing for Toby. His wife simply did not want the marriage any more, but Toby continued pouring his life into his kids and also the new role as 'friend' with his former wife ███.

Letter of Steve Huffman, p. 1: Exhibit C. He was not sleeping and suffered from severe, long-

term anxiety and depression for which Dr. Friedson provided appropriate treatment:

> ███ stayed with Toby and Toby believed that his worst nightmare was coming to pass: His children were facing parental abandonment just as he had. By February 2014, *Toby was in a full blown anxious depression characterized by significant insomnia, obsessive thoughts about his wife, anergia and anhedonia.* I prescribed ███ to treat his anxiety, ███ for the depression and ███ for the insomnia.

Letter for Joan Friedson, M.D. p. 2 (emphasis added); Exhibit B.

During the years that Mr. Macfarlane's marriage was failing, his son ███ was another

constant source of concern. Throughout his high school years, ███ increasingly struggled with

depression and anxiety:



> ███████████████████████████ ███████████. At some level, Toby blamed himself and his failing marriage for ███'s condition. Toby tried to ensure that ███ participated in sports, worked with tutors and did his school work. Toby attended ███'s basketball games and other school events. Throughout ███'s high school years, and indeed to this day, ███ was and is a constant worry for Toby.

Letter of Joan Friedson, M.D., p. 2; Exhibit B. During the years 2015, 2016 and 2017, with ███

away at college and ███ unpredictable, Mr. Macfarlane worked tirelessly to keep ███

engaged with friends, attending school, and playing sports. ██ played junior varsity basketball his sophomore year and varsity during his junior and senior years. There were also frequent doctor's office and therapy visits. One of the special events that Mr. Macfarlane arranged for ██ was a two-week father/son trip to Italy with the U.S.C. basketball team. That trip helped cement ██'s focus on U.S.C. as his school of choice. But it was not a lasting cure. Throughout his junior and senior years, ██ ████████████████████████████████████████████ ████████████████████████████████

In early 2017, ██ filed for divorce. Finally accepting the inevitable, Mr. Macfarlane commenced laying the groundwork for a life without her. Despite all of the pain and anguish that he had endured (and after a lot of counseling), Mr. Macfarlane eventually started to clear his head, and he agreed to pursue an amicable divorce in which the couple evenly divided up their assets. Mr. Macfarlane's divorce attorney describes the truly exceptional compassionate, fair-handed manner in with which Mr. Macfarlane handled that painful process:

> First, despite their poor marital relationship, Mr. Macfarlane repeatedly expressed concern for Ms. Macfarlane and wanted her to be well taken care of after the divorce. Secondly, this process would not have worked if anyone believed Mr. Macfarlane was not completely honest and reliable in providing information and documentation. In my 42 years of practice, I often encouraged clients to approach their litigation in a collaborative fashion, but I am not sure that I ever had a case with this level of complexity nor a client as straightforward and honest as Mr. Macfarlane.

Letter of David Huffman, J.D., p. 2; Exhibit C. The divorce was final on January 1, 2018.

### D. A Record of Charity and Generosity

As noted previously, the tragic death of Mr. Macfarlane's kid sister spurred him as a young man to be a giver, not a taker:

> After ███ died, I got involved with the Make a Wish foundatjon [sic] and the Leukemia Society back in San Diego. I longed to do more and make a bigger impact so I joined the Big Brothers and had a little brother that I spent time with and mentored. I also joined the board of the San Diego Tennis patrons-who provide after school tennis programs to kids in poor neighborhoods. During my time on the board we raised $4,000,000 to build the Barnes Tennis Center a facility with 21 courts complete with transportation for under-privileged kids to take part in a multi-faceted after school program.

Macfarlane Personal Statement, p. 2; Exhibit A. Since that time, as others note, Mr. Macfarlane has consistently striven to support and be involved with charitable organizations. One friend describes Mr. Macfarlane's willingness to participate in a humanitarian trip Cuba at a time when some, like the friend himself, thought it was too dicey:

> I remember being invited by some of our real estate clients to travel to Cuba, (circa 2004), on a US Government sanctioned humanitarian mission. I informed everyone that I would not feel comfortable in Cuba, so I backed out, but Toby went eagerly anyway.
>
> Their mission was to deliver medicine and blankets to various Orphanages. When Toby returned back home, I remember telling him "you're a far better man than I will ever be for making a trip like that." He just looked at me and said it was an experience he will never forget, and well worth any inconvenience he encountered, because the look on those children's faces when they received new blankets, was heartwarming and well worth it.

Letter of Jim Crestani, p. 1; Exhibit C. Other friends observe that Mr. Macfarlane's charitable instincts find expressions both personal and international. *See* Letters of Ann Block, p. 1, Robert Farrier, p. 2, and Elizabeth Rabbitt, pp. 1-2; Exhibit C.

Notably, during the years 2014 to 2017, Mr. Macfarlane's largesse also extended to U.S.C. athletics: over those three years he made eleven donations exceeding $150,000 wholly apart from Singer's scheme. Exhibit D. And on a more personal level, Mr. Macfarlane's kindness and generosity of spirit is demonstrated virtually every day to everyone who knows him. *See* e.g. Letters of Jules Arthur, ███, Conor Evans, Robert Evans, Robert Farrier, Lorena Gaxiola, Todd Glick, Ken London, John Trotter and Art Wadlund.

## III.    THE OFFENSE CONDUCT

Rick Singer walked into Mr. Macfarlane's life just as his marriage was beginning to crumble in 2012.  As Dr. Friedson notes,

> [F]or much of the period between 2013 through 2017, Toby suffered subsyndromal phases of depression and anxiety.  These episodes were evidently acute reactions to the emotional stress Toby endured during the deterioration and eventual termination of his marriage, and Toby's condition was severe enough on occasion throughout this period to require treatment with medication.  It is well documented that such depression and anxiety impact the brain's executive functioning and can be associated with impaired judgment and poor insight.

Letter of Joan Friedson, M.D., p. 2-3; Exhibit B.  Mr. Macfarlane's impaired judgment is more than evident here.

During the summer of 2012, ▮ was about to commence her junior year of high school. She was a very bright and accomplished student, and her college prospects were excellent: By the time she actually applied to colleges, her ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[1]  But like most parents facing the onslaught of the college testing and application process for the first time, the Macfarlanes were intimidated by the process and looked for someone to provide ▮ with college preparatory services to help manage the process.  Mr. Macfarlane just wanted someone who would "solve the problem" so he could check it off his list of worries.  The Macfarlanes initially hired a local counselor to work with ▮, but they soon felt that she was not adequate to the task; then a friend highly recommended Singer to for college preparatory services for ▮.  The Macfarlanes met with Singer and were impressed.  In October 2012, ▮ started working with Singer on test taking, essay writing and other matters.  ▮ liked him and felt that she was making progress.  It was all very legitimate.

Nevertheless, as time went on Mr. Macfarlane remained extremely anxious about the

---

[1] The SAT percentile scores for 2013 are found here:  https://blog.prepscholar.com/sat-historical-percentiles-for-2014-2013-2012-and-2011.

college entrance process and frequently expressed his concerns to Singer.  At some point during the summer of 2013, Singer mysteriously suggested that there was a way to get more certainty for ██ .  He called it a "side door" and eventually explained that if Mr. Macfarlane made a donation to Singer's § 501(c)(3) entity, "KWF," Singer could use his connections at U.S.C. to get ██ admitted as a women's soccer recruit.  ██ had played club soccer but was not on the high school team.  Singer said that did not matter and was very reassuring.  He told Mr. Macfarlane that KWF was a legitimate charitable entity that supported athletics at various universities and, more specifically, provided support to disadvantaged student athletes.  Other than that, Singer's descriptions of how the "side door" functioned were very opaque.  Wanting ██ 's college applications to be a "problem solved," Mr. Macfarlane eventually agreed to Singer's scheme.  As Mr. Macfarlane explains, despite Singer's assurances that the "side door" was a legitimate way to ensure ██ 's admission to U.S.C., Mr. Macfarlane knew it was wrong to seek her admission as a recruited student athlete when she was not:

> I knew it was wrong, but at the time I was feeling completely overwrought and all I could think of was not having to worry about my kids getting into college. Foolishly and selfishly, I took what seemed like an easy way out.

Macfarlane Personal Statement, p. 2; Exhibit A.

Mr. Macfarlane agreed to pay $200,000 to KWF to ensure ██ 's admission to U.S.C.  She was formally admitted on March 26, 2014.  Just before the payment was due, Singer called Mr. Macfarlane and instructed him to issue the check to Singer's for-profit entity, "the Key," instead.  Mr. Macfarlane was nonplussed by this request, and Singer deflected inquiries.  Singer told Macfarlane that he could still deduct the payment as a business expense.  Mr. Macfarlane agreed and later took that deduction.

Two years later, ██ was a junior in high school and was struggling emotionally and

academically. His ██████████████████████████████████████████████
████████████████████████.[2] As with ███, Singer initially provided legitimate

college preparatory services to ███. But eventually, Singer again raised the "side door" option

for U.S.C. Mr. Macfarlane questioned the viability of that option, given ███'s emotional

difficulties, but Singer assured him that U.S.C. was the right fit for ███. Singer said that ███

could be admitted as a recruited basketball player, even though he was not one. Mr. Macfarlane

agreed. This time, Singer charged $250,000—consisting of a check for $200,000 made payable

to the Key, Singer's for-profit entity, and a check for $50,000 made payable to U.S.C. Athletics.

Per Singer's instructions, Mr. Macfarlane mailed the $50,000 check to a senior Athletic Director

at U.S.C., with a memo notation: "████████████." ███ was formally admitted to U.S.C. on

March 23, 2017. Once again, Mr. Macfarlane improperly took tax deductions.

## IV. POST-OFFENSE CONDUCT AND COLLATERAL CONSEQUENCES

### A. ████████████ and U.S.C.

███ thrived at U.S.C., graduating in four years with a Bachelor's of Science Degree in

Business (just like her father). ███'s success was not surprising given her grades and test scores.

She had in fact been accepted at ten other colleges, including N.Y.U., Boston University, S.M.U.

and U.C. Santa Barbara; and ███ had a very difficult time choosing between N.Y.U. and U.S.C.

For at least two semesters, ███ made the Dean's List at U.S.C. and earned good enough grades to

participate in an exclusive study abroad program.



---

[2] The SAT percentile scores for 2013 are found here: https://blog.prepscholar.com/historical-percentiles-new-sat.



The following spring, ██ tried again. ████████████████████████████████████████████ ████████████████████████████ He never returned. To this day, life is a constant struggle for ██, and Mr. Macfarlane continues to do everything he can to keep him engaged, functioning and feeling good about himself. Last spring, ███ was hospitalized and involuntarily committed on two occasions for his own safety.

### B. Personal and Professional Life

During the months following █████'s second declaration of her intention to divorce in early 2017, Mr. Macfarlane finally commenced pulling his life back together. After his divorce become final, Mr. Macfarlane started to refocus on his business affairs, all the while keeping a watchful eye on ███. The amazing thing that happened to Mr. Macfarlane in his personal life is █████. They started dating in in the spring of 2017, hit it off immediately and have been living together since December 2018. █████s son has developed a close relationship with Mr. Macfarlane, and his children warmly accept █████ into their lives.

> I fell in love with Toby because he is like no other man that I have known before. He is an amazing father, a loving partner, and honest, faithful, smart, integral man.
>
> . . . [¶] . . .
>
> Toby together with his ex-wife, raised two beautiful loving young adults. They both have accepted me and my son in their father's life with lots of love and respect. I am proud to be a part of this mixed family that Toby and I are creating.

Letter of █████, p. 1; Exhibit C. █████ is keenly aware of ███'s struggles and strives to create a support environment for him:

> Toby's son, ███, is an extremely sensitive and vulnerable young person who has been suffering through severe emotional issues the whole time I have known him. Toby is a wonderfully supportive and understanding father, and I know how

painful it has been for Toby to watch ██'s struggles. I think that one of the hardest things for Toby as he contemplates his future is the possibility that one consequence of his misconduct could be that Toby will not be able to be present for ██ when ██ needs him.

Letter of ████████, p. 1; Exhibit C.

### C. Prompt Acceptance of Responsibility; Contrition and Remorse

Early on the morning of March 12, 2019, without notice, Mr. Macfarlane received a phone call from the F.B.I. informing him that they had a warrant for his arrest. Mr. Macfarlane immediately drove to his home and surrendered. After a shocking "perp walk" in front of his neighbors, followed by intense local publicity, he was released that same day on a personal recognizance bond. His first court appearance in Boston was on April 3, 2019. At that time, Mr. Macfarlane's counsel was among several attorneys who met with members of the U.S. Attorney's office to discuss potential resolutions for their clients. The government imposed a short deadline to accept a plea bargain. Sadly, at this time of intense negotiation, ████████ ████████████████████████████████████████████████████████ ████████ The government graciously extended their deadline for Mr. Macfarlane to accept a plea bargain so that he could return home and attend to his son.

████████████████████, Mr. Macfarlane returned his attention to this case and promptly agreed to plead guilty. In the meantime, eleven other defendant-parents charged in the scandal had agreed to plead guilty. Their cases were consolidated into a single Information that was assigned to Judge Talwani. Mr. Macfarlane also agreed to waive Indictment and to enter a plea to an Information, but because of the timing, he was charged separately. Mr. Macfarlane entered his guilty plea before this Court on June 19, 2019.

Since determining to plead guilty, Mr. Macfarlane has consistently and unequivocally taken responsibility for his misconduct. To friends, family and colleagues, he has clearly

expressed his remorse and blamed no one but himself.  Not surprisingly, ██████████ is among

those to whom Mr. Macfarlane has bared all:

> Toby and I have talked for hours and hours about the flawed decision-making and
> bad choices he made when he decided to participate in this scheme. I know that he
> is truly remorseful for his mistakes. Although it is no excuse, I'm convinced that
> Toby was motivated only by concern for his children. Toby has a strong sense of
> fairness; and I know that he has spent untold hours of therapy and introspection
> trying to understand how he failed to see and consequences of his actions.

Letter of ██████████, p. 2; Exhibit C.  After probing Mr. Macfarlane's motivations in therapy,

Dr. Friedson also confirms the sincerity of his remorse:

> Toby has spoken to me at length concerning the improper decisions he made
> regarding the scheme to get his children into U.S.C.  He understands the gravity
> of his misconduct and is sincerely remorseful for it.  He also understands that
> through a twisted sense of loyalty to his children, he brought shame not only upon
> himself but also upon his family and especially upon his children – whom he so
> desperately wished to protect.

Letter of Joan Friedson, M.D., p. 3; Exhibit B.

Numerous friends and colleagues attest to Mr. Macfarlane's forthrightness in addressing

his misconduct and accepting responsibility for it.  One writes:

> Toby … has acknowledged his shortcomings and taken responsibility for his
> actions. Toby has disappointed his community, his family, and most importantly,
> himself. With 40 years of friendship as a basis I submit that Toby will not return
> to this Court in the future, will be an example of integrity in everything he does,
> and will continue to demonstrate compassion and care for his family, friends, and
> society in general.

Letter of Patrick Ford, Exhibit C.  And another explains:

> I have talked to Toby several times since the college admissions case broke open.
> I can't even adequately explain just how remorseful Toby has been because of this
> situation. He has openly expressed sincere contrition for his actions and I can tell
> you that he is a different person today. Toby does not need to learn any lessons.
> He gets it.

Letter of Robert Farrier, p. 2; Exhibit C; *see also* Letters of Jules Arthur, Steve Hougard, Steve

Malachowski, Elizabeth Rabbitt, and Art Wadlund; Exhibit C.  Of course, the clearest and most

poignant statement of contrition comes from Mr. Macfarlane himself. *See* Macfarlane Personal Statement, pp. 3-4; Exhibit A, and *supra* at 1.

Equally importantly, Mr. Macfarlane has begun proactively atoning for his misconduct. Promptly after entering his guilty plea, he engaged an accountant to amend his 2014 and 2017 returns to correct for the inappropriate deductions he had taken. Once draft returns were prepared, counsel alerted the prosecution to this effort and at their direction submitted the draft returns to the case agent for review. Ultimately, the prosecution sent the draft returns back to counsel and determined that Mr. Macfarlane should simply file the returns with the IRS. Mr. Macfarlane promptly mailed the amended returns to the IRS, together with checks totaling $82,612, representing the accountant's best estimate of back taxes and interest owed by Mr. Macfarlane for the two years.[3] Copies of the checks are appended as Exhibit E.

### D. Collateral Consequences

For Mr. Macfarlane, the collateral consequences of his decision to plead guilty were unexpectedly immediate and severe. Just ten days after the Information was filed against Mr. Macfarlane, the California Department of Insurance ("DOI") suspended his license. Exhibit F. A few days later, Mr. Macfarlane's firm terminated him. On July 2, 2019, the DOI revoked Mr. Macfarlane's license. Exhibit G. Added to these actions, of course, with all of the attendant publicity to this case, Mr. Macfarlane's stellar professional reputation has been irreparably damaged. The effect on Mr. Macfarlane has been devastating, as one friend observes:

> Toby has worked so very hard all of his adult life to build up his business and reputation to where it was until recently. He has already paid a severe personal price because of this conviction. Toby and his family have been devastated. He

---

[3] That amount did not include half of the back taxes and interest owed for 2014, as Mr. Macfarlane filed jointly with his ex-wife that year. However, Mr. Macfarlane's ex-wife has accepted the accountant's numbers and has informed counsel that she paid her share of the 2014 underpayment.

has been humiliated within the San Diego business community as well as San Diego in general. He has suffered from a job loss, loss of his license, and he has suffered serious monetary consequences. This will haunt Toby for the rest of his life.

Letter of Robert Farrier, p. 2; Exhibit C. And a younger man, for whom Mr. Macfarlane was a

mentor, describes the profound injury that Mr. Macfarlane's reputation has sustained:

I know that Toby has gone through a lot recently and this news has been extremely difficult and shocking to hear for my family. Toby has always been a proud family man that puts others ahead of himself and I know that the recent headlines have been embarrassing to his legacy. Toby always taught me that you are only as good as your reputation, and I'm sure that he is most saddened to see his reputation tarnished through these recent events that have ripple effects on ████████.

Letter of Conor Evans, Exhibit C; *see also* Letters of John Garner, Steve Hougard, Steve

Huffman; Exhibit C. In the blink of an eye, Mr. Macfarlane's thirty-two-year career as a highly

respected title insurance professional was rendered forfeit.

Contemporaneously, Mr. Macfarlane's banks and lenders cancelled his accounts and

lines of credit. *See* Letter from California Bank and Trust, Exhibit H. Over the years, Mr.

Macfarlane had entered into a number of commercial real estate partnerships as a second source

of income and investment. These investments now represent the majority of Mr. Macfarlane's

net worth. But the effect of the lenders' actions has been devastating. Mr. Macfarlane was

forced to enter into disadvantageous fire sales of two properties and likely additional such

transactions. Macfarlane Personal Statement, p. 3; Exhibit A. Going forward, Mr. Macfarlane's

ability to conduct that business will be neutralized by the lack of credit.

## V.     RELATED PROSECUTIONS, CONVICTIONS AND SENTENCES

There have been at least nine other criminal cases filed in this District involving charges

relating to the college admissions scandal. All told, at least 62 individuals have been charged.

Of these, thirteen people have been sentenced to date, including twelve defendant-parents and a

college coach. A summary of those thirteen cases, including the government's recommended sentences and the sentences the judges actually imposed, is attached as Exhibit I. In addition, we offer the following observations:

- John Vandemoer (No. 19-CR- 10079 RWZ), the Stanford sailing coach who received a total of $610,000 from the parents of three potential applicants to facilitate their admission to the university as recruited sailors when in fact they were not, received a prison sentence of one day, with credit for time served.

- All twelve of the defendant-parents sentenced to date received sentences commensurate with the advisory guideline total offense level five, with a sentencing range of zero to six months prison. Case Nos. 19-CR-10117 IT and 19-CR-10222. These included eight defendant-parents who participated in the test cheating scheme only, three who participated in the recruitment scheme only, and one who participated in both schemes.

- The eight defendant-parents who participated in only the test cheating scheme received sentences of 30 days prison or less. One received probation without incarceration.

- Two of the defendant-parents who received 30-day sentences (Gregory and Marcia Abbott, No. 19-CR-10117 IT) were "repeat offenders," having arranged for their student to cheat on the ACT on two different occasions.

- The three defendant-parents who participated in the recruitment scheme only received prison sentences of two and four months. (Jeffrey Bizzack in 19-CR-10222 DPW, and Devin Sloan and Stephen Semprevivo in No. 19-CR-10117 IT).

- The defendant-parent who participated in both schemes received a prison sentence of five months. (Augustus Huneeus in No. 19-CR-10117 IT).

## VI.   ARGUMENT

The U.S. Sentencing Guidelines are advisory and establish a "starting point" for the

district court's sentencing determination.  *Gall v. United States*, 552 U.S. 38, 57 (2007); *accord*

*Cunningham v. California*, 549 U.S. 270, 286-87 (2007).  District courts must consider the

Guidelines but should "tailor the sentence in light of other statutory concerns, as well."

*Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  In so doing, the court "may not presume

that the Guidelines range is reasonable," and "must make an individualized assessment based on

the facts presented."  *Gall*, 552 U.S. at 50 (citing *Rita v. United States*, 551 U.S. 338, 351

(2007)).  After determining the applicable advisory guideline range, the sentencing court must

determine the appropriate sentence by considering all of the factors set forth in 18 U.S.C.

§ 3553(a).  *Gall*, 552 U.S. at 49-50.  Section 3553(a) makes clear that the appropriate sentence is

one that is "sufficient, but not greater than necessary" to accomplish the objectives of the

sentencing statutes.

### A.  The Guidelines[4]

The plea agreement states that the applicable guideline range is established by U.S.S.G.

§ 2B1.1(a)(1), with a twelve-level increase pursuant to § 2B1.1(b)(1)(G) for the "loss" that Mr.

Macfarlane inflicted on victims—i.e., the amount of money that Mr. Macfarlane paid ($450,000),

leading to a total offense level of 16 (after a three-level reduction for acceptance of

responsibility).  Probation disagrees with that conclusion.  After conducting its own investigation

and analysis of the applicable guidelines, Probation rejected the government's various theories

---

[4]   In Response to the Court's Amended Procedural Order, Dkt. 323, counsel for Mr. Macfarlane
state that there is no outstanding factual issue that requires a hearing.  In counsel's view, the only
legal issue for the Court to decide at sentencing is the conflict between the guideline calculations
set forth in the plea agreement and those adopted by the Probation Officer.

that U.S.C. has sustained a cognizable "loss."  *See* Addendum to the Presentence Report, pp. 37-50.  This conclusion is consistent with Probation's findings in the *Abbott* cases.  *See* Probation Office's Submission in Response To court's Order of September 10, 2019, *United States v. Abbott, et al.*, No. 19-CR-10117 IT, Dkt. 440.  Consequently, Probation concluded that there should be no upward level increase pursuant to § 2B1.1(b)(1)(G), that the adjusted offense level is seven and that the total offense level (after a two-level reduction for acceptance of responsibility) is five.

The plea agreement expressly provides that the guideline calculations are not binding on the Court.  Dkt. 318, p. 2; *see also* Federal Rule of Criminal Procedure 11(c)(1)(B).  In the related cases, three judges of this District presented with analogous situations have now considered and rejected the government's argument that the victim colleges in the recruitment scheme suffered a cognizable "loss" within the meaning of the Guidelines.  Instead, these judges have accepted Probation's determination that there was no "loss" and that the total offense level for defendants in the recruitment scandal is five.  *See United States v. Abbott et al.*, No. 19-CR-10117 IT, Dkt 443 (Memorandum and Order by J. Talwani); *United States v. Vandemoer*, No. 19-CR-10079 RWZ, Transcript of Sentencing Hearing, June 12, 2019, p. 32; *United States v. Jeffrey Bizzack*, 19-CR-10222 DPW Statement of Reasons, Dkt. 32.

Mr. Macfarlane is of course bound by the plea agreement and does not take a position on this issue.  We do note, however, that in the event the Court were to accept the guidelines calculations set forth in the plea agreement, both parties agree that a fair sentence would require a substantial downward variance well below the advisory guideline range.

### B. Section 3553(a) Factors

#### 1. The Aberrant Nature of Mr. Macfarlane's Misconduct

When the offense of conviction is an extreme departure from an otherwise well-led life and there is no likelihood of re-offense, a variance from the guideline range may be warranted. *See United States v. Pauley*, 511 F.3d 468, 470 (4th Cir. 2007); *United States v. Stall,* 81 F.3d 276, 279 (6th Cir. 2009); *United States v. Germosen*, 473 F. Supp. 2d 221, 224, 230 (D. Mass. 2007). So it is here. Mr. Macfarlane is an esteemed member of his community with a well-earned reputation for honesty and integrity in both his professional and personal lives. For over thirty years he excelled in a profession that entailed fiduciary responsibilities and demanded the highest ethical standards. Not surprisingly, those who know him best found Mr. Macfarlane's involvement in this offense not just uncharacteristic, but completely unfathomable. We quote but a few; one writes:

> To know Toby is to appreciate what a fine person he is and I wish you could. This drastic diversion from the course of his life actions was such a shock to me and completely out of character with the Toby I know, and I know for certain that his every waking moment is now is filled with remorse and a drive to make it up to society in every way he can find possible.

Letter of Elizabeth Rabbitt (friend and colleague), Exhibit C.

> Although Toby has admitted guilt to this crime, I would be remiss in not stating that it was completely out of his character. In all the years I have known him, Toby has led an honorable, upstanding life.

Letter of Jim Crestani (mentor and former business partner), Exhibit C.

> My family and friends were shocked by the recent revelations because is it extremely out of character for Toby to have done anything unethical.

Letter of Robert Evans (friend since 1982, former Naval officer, business executive), Exhibit C.

Dr. Friedson adds that in her opinion Mr. Macfarlane "is not a risk to re-offend." Letter of Joan Friedson, M.D., p. 3; Exhibit B.

We urge that Mr. Macfarlane's offense constituted a grave and singular breach of his personal integrity, committed during a time of great duress, that stands in sharp relief to his life-long record. A downward variance is warranted for this reason.

## 2. Psychological Factors

The ready explanation for Mr. Macfarlane's patently aberrant misconduct lies in the well-documented evidence of his emotional distress and severe depression. As Dr. Friedson explained, the slow deterioration of Mr. Macfarlane's marriage shook his identity to the core, and he clung irrationally to his life-long aspiration to keep his family intact for the sake of his children: "[b]y February 2014, Toby was in a full blown anxious depression characterized by significant insomnia, obsessive thoughts about his wife, anergia and anhedonia." Letter of Joan Friedson, M.D. p. 3; Exhibit B. Mr. Macfarlane's extreme duress, emotional frailty and mental condition persisted throughout the relevant years, rendered him especially vulnerable to the types of easy solutions offered by a charlatan like Singer and contributed to his bad decision-making. Again from Dr. Friedson:

> It is my opinion that for much of the period 2013 through 2017, Toby suffered subsyndromal phases of depression and anxiety. These episodes were evidently acute reactions to the emotional stress Toby endured during the deterioration and eventual termination of his marriage, and Toby's condition was severe enough on occasion throughout this period to require treatment with medication. *It is well documented that such depression and anxiety impact the brain's executive functioning and can be associated with impaired judgment and poor insight. It is no surprise to me that Toby's uncharacteristic misconduct occurred during this time.*

Letter of Joan Friedson, M.D., p. 3 (emphasis added); Exhibit B.

We submit that Mr. Macfarlane's severe and enduring depression throughout his involvement with Singer was a contributing factor to his commission of the offense and supports a downward variance. *See, e.g., D'Angelo v. United States*, No. 2:13-cr-00114-NT-1, 2017 U.S.

Dist. LEXIS 180146, 2017 WL 4931671 (D. Me. Oct. 31, 2017) (denying a challenge under 28 U.S.C. § 2255 to the petitioner's sentence based on alleged ineffective assistance of counsel and noting that the sentencing court granted a downward departure in part based upon "Petitioner's mental health history"); *United States v. Nieto*, No. CR 10-0052 JB, 2011 U.S. Dist. LEXIS 14424 at *14-15 (D.N.M. Jan. 5, 2011) (Nieto's "characteristics, such as his psychological condition, and the circumstances surrounding the offense, namely his addiction, support[ed] a variance.").

### 3. Familial Ties and Exceptional Dependence

Mr. Macfarlane's children remain financially dependent upon him. Although ▮ graduated from U.S.C. in May 2018 and is doing well, she still requires financial assistance. ▮ continues to struggle and moves back and forth between his parents' homes. Mr. Macfarlane remains perhaps ▮'s sole steady and constant source of emotional support. One close friend who has experienced similar familial concerns observes:



Letter of Art Wadlund, p. 1; Exhibit C. And another describes how difficult a separation would be for ▮:

> Lastly, one of Toby's children ▮ ▮ mental health issues and depression. As a result of this illness, ▮ did not speak with his father for nearly 20 months, and just recently they reconnected. Toby's continued mentoring and parenting is paramount right now for ▮ to succeed, and ▮ is once again living with Toby. I am very concerned that any incarceration could be a huge setback for ▮. I hope you will consider this as well.

Letter of Steve Huffman, p. 2; Exhibit C.

The dependence of Mr. Macfarlane's children, especially ███, supports a downward variance. *See, e.g., United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006), *as amended on pet'n for reh'g, overruled on other grounds as stated in United States v. Munoz-Camarena*, 621 F.3d 967, 969-70 (9th Cir. 2010) (per curiam); *see also United States v. Munoz-Nava*, 524 F.3d 1137, 1148 (10th Cir. 2008).

### 4. Post-Offense Rehabilitation

As demonstrated above, Mr. Macfarlane promptly agreed to plead guilty and has expressly and unequivocally accepted responsibility for this offense. In addition, he moved proactively to correct the improper tax deductions that he took, to amend his returns and to pay the back taxes and interest that he owed. These are proper considerations for a downward variance. *See Pepper v. United States*, 562 U.S. 476, 481 (2011) (post-offense rehabilitation is a relevant factor under 18 U.S.C. § 3553(a)); *United States v. García-Ortiz*, 657 F.3d 25, 30 (1st Cir. 2011) ("[P]ost-offense rehabilitation may, in appropriate circumstances, constitute a basis for a discretionary sentence reduction.").

### 5. Collateral Consequences

As set forth previously, for Mr. Macfarlane these have been especially severe and immediate. To our knowledge, Mr. Macfarlane is the only defendant-parent in the related cases to have endured an immediate license revocation with virtually no prospect of reinstatement and resulting in the immediate loss of his employment and career.[5] Additionally, the response of Mr.

---

[5] Defendant Gordon Caplan (No. 19-CR-10117 IT) was an attorney whose license was suspended (not revoked). His attorney informed Judge Talwani that Mr. Caplan would lose his bar license for some period of time and that he does not know how long. Defendant Augustin Huneeus (No. 19-CR-10117 IT) apparently lost a liquor license as a result of his conviction, but there was no suggestion that he would actually lose a source of income from his winery as a consequence. We are not aware that any other parent-defendants faced licensing issues.

Macfarlane's bankers and lenders has interfered with his ability to participate in commercial real estate partnerships, which previously was his other primary source of income. These circumstances also support a downward variance. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (sentencing court properly considered fact defendant's loss of "his teaching certificate and his state pension" as reasons justifying a variance).

### 6. Avoiding Unwarranted Discrepancies Among Defendants

Potentially the most compelling factor for a downward variance is the statutory directive to "avoid unwarranted disparities in sentences among defendants" with similar circumstances. § 3553(a)(6). As demonstrated above, each of the thirteen defendants in the related cases previously sentenced in this District has received a sentence of five months or less, the majority received sentences of one month or less, and two received probation or time served. *See* Part V, *supra* and Exhibit I. In addition to the other arguments set forth above, Mr. Macfarlane urges that his culpability is less than many of the other defendant-parents and certainly less than that of three who received sentences of four or five months, for the following reasons.

- Mr. Macfarlane did not seek out Singer for the purpose of committing a fraud. Several of the sentenced defendant-parents did. Mr. Macfarlane, by contrast, hired Singer for legitimate college counseling services. By the time Mr. Macfarlane agreed to his scheme, Singer had become a trusted family advisor.

- Mr. Macfarlane was not an active participant in the scheme. Many defendant-parents participated affirmatively by lying to school counselors, college admissions officials

and the like; others arranged for photoshopped images of their children to be sent to colleges.  Mr. Macfarlane did not.

- Mr. Macfarlane did not have insight into the details of the scheme.  Many of the defendant-parents acted with full knowledge of the intricacies of Singer's schemes.  Mr. Macfarlane did not.

- Mr. Macfarlane did not affirmatively enlist his children to participate in the scheme.  Several defendant-parents encouraged their children to present false or misleading information to colleges.  Mr. Macfarlane did not.

- Devin Sloan (sentenced to four months) paid $250,000 to have his son admitted to U.S.C. as a water polo player when he was not.  According to the government, Mr. Sloan affirmatively involved his son in the scheme; participated in "elaborate ways," including lying to high school counselors, lying to U.S.C. admissions staff, and photoshopping images of son; agreed to lie to the I.R.S. in the context of Singer's "audit"; and after pleading guilty "continued to show a striking lack of remorse and disdain for the law."  Govt.'s Sentencing Memo, pp. 2-3, Case No. 19-CR-10117 IT, Dkt. 445.

- Stephen Semprevivo (sentenced to four months) paid $400,000 to have his son admitted to Georgetown as a tennis player when he was not.  According to the government, Mr. Semprevivo affirmatively involved his son in the scheme, had complete insight into the details of the scheme, and after pleading guilty exhibited a "complete lack of remorse" (including filing a lawsuit against Georgetown to stop his son from being expelled).  Govt.'s Sentencing Memo, pp. 1-4 and 6, Case No. 19-CR-10117 IT, Dkt. 466.

- Augustin Huneeus (sentenced to four months) paid $300,000, including $50,000 for the test cheating scheme and $250,000 to have his son admitted to U.S.C. as a water polo player when he was not. According to the government, Mr. Huneeus was a "repeat player" who repeatedly lied to high school counselors, was the most active of the defendant-parents before Judge Talwani, had complete insight into the scheme, enlisted his daughter to write a false email, agreed to take tax deductions for his payments and later agreed to lie to the IRS in the context of Singer's "audit." Govt.'s Sentencing Memo, pp. 1, 5 and 7-8, Case No. 19-CR-10117 IT, Dkt. 495.

This is the context for the evaluation of Mr. Macfarlane's sentencing in this matter. We recognize, of course, that the Court will consider sentences imposed in other similar cases as well, not just in this District but nationwide; and we will be prepared to address those considerations at the sentencing hearing. In the meantime, we urge that fundamental fairness and justice mandate that Mr. Macfarlane's sentence be consistent with those previously imposed in the related cases, by three judges of this District.

## VII. CONCLUSION

For all of the reasons set forth above, we ask the Court to impose a lenient sentence.

Dated: November 8, 2019

Respectfully submitted,

/s/ Ted W. Cassman

Ted W. Cassman (Admitted Pro Hac Vice)
Arguedas, Cassman, Headley & Goldman LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Email: cassman@achlaw.com

Attorneys for Defendant Toby Macfarlane

CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019, I filed the foregoing with the foregoing with the Clerk of the Court for the District of Massachusetts using the CM/ECF system, which will send notification of such filing to all attorneys of record via the notice of electronic filing (the "NEF").

Dated:  November 8, 2019


/s/ Ted W. Cassman
Ted W. Cassman