UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____-
                                      )
UNITED STATES OF AMERICA,             )
                                      )
       Plaintiff,                     )
                                      )        Case No. 1:19-cr-10131 NMG
       v.                             )
                                      )
TOBY MACFARLANE,                      )
                                      )
       Defendant.                     )
_____)

**<u>MEMORANDUM IN SUPPORT OF DEFENDANT MACFARLANE'S EMERGENCY
MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C § 3582(c)(1)</u>**

## I.     INTRODUCTION

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), defendant Toby Macfarlane, by and through undersigned counsel, seeks an order modifying his term of imprisonment to reduce his six month prison sentence to "time served" and to direct that he serve the remaining portion of that term in home confinement.[1]  As of this date, Mr. Macfarlane is the only parent involved in the college admissions scandal who is currently incarcerated—and, in light of the remedial steps that this Court and Judge Talwani have taken over the last several weeks to address the extraordinary and unprecedented dangers presented by the ongoing COVID-19 pandemic, Mr. Macfarlane is therefore the only parent in the case who has or will confront the prospect of confinement in an environment that daily threatens exposure to a potentially fatal disease.  We ask the Court to exercise its discretion and grant the requested relief.

Mr. Macfarlane is statutorily eligible to seek this relief because the Bureau of Prisons ("BOP") refused his request that that the BOP move for a reduction of the term of his imprisonment.  *See* § 3582(c)(1)(A).  Relief is warranted in light of "extraordinary and compelling" circumstances: the national emergency posed by the ongoing COVID-19 pandemic, which especially threatens the health and safety incarcerated individuals; the unique and unduly harsh circumstances of Mr. Macfarlane's current "quarantine" and isolation; Mr. Macfarlane's age (57 years old); and his status as a first-time offender

---

[1] The government has informed Mr. Macfarlane's counsel that it The opposes Mr. MacFarlane's request but notes that, to the extent the defendant seeks relief from this Court so as not to serve the next 14 days in solitary confinement as part of a 14-day quarantine, pursuant to the Memorandum of the Attorney General, dated April 3, 2020, the Bureau of Prisons has discretion to release Mr. MacFarlane to his home to self-quarantine.

who poses no danger to the safety of another person in the community.  *See*

§ 3582(c)(1)(A)(i).

## II.   BACKGROUND AND PROCEDURAL POSTURE

On June 21, 2019, Mr. Macfarlane pled guilty to a single count of conspiring to

commit mail fraud in violation of 18 U.S.C. § 1349.  On November 13, 2019, this Court

sentenced Mr. Macfarlane to six months imprisonment.  *See* Dkt. 340, 342, 343.  Mr.

Macfarlane paid all fines and restitution ordered by the Court, *see* Dkt. 345 and reported

to the Bureau of Prisons on January 2, 2020.  The BOP calculates his release date as

June 30, 2020.  Mr. Macfarlane is presently incarcerated at the U.S.P. Tucson Satellite

Camp in Arizona and has served 100 days—more than half—of his sentence.

Over the last few weeks, the COVID-19 pandemic has spread extensively

throughout the United States, including within Arizona.  On March 13, 2020, President

Donald Trump declared a national emergency arising from the COVID-19 pandemic.

*See* 85 FR 15337 (Mar. 13, 2020).  As U.S. Secretary of Health and Human Services

Alex M. Azar II observed in his own declaration, the COVID-19 "virus has been known

to cause severe respiratory illness and death in a subset of those people infected . . . ."

85 FR 15198 (Mar. 17, 2020).  Arizona governor Douglas A. Ducey declared a Public

Health State of Emergency on March 11 and issued an executive order on March 30,

2020; the executive order mandates, "based on an epidemiological assessment of

Arizona specific data," that residents "limit their time away from their place of residence"

except to conduct certain "essential" activities and work.  *See* State of Arizona

Executive Order 2020-18, *https://azgovernor.gov/ sites/default/files/eo_2020-*

*18_stay_home_stay_healthy_stay_ connected_1.0.pdf* (Mar. 30, 2020).  As of April 10,

2020, there were over 475,000 confirmed cases of the virus in the United States and over 18,000 deaths attributable to it; 3,112 confirmed cases and 97 deaths in Arizona, and 543 cases and 26 deaths in Pima County, Arizona. *See https://www. worldometers.info/coronavirus/country/us/*; Gloria Knott, *More than 3,100 Confirmed Coronavirus Cases in Arizona; 543 Cases in Pima County*, Tucson.com, *https://tucson.com/news/local/more-than-3-100-confirmed-coronavirus-cases-in-arizona-543-cases-in-pima-county/article_154fc12a-7b43-11ea-81ac-13331630917c.html* (Apr. 10, 2020).[2]

On March 18, 2020, counsel sent by overnight delivery to the Warden of the U.S.P. Tucson facility a request that, in light of the dangers posed by the pandemic to Mr. Macfarlane's health, the BOP seek a modification of Mr. Macfarlane's term of imprisonment. *See* Declaration of Ted W. Cassman ("Cassman Decl.") ¶ 3, Ex. A. The Warden responded with a letter refusing Mr. Macfarlane's request. *Id.* ¶ 4, Ex. B.

On March 26, 2020, U.S. Attorney General William Barr issued a memorandum to the BOP directing the BOP to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." *See https://www.justice.gov/file/1262731/download* at 1. On March 27, 2020, President Trump signed into law the CARES Act, which temporarily

---

[2] Under Federal Rule of Evidence 201, the Court make judicially notice a fact that "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." We request that the Court take judicial notice of the fact of the COVID-19 pandemic and the danger it poses to human life. A review of this Court's own recent orders, *see, e.g.,* General Order 20-1 through 20-15, or recent issues of the *Boston Globe*, *Washington Post*, *New York Times*, *Arizona Daily Star* or almost any other news source, will establish beyond reasonable cavil that COVID-19 is spreading as part of a pandemic that threatens human life.

expanded the scope of the "statutory authorities" to which the Attorney General referred. 18 U.S.C. § 3624(c)(2) generally provides that the BOP may "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." However, § 12003(b)(2) of the new CARES Act directs that, during the COVID-19 pandemic, "the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18."

Also on March 27, Mr. Macfarlane sent a letter to the Warden of F.S.P. Tucson requesting an immediate transfer to home confinement. Cassman Decl. ¶ 6, Ex. C.  On April 2, 2020, Mr. Macfarlane was informed by his Case Manager that the Warden had denied that request and that a formal written denial would be forthcoming.  *Id.* ¶ 6.[3] Over the last weeks, the pandemic has significantly worsened and the situation for Mr. Macfarlane has deteriorated.  On April 1, 2020, the BOP instituted a general "lockdown" policy designed to prevent the spread of COVID-19.  *See* https://www.bop.gov/ resources/news/20200331_covid19_action_ plan_5.jsp (Mar. 31, 2020).  But for Mr. Macfarlane the unfortunate result of this well-intended policy was to preclude visitation by his friends and family while actually increasing his risk of infection: he was confined in single a room with 140 other inmates, sleeping on beds head-to-toe and living in extremely close proximity with his fellows.  Cassman Decl. ¶ 11.  Ominously, on April 1,

[3] The Warden's written denial has not yet been received.  We note that the denial is consistent with a pattern, observed by Federal Defenders' offices throughout the country, of the BOP's abdication of its responsibility to exercise its discretion to issue transfers to home confinement consistent the new statutory authority and DOJ policy. See April 1, 2020 Letter of David Patton Executive Director, Federal Defenders of New York Co-Chair, Federal Defender Legislative Committee to Attorney General Barr. Cassman Decl. ¶ 7, Ex. D.

2020, the camp's administration reported that correctional officers at the facility had tested positive for COVID-19—and now inmates are beginning to show signs of illness. *Id.* at ¶ 13.  The BOP's own website confirms that staff at the facility have tested positive.  *See https://www.bop.gov/ coronavirus/.*  Further spread at U.S.P. Tucson seems inevitable.

On April 3, 2020, Mr. Macfarlane was informed by his case manager that an internal request for early transfer to a halfway house that he had previously submitted to the BOP had been granted and that he would be released on the morning of April 8, 2020.  Cassman Decl. ¶ 14.  On the evening of April 7, 2020, Mr. Macfarlane's partner was driving from Southern California to Tucson in order to pick up Mr. Macfarlane when she received a phone call from the staff at the Satellite Camp informing her that Mr. Macfarlane would not be released the next morning.  *Id.* ¶ 15.  Instead, Mr. Macfarlane would be placed into a 14-day quarantine.  *Id.*

On April 8, 2020, Mr. Macfarlane's counsel spoke to the Camp Administrator at Tucson F.S.P. Satellite Camp, who said that, pursuant to a new BOP policy issued by Washington D.C. the previous day, Mr. Macfarlane had to undergo a 14-day quarantine before transfer to the halfway house.  Cassman Decl. ¶ 16.  The Camp Administrator explained that because the Camp had no facilities for such a quarantine, Mr. Macfarlane had been transferred to the F.S.P., a high security facility where he would be housed in a 10 foot by 8 foot cell, possibly with another "quarantined" inmate.  *Id.*  Mr. Macfarlane's counsel was subsequently informed that Mr. Macfarlane would be confined to those quarters 23 hours/day and would be allowed to go outdoors for an hour.  *Id.*  The Camp staff was not able say whether Mr. Macfarlane would be able to

communicate with his family or anyone else outside the prison during the 14-day period, which he said would end on April 21, 2020. Neither of them has access to Mr. Macfarlane while he is housed at the F.S.P.  *Id.*

## III.   MR. MACFARLANE IS ELIGIBLE FOR RELIEF UNDER 18 U.S.C. § 3582(c)

Under § 3582(c)(1)(A), as recently amended by the First Step Act, *see* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018), a court may reduce a sentence for "extraordinary and compelling reasons" in two circumstances: if (i) the Director of the BOP files a motion requesting such relief; *or* (ii) the defendant files a motion after his or her efforts to seek administrative relief have been rejected or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A); *see also United States v. Redd*, No. 1:97-cr-00006-AJT, 2020 U.S. Dist. LEXIS 45977 at *7-8 (E.D. Va. Mar. 16, 2020); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS 100923 at *6, 2019 WL 2498923 (S.D. Tex. Jun. 17, 2019); *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 U.S. Dist. LEXIS 105271 at *2, 2019 WL 2578272 (S.D. Tex. Jun. 24, 2019).

As noted above, Mr. Macfarlane has requested that the BOP file a motion to reduce the term of his imprisonment, but the BOP has refused.  Cassman Decl. ¶¶ 3-4, Exs. A & B.  Accordingly, pursuant to § 3582(c)(1)(A), this Court has authority to address Mr. Macfarlane's motion.[4]

## IV.   EXTRAORDINARY AND COMPELLING CIRCUMSTANCES WARRANT REDUCING THE TERM OF MR. MACFARLANE'S IMPRISONMENT

---

[4] In any case, as the court found in *United States v. Perez*, No. 17-cr-00513-AT, 2020 U.S. Dist. LEXIS 57265 (S.D.N.Y. Apr. 1, 2020), the exhaustion requirement of § 3582(c) may be waived by a court when, as is the case with the rapidly-spreading COVID-19 pandemic, "undue delay" could render the requested relief futile or inadequate or otherwise unduly prejudice the movant.  *Id.* at *5-9 & n.2-3.

Section 3582(c)(1)(A) authorizes a sentencing court to reduce the term of a defendant's imprisonment if, "after considering the factors set forth in [18 USCS § 3553(a)] to the extent that they are applicable," the court finds that "extraordinary and compelling reasons warrant such a reduction" and the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."  Those conditions are satisfied here, and a sentence reduction is warranted.

### A.   This Court Has Discretion to Determine the Circumstances that Warrant Relief Under § 3582(c)

Congress did not define what would constitute an "extraordinary and compelling reason" warranting the reduction of a sentence under § 3582(c).  Instead, the legislative history confirms that Congress intended to grant sentencing courts broad discretion to make those determinations on a case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist.

Congress's initial goal in passing the Comprehensive Crime Control Act of 1984 was to abolish federal parole and create a "completely restructured guidelines sentencing system."  S. Rep. No. 98-225, at 52, 53 n.74 (1983).  But Congress recognized that the elimination of parole as a corrective measure in cases where early release is warranted created a need for an alternative review process, and therefore allowed for judicial reduction of certain sentences under § 3582(c).  *Id.* at 55-56.

The situations listed in § 3582(c) were thus intended to serve as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. *Id.* at 121.  This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of

7

sentences in particularly compelling situations." *Id.* Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion. The mandate was simple: if extraordinary and compelling circumstances were present, they would "justify a reduction of an unusually long sentence." *Id.* at 55-56 (1983).

As discussed, in 2018 Congress enacted the First Step Act, which was expressly designed to "[i]ncreas[e] the use and transparency of compassionate release" under § 3582. *See* P.L. 115-391, 132 Stat. 5194, at § 603(b). The amendment to § 3582(c) reduced the BOP's gatekeeping role—previously, relief could be granted *only* after a BOP motion—but otherwise left unchanged the courts' discretion to grant relief in appropriate circumstances. *Redd*, 2020 U.S. Dist. LEXIS 45977 at *16. Accordingly, "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist . . . ." *Id.* at *18-19.

For the reasons discussed below, extraordinary and compelling reasons exist to reduce Mr. Macfarlane's sentence.

**B.    Extraordinary and Compelling Reasons Warrant a Reduction in Mr. Macfarlane's Term of Imprisonment**

We are indisputably living though an extraordinary time—one that no one could have predicted when Mr. Macfarlane was sentenced in November 2019. A pandemic disease, COVID-19, is sweeping through the United States and the world. President Trump has declared a national state of emergency. *See* 85 FR 15337 (Mar. 13, 2020). Mr. Macfarlane is incarcerated at a facility in Arizona, where the governor has also declared a Public Health State of Emergency, *see https://azgovernor.gov/sites/default/*

*files/declaraton_0.pdf* (Mar. 11, 2020), and recently issued an executive order that

mandates, "based on an epidemiological assessment of Arizona specific data," that

residents "limit their time away from their place of residence" except to conduct certain

"essential" activities and work.  *See* State of Arizona Executive Order 2020-18, *https://*

*azgovernor.gov/sites/default/files/eo_2020-18_stay_home_stay_healthy_stay_*

*connected_1.0.pdf* (Mar. 30, 2020).

As U.S. Secretary of Health and Human Services Alex M. Azar II observed in his

own declaration, the COVID-19 "virus has been known to cause severe respiratory

illness and death in a subset of those people infected with such virus(es)."  85 FR

15198 (Mar. 17, 2020).  As noted previously, over 475,000 Americans are known to

have contracted the virus, and over 18,000 have died from the resulting disease—and

the numbers in Arizona and in Pima County are also increasing dramatically.  *See* p.3,

*supra*.

Inmates are at a heightened risk of contracting COVID-19 should an outbreak

develop in a custodial facility.  *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and*

*Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), *https://doi.org/10.1086/*

*521910*; *see also* Kimberly Kindy, Emma Brown, Dalton Bennett, *'Disaster Waiting to*

*Happen': Thousands of Inmates Released as Jails and Prisons face Coronavirus*

*Threat, https://www.washingtonpost.com/national/disaster-waiting-to-happen-*

*thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-*

*6b8c-11ea-b313-df458622c2cc_story.html*, Washington Post (Mar. 25, 2020); U.S.

Senators' Letter to Attorney General Barr and Director of the Federal Bureau of Prisons

Carvajal, *available at https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20*

*DOJ%20 and%20BOP%20 on%20COVID-19%20and%20 FSA%20provisions%20-*
*%20final%20bipartisan%20text %20with%20signature%20blocks.pdf* (Mar. 23, 2020);

Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*,

Associated Press (Mar. 7, 2020).  Moreover, although Mr. Macfarlane is not a member

of the age group that appears to experience the very highest mortality rates from

COVID-19, he is 57 years old—and therefore in a group that, according to a recent

Centers for Disease Control and Prevention report, suffers from a COVID-19 mortality

rate of between 1 and 3% and hospitalization rate of approximately 20 to 30%.  *See*

Morbidity and Mortality Weekly Report 2020, *Severe Outcomes Among Patients with*

*Coronavirus Disease 2019 (COVID-19)—United States, February 12–March 16, 2020*,

69:343-346, *http://dx.doi.org/10.15585/mmwr.mm6912e2* (Mar. 26, 2020).

Predictably and inevitably, the COVID-19 virus has made its way into federal

facilities.  Outbreaks are underway at numerous BOP facilities, including in Oakdale,

Louisiana, where dozens of staff and inmates have been sickened and five inmates

have died.  *See https://www.bop.gov/coronavirus/.*  The BOP itself reports that 318

inmates across 35 BOP facilities and 125 BOP staff members across 33 facilities have

tested positive for COVID-19—and nine inmates have died.  *Id.*[5]

---

[5] For reference, these numbers are on the rise: on April 1, 2020, the BOP reported
positive tests for 57 inmates across 15 facilities and 37 staff members across 18
facilities.  Moreover, the BOP's statistics report only positive tests—almost surely a
significant undercount of the actual population of inmates and staff who are infected
with the virus.  For example, the BOP reported on April 1 that two inmates had tested
positive for the virus at the federal facility in Elkton, Ohio, but press reports indicated
that 65 other inmates at that facility had been isolated after showing symptoms of the
disease.  *See* Eric Heisig, *Federal Prison in Ohio, Where Jimmy Dimora is Doing Time,*
*Reports Coronavirus Cases Among Inmates*, Cleveland.com, *https://www.*
*cleveland.com/court-justice/2020/03/federal-prison-in-ohio-where-jimmy-dimora-is-*
*doing-time-reports-coronavirus-cases-among-inmates.html* (Mar. 31, 2020).  Now there

On April 1, 2020, the BOP implemented a new phase of its "Action Plan" designed to respond to the COVID-19 pandemic.  *See https://www.bop.gov/resources/ news/20200331_covid19_action_plan _5.jsp* (Mar. 31, 2020).  The plan provides, among other things, that "[f]or a 14-day period [beginning April 1], inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus."  *Id.*

The BOP's measures, however well intentioned, likely increased Mr. Macfarlane's risk of exposure to the virus.  Confined in a minimum-security prison camp, where he resides in "dormitory housing," *see https://www.bop.gov/about/ facilities/federal_prisons.jsp*, he was literally warehoused in a large room with 140 other inmates.  The beds are arranged such that the inmates sleep about two to four feet apart from one another.  Cassman Decl. ¶ 11.  Such communal-living conditions were ripe for the quick spread of COVID-19.  Most importantly, the BOP's new limitations on inmate mobility do not even purport to address the most likely source of community spread of the disease in prison: the comings and goings of prison staff.  *See, e.g.,* Robin McDowell, Margie Mason*, Locked Up: No Masks, Sanitizer as Virus Spreads Behind Bars*, Associated Press, *https://apnews.com/4e1e4ffaeb6bf9a9fabcc 566fe5b110d* (Mar. 30, 2020) ("[J]ail and prison employees are . . . the ones most likely to bring the virus into . . . facilities . . . .").  In fact, the U.S.P. Tucson Camp

---

are ten inmates and nine staff members who have tested positive.  *See https://www. bop.gov/coronavirus/.*  Even worse, many additional people may be infected even though they remain asymptomatic for now: "symptoms of COVD-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up . . . . We don't know who's infected."  *In re Manrique*, No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017 at *2, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020).

Administrator reported during a "town hall" meeting with inmates on the morning of April 1, 2020 that *two of the facility's correctional officers had tested positive for COVID-19*. Cassman Decl. ¶ 13.  We not yet aware of any inmates having tested positive for the virus, but Mr. Macfarlane reported that a number of inmates in his housing facility began to show signs of illness last week.  *Id.* ¶ 18.[6]

We submit that the danger to Mr. Macfarlane's health and safety presented by this pandemic, together with the unduly harsh circumstances of his current "quarantine," constitute an "extraordinary and compelling reason[ ]" to reduce Mr. Macfarlane's term of imprisonment to time served.  *See* § 3582(c)(1)(A)(i).  The BOP's current plan to transfer Mr. Macfarlane to a halfway house fails to provide sufficient protection from the dangers of the pandemic.  The BOP's Residential Reentry Centers are communal-living facilities, and thus present many of the same dangers to which Mr. Macfarlane has already been subjected while at the Satellite Camp.  Indeed, the BOP's website indicates that inmates have already tested positive for COVID-19 in six Residential Reentry Centers.  *See* www.bop.gov/coronavirus/.  The only adequate way to protect Mr. Macfarlane from the dangers of the disease is to put him in home confinement.

Mr. Macfarlane is a low-level offender, poses no risk to the community, and the Court sought to punish him with the relatively light sentence of six months in prison. Certainly this Court did not anticipate or intend at the time of sentencing that the relatively brief prison term it imposed would subject Mr. Macfarlane to the significant risk of serious illness or death that the coronavirus now presents or to the imposition of

---

[6] The BOP reports that one staff member has tested positive.  *See https://www.bop.gov/ coronavirus/.*

confinement in a high security prison in circumstances approaching solitary confinement—and such an outcome cannot be considered appropriate punishment for Mr. Macfarlane's offense.  *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33-35 (1993) (holding that the Eighth Amendment to the United States constitution "requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety,'" that "[i]t is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions,'" and that unreasonably exposing prisoners to the risk of death or illness may violate the Eighth Amendment); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076-77 (9th Cir. 1995); *Allen v. Kramer*, No. 1:15-cv-01609-DAD-MJS (PC), 2016 U.S. Dist. LEXIS 115024 at *16-21, 2016 WL 4613360 (E.D. Cal. Aug. 17, 2016); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. 2004) (finding the law "clearly established" that a custodial facility may not knowingly expose an inmate to an "unacceptably high risk of the spread of contagious disease").  Mr. Macfarlane has not been permitted any visitors since March 27, 2020.

Several other federal judges have granted under § 3852(c) compassionate-release motions filed by inmates who are vulnerable to the COVID-19 pandemic and have short periods of incarceration left to serve.  *See, e.g., United States v. Perez*, No. 17-cr-00513-AT, 2020 U.S. Dist. LEXIS 57265, (S.D.N.Y. Apr. 1, 2020); *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 U.S. Dist. LEXIS 57007 (D. Conn. Apr. 1, 2020); *United States v. Campagna*, No. 16 Cr. 78-01 (LGS), 2020 U.S. Dist. LEXIS 54401, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020).  Likewise, further supporting the conclusion that the reasons for relief here are "compelling" is the fact that many other jurisdictions around the nation are now seeking to mitigate the health risks posed by the

pandemic by releasing low-risk prisoners or those who were otherwise due to be released in the near future.  Indeed, this Court's intention to protect those similarly situated to Mr. Macfarlane—i.e. other parents caught up in the college admissions scandal—has been repeatedly demonstrated over the last several weeks:

- On February 7, 2020, the Court sentenced Douglas Hodge to nine months in prison with a surrender date of April 20, 2020.  Thereafter, on March 13, 2020, the Court granted Hodge's assented motion to continue his surrender date to May 4, 2020, which was based in part on the increased health risks posed for Mr. Hodge (aged 60) should he be incarcerated during the COVID-19 epidemic. *United States v. Hodge*, No. 19-10080, Dkt. 939 and 940, p. 3.

- On March 31, 2020, the Court sentenced Elizabeth Henriquez to seven months prison.  In response to Ms. Henriquez's attorney's argument that the Court should impose home detention instead of prison because of the threat to inmates created by the coronavirus pandemic, the Court delayed Mr. Henriquez's surrender date to June 30, 2020 while observing that the defendant should be permitted "to serve her sentence safely," and stating that if the pandemic had not abated by that date, the Court would entertain a motion for reconsideration of its sentence.  Cassman Decl. ¶ 11.[7]

---

[7] Additionally, on March 5, 2020, the Court sentenced Michelle Janavs to five months in prison and ordered her to surrender on April 7, 2020.  *See United States v. Janavs*, No. 1:19-cr-10117-IT-11, Dkt. 922.  Then on March 17, 2020, the Court granted Ms. Janav's assented motion to continue her surrender date to May 7, 2020 based upon recent disclosures by the government of potential *Brady* violations.  Dkt. 946.  On April 2, 2020, this Court issued an order re-scheduling the sentencing hearing for Miguel Henriquez from April 8, 2020 to June 10, 2020.  *See United States v. Miguel Henriquez*, No. 1:19-cr-10117-IT-11, Dkt. 1049.

This Court's concern for the health of those parents caught up in the admissions scandal and confronting prison terms during the pandemic is consistent with the position that Judge Talwani has taken in response to two recent requests for compassionate relief.  Judge Talwani originally sentenced Augustin Huneeus to five months imprisonment.  On March 17, 2020, with two weeks remaining to be served on that sentence, Judge Talwani granted Mr. Huneeus's motion to reduce his sentence pursuant to § 3582(c)(1)(A)(i):  "[I]n light of the national state of emergency due to the global COVID-19 pandemic and Huneeus' unique health circumstances, the court finds that extraordinary and compelling reasons warrant the requested approximately two week reduction of the sentence imposed to time served . . . ."  *See United States v. Huneeus*, No. 19-cr-10117-IT, Dkt. 642 (Mar. 17, 2020).

On March 18, 2020, Devin Sloane filed an Emergency Motion Judge Talwani to reduce his sentence to time served under § 3582(c).  *See United States v. Sloane*, No. 1:19-cr-10117-IT-11, Dkt. 647 (Mar. 19, 2020).  Unlike Mr. Macfarlane, Mr. Sloane had not submitted a request to his Warden to file a motion to reduce his sentence before filing his Emergency Motion.  *Id.* at 2.  Judge Talwani therefore found that Mr. Sloane had failed to exhaust his administrative remedies and ruled that she lacked the authority under § 3582(c) to grant relief.  *Id.*  Nevertheless, Judge Talwani observed that the requested relief

> may well be warranted in light of the pandemic due to COVID-19, the national emergency as declared by the President of the United States, the risk of infection and transmission for inmates and staff posed by the population density of prisons, and the fact that Defendant is a first time offender who does not pose a danger to the safety of another person or the community.

*Id.* at 1.

Because of the remedial and humanitarian steps this Court and Judge Talwani have taken over the last several weeks, Mr. Macfarlane is now the only parent involved in the college admissions scandal who is currently serving a prison sentence while our nation confronts the coronavirus pandemic.  This Court should now act to ensure that Mr. Macfarlane is not compelled to serve his term under circumstances that subject Mr. Macfarlane to an untenable risk of infection or that impose harsh conditions of confinement that this Court could not have anticipated.  He should be permitted to complete the remainder of his sentence in home confinement.

**C.     The § 3553(a) Factors Militate in Favor of a Reduction in Mr. Macfarlane's Prison Term**

Section 3582(c)(1)(A) directs that, in deciding whether to reduce a sentence, the sentencing court should "consider[ ] the factors set forth in [18 USCS § 3553(a)] to the extent that they are applicable."  The § 3553(a) factors support Mr. Macfarlane's motion.

As the Court is aware, Mr. Macfarlane has no criminal history and forthrightly admitted his misconduct.  Importantly, Mr. Macfarlane is not a danger to the community. He has absolutely no record of violence (or any other criminal misconduct other than the instant offense), has served his sentence with no alleged improprieties, and has abided at all times by the orders and conditions imposed by the Court during the pendency of this case.  This Court previously determined that "the nature and circumstances of the offense and the history and characteristics of the defendant," *see* § 3553(a)(1), do not demand a long prison sentence.

Similarly, § 3553(a)(2) looks to the need for a sentence to "reflect the seriousness of the offense," afford deterrence to future criminal conduct, and protect the public.  The Court found that a six-month sentence was appropriate in this case—but

16

that was before it became apparent that even a short prison sentence is a danger to Mr.

Macfarlane's health and safety.  Here, as the Court acknowledged during the

sentencing hearing, there is no need for specific deterrence: Mr. Macfarlane does not

present a threat of re-offense.  Moreover, the sentence that the Court already imposed

will certainly demonstrate to similarly-situated individuals who contemplate illegal

activity that they can expect a prison sentence commensurate with Mr. Macfarlane's

original one.  The fact that the Court later mercifully granted relief to Mr. Macfarlane

under the extraordinary circumstances presented by the pandemic is not likely to affect

that calculation.  And, as to the requirement that the sentence reflect the seriousness of

the offense, Mr. Macfarlane has already served more than half of the six-month prison

term that the Court imposed.  If the Court now grants relief and permits Mr. Macfarlane

to serve the remainder of that term in home confinement, the resulting punishment

would essentially reflect the severity of the sentence the Court originally imposed.

Finally, we note that a sentence of more than three months in prison and less

than three months in home confinement is among "the kinds of sentence and the

sentencing range established for" a defendant who had an adjusted offense level of

nine.  *See* § 3553(a)(4); U.S.S.G. Ch. 5, Pt. A (sentencing table setting an imprisonment

range of four to ten months for a defendant with an offense level 9 and criminal history

category I); U.S.S.G. § 5C1.1(c)(2) (permitting, for offenders in "Zone B" of the

sentencing table, "a sentence of imprisonment that includes a term of supervised

release with a condition that substitutes community confinement or home detention

according to the schedule in subsection (e), provided that at least one month is satisfied

by imprisonment").

17

**D.    A Reduction in Mr. Macfarlane's Prison Term in Light of the Ongoing Pandemic Would be "Consistent with Applicable Policy Statements Issued by the Sentencing Commission"**

Section 3582(c)(1)(A) also directs a sentencing court to determine whether a defendant's request for a reduction in his prison term is "consistent with applicable policy statements issued by the Sentencing Commission."  The Court should find that condition satisfied.

First, as the *Redd* court found,

> there does not currently exist, for the purposes of satisfying the First Step Act's "consistency" requirement, an "applicable policy statement."  The only possibly applicable policy statement with respect to such a reduction is U.S.S.G. § 1B1.13 (2018), which by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants.

2020 U.S. Dist. LEXIS 45977 at *15 (footnote omitted); *see also Beck*, 2019 U.S. Dist. LEXIS 108542 at *15; *Cantu*, 2019 U.S. Dist. LEXIS 100923 at *9; *Bucci*, 409 F. Supp. 3d at 2; *United States v. Young*, No. 2:00-cr-00002-1, 2020 U.S. Dist. LEXIS 37395 at *6, 2020 WL 1047815 (M.D. Tenn. Mar. 4, 2020) ("The government also concedes that, because the Sentencing Commission's policy statement 'has not been amended to reflect that, under the First Step Act, a defendant may now move for compassionate release after exhausting administrative remedies,' the existing policy statement, while providing 'helpful guidance,' is not ultimately conclusive given the statutory change.").

Second, "[t]he First Step [Act] was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants.  And while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the *exclusive* channel through which a sentence reduction could be considered by

courts." *Redd*, 2020 U.S. Dist. LEXIS 45977 at *16 (emphasis in original, footnotes

omitted).  "Indeed, the First Step Act authorized courts to act independently of the BOP

Director, upon a defendant's motion, once administrative remedies are exhausted,

reflecting the First Step Act's legislative purpose and intent to expand the opportunity for

a defendant to seek review (and potentially a reduction) of his or her sentence." *Id.*

> Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance, particularly since it would be unlikely that the BOP Director would determine that an extraordinary and compelling reason exists under Application Note 1(D) but then decline to file a motion for compassionate release based on that determination.  For these reasons, whether a court's finding of a warranted sentence reduction based on "other reasons" would be consistent with U.S.S.G. § 1B1.13 should be assessed based on whether that finding would be consistent with those other reasons had they been presented to the Court by the BOP Director as the basis for relief.

*Id.* at *17-18.  Accordingly, "a court may find, independent of any motion, determination

or recommendation by the BOP Director, that extraordinary and compelling reasons

exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13

cmt. n.1(A)-(C) and . . . the reasons it has determined in this case constitute

extraordinary and compelling reasons warranting a sentence reduction satisfy any

requirement for consistency with any applicable policy statement." *Id.* at *18-19.

As previously discussed, extraordinary and compelling reasons exist to reduce

Mr. Macfarlane's sentence.

### E.    Proposed Relief

We request that the Court amend its judgment to provide for a sentence of time

served (currently 100 days) and to require that Mr. Macfarlane spend the balance of his

initial six-month term in home confinement with the following conditions:[8]

- That he travel from the F.S.P. Tucson in a vehicle that he drives by himself and proceed straight to his residence;

- That he then stay in his residence by himself, under a self-quarantine, until at least April 21, 2020, or a later date as determined by his supervising probation officer; and

- That he comply with all other terms of supervised release.

## V.    CONCLUSION

For all of the reasons set forth above, the Court should issue an order under § 3582(c)(A)(1) reducing Mr. Macfarlane's term of imprisonment to time served and permitting him to serve the remainder of his term in home confinement with any other conditions imposed by the Court.

Dated:  April 10, 2020                   Respectfully submitted,

                                        _____/s/ Ted W. Cassman_____

                                        Ted W. Cassman (Admitted Pro Hac Vice)
                                        Arguedas, Cassman, Headley & Goldman LLP
                                        803 Hearst Avenue
                                        Berkeley, CA 94710
                                        Telephone: (510) 845-3000
                                        Email:  cassman@achlaw.com

                                        Attorneys for Defendant Toby Macfarlane

---

[8] A U.S. Probation Officer has already inspected Mr. Macfarlane's residence accepted it for his post-release; and a land phone line has been installed to facilitate monitoring. Cassman Decl. ¶ 8.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2020, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  April 10, 2020


                            /s/ Ted W. Cassman
                            Ted W. Cassman